UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                          :

CC/DEVAS (MAURITIUS) LTD,         :
DEVAS EMPLOYEES MAURITIUS     :
PRIVATE LIMITED, and            :
TELCOM DEVAS MAURITIUS LIMITED, :
                          :

           Plaintiffs,    :  No. __21-cv-5601__

   v.                    :

AIR INDIA, LTD               :

           Defendant.    :
                          :
---------------------------------------------------------x

## COMPLAINT

Plaintiffs CC/Devas (Mauritius) Ltd ("CC/Devas"), Devas Employees Mauritius Private Limited ("DEMPL"), and Telcom Devas Mauritius Limited ("Telcom Devas") bring this action for declaratory relief and a money judgment against defendant Air India, Ltd., as the alter ego of the Republic of India ("India"), and therefore jointly and severally liable for the debts and obligations of India itself. Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.     This is an action for declaratory relief against Air India pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to resolve questions of actual controversy involving the relationship between India's wholly owned national airline, Air India, and India, and in particular, for a determination that Air India is the alter ego of India. In addition, Plaintiffs seek a judgment that Air India is jointly and severally liable to satisfy the money judgment that Plaintiffs expect to be awarded against India based upon a petition pending in the U.S.

District Court for the District of Columbia to confirm an arbitration award issued on October 13, 2020 (the "BIT Award") against India and in favor of Plaintiffs.

2.      The dispute giving rise to the BIT Award began with a breach of contract committed by Antrix Corporation Ltd. ("Antrix"), another entity wholly owned and controlled by the Republic of India to act as the commercial arm of India's space program.  In 2005, Devas Multimedia Private Ltd. ("Devas"), an Indian company backed by an international group of investors with significant experience in satellite and telecommunications technology, entered into a contract (the "Agreement") with Antrix, in which Devas agreed to pay Antrix to lease transponder capacity on up to two satellites that Antrix and its Indian government affiliates would build, launch, and operate.  Years later, notwithstanding Devas's unimpeachable performance under the Agreement, the Indian government began looking for ways to malign the Agreement and repudiate it.  In 2011, under India's control and direction, Antrix annulled the Agreement altogether, asserting *force majeure* self-induced by the Indian government.

3.      Soon thereafter, in 2012, Plaintiffs, shareholders of Devas, commenced an arbitration against India under the Agreement Between the Republic of India and the Republic of Mauritius for the Promotion and Reciprocal Protection of Investments (the "BIT"), because India's directive to Antrix to annul the Agreement eliminated the value of their multimillion-dollar investments in Devas, in violation of India's obligations to Plaintiffs under the BIT.  In 2016, the arbitral tribunal ("BIT Tribunal") unanimously found that India's conduct constituted an unlawful expropriation of Devas's business and a breach of India's obligation to accord them fair and equitable treatment, and in 2020, the BIT Tribunal awarded Petitioner over US $111 million, plus interest. In January 2021, Plaintiffs sought confirmation of the BIT Award in the U.S. District Court for the District of Columbia.  After India failed to respond or acknowledge Plaintiffs' attempts to serve

it pursuant to 28 U.S.C. § 1608(a)(2) on January 21, 2021, and March 26, 2021, Plaintiffs accomplished service under 28 U.S.C. § 1608(a)(3) on May 28, 2021.  India's response is due by July 27, 2021.  28 U.S.C. § 1608(d).

4.      Separately, Devas filed an arbitration under the rules of the International Chamber of Commerce ("ICC") against Antrix pursuant to the arbitration clause in the parties' Agreement. Devas prevailed in that arbitration, with the tribunal awarding $562.5 million in damages plus interest on September 14, 2015 (the "ICC Award").  On September 13, 2018, Devas sought confirmation of the ICC Award before the U.S. District Court for the Western District of Washington, which confirmed and entered judgment on it on November 4, 2020.  Antrix has paid no part of the judgment or the ICC Award.

5.      India has subsequently engaged in extraordinary measures to undermine and evade payment of both the BIT Award and the ICC Award, far beyond ordinary applications to set aside each award at the seat of arbitration (in the Netherlands and in India, respectively).  Within India, the government has mobilized the investigative, regulatory, taxation and judicial powers of the state in a coordinated scheme to obliterate Devas and undo the ICC Award.  On the basis of mere allegations of fraud by Antrix, falsely contrived only *after* defeat in arbitration, an Indian companies tribunal granted Antrix's petition to appoint a government-employed liquidator to seize control of Devas.  The Indian court's order explicitly states that the liquidation was necessitated by and is intended to prevent enforcement of the ICC Award.  Other baseless regulatory actions are pending against Devas and its shareholders and principals, including the Plaintiffs, and Plaintiffs have consequently notified India of their intent to bring a second arbitration under the BIT.

6.      Given India's outlandish and extraordinary measures to evade and nullify the unanimous arbitration award for which the country is ultimately liable, Plaintiffs deem it urgent and

essential to begin identifying and securing assets of the Indian government that may be used to satisfy the anticipated judgment in the District of Columbia confirming the BIT Award. Plaintiffs therefore request that this Court declare that the assets of Air India in this District may be utilized to satisfy the anticipated judgment. Another arbitration award creditor of India has already filed suit for similar relief, *Cairn Energy PLC and Cairn UK Holdings Limited v. Air India, Ltd.*, No. 21-CV-04375 (S.D.N.Y. 2021).

7.     As set forth in detail below, India's control over Air India is wide-ranging, extending from Air India's legal existence through its day-to-day operations and its financial affairs. India comprehensively dominates Air India in governance matters large and small by, among other things, controlling, appointing, and having the power to remove Air India's officers and directors; determining whether, when, and from whom Air India acquires fleet equipment; dictating the airline's operational policies, from wages for its employees, to routes and fares charged; and making regular intrusive demands for information regarding operations. India entrenches these powers by making Air India dependent for its financial survival on grants, loans, and guarantees from India.

8.     As the Supreme Court held in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), a judgment creditor of a foreign sovereign may look to an instrumentality of the sovereign debtor for satisfaction of a judgment either when the instrumentality is "so extensively controlled by its owner that a relationship of principal and agent is created," or when giving effect to the ostensibly separate legal status of the state and its instrumentality would work a "fraud or injustice." *Id.* at 629 (quotation marks omitted). Both tests are satisfied here.

9.      Courts consider five "*Bancec* factors" in their analysis of the entity's separateness: (1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which governmental officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.   *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018).  These factors are not a "mechanical formula" for determining extensive control and are applied on a case-by-case basis.  *Bancec*, 462 U.S. at 633.

10.      Here, India's extensive control of Air India establishes that Air India is India's alter ego.  In addition, it would give rise to fraud and result in injustice to give effect to the legal fiction that Air India and India are separate.

## PARTIES

11.      Plaintiff CC/Devas (Mauritius) Ltd is registered under the laws of Mauritius and has its registered office in Port Louis, Mauritius.  CC/Devas is a shareholder of Devas.

12.      Plaintiff Devas Employees Mauritius Private Limited is registered under the laws of Mauritius and has its registered office in Port Louis, Mauritius.  DEMPL is a shareholder of Devas.

13.      Plaintiff Telcom Devas Mauritius Limited is registered under the laws of Mauritius and has its registered office in Port Louis, Mauritius.  Telcom Devas is a shareholder of Devas.

14.      Defendant Air India is the national airline of India and is a foreign corporation incorporated under the laws of India and wholly owned and controlled by India.  Air India operates in the United States and does substantial business in this judicial district, where its United States operations are headquartered.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§ 1330(a) and 28 U.S.C. § 1367, because this is a "nonjury civil action against a foreign state" on

a claim "with respect to which the foreign state is not entitled to immunity" under the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 497 (1983) (holding that "every action against a foreign sovereign necessarily

. . . 'arises under' federal law").

16.     Air India is a "foreign state" as defined in 28 U.S.C. § 1603 because it is "an agency

or instrumentality of" India.  Air India is not immune from the subject-matter jurisdiction of this

Court under 28 U.S.C. § 1605(a)(1), (2), and (6).  Pursuant to § 1605(a)(1) of the FSIA, Indian

instrumentalities such as Air India are not entitled to immunity in an action to enforce an arbitration

award because India has waived that immunity by agreeing to the Convention on the Recognition

and Enforcement of Foreign Arbitral Awards ("New York Convention"), a treaty in force in the

United States for the recognition and enforcement of arbitral awards, which "contemplate[s] en-

forcement actions in other [Contracting] [S]tates." *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 84 (2d Cir. 2013) (second and third alterations in original) (quotation marks

omitted); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 243–44 (2d Cir.

1996); *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 577–79 (2d Cir. 1993); *see also Tatneft v. Ukraine*, 771

F. App'x 9, 10 (D.C. Cir. 2019).  Moreover, pursuant to § 1605(a)(2), Air India is not immune

because this action is based on (i) Air India's commercial activity in the United States; (ii) at least

one act performed by Air India in the United States in connection with its commercial activity

elsewhere; and/or (iii) at least one act committed outside the territory of the United States in connection with Air India's commercial activity elsewhere, where that act caused a direct effect in the United States.  Finally, Air India is not immune under § 1605(a)(6) from an action to enforce an arbitral award governed by the New York Convention.

17.     This Court has personal jurisdiction over Air India pursuant to 28 U.S.C. § 1330(b), which allows the exercise of personal jurisdiction over a foreign state that is not immune from suit and that has been properly served with process pursuant to 28 U.S.C. § 1608.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) because Air India resides and conducts business in this District.  Specifically, Air India's United States operations are headquartered in this District at 570 Lexington Avenue, New York, New York 10022.  In addition, Air India holds property in this District and State against which Plaintiffs expect to enforce their anticipated judgment including, but not limited to, airplanes, cargo handling equipment, airport gate rights, furnishings, artwork, and other property including contractual rights.

## FACTUAL ALLEGATIONS

19.     The BIT Award arises from India's mistreatment of Plaintiffs' investments in a hybrid satellite and terrestrial communications business developed and owned by Devas.  The relevant factual background is summarized in the July 25, 2016 "Award on Jurisdiction and Merits" (the "Merits Award") issued by the tribunal in the arbitration.[1]

## I.     The Underlying Dispute

20.     On January 28, 2005, Devas entered into a contract with Antrix entitled "Agreement for the Lease of Space Segment Capacity on ISRO/Antrix S-Band Spacecraft."[2]  The Agreement identified Antrix as the "marketing arm" of India's Department of Space ("DOS") and the

---

[1]  Ex. 1.
[2]  *Id.* ¶ 5.

"entity through which ISRO [the Indian Space Research Organization] engages in commercial activities."[3]

    21.    Antrix is wholly owned by the government of India.[4]  DOS and ISRO are organs of the Indian government, and the minister responsible for both DOS and ISRO (and through them, Antrix) has at all material times been the Prime Minister of India.

    22.    In the Agreement, Antrix agreed to cause DOS and ISRO to build, launch, and operate two satellites and to make available to Devas 70 MHz of transponder capacity in the "S-band" of the electromagnetic spectrum.[5]  The Agreement became fully binding and effective on February 2, 2006, when Antrix wrote to Devas confirming that it had "received the necessary approval for building, launching and leasing" the first satellite.[6]  On the basis of Antrix's notification, and numerous and widespread other indications of support from Indian governmental officials, Plaintiffs made multiple substantial investments in Devas in order to perform the Agreement, as well as raising additional capital from other foreign investors.  Devas diligently performed its duties under the Agreement including conducting field trials in 2009 in Bangalore, India that successfully demonstrated its proprietary hybrid satellite-terrestrial systems and end-user terminals.[7]  Devas continued to perform throughout 2010 and early 2011,[8] with the consistent endorsement and support of DOS, ISRO, and Antrix.  Yet during this time, higher officials within the Indian government were covertly scheming to annul the Agreement on pretextual grounds, apparently motivated by a combination of political and economic considerations.

---

[3]  *Id.* ¶ 193 (quotation marks omitted).
[4]  *Id.* ¶ 5.
[5]  *Id.* ¶¶ 71, 86, 202, 300.
[6]  *Id.* ¶ 204 (quotation marks omitted).
[7]  *Id.* ¶ 109.
[8]  The Tribunal noted that Devas at all times "honoured" its obligations under the Agreement.  *Id.* ¶ 208.

23.    On February 17, 2011, the prime-ministerial level Cabinet Committee on Security ("CCS") announced that it "had decided to annul" the Agreement.[9]  A few days later, citing the CCS decision, Antrix informed Devas that the Agreement was "terminated."[10]

24.    As a direct consequence of India's annulment of the Agreement, Devas's business was completely and irreversibly destroyed (and with it, Plaintiffs' investments in that business).[11]

## II.    Plaintiffs' Initiation of the Arbitration and the BIT Tribunal's Award Against India

25.    On July 3, 2012, Plaintiffs, Mauritius-based shareholders of Devas, initiated an arbitration against India under the BIT.[12]  On July 25, 2016, the duly constituted BIT Tribunal issued a "Merits Award" in favor of the Plaintiffs in this action, finding India liable for its breaches of the BIT in connection with the annulment of the Agreement.[13]  On October 13, 2020, the BIT Tribunal issued its final Award (also referred to as the "Quantum Award"), ordering India to pay:

(a)    $50,497,600 as compensation to Plaintiff CC/Devas (owner of 17.06% of the issued share capital of Devas);[14]

(b)    $10,300,800 as compensation to Plaintiff DEMPL (owner of 3.48% of the issued share capital of Devas);[15]

(c)    $50,497,600 as compensation to Plaintiff Telcom Devas (owner of 17.06% of the issued share capital of Devas);[16]

(d)    interest on the above amounts "at a rate of the six-month USD LIBOR + 2 percentage points, compounded semi-annually from February 17, 2011 until the date of full payment";[17] and

---

[9]    *Id.* ¶ 146.
[10]    *Id.*  Devas did not accept the validity of the termination notice and, as noted below, commenced an arbitration in which it sought and obtained an award of damages for repudiation of the Agreement. *See infra* ¶¶ 28–29.  As noted below, that award remains unpaid.
[11]    Merits Award, Ex. 1, ¶ 422.
[12]    Ex. 2.
[13]    *See* Merits Award, Ex. 1, ¶ 501.
[14]    Award, Ex. 3, ¶ 663(c).
[15]    *Id.*
[16]    *Id.*
[17]    *Id.* ¶ 663(d).

(e)    $10,000,000 to Plaintiffs for their costs, including legal fees, plus interest at a rate of the six-month USD LIBOR + 2 percentage points compounded semi-annually from the date of the Award until the date of full payment.[18]

26.    India petitioned the courts of the Netherlands to set aside the Merits Award, but in a November 14, 2018 decision, the Hague District Court denied India's challenge and upheld the Merits Award.[19]  India appealed the Hague District Court's decision to The Hague Court of Appeal, which on February 16, 2021 affirmed the judgment in favor of Plaintiffs.  India's appeal to the Dutch Supreme Court is currently pending.

27.    On February 5, 2021, India petitioned The Hague District Court to set aside the Quantum Award and that application remains pending.  On May 17, 2021, the same Hague District Court granted exequatur to commence enforcement of the Quantum Award.

## III.    Related Proceedings Concerning Antrix's Breach of the Agreement

28.    In 2011, Devas itself commenced an arbitration (the "ICC Arbitration") against Antrix pursuant to the arbitration clause in the Agreement, which provides, *inter alia*, for arbitration of disputes under the rules of the International Chamber of Commerce ("ICC").[20]  The ICC Arbitration resulted in the unanimous final ICC Award on September 14, 2015 in favor of Devas, concluding that Antrix wrongfully repudiated the Agreement and ordering Antrix to pay Devas $562.5 million in contractual damages, plus pre-award and post-award interest.[21]  Post-award interest on the ICC Award runs at the Indian statutory rate of 18% per annum.[22]  The BIT Tribunal was informed of the ICC Award and made provisions to protect from the risk of double recovery as between the BIT and ICC Awards.[23]

---

[18]  *Id.* ¶¶ 660, 663(f)–(g).
[19]  Ex. 4.
[20]  *See* Merits Award, Ex. 1, ¶¶ 59, 161.
[21]  *Id.* ¶¶ 60, 161.
[22]  ICC Award, Ex. 5.
[23]  Award, Ex. 3, ¶ 663(k).

29.     Antrix asserted no claims of fraud, either in the ICC Arbitration or in opposing confirmation of the ICC Award before the United States District Court for the Western District of Washington—indeed, in Washington it specifically disclaimed that it was doing so—and on October 27, 2020, that court issued an Opinion and Order recognizing and enforcing the ICC Award. On November 4, 2020, the Western District of Washington entered a judgment against Antrix on the ICC Award for $1,293,993,410.15 on which interest continues to accrue.[24]  Antrix appealed the Western District of Washington judgment to the United States Court of Appeals for the Ninth Circuit.

30.     Soon after Devas filed the ICC Arbitration and continuing to the present day, Antrix and India have engaged in a coordinated campaign to harass, impugn, and discredit Plaintiffs and Devas, using demonstrably false allegations in order to evade liability under the ICC and BIT Awards.

31.     A key element of this campaign has been to seize and dissolve Devas, an Indian company.  As early as August 11, 2011, soon after Devas commenced the ICC Arbitration against Antrix, India's Registrar of Companies ("ROC") began harassing Devas with unwarranted inspections and demands for documents until the Delhi High Court itself enjoined the ROC from continuing such harassment.

32.     Beginning on December 5, 2011, the Directorate of Enforcement, Ministry of Finance, Department of Revenue ("ED"), a law-enforcement agency responsible for enforcing India's economic laws, including the Foreign Exchange Management Act ("FEMA") and the Prevention of Money Laundering Act ("PMLA"), launched a series of unprovoked investigations into Devas.  These sham investigations have resulted in the freezing of Devas's investments and bank

---

[24]   The ICC Award also has been confirmed in the courts of France and the United Kingdom.  The ICC Award is also the subject of pending set-aside proceedings in the courts of India.

accounts, a physical raid on Devas's Bangalore offices, detention of Devas's employees, and governmental coercion designed to force Devas officials into signing false witness statements without counsel.  The ED has also purported to assess over $220 million in fines against the Plaintiffs and Devas, presumably as an offset to the BIT and ICC Awards.  The ED gave Plaintiffs no meaningful opportunity to contest these fines before imposing them, and Plaintiffs are confident that they are without foundation.

33.      In 2015, India's Central Bureau of Investigation ("CBI"), its principal law enforcement and investigative agency, opened a case against Devas, its officers, and some employees of Antrix and Indian governmental agencies.  India sought to use the CBI investigation as a basis to stay the Plaintiffs' arbitration proceedings, but the BIT Tribunal rejected this ploy, noting that India had offered "no evidence of wrongdoing" on the part of Devas or its officers, no less any adjudication of the unsupported allegations.[25]

34.      Just eight days after the Western District of Washington confirmed the ICC Award, Indian government officials announced that a committee had been formed to "expedite the statutory proceedings" against Devas and put them "on a war footing."[26]

35.      In an extraordinary role reversal a few weeks later, the award debtor Antrix applied to India's Ministry of Corporate Affairs to "wind up" its creditor Devas on the basis of alleged fraud in the Agreement.  This was facilitated by an amendment to India's arbitration laws in late 2020, mandating a stay on the enforcement of arbitration awards based merely on a *prima facie* allegation of fraud.  Neither Antrix nor India had previously made any such allegations of fraud

---

[25]  Procedural Order No. 7, Ex. 6, ¶ 17.
[26]  Ex. 7.

through the preceding years of three separate arbitration proceedings or the ICC Award enforcement proceeding.  The Ministry granted Antrix permission to pursue Devas's "winding up" that same day.

36.     Proceedings then moved to the provincial National Company Law Tribunal ("NCLT") in Bangalore, where ISRO and Antrix have a preeminent presence.  On the very next day after Antrix's filing, January 19, 2021, the NCLT appointed a "Provisional Liquidator" to take control over Devas and to prepare its dissolution.  This individual, the official liquidator of Karnataka state, is a full-time, permanent government employee.  One of his first acts was to debilitate Devas's ability to defend itself by terminating counsel across the globe.  After perfunctory hearings, the NCLT issued its final liquidation order against Devas on May 25, 2021, specifically noting its need to act urgently to prevent Devas from using its incorporated status to pursue enforcement of the ICC Award, and directing the liquidator to take prompt action to inhibit enforcement.

37.     Inasmuch as Devas had effectively been captured by its judgment debtor, the Plaintiffs filed an emergency motion to intervene in the Western District of Washington, which was granted on February 24, 2021, and a motion to intervene in Antrix's appeal in the Ninth Circuit, which was granted on June 8, 2021, meaning that the Plaintiffs will be acting alongside Devas in both proceedings.

38.     As of the date of this Complaint, Antrix has not paid any part of the ICC Award, and India has paid no part of the BIT Award.

## IV.     Pending Petition to Confirm the BIT Award and Anticipated Judgment Against India

39.     On January 13, 2021, Plaintiffs sought confirmation of the BIT Award before the United States District Court for the District of Colombia, in a proceeding captioned *CC/Devas*

*(Mauritius) Ltd et al. v. Republic of India*, 1:21-cv-00106-RCL (D.D.C. Jan. 13, 2021). Plaintiffs seek entry of (i) an order recognizing and confirming the BIT Award; and (ii) a money judgment against India in an amount equal to the full amount of damages and interest under the BIT Award, as well as post-judgment interest.

40.     The Petition has been served and India's response is currently due July 27, 2021. Plaintiffs anticipate that the Petition will result in a money judgment against India in favor of Plaintiffs. As soon as any such judgment is issued, Plaintiffs expect to register the judgment in this District and pursue enforcement efforts against India's property located in New York, including Air India.

41.     Plaintiffs have also initiated proceedings in numerous other locations around the world seeking recognition and enforcement of the Award. Exequatur was granted in the Netherlands on May 17, 2021; in Belgium on May 25, 2021; in France on May 27, 2021; and in Luxembourg on June 8, 2021. An order recognizing the Award in England and Wales was granted on May 11, 2021, pending service. An action to confirm the Award in Australia is pending. India continues to refuse to pay the amounts due.

## V.     Cairn Commences an Enforcement Action Against Air India

42.     Devas and the Plaintiffs are not the only holders of unpaid international arbitration awards against India. According to a complaint recently filed in this District, Cairn Energy PLC, a UK company, made a series of oil and gas exploration investments in India over the course of several decades. *Complaint*, ECF No. 1, *Cairn Energy PLC v. Air India, Ltd.*, No. 1:21-cv-4375 (S.D.N.Y. May 14, 2021) ("*Cairn* Comp."). Cairn later had a tax dispute with India and, in an arbitration based on the UK-India Bilateral Investment Treaty, Cairn was awarded damages of $1.2 billion plus interest. *Cairn* Compl. ¶ 26. Cairn is currently seeking to have this arbitral award

confirmed in another federal district court.  *See Cairn Energy PLC et al. v. Republic of India*, 1:21-cv-396-RJL (D.D.C. Feb. 12, 2020).

43.      Cairn alleges that Air India is the alter ego of the Republic of India and that, as a result, Cairn's arbitral award can be enforced against Air India.  *Cairn* Compl. ¶¶ 31–129.  Cairn attached a considerable volume of documents to its complaint detailing the extent to which Air India is dominated by and indistinguishable from the Republic of India.  *See*, ECF Nos. 1-1–1-98, *Cairn Energy*, No. 1:21-cv-4375 (S.D.N.Y. May 14, 2021).

44.      Pursuant to Rule 10(c), Plaintiffs adopt by reference the allegations made in the *Cairn* Complaint regarding the relationship between Air India and the Republic of India and further adopt by reference the documents submitted as attachments to the *Cairn* Complaint.[27]  *See* ECF Nos. 1–1–96, *Cairn Energy*, No. 1:21-cv-4375 (S.D.N.Y. May 14, 2021).

## VI.    Air India Is India's Alter Ego

45.      Plaintiffs seek a ruling that Air India is the alter ego of India and that it should be held jointly and severally responsible for India's debts, including from any judgment resulting from recognition of the Award.

46.      Air India is extensively controlled by its sovereign parent to the extent that a principal-agent relationship exists between them.  Moreover, recognizing Air India and India as separate entities would work a fraud or injustice.  Air India may therefore be held liable for the debts of India.  *See Bancec*, 462 U.S. at 629.

47.      As described below, India dominates Air India's activities to such an extent that its relationship with Air India is clearly one of principal-agent.

---

[27]   Citations in the form "*Cairn* ECF No. X" reference by docket number the exhibits attached in the *Cairn* proceeding, which are adopted by reference in this Complaint.

48.     "*Bancec* does not require a connection between a sovereign's extensive control of its instrumentality and the plaintiff's injury" for that plaintiff to execute against the assets of the state instrumentality.  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 143 (3d Cir. 2019).  Nor does *Bancec* require a court to consider the interests of third-party creditors of the state instrumentality.  *Id.* at 143–44.  And Plaintiffs must demonstrate India's extensive control over Air India by only a preponderance of the evidence to be entitled to relief.  *See id.* at 144–46.

49.     India's extensive control over Air India is undeniable and the facts presented below more than satisfy the *Bancec* standard, which considers: (1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which governmental officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018).

50.     ***First***, India exerts a high level of economic control over Air India.  India supports Air India financially through grants, capital contributions, guarantees, loans, and special tax treatments.  India also controls (1) Air India's access to other sources of funding, including private bank loans; (2) Air India's earnings from air-service operations, including by regulating fares and routes; and (3) Air India's spending.  Therefore, India enjoys control over all aspects of Air India's financial affairs.

51.     ***Second***, Indian governmental officials manage the airline and control its day-to-day operations.  As detailed below, India appoints Air India's leadership, sets their pay, and has the power to remove them from their positions.

52.     Air India's Board of Directors is dominated by governmental officials.  Directors or managers who criticize India's micromanagement of the airline have historically been removed from the Board.  India's control over Air India's daily operations extends to mundane matters, such as pest control, and includes employee grievances, passengers' complaints and suggestions, and determination of routes, fares, and schedules.  The government holds performance reviews and intrusive audits of Air India, closely monitors the airline and directs myriad aspects of Air India's operations, including (but not limited to) aircraft acquisition and leasing; flight operations; flight incidents/delays; customer service; recruitment; and labor and wages.  *See Crystallex*, 932 F.3d at 146 (holding that a state-owned entity's assets were subject to execution in part because Venezuela could require it to acquire assets).

53.     ***Third***, all of Air India's profits and losses are borne by India.  *See Crystallex*, 932 F.3d at 148 (noting that Venezuela received all the profits of its alter ego).  Air India has run continuous losses since it was merged with Indian Airways, and the government has covered all of those losses.  India also guarantees Air India's loans.  In return, Air India provides India with valuable services by upgrading governmental employees' tickets for free, delaying collection of outstanding payments, and purchasing specially made aircraft exclusively for governmental VIP service.

54.     ***Fourth***, India is the real beneficiary of Air India's conduct.  India forces Air India to undertake uneconomic transactions to accomplish foreign-policy goals, to fly routes that generate more losses than revenues for its own political and diplomatic purposes, and to give governmental officials perks on its airlines.  *See Crystallex*, 932 F.3d at 147, 149 (holding that a state-owned entity's assets were subject to execution in part because Venezuela ordered it to sell oil to certain persons at preferential rates).  India has also freely transferred Air India's debts and assets

to itself or to companies wholly owned by it.  *See id.* at 147–48 (noting that Venezuela controlled its alter ego's debt structure).   If Air India were run as a truly independent juridical entity, it would have gone out of business well over a decade ago.  It has been kept in existence only to further India's interests.  *See id.* at 146 (noting that Venezuela could impose conditions on its alter ego that adversely affected its operations and financial results).

55.     ***Fifth***, the distinction between Air India and India is illusory, and respecting their purported separateness would inequitably allow India to shield its assets from creditors.   India does not observe corporate formalities, but rather stacks the Board of Air India with politicians and civil servants, all while dictating the airline's everyday policy decisions.  Governmental revenue is funneled into Air India to keep this unprofitable enterprise running.  And India would inevitably offset any judgment entered against Air India by contributing cash to the company.  It would, as a result, be inequitable to treat Air India as a separate corporate entity when India does not treat it the same way.

### A.     Air India Has Always Been an Alter Ego of India

56.     Air India is not a typical state-owned airline.  India has full functional, administrative, and economic control over Air India pursuant to its internal laws and the Articles of Association under which Air India was created.  India controls its operations through its Ministry of Civil Aviation (the "MoCA").

57.     The Tata Group established Air India in the 1930s.  In 1948, India acquired 49% of Air India's shares from the Tata Group.   The Air Corporations Act of 1953 (the "1953 Act") nationalized the private airlines then in existence in India and established two statutory corporations in their place: Air India International (which flew to international destinations from India)

and Indian Airlines (for domestic travel).[28]  The 1953 Act made Air India the sole Indian carrier permitted to operate on virtually all international routes and gave Indian Airlines a monopoly over all domestic flights.  The 1953 Act made it illegal for any other airline company incorporated in India to operate in India without the permission of the Indian government.[29]

58.     The 1953 Act gave the Indian government the authority to appoint the Chairmen and Directors of Air India and Indian Airlines, to direct the hiring of certain employees for both companies, and to direct the operational decisions of the companies.[30]

59.     Though the Air Corporations (Transfer of Undertakings and Repeal) Act of 1994 (the "1994 Act") repealed the 1953 Act by allowing private airlines to compete against both Air India and Indian Airlines,[31] this law did nothing to lessen India's control over Air India.  The 1994 Act reconstituted the airlines as joint-stock Government Companies under the Companies Act of 1956,[32] which were still fully owned by India, and maintained India's power over the day-to-day operations of Air India and Indian Airlines.[33]

60.     Throughout the 1990s, India provided repeated capital contributions to Air India and routinely guaranteed Air India's loans, while failing to collect guarantee fees that a company would normally pay for such services.[34]  This allowed Air India and Indian Airlines to continue operating at net losses in many years throughout the 1990s and 2000s.[35]

---

[28]  *See Cairn* ECF No. 1-2, §§ 3(1), 16, 20.

[29]  *See id.* §§ 16–19.

[30]  *See id.* §§ 4(1)(A), 8, 10, 20(2), 34–35, 39.

[31]  *See Cairn* ECF No. 1-3, § 11.

[32]  The Companies Act of 1956 defined a "Government Company" as "any company in which not less than fifty-one per cent of the paid-up share capital is held by the Central Government" or other Indian governmental entity.  *See Cairn* ECF No. 1-4, § 617.  A similar provisions exists under the current Companies Act of 2013.  Companies Act of 2013, § 2(45).

[33]  *See Cairn* ECF No. 1-3, §§ 3, 9.

[34]  See *infra* section VI.E.2.  A 2006 Parliamentary Committee revealed that the government had not collected guarantee fees from Air India from 1989 to March 2004, *Cairn* ECF No. 1-6, ¶ 6, and the company's most recent financial statements confirm that this practice has persisted.

[35]  *See Cairn* ECF No. 1-7, ¶ 3.4.

In 2007, India attempted to bail out both companies by merging them to form the National Aviation Company of India Ltd.[36]—which was renamed to "Air India Limited" in 2010. It is still colloquially known as "Air India."  The merger illustrates India's level of control over Air India and every aspect of its business.  It was government-directed and orchestrated, despite making little business sense, and solidified India's control over all aspects of Air India's business.

## B.    India Maintains Control through Its Economic Ownership and Air India's Corporate Charter

61.    To this day, India owns 100% of Air India—which it has described as "a symbol of the State"—and can (and does) control essentially everything it does.

62.    India maintains the power to appoint all members of the Board of Directors, including the Chairman of the Board, to dictate the length of their terms, to set their remuneration,[37] and to remove them for any reason.[38]  India is also permitted to appoint Air India's Managing Director and determine the Managing Director's remuneration.[39]

63.    The MoCA continues to oversee and monitor day-to-day operations, including those most central to Air India's operation.  For example, India requires governmental approval of all international routes.  The MoCA makes "suggestions" for all domestic routes, which, on information and belief, Air India interprets as directives.[40]  Most of Air India's routes (domestic and international) operate at a loss.[41]  Additionally, the Directorate General for Civil Aviation (India's aviation sector regulator) is required to take into consideration Air India's operational plans before

---

[36]  *Id.* ¶ 1.1.
[37]  *See Cairn* ECF No. 1-10, § 106.
[38]  *Id.* §§ 97, 115.
[39]  *Id.* §§ 130–31.
[40]  *Cairn* ECF No. 1-7, ¶¶ 5.1, 5.17.
[41]  *Cairn* ECF No. 1-9, at xv.

allocating routes to other airlines.[42]  As of 2009, only 13 of its routes (5% of its total routes) were profitable and that number has declined over time.[43]

64.     MoCA has barred Indian Airlines from flying on financially viable routes, which were instead snapped up by their competitors.[44]

65.     The private sector recognizes that India continues to dominate Air India to its detriment.  In 2018, India sought to partially divest Air India, offering 76% of its shares for sale, but received no bids.[45]  As *The Economist* explains, investors stayed away from the bidding process because they suspected that India would use its anticipated remaining 24% ownership interest to "keep meddling after the sale to stop job losses ahead of next spring's general election."[46]

66.     The Indian government currently regulates the autonomy of public sector enterprises by granting different levels of "ratna" status, ranging from "maharatna" through "navratna" down to "miniratna I and II."  The classification is based upon a variety of factors including revenues, profitability, net worth, financial stability, national and global market presence, stock exchange listing, loan servicing reliability and need for government budgetary support and guarantees.  Despite the size and international presence of Air India, it has not been granted the financial and administrative independence of ratna status.

**C.     Air India's Leadership Is Comprised of Governmental Officials and Persons Who Have Strong Links with the Government.**

67.     India retains the power to appoint and replace Air India's Directors, determine their remuneration, appoint the Chairman of the Board and appoint the Managing Director.

---

[42]  *Cairn* ECF No. 1-11, ¶ 3.6.
[43]  *Cairn* ECF No. 1-12; *Cairn* ECF No. 1-13, at 4–5.
[44]  *See Cairn* ECF No. 1-14; *Cairn* ECF No. 1-15; *see also Cairn* ECF No. 1-16, ¶¶ 117–20 (listing international and domestic routes from which Air India withdrew service that were taken up by private sector competitors).
[45]  *See Cairn* ECF No. 1-17.
[46]  *Cairn* ECF No. 1-18.

68.     A former board member describes Air India's board meetings as "a farce" with "[i]nstructions on key agenda items . . . communicated beforehand . . by [MoCA]" with an expectation of "immediate and unquestioned compliance."[47]  The Minister has instructed board members that "when the [M]inister and the [S]ecretary himself are satisfied, what more is there for [the Directors] to see?"[48]

69.     MoCA has also directed the Board to approve a 4 billion Rupee expenditure (the current equivalent to US $54 million)[49] to refurbish airplanes without any cost-benefit analysis done on the proposal.

70.     Vinod Rai, the former Comptroller and Auditor General of India, has observed that it was commonplace for Air India Board members to receive "telephonic instructions from the minister or his representative on what decision to take" at Board meetings.

71.     As a consequence of India's extensive interference in day-to-day operations, Air India has been unable to attract and retain talented officers.  Officers who show independence are punished with restrictions on their authority and responsibilities and are ultimately forced out of Air India.[50]

72.     India also uses its power of appointment to stack the board with civil servants and politicians with no experience in the airline industry, rather than businessmen and women with relevant industry knowledge.  As *The Economist* explains, India's inexperienced yet connected Board appointments ensure that Air India's leadership will not act independently to benefit the company but rather remain "pliant" to political interference to benefit politicians.[51]

---

[47]  *Cairn* ECF No. 1-14.
[48]  *Id.*
[49]  All Rs-USD calculations use the present exchange rate, unless otherwise noted.
[50]  *Cairn* ECF No. 1-19; *see Cairn* ECF No. 1-20.
[51]  *See Cairn* ECF No. 1-21.

73.     A 2010 report by the Parliamentary Committee on Transport, Tourism, and Culture found that India has consistently appointed as Air India's Managing Director a "generalist[]" civil servant rather than "technocrats and knowledge experts."[52]  That same report found that Air India's Directors were often appointed for short periods of time ("some even for a few days"), lacked any "substantive expertise," and that, at the time of the report, there were no "professionals [or] independent Directors on the Board."[53]

74.     Four of the nine present-day Directors are current or former politicians and civil servants, four are current Air India officers, and every one of the nine has substantial governmental ties.[54]

75.     Rajiv Bansal, the Chairman of the Board and Managing Director of Air India, is a senior civil servant and officer of the Indian Administrative Service, India's principal civil service comprised of career bureaucrats who administer central-government ministries, departments, agencies, and corporations.[55]  Two other Directors, Vimalendra Patwardhan and Satyendra Kumar Mishra, are also senior civil servants nominated by the MoCA.[56]  Daggubati Purandeswari, an "independent Director," is a former member of Parliament.[57]  Kumar Mangalam Birla, the other ostensibly "independent Director" is a frequent appointee to government task forces and has

---

[52]  *Cairn* ECF No. 1-16, ¶¶ 161–62.
[53]  *Id.* ¶ 157.  This is a longstanding problem: a 2003 parliamentary committee report criticized Air India for failing to "professionalize[]" (*i.e.*, appoint "professional managers in industry and trade with a high degree of proven ability") the "Board of Directors for Air India" in accordance with guidelines applicable to public sector enterprises.  *Cairn* ECF No. 1-22, at 22–24.
[54]  *See Cairn* ECF No. 1-23.
[55]  *See Cairn* ECF No. 1-24.  In April 2020, India's cabinet of ministers upgraded Mr. Bansal to a rank equivalent to a secretary to the government (the senior-most position available to officers working for the government).  *Cairn* ECF No. 1-25.
[56]  *See Cairn* ECF No. 1-26.
[57]  *See id.*

served as Director of a variety of state-owned or controlled entities.[58]  Vinod Hejmadi is Air India's present Chief Financial Officer; Amrita Sharan is Air India's Director of Personnel; Meenakshi Mallik is Director of Commercial; and R.S. Sandhu is Director of Operations.[59]

76.   India also preserves its control with high turnover among its officers.  According to the Parliamentary Report, this turnover "has resulted in the impairment of the entire decision making process."[60]  Even governmental officials have acknowledged that, in reality, Air India is not a "board managed company."[61]

**D.   India Dictates Air India Policy and Manages It on a Day-to-Day Basis.**

**1.   Indian Law Grants India Broad Control over Air India's Operations.**

77.   India's Business Allocation Rules divide power amongst the ministries and departments of the government.[62]  These Rules place Air India under the direct control of MoCA.  MoCA has administrative control over the following matters for Air India and its subsidiaries:

    (i)      "General policy and allied matters";

    (ii)     "Constitution of [the] Board of Directors";

    (iii)   "Administrative matters including deputations/delegations/training; requestsfor posting/transfers/promotion/housing; SC/ST matters etc; verification of characters & antecedents of employees";

    (iv)   "Air India employees service regulations/rules, and amendments/interpretations thereof";

---

[58]   *See Cairn* ECF No. 1-27.

[59]   *See Cairn* ECF No. 1-23.

[60]   *Cairn* ECF No. 1-16, ¶ 163.  These are longstanding problems.  *See, e.g.*, *Cairn* ECF No. 1-28, ¶ 8.1 (observing that Air India's then-current "Managing Director is the only person who is professionally conversant with the airlines business in the current Board of Directors which consists of four Government Directors and one professional manager").

[61]   *Cairn* ECF No. 1-29.

[62]   Article 77(3) of the Constitution of India states, "The President shall make rules for the more convenient transaction of the business of the Government of India, and for the allocation among Ministers of the said business." *Cairn* ECF No. 1-30, art. 77(3).

(v)   "Financial matters including five years/annual plans, annual reports and [a]ccounts, budgetary support/[f]inancing arrangements for capital expenditure/[g]ovt. [g]uarantees";

(vi)   "Investments proposals including . . . purchase/lease of aircraft and equipments; investment of funds abroad; duty exemptions";

(vii)   "Performance review/monitoring of targets";

(viii)   "Labour welfare; wage revision; strikes/[i]ndustrial disputes; [g]rievances of employees";

(ix)   "Matters relating to fares and freight rates/concessional fares";

(x)   "Grant of free/concessional passages and transportation of cargo";

(xi)   "Matters relating to air services/carriage of cargo; priority quota of [s]eats";

(xii)   "CSA/passenger/cargo [s]ervices agents and related matters";

(xiii)   "Advisory [c]ommittees, passenger facilitation";

(xiv)   "Passengers['] complaints/suggestions";

(xv)   "Board meetings";

(xvi)   "VIP references on matters handled in the Section";

(xvii)   "International operations of Air India except the 'designation' and utilization of entitlements/traffic rights[] available for Indian carriers";

(xviii)   "Deputation/delegation of Air India and its subsidiaries officials for participation in conferences/meetings on matters with ICAO and Bilateral air agreements";

(xix)   "Directions to Air India (on [i]nternational [s]ervices) for grant of free/concessional air passage/air transportation";

(xx)   "Annual Reports and laying of accounts before Parliament."[63]

78.   MoCA is also in charge of "[l]egal matters and court cases, audit reports/observations," "Parliament [q]uestions, reports of Parliamentary [c]ommittees and other related matters," "[m]eetings of [c]ommittee constituted" and "[d]rafting of legislation" in relation to the subjects

---

[63]   *Cairn* ECF No. 1-31, at 6.

listed above in paragraph 77, "[d]isinvestment, allocation of shares, issues of bonds etc of Air India," and "[p]ermission to travel by [p]rivate [a]irline by [g]overnment [s]ervants/[o]fficers."[64]

79.    Other rules, the Government of India (Transaction of Business) Rules, 1961, require that India's Cabinet of Ministers approve the appointment of the Chairman and the Boards of "State-owned public corporation[s]" like Air India.[65]  MoCA's internal documents further allocate responsibility for oversight of specific aspects of Air India's management and business decisions to a variety of MoCA officials.[66]  MoCA holds regular performance review meetings and issues Annual Plans, and Monthly/Quarterly Performance Reports to closely monitor the operation of Air India.[67]

80.    For its part, the Indian Parliament intimately scrutinizes the MoCA's management of Air India, and Air India's performance.  Much of this examination takes place during the "Question Hour," the first hour of the Parliament's sitting session, which is customarily devoted to questions that Members of Parliament raise about any aspect of administrative activity to specific Ministers.[68]  In addition, parliamentary committees "examine [Air India]," "hold discussions on its . . . performance" and "giv[e] suggestions and recommendations."[69]

81.    India also exercises control over Air India's business operations by conducting exceptionally detailed, operational as well as financial audits of Air India's accounts and performance.  Sections 139(5) and 143(5) of the Companies Act of 2013 empower the Comptroller and Auditor General of India to (i) appoint the auditor of a Government Company (such as Air India) and (ii) to direct such auditor as to the manner in which Air India's accounts are to be audited.[70]

---

[64]  *Id.* at 7.
[65]  *Cairn* ECF No. 1-32, at 14.
[66]  *Cairn* ECF No. 1-33, at 4.
[67]  *Id.*
[68]  *See generally Cairn* ECF No. 1-13.
[69]  *Cairn* ECF No. 1-34.
[70]  *See Cairn* ECF No. 1-5, §§ 139(5), 143(5)–(6); *see also Cairn* ECF No. 1-35, § 57.

Under Section 394 of the same Act, the Comptroller and Auditor General of India performs comprehensive reviews of Air India's accounts and operations and issues reports to each House of the Parliament.[71]   The Comptroller and Auditor General of India audits the accounts of (i) the union government, (ii) state governments,[72] and (iii) government-owned companies.   The Comptroller and Auditor General submits its audit reports to the government, which in turn submits these reports to Parliament for its review.

82.      For example, in 2011, India examined and commented on, among other things, aircraft acquisition (pp. 5–35), revenue parameters (pp. 87– 88), aircraft leases (pp. 91–92), cargo operations (pp. 92–93), route strategy (pp. 93–96), customer service (pp. 98–99), publicity and sales promotion (pp. 99–101), financial performance (pp. 104–109), and Air India's revenue-management system (p. 110).[73]   The 2017 Performance Audit Report was similarly detailed.[74]

### 2.      India Subordinates Air India's Operations to Its Political Interests.

83.      India often subordinates Air India's business interests to its foreign-policy objectives and the whims of governmental officials.

84.      In 2002, for example, India transferred three Air India planes to Afghanistan's national airline as part of the government's initiative to rebuild Afghanistan.[75]   India's foreign minister presented this gift during an official trip to Kabul, in which he announced that India would donate the airplane he arrived in.[76]

85.      In 2013, a Canadian court convicted a Canadian-Indian individual for conspiring to bribe the Indian Minister of Civil Aviation to use his official position to force Air India to award

---

[71]   *See Cairn* ECF No. 1-5, § 394.
[72]   India has a quasi-federal form of government, with power divided between the government at the national level (the so called the "union" or "central" government) and state governments.
[73]   *Cairn* ECF No. 1-9.
[74]   *Cairn* ECF No. 1-36.
[75]   *See Cairn* ECF No. 1-37.
[76]   *See Cairn* ECF No. 1-38.

a US $100 million contract to a biometric security company.[77]  Although the bribery scheme fell apart, the conspiracy illustrates the extent of the MoCA's real and perceived control over Air India's business decisions.

86.     MoCA has also attempted to control Air India's service in baffling (and irrational) detail, demanding in 2002 that Air India offer executive-class passengers ayurvedic massages during flights.[78]  Air India eventually scrapped the plan, but only after months spent attempting to implement the idea.[79]

87.     MoCA and India extensively use Air India as a diplomatic pawn.  MoCA forced Air India to purchase 68 aircraft from U.S.-based Boeing Corporation ("Boeing") between 2004 and 2006.  This was the largest aircraft purchase in India's civil-aviation history.[80]  Air India did not need and cannot afford to service the costs of acquiring and operating these airplanes.

88.     While the Boeing purchase made little economic sense for Air India, it was of substantial diplomatic value to the Republic of India.  When India and the United States started discussing nuclear cooperation between the two countries in the early 2000s, 43 members of the U.S. Congressional Caucus on India and Indian Americans pressed India's prime minister to push Air India to purchase aircraft from Boeing.[81]  MoCA did so.[82]

89.     As a result of pressure from MoCA,[83] Air India grossly inflated the aircraft requirements in its planning for its and its subsidiaries' aircraft needs.  Air India's plan changed from a

---

[77]  *See Cairn* ECF No. 1-39; *Cairn* ECF No. 1-40.

[78]  *Cairn* ECF No. 1-41.

[79]  *Cairn* ECF No. 1-42.

[80]  *Cairn* ECF No. 1-9, at 5–21; *Cairn* ECF No. 1-43.

[81]  *Cairn* ECF No. 1-8, at 147; *see also Cairn* ECF No. 1-44 (Congressman Joseph Crowley "urg[ed] Prime Minister Vajpayee to authorise the sale as soon as possible"); *Cairn* ECF No. 1-45 (Congressman Joseph Crowley urged the sale as "it will serve as a 'great demonstration' of 'strengthened' Indo-US commercial ties"); *Cairn* ECF No. 1-46, at 45  (India confirmed on July 31, 2003 that it "[was] involved in a dialogue with the United States to develop and expand nuclear and space cooperation").

[82]  *Cairn* ECF No. 1-8, at 120–21.

[83]  *Id.* at 141–43 (brief chronology of Air India's aircraft acquisition from Boeing).

total of 28 airplanes (only 18 to be acquired from Boeing), to a total of 68 aircraft (50 to be acquired from Boeing).[84]

90.     Boeing offered less favorable terms than other bidders,[85] and the Board of Air India told MoCA it would not be economically feasible to purchase from Boeing.[86]   The Air India–Indian Airlines merger further highlighted the folly of the purchase: Indian Airlines' pilots could not operate Boeing aircraft.[87]

91.     But because the deal benefitted India's position in nuclear technology sharing negotiations with the United States, MoCA forced Air India to proceed.[88]

92.     After the bid was accepted, MoCA continued its control of the deal.[89]   MoCA forced Air India to purchase the maximum number of planes offered under the bid and, in exchange, Boeing agreed to make investments in India unrelated to Air India.[90]

93.     The Secretary of the MoCA approvingly noted that Air India's Boeing purchase went through three government committees, the Cabinet, and the Empowered Group of Ministers before being concluded.[91]   Final approval came from the Prime Minister's office.[92]

---

[84]  *Cairn* ECF No. 1-9, at 9–12.
[85]  *Cairn* ECF No. 1-8, at 120.
[86]  *Id.* at 120–21.
[87]  *Id.* at 69–70.
[88]  *See Cairn* ECF No. 1-47.
[89]  *Cairn* ECF No. 1-8, at 142.
[90]  *Id.* at 30 ("In view of cumulative factors mentioned above the [Empowered Group of Ministers ('EGoM')] chose to place firm orders of 50 aircraft on account of discounts made available by Boeing Company as also the other investments to be made by the Boeing Company in India."); *Cairn* ECF No. 1-9, at 33 ("The commitments obtained from Boeing in respect of the AIL aircraft acquisition, as reflected in Chairman, EGoM's note to the PM, were . . . : [i] Boeing would provide training simulators costing up to US $75 million.  [ii] Boeing would invest up to US $100 million for creation of MRO [Maintenance, Repair and Overhaul] facilities for Boeing aircraft in India.  [iii] Boeing would invest US $10 million in training and other civil aviation requirements.").
[91]  *Cairn* ECF No. 1-8, at 54.
[92]  *Id.* at 142 (brief chronology of Air India's aircraft acquisition from Boeing).

94.     At the same time, MoCA began to press Air India to open non-stop service between the United States and India.[93]  Air India later opened a non-stop India-U.S. route, but has consistently lost money on operating these flights.  In fact, an audit from 2014 revealed that the India-U.S. route was Air India's single largest loss-making route.[94]

95.     Although catastrophic for Air India, these deals achieved what India wanted.  Soon after finalizing the deal with Boeing, on March 2, 2006, India signed the Civil Nuclear Cooperation Agreement with the United States.  This Agreement was the first step in lifting a ban on selling nuclear technology to India.[95]   President Bush commented when signing the Agreement that "[m]iddle class Indians are buying home appliances from American companies like Whirlpool.  Younger Indians are enjoying McCurry meals from McDonald's.  *And Air India has recently ordered 68 planes from Boeing*."[96]

96.     Air India ultimately sold many of these unnecessary Boeing planes to a competitor at a steep loss for just a third of their listing price.[97]

97.     In 2012, an Indian court, in an action challenging Air India's purchase of aircraft, also questioned Air India's "giving away . . . profitable air routes to the private airlines and retaining only loss making routes and even the unprofessional decision of merger of Indian Airlines and Air India."[98]

98.     Reviewing these events retrospectively, a 2014 Parliamentary committee report faulted the government for "impinging on the autonomy of [Air India] leading to loss of traffic to [Air India]," noting that the government pressured Air India into offering the India-US routes "in

---

[93]  *See*, *e.g.*, *Cairn* ECF No. 1-9, at 10–11 ("Minister (CA) in a meeting at Mumbai impressed upon the need for Air India to examine the possibility of non-stop India-US operations.").
[94]  *Cairn* ECF No. 1-8, at 93, 135.
[95]  *See*, *e.g.*, *Cairn* ECF No. 1-48.
[96]  *Cairn* ECF No. 1-49 (emphasis added).
[97]  *See Cairn* ECF No. 1-50.
[98]  *See Cairn* ECF No. 1-51, at 23–24.

[spite] of the fact that historically, India-USA sector was a loss-making sector and a commercially unviable route."[99]

### 3. India Runs Air India's Business on a Day-to-Day Basis.

99.     There is no doubt that India's extensive control encroaches into even the most trivial aspects of Air India's day-to-day operations.    The MoCA evaluates and negotiates terms for transactions involving aircraft acquisition,[100] aircraft insurance,[101] lease of aircraft,[102] and aircraft grounding.[103]  When Air India sought admission to the Star Alliance, a global airline alliance, the Star Alliance demanded concessions from India.[104]    India interferes with Air India's route-planning strategy as a matter of course with little concern for Air India's profits or financial health.

100.     MoCA also routinely submits reports on issues such as operational delays and emergency landings to the Members of Parliament.[105]  Supervision of Air India's daily operations reaches such mundane matters as technical issues of aircraft,[106] Air India's business dealings with vendors and travel agencies,[107] and even taking steps to "keep rats away from flights and its surrounding places."[108]

---

[99]   *Cairn* ECF No. 1-8, at 136.
[100]  *See*, *e.g.*, *Cairn* ECF No. 1-9, at 5–35.
[101]  *See*, *e.g.*, *Cairn* ECF No. 1-13, at 33–34 (the MoCA reporting to the Parliament insurance premium paid by Air India for grounded aircraft).
[102]  *See*, *e.g.*, *id.* at 31–32 (the MoCA reporting to the Parliament aircraft lease terms); *id.* at 28 (the MoCA reporting to the Parliament lease of aircraft for regional operations).
[103]  *See*, *e.g.*, *id.* at 7 (the MoCA reporting to the Parliament the number of grounded aircraft and reasons for grounding).
[104]  *See Cairn* ECF No. 1-8, at 70–71.
[105]  *See*, *e.g.*, *Cairn* ECF No. 1-13, at 27 (flight delay due to fight between flight attendants); *id.* at 12 (a tail strike and hard landing incident); *id.* at 9 (emergency landing due to engine problems with the Boeing 787 Dreamliners).
[106]  *See*, *e.g.*, *id.* at 24 (technical glitches with the Boeing 787 Dreamliners and maintenance process); *id.* at 44 (investigating into software glitch in the airline's check-in system).
[107]  *See*, *e.g.*, *id.* at 45 (potential conflict of interest arising from the distribution deal with Air India's ticket agency); *id.* at 29 (alliance with Indian Railway Catering and Tourism Corporation Limited).
[108]  *Id.* at 24.

101.    MoCA negotiates with representatives of pilots and directly regulates pay, employee benefits, and their working schedule.[109]   MoCA appointed a Committee headed by a former Indian Supreme Court justice to review various issues related to pay and wage rationalization between employees of the two airlines following the Air India–Indian Airlines merger.[110]   The Minister of Civil Aviation described these disputes with Air India's employees as purely matters "between me and my children."[111]

102.    India commissioned a Turn Around Plan and Financial Restructuring Plan ("FRP") to keep the airline afloat.  Rather than increase Air India's independence, the Turn Around Plan actually made it easier for India to interfere with Air India's business operations by creating an Oversight Committee and a Group of Ministers to monitor Air India's progress under the Turn Around Plan.[112]   The Oversight Committee—which is headed by the Secretary of the MoCA and consists of other governmental officials, including the Secretary of the Department of Expenditure, Additional Secretary & Financial Advisor of the MoCA, and Joint Secretary of the MoCA—reviews Air India's performance monthly.[113]

103.    Air India has been an essential instrument of India's effort to combat the COVID-19 pandemic.  India designated Air India as the "nodal agency" and ordered it and its subsidiaries to operate non-scheduled flights to evacuate stranded Indian citizens throughout the world under the supervision of multiple governmental agencies.[114]   As of April 16, 2021, Air India

---

[109]   *See*, *e.g.*, *id.* at 39 (government meeting with pilot representatives to negotiate pay and allowances); *id.* at 10 (pilot recruitment and pilot working hour rules); *id.* at 16 (stressed pilots); *id.* at 6 (payment of house rent allowance to Air India employees); *id.* at 14 (working schedule for technical staff of the merged entity of Air India and Indian Airlines Limited).
[110]   *Cairn* ECF No. 1-36, at 93.
[111]   *Cairn* ECF No. 1-54.
[112]   *Cairn* ECF No. 1-13, at 13 (the MoCA reporting to the Parliament about setting up an Oversight Committee to monitor Air India's progress under the Turn Around Plan).
[113]   *Cairn* ECF No. 1-8, at 1–2.
[114]   *Cairn* ECF No. 1-55; *Cairn* ECF No. 1-56, at 161; *Cairn* ECF No. 1-57 (designating Air India as the "nodal agency" to facilitate the government's repatriation process).

has operated a total of 23,051 repatriation flights to evacuate 3,188,191 stranded passengers.[115]
Air India is currently scheduled to operate at least over 1,500 further repatriation flights.[116]   Air
India also operated special charter flights on domestic and international routes to transport essential
medical supplies across the country and the world "on the directions of the Government."[117]

104.    MoCA has also managed Air India's financial response to the pandemic.  MoCA
meets frequently with Air India's officials to review staff costs and adjust pay.[118]  The Indian
National Congress (the leading opposition party in the Indian Parliament) and the pilots unions
have raised vehement protests against the MoCA regarding its treatment of Air India's employees
and urged *MoCA* (not Air India) to withdraw the leave without pay policy.[119]

**E.    India Exerts Economic Control over Air India.**

105.    India enjoys control over all aspects of Air India's financial affairs.  Air India's
revenues come "from its internal accruals, bank borrowing and financial support from the Gov-
ernment of India."[120]   India essentially controls Air India's access to funding, including private
bank loans; Air India's internal accruals, including by regulating fares and routes; and Air India's
spending.   Air India has lost money every year in the past decade.  Air India's management has
candidly acknowledged in its most recent annual report that it can sustain its business only with
"continued support of the Government";[121] indeed, in the words of a former Managing Director,
"[i]f Air India had been private, it would have closed down long ago."[122]

---

[115]   *Cairn* ECF No. 1-58; *Cairn* ECF No. 1-56, at 161–62.
[116]   *See Cairn* ECF No. 1-58.
[117]   *Cairn* ECF No. 1-56, at 161–62.
[118]   *Cairn* ECF No. 1-60 (Air India tweeted that "[r]ecent decisions . . . regarding rationalization of staff cost were
reviewed in a meeting at @MoCA_goi"); *see also Cairn* ECF No. 1-61.
[119]   *See Cairn* ECF No. 1-61; *Cairn* ECF No. 1-62.
[120]   *Cairn* ECF No. 1-13, at 53.
[121]   *See Cairn* ECF No. 1-56, at 82.
[122]   *Cairn* ECF No. 1-12.

1.    **India Provides Significant Financial Support to Air India.**

106.    India provides significant and regular financial support to Air India through a combination of capital contributions, grants, and loans.  Overloaded with debt due to its irresponsible aircraft purchases, Air India is so dependent on India's financial support that, without such support, Air India's management says it would be "extremely difficult to maintain . . . current operations,"[123] and its independent auditor has questioned Air India's ability "to continue as a going concern," given the "complete erosion of [its] net worth."[124]

107.    *First*, financial support is regularly made available to Air India by India through direct capital contribution.[125]  Although the Turn Around Plan contemplates "both operational and financial turnaround of [Air India],"[126] even to this day, Air India "relies on Government support to conserve its liquidity position."[127]  The cumulative total of the government's capital contribution to date has risen from 1.45 billion Rupees (US $36.03 million)[128] since 2007–2008 to 326.65 billion Rupees (US $4.41 billion)[129] in 2019–2020.[130]  From 2007–2008 to 2019–2020, India's average

---

[123]   *See Cairn* ECF No. 1-56, at 10.

[124]   *Id.* at 81–82.

[125]   *Id.* at 188 ("The Company has regularly received Equity Infusion from the [government of India]. . . . All these steps are aimed at creating a positive environment.  In view of the above and the financial support from the Govt of India and various measures taken by the Company to improve its operational efficiencies, various revenue enhancing measures, cost control measures undertaken etc. the Company expects improvement in its Operational and Financial Performance, in the near future and hence, the Financial Statements of the Company have been prepared on the 'Going Concern' basis."); *see Cairn* ECF No. 1-63; *see also Cairn* ECF No. 1-13, at 51–52; *Cairn* ECF No. 1-56, at 81 ("The Company has received continuous support from the Government of India (GoI) initially through the introduction of the Turnaround Plan (TAP)/Financial Restructuring Plan (FRP) approved in 2012 and then under the Strategic Revival Plan in FY 2018-19 which has helped the Company to improve its operating and financial parameters.").

[126]   *Cairn* ECF No. 1-64, at 17–18 (excerpts of 2014–2015 Air India Annual Report).

[127]   *Cairn* ECF No. 1-56, at 193 (excerpts of 2019–2020 Air India Annual Report).

[128]   The USD figure is calculated based on the average exchange rate for Rs-USD in 2007–2008.

[129]   The USD figure is calculated based on the average exchange rate for Rs-USD in 2019–2020.

[130]   *See Cairn* ECF No. 1-65, at 101 (excerpts of 2007–2008 Air India Annual Report); *Cairn* ECF No. 1-66, at 89 (excerpts of 2009–2010 Air India Annual Report); *Cairn* ECF No. 1-67, at 63 (excerpts of 2010–2011 Air India Annual Report); *Cairn* ECF No. 1-68, at 76 (excerpts of 2011–2012 Air India Annual Report); *Cairn* ECF No. 1-69, at 95 (excerpts of 2012–2013 Air India Annual Report); *Cairn* ECF No. 1-70, at 93 (excerpts of 2013–2014 Air India Annual Report); *Cairn* ECF No. 1-64, at 117 (excerpts of 2014–2015 Air India Annual Report); *Cairn* ECF No. 1-71, at 124 (excerpts of 2016–2017 Air India Annual Report); *Cairn* ECF No. 1-72, at 142 (excerpts of 2017–2018 Air India Annual Report); *Cairn* ECF No. 1-73, at 157 (excerpts of 2018–2019 Air India Annual Report); *Cairn* ECF No. 1-56, at 141 (excerpts of 2019–2020 Air India Annual Report).

annual capital contribution was 25.13 billion Rupees (US $342.70 million).   These funds are appropriated in the national budget approved by the Parliament each year.

108.    After the 2012 financial restructuring plan failed, India considered a new Turn Around Plan in 2018, known as the Strategic Revival Plan, to allow Air India to "stand on its own feet" so as to prepare the airline for an eventual sale to the private sector.[131]   Competing airlines regularly question India's financial support to Air India, accusing the government of granting Air India "special privileges" and "funding their losses."[132]

109.    **Second**, Air India receives aid in the form of grants from MoCA.  For example, during financial year 2020–2021, MoCA issued approximately 8.1 billion Rupees (US $110.2 million) as grants to Air India for the purchase of two new aircraft "for special operations."[133]   These aircraft used to fly the country's top leadership on important governmental missions and have since been transferred to the Indian Air Force.[134]

110.    **Third**, India allocates substantial sums on a regular, annual basis to Air India Asset Holding Ltd ("AIAH"), a special purpose vehicle ("SPV") incorporated by India in 2018 to offload Air India's debt in order to make Air India a more attractive acquisition target.   For the 2021–2022 fiscal year alone, India through the MoCA budgeted 22.69 billion Rupees (US $308.79 million) for AIAH.[135]

111.    **Fourth**, India provides loans to Air India on non-commercial and highly favorable terms.  For example, India's National Small Saving Fund loaned US $612 million to Air India in the 2020–2021 fiscal year.[136]

---

[131]   *Cairn* ECF No. 1-29.
[132]   *Cairn* ECF No. 1-74.
[133]   *Cairn* ECF No. 1-75.
[134]   *Cairn* ECF No. 1-76.
[135]   *See Cairn* ECF No. 1-77, at 18.
[136]   *Cairn* ECF No. 1-13, at 59.  The NSSF is a fund administered by the Department of Economic Affairs of the MoF pursuant to the National Small Savings Fund (Custody and Investment) Rules, 2001 (the "NSSF Rules"), and was

112.    *Fifth*, unlike private airlines, Air India enjoys special treatment under Indian tax law, which allows it to carry forward indefinitely unabsorbed depreciation into future years.[137]  Air India has not made any taxable income since its merger and therefore has not paid any income tax to the government.  As of March 31, 2020, the company had a total deferred tax asset of 200.74 billion Rupees (US $2.73 billion), which will be offset against future tax liabilities.[138]

### 2.    India Controls Air India's Access to Other Sources of Funding.

113.    Even where Air India obtains income from outside of India, India controls those revenue streams in two respects.  First, Air India obtains more favorable commercial loans thanks to Indian governmental guarantees.  Second, India dictates Air India's fares.

114.    *India routinely guarantees loans and other payment obligations for Air India*. The government's financial rules allow it to act as guarantor to enable Air India to raise financing at lower interest rates or on "more favourable terms."[139]   As of March 2020, India had agreed to guarantee amounts of over 750 billion Rupees (over US $10 billion).[140]

115.    Between March 2008 and March 2020, Air India's total outstanding governmental guarantees ranged in value  between approximately  46 billion  Rupees  (US  $1.1 billion[141]) in  2008  to approximately 430 billion Rupees  (US $5.8 billion[142]) in 2020.[143]  During the fiscal year 2020–2021, India guaranteed additional loans Air India received—totaling 9 billion Rupees (US $122.73 million).[144]

---

established in 1999 to consolidate collections from the public under various "small saving schemes" floated by India; *Cairn* ECF No. 1-78.
[137]   *Cairn* ECF No. 1-79.
[138]   *Cairn* ECF No. 1-56, at 185 ("Further, the Deferred Tax Assets have been created against carry forward Depreciation *only which are available to the Company indefinitely* as per the provisions of the Income Tax Act.") (emphasis added).
[139]   *See Cairn* ECF No. 1-80.
[140]   *Cairn* ECF No. 1-81, at 5–8.
[141]   The USD figure is based on average exchange rate for Rs-USD in 2007–2008.
[142]   The USD figure is based on average exchange rate for Rs-USD in 2019–2020.
[143]   *See Cairn* ECF No. 1-81, at 2, 3, 5–8.
[144]   *Cairn* ECF No. 1-13, at 60–61.

116.    Although under India's financial rules, the government must be paid a guarantee fee in exchange for its guaranteeing loans, Air India does not pay those fees.[145]  And, as part of India's efforts to make Air India an attractive asset to potential buyers, it decided to forgive any outstanding guarantee fees owed by the airline.[146]

117.    Loan guarantee support has continued after India halted capital contributions and began discussing divestment from Air India.[147]  In 2021–22, India extended "a guarantee support of Rs 9.6 billion [Rupees, or around US $127 million,] to [Air India] which was used to raise new working capital loans"[148] and to refinance, rolled-over bridge loans where the lenders were "not in agreement to further extend these . . . facilities."[149]

118.    ***India controls other sources of Air India's income.***  India has the right to set Air India's fares.[150]  In fact, Air India operates politically favored domestic flights with a $35 price cap as "insisted" by the Indian Prime Minister.[151]

### 3.    India Controls Air India's Spending and Oversees Its Financial Situation.

119.    India also exerts control over Air India's spending and closely monitors its financial state and accounts.  MoCA "and governmental bodies such as the Public Investment Board" and "the Cabinet Committee on Economic Affairs" have power to "approve[]" "all project [sic] for

---

[145]   *Cairn* ECF No. 1-6, at 2.
[146]   *Cairn* ECF No. 1-82; *see also Cairn* ECF No. 1-83 (all contingent liability confirmed against Air India for "Guarantee Fee/Penal charges due to [the Government of India]" will be indemnified by the Government); *Cairn* ECF No. 1-56, at 147, 155; *Cairn* ECF No. 1-72, at 144–45 (classifying a portion of the guarantee fees as contingent liabilities).
[147]   *Cairn* ECF No. 1-84.
[148]   *Id.*
[149]   *Cairn* ECF No. 1-56, at 27.
[150]   *Cairn* ECF No. 1-10 § 129 (Air India Articles of Association); *Cairn* ECF No. 1-85, at 21 (Instrument of Delegation of Financial Powers of Air India Ltd.).
[151]   *Cairn* ECF No. 1-86.

acquisition of aircraft / engines / simulators / APUs" and other purchases that "require capital expenditure."[152]

120.    Further, any investments made by Air India must comply with guidelines issued by the "Department of Public Enterprises, Ministry of Heavy Industries & Public Enterprises or any other authority of Government of India with regard to investment to be made by the Public Sector Undertakings."[153]  Wages paid to Air India's employees must be "in accordance" with guidelines issued by the Department of Public Enterprises, and while Air India has notional autonomy in employee matters, India routinely interferes in such matters.[154]  Constitutional limitations against discrimination also apply to Air India's employment decisions as though it were an arm of the government.[155]

### F.    India Treats the Property of Air India and Its Own Interchangeably

121.    To this day, India treats Air India as its personal fiefdom, rather than an independent company.

122.    India routinely receives air transportation from Air India for which it does not pay. Even though Air India has operated at a loss every year since the 2007 merger, MoCA (in 2020) required Air India to upgrade tickets for all former Secretaries of the MoCA and their families.[156] All official travel by governmental officials is done through Air India, absent written authorization of a senior governmental officer.[157]  The government rarely makes on-time payments to Air India

---

[152]  *Cairn* ECF No. 1-85 § 3.3 (Instrument of Delegation of Financial Powers of Air India Ltd.).
[153]  *Id.* § 22.
[154]  *See also Cairn* ECF No. 1-56, at 180 ("In view of Department of Public Enterprises (DPE) guidelines applicable to PSUs no wage revision can be granted to the employees of loss-making PSUs.  The Company has been making losses since 1st January 2007 hence no provision has been made towards wage revision/settlement."); *Cairn* ECF No. 1-13, at 54–55 (detailing government plans to rationalize staff in the Turn Around Plan).
[155]  *See infra* Section VI.G.
[156]  *Cairn* ECF No. 1-9, at xiv.
[157]  *Cairn* ECF No. 1-7 § 2.15.

in spite of the airline's financial difficulties,[158] and pays no interest to Air India on delayed payments.[159] As of December 2019, for example, India owed 7.01 billion Rupees (US $95.4 million) to Air India solely for the cost of the Prime Minister's and President's travel.[160] India owed a further 5 billion Rupees (US $68.05 million) in airfare for flights of government "VVIPs" ("very, very important persons"), at a time when Air India was forced to borrow 2.25 billion Rupees through a short-term loan facility to refinance an earlier loan.[161]

123.    Air India has operated at a loss every year since its 2007 merger.[162] Its losses for this past year are estimated to be between 9.5–10 billion Rupees (US $129.3–136.1 million), up from 8 billion Rupees (US $108.87 million) the previous year.[163] Air India is able to stay in business only because India subsidizes its losses[164] and routinely guarantees its debts.[165]

124.    India also assumes Air India's debts directly and without this assistance Air India could not operate. In 2019, the government transferred half of Air India's debt (29.464 billion Rupees of 58.255 billion Rupees total, or US $400.98 million to $792.80 million) to AIAH, the SPV established by India to offload Air India's debt.[166] India has also transferred debts of some of Air India's subsidiaries to this SPV.[167] The government will ultimately absorb these debts.[168] Air India's most recent Annual Report states that India may assume even more debt.[169]

---

158  *Cairn* ECF No. 1-9, at xxi.
159  *Cairn* ECF No. 1-13, at 58.
160  *See Cairn* ECF No. 1-87.
161  *See Cairn* ECF No. 1-88; *see also Cairn* ECF No. 1-36, at 19.
162  *See Cairn* ECF No. 1-89.
163  *See id.*
164  *See Cairn* ECF No. 1-90.
165  *See Cairn* ECF No. 1-89.
166  *See Cairn* ECF No. 1-93.
167  *See Cairn* ECF No. 1-13, at 46–48.
168  *See Cairn* ECF No. 1-94.
169  *See Cairn* ECF No. 1-56, at 188.

125.    India declines to respect corporate formalities with regards to Air India's assets.  India transferred most of Air India's real-estate assets to AIAH,[170] and is in the process of selling Air India's other valuable real-estate assets.[171]  This process was initially overseen by a committee made up of a Supreme Court justice, a retired Auditor General, and a retired civil servant, and all sales are approved by the Cabinet.[172]  The government, rather than the company, appointed consultants to ascertain the value of these properties to determine which properties should be sold.[173] This whole process is subject to intense parliamentary scrutiny as well.[174]

### G.    India's Own Courts Have Held that Air India Is One and the Same with the State[175]

126.    Air India is considered to be the "State" under Indian law.

127.    Articles 12 through 35 of the Indian Constitution require the "State" to respect various fundamental rights.   Article 12 defines the "State" to include (a) the central government of India and the local state governments; (b) Parliament and the state legislatures; (c) all local authorities; and (d) "*other authorities* within the territory of India, *or under the control of the Government of India*."[176]  Under Indian law, corporations can be considered the "State" of India when they are "financially, functionally and administratively dominated by, or under the control of, the government."[177]

128.    Given its extensive financial, functional, and administrative domination by the government, Air India has routinely been considered to be the "State" under Indian law.  In *Lena Khan*

---

[170]   *See Cairn* ECF No. 1-93.
[171]   *See Cairn* ECF No. 1-13, at 37–38.
[172]   *See Cairn* ECF No. 1-13, at 37–38.
[173]   *Id.* at 42–43.
[174]   *See id.*; *id.* at 41 (questions concerning sale of iconic buildings in Mumbai).
[175]   Plaintiffs intend to raise an issue of Indian law as set forth in this section and hereby provide notice of same pursuant to Federal Rule of Civil Procedure 44.1.
[176]   *Cairn* ECF No. 1-30 (excerpts of India Const., Art. 12) (emphasis added).
[177]   *Cairn* ECF No. 1-95, at 111 ¶ c (excerpts of *Pradeep Kumar Biswas v. Indian Inst. of Chemical Biology*, (2002) 5 SCC 111).

*v. Union of India*, the Indian Supreme Court held that Air India was "a corporation which is for all purposes State within the meaning of the term as provided in Article 12 of Constitution of India," and thus required to respect constitutional rights.[178]  Other Indian courts have come to the same conclusion.[179]

## COUNT I
### (For Declaratory Judgment)

129.    Plaintiffs repeat and re-allege each and every allegation of Paragraphs 1 through 128 of this Complaint as though set forth herein.

130.    Plaintiffs seek a declaration that Air India is an alter ego of India, that Air India is liable to Plaintiffs for India's debts; and that Plaintiffs may execute judgments against India on Air India's assets.

131.    A justiciable and actual controversy exists with respect to Air India's relationship with India.  A declaratory judgment resolving this question is likely to clarify or settle the legal rights of the parties to this action, and/or terminate a principal source of the insecurity and/or controversy that brought about this action.

132.    As a matter of Indian constitutional law, Air India is the "State" under Indian law.

133.    An instrumentality like Air India is the alter ego of its parent state when the parent state controls the instrumentality so extensively that a principal-agent relationship exists between them, or where giving effect to the nominal separateness of the instrumentality would work a fraud or injustice.

134.    India undoubtedly controls Air India, as demonstrated by the facts set forth above. Moreover, the nominal distinction between India and Air India is illusory and serves only to aid

---

[178]  *Cairn* ECF No. 1-96 ¶ 10 (*Lena Khan v. Union of India*, (1987) 2 SCC 402).
[179]  *See Cairn* ECF No. 1-97 ¶ 49 (*Jeetendra Krishna Verma v. Air India Limited*, (2019) LLR (SN 49) 777); *Cairn* ECF No. 1-98 ¶ 3 (*Rakesh Rai v. National Aviation Company of India*, (2013) W.P No. 287).

India in improperly shielding its assets from creditors like Plaintiffs.  Specifically, giving effect to Air India's nominal separateness from India would unjustly deprive Plaintiffs of the ability to recover the assets located in this District that, although nominally held by Air India, are actually controlled by India.

135.    Plaintiffs' arbitral award (and eventual judgment from the District Court for the District of Columbia) is thus enforceable against Air India.

## COUNT II
### (For Money Judgment Against Air India in Favor of Plaintiffs)

136.    Plaintiffs repeat and re-allege each and every allegation of Paragraphs 1 through 135 of this Complaint as though set forth herein.

137.    On January 13, 2021, Plaintiffs brought a Petition to Recognize and Confirm Foreign Arbitral Award against India in a proceeding captioned *CC/Devas (Mauritius) Ltd et al. v. Republic of India*, 1:21-cv-00106-RCL (D.D.C. Jan. 13, 2021).   Plaintiffs expect to be awarded judgment against India in that proceeding.

138.    Accordingly, Plaintiffs will be entitled to judgment expressly adjudging Air India, as the alter ego of India and legally indistinct from the state itself, to be jointly and severally liable for any judgment entered against India pursuant to the Petition to Recognize and Confirm Foreign Arbitral Award.

## COUNT III
### (Permanent Injunctive Relief and Execution)

139.    Plaintiffs repeat and re-allege each and every allegation of Paragraphs 1 through 138 of this Complaint as though set forth herein.

140.    Air India is the alter ego of India, which is subject to an arbitration award, and soon judgment creditor, of Plaintiffs.

141.     Federal Rule of Civil Procedure 65 addresses the authority of a district court to issue "injunctions and restraining orders." Federal Rule of Civil Procedure 64 complements Rule 65 in stating that, at "the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64.  The rule goes on to state that the "remedies available under this rule include," among other things, "attachment, garnishment, replevin, sequestration and other corresponding or equivalent remedies," and that such remedies are available "however designated and regardless of whether state procedure requires an independent action." *Id*.

142.     Federal Rule of Civil Procedure 69 directs that "a money judgment is enforced by a writ of execution."  It empowers the Court to order discovery, as appropriate, and to proceed under both state and federal law to secure execution of the judgment.  Fed. R. Civ. P. 69.

143.     Plaintiffs, as arbitral judgment creditors of India, are entitled to an order for execution, attachment, and other relief including preliminary and permanent injunctive relief, requiring Air India, as the alter ego of India, to satisfy Plaintiffs' arbitral award and eventual District Court for the District of Columbia judgment against India.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendant be entered as follows:

     a.    Declaring pursuant to 28 U.S.C. § 2201 that Air India is the alter ego of India and legally indistinct from the state itself;

     b.    Adjudging that Air India shall be jointly and severally liable for the judgment that will be awarded to Plaintiffs against India based on the Award;

c.      Awarding money damages against Air India in the amount of the judgment entered against India;

d.      Allowing execution, attachment, and other orders as appropriate under State and federal law including orders for injunctive relief, requiring Air India to satisfy the liability owed to Plaintiffs;

e.      Awarding interest, costs, fees and other expenses associated with this action, including reasonable attorney fees; and

Awarding such other legal or equitable relief as this Court deems just and proper.

Dated: June 28, 2021                        Respectfully submitted,


                                            */s/ Matthew D. McGill*
                                            MATTHEW D. MCGILL
                                            GIBSON, DUNN & CRUTCHER LLP
                                            1050 Connecticut Avenue, N.W.
                                            Washington, DC 20036
                                            Telephone: 202.887.3680
                                            mmcgill@gibsondunn.com

                                            ANNE CHAMPION
                                            GIBSON, DUNN & CRUTCHER LLP
                                            200 Park Avenue
                                            New York, NY 10166
                                            Telephone: 212.351.5361
                                            achampion@gibsondunn.com

                                            *Counsel for Plaintiffs*