# EXHIBIT 1

PCA CASE NO. 2013-09

IN THE MATTER OF AN ARBITRATION ARISING UNDER THE AGREEMENT
BETWEEN THE GOVERNMENT OF THE REPUBLIC OF MAURITIUS AND THE
GOVERNMENT OF THE REPUBLIC OF INDIA FOR THE PROMOTION AND
PROTECTION OF INVESTMENTS ENTERING INTO FORCE JUNE 20, 2000 AND THE
ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON
INTERNATIONAL TRADE LAW 1976

_____

-between-

CC/DEVAS (MAURITIUS) LTD.,
DEVAS EMPLOYEES MAURITIUS PRIVATE LIMITED., and
TELCOM DEVAS MAURITIUS LIMITED.

(the "Claimants")

-and-

THE REPUBLIC OF INDIA

(the "Respondent," and together with the Claimants, the "Parties")

_____

AWARD ON JURISDICTION AND MERITS

July 25, 2016

_____

**Arbitral Tribunal**

The Hon. Marc Lalonde, P.C., O.C., Q.C. (Presiding Arbitrator)
Mr. David R. Haigh, Q.C.
The Hon. Shri Justice Anil Dev Singh

Case 1:21-cv-05601-PGG   Document 1-1   Filed 06/28/21   Page 3 of 154

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page i of xi

**TABLE OF CONTENTS**

**CHAPTER I - INTRODUCTION** ................................................................................1
  **A. THE PARTIES** ......................................................................................................1
  **B. THE DISPUTE** .....................................................................................................1
**CHAPTER II - PROCEDURAL HISTORY** ..........................................................2
  **A. COMMENCEMENT OF THIS ARBITRATION** .............................................2
  **B. CONSTITUTION OF THE ARBITRAL TRIBUNAL** ....................................2
  **C. ADOPTION OF THE TERMS OF APPOINTMENT AND THE FIRST PROCEDURAL MEETING** ...................................................................................3
  **D. CHALLENGES TO THE APPOINTMENT OF ARBITRATORS** ..................4
  **E. THE PARTIES' WRITTEN SUBMISSIONS** ....................................................5
  **F. THE PARTIES' REQUESTS FOR THE PRODUCTION OF DOCUMENTS**.....5
  **G. HEARING ON JURISDICTION AND LIABILITY** ........................................6
  **H. THE NEW DOCUMENTS PRODUCED BY THE RESPONDENT ON DECEMBER 20, 2014**................................................................................................8
  **I. THE LAUNCHING OF GSAT-6** ......................................................................9
  **J. THE ICC FINAL AWARD IN** *DEVAS MULTIMEDIA PRIVATE LIMITED V. ANTRIX CORPORATION LIMITED* ...........................................10
**CHAPTER III - FACTUAL BACKGROUND** .....................................................10
  **A. THE KEY ACTORS - CORPORATE AND STATE ENTITIES AND ORGANS OF THE STATE** .............................................................................................11
  **B. BACKGROUND TO THE DEVAS PROJECT** ..............................................15
    1. The S-band and Its Allocation within India ................................................15
    2. The Proposed Devas Satellite-Terrestrial Communications System............16
    3. Negotiations Leading to the Devas Agreement...........................................18
  **C. THE DEVAS AGREEMENT** ...........................................................................19
    1. Leased Capacity .............................................................................................19
    2. Upfront Capacity Reservation Fees ..............................................................20
    3. Regulatory Approvals......................................................................................21
    4. Delay Damages...............................................................................................21
    5. Termination.....................................................................................................22
    6. Force Majeure ................................................................................................25
  **D. THE INITIAL DEVELOPMENT OF THE DEVAS PROJECT** .....................26
    1. Establishment of Corporate Infrastructure and Initial Financing..................26
    2. Delays to the Delivery of Satellites...............................................................27
  **E. THE PARALLEL REVIEW PROCESS OF THE DEVAS AGREEMENT AND ITS SUBSEQUENT ANNULMENT**..............................................................29
    1. India's Internal Discussions on Security Needs for S-band Capacity ............29
    2. The Suresh Report .........................................................................................30
    3. The Space Commission's Determination to Annul the Devas Agreement........32
    4. The Opinion of the Additional Solicitor-General...........................................35
    5. DOS' Note for the CCS and the CCS' Decision to Annul the Devas Agreement............37
  **F. THE PERIOD FOLLOWING THE ANNULMENT OF THE DEVAS AGREEMENT**....40

Case 1:21-cv-05601-PGG   Document 1-1   Filed 06/28/21   Page 4 of 154

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page ii of xi

1. Initial Reactions of Devas and Antrix to the Annulment of the Devas Agreement.........40
2. The Satellites ..........................................................................................................41
3. Related Arbitration Proceedings ...............................................................................42
CHAPTER IV - REQUESTS FOR RELIEF ..........................................................................43
CHAPTER V - THE MEANING OF "INVESTMENT" FOR THE PURPOSES OF THE
TREATY ......................................................................................................................44
  A. THE PARTIES' ARGUMENTS...................................................................................44
    1. The Respondent's Position .....................................................................................45
    2. The Claimants' Position .........................................................................................49
  B. THE TRIBUNAL'S ANALYSIS .................................................................................52
    1. The Devas Agreement.............................................................................................52
    2. Investment Under the Treaty....................................................................................52
CHAPTER VI - THE "ESSENTIAL SECURITY INTERESTS" PROVISION .........................56
  A. INTERPRETATION OF ARTICLE 11(3) OF THE TREATY IN CONTEXT .................56
    1. What Constitutes "Essential Security Interests"? .....................................................56
      a. Can "Essential Security Interests" Be Construed as a Matter of Self-judgment by the
        Respondent?......................................................................................................56
        i.  The Respondent's Position ..........................................................................56
        ii. The Claimants' Position .............................................................................57
        iii. The Tribunal's Analysis ............................................................................58
      b. What Conditions Must the Respondent Meet to Show that its Measures Were "Directed to
        the Protection of its Essential Security Interests"? ................................................59
        i.  The Respondent's Position ..........................................................................59
        ii. The Claimants' Position .............................................................................60
        iii. The Tribunal's Analysis ............................................................................62
    2. Does Article 11(1) of the Treaty Allow for the Introduction of Customary International
      Law Restrictions Imposed on a State of Necessity Defence?.........................................66
      a. The Claimants' Position....................................................................................66
      b. The Respondent's Position .................................................................................67
      c. The Tribunal's Analysis ....................................................................................68
    3. Can the Claimants Invoke Article 11(4) of the Treaty? ..............................................69
      a. The Claimants' Position....................................................................................69
      b. The Respondent's Position .................................................................................70
      c. The Tribunal's Analysis ....................................................................................72
    4. Does Article 11(3) Prevent Entitlement to Compensation?.........................................78
      a. The Claimants' Position....................................................................................78
      b. The Respondent's Position .................................................................................78
      c. The Tribunal's Analysis ....................................................................................79
  B. APPLICATION OF THE LAW TO THE FACTS ...........................................................79
    1. The Parties' Arguments ..........................................................................................80
      a. Historical Analysis of Demands for S-band Spectrum in India................................80
        i.  The Claimants' Position .............................................................................80
        ii. The Respondent's Position ..........................................................................82

Case 1:21-cv-05601-PGG   Document 1-1   Filed 06/28/21   Page 5 of 154

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page iii of xi

b. MSS Demands Versus BSS Demands ...........................................................................83
  i. The Claimants' Position ...........................................................................................83
  ii. The Respondent's Position .......................................................................................85
2. The Tribunal's Analysis ....................................................................................................86
CHAPTER VII - EXPROPRIATION .............................................................................................101
A. THE PARTIES' ARGUMENTS .................................................................................................101
1. The Existence of an Expropriation ...............................................................................102
  a. The Claimants' Position ...........................................................................................102
  b. The Respondent's Position .......................................................................................103
2. Lawfulness of the Expropriation ..................................................................................104
  a. Public Purpose ...........................................................................................................104
    i. The Claimants' Position .........................................................................................104
    ii. The Respondent's Position ....................................................................................106
  b. Due Process .................................................................................................................106
    i. The Claimants' Position .........................................................................................106
    ii. The Respondent's Position ....................................................................................107
3. Potential Discrimination in the Expropriation ...........................................................108
  a. The Claimants' Position ...........................................................................................108
  b. The Respondent's Position .......................................................................................108
4. Fair and Equitable Compensation ...............................................................................109
  a. The Claimants' Position ...........................................................................................109
  b. The Respondent's Position .......................................................................................109
5. The Pendency of a Breach of Contract Claim .............................................................110
  a. The Claimants' Position ...........................................................................................110
  b. The Respondent's Position .......................................................................................111
B. THE TRIBUNAL'S ANALYSIS ................................................................................................112
1. The Existence of an Expropriation ...............................................................................112
2. The Lawfulness of the Expropriation ...........................................................................113
  a. Public Purpose ...........................................................................................................113
  b. Due Process .................................................................................................................113
  c. Potential Discrimination in the Expropriation ......................................................114
  d. Fair and Equitable Compensation............................................................................114
  e. The Pendency of a Breach of Contract Claim ........................................................114
3. Conclusion .......................................................................................................................115
CHAPTER VIII - FAIR AND EQUITABLE TREATMENT .......................................................115
A. THE PARTIES' ARGUMENTS .................................................................................................115
1. The Applicable Standard of Treatment ........................................................................116
  a. The Claimants' Position ...........................................................................................116
  b. The Respondent's Position .......................................................................................118
2. The Alleged Violation of the FET Standard ................................................................121
  a. The Claimants' Position ...........................................................................................121
  b. The Respondent's Position .......................................................................................122
B. THE TRIBUNAL'S ANALYSIS ................................................................................................124

Case 1:21-cv-05601-PGG   Document 1-1   Filed 06/28/21   Page 6 of 154

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page iv of xi

**CHAPTER IX - UNREASONABLE OR DISCRIMINATORY MEASURES**............................**131**

    **A. THE PARTIES' ARGUMENTS**...................................................................**131**

        **1. The Claimants' Position** ...............................................................**131**

        **2. The Respondent's Position** ...........................................................**132**

    **B. THE TRIBUNAL'S ANALYSIS** ..............................................................**133**

**CHAPTER X - MOST-FAVOURED-NATION TREATMENT**.......................................**134**

    **A. THE PARTIES' ARGUMENTS**...................................................................**135**

        **1. The Possibility of Importing the 'Full Legal Protection and Security' Clause of the Serbia-India BIT**...........................................................**135**

            a. The Claimants' Position.................................................................135

            b. The Respondent's Position ...........................................................136

        **2. The Respondent's Alleged Violation of the 'Full Legal Protection and Security' Provision** ...............................................................**137**

            a. The Claimants' Position.................................................................137

            b. The Respondent's Position ...........................................................138

    **B. THE TRIBUNAL'S ANALYSIS** ..............................................................**138**

**CHAPTER XI - DECISIONS**................................................................................**139**

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page v of xi

## LIST OF DEFINED TERMS

| | |
|---|---|
| **Antrix** | Antrix Corporation Ltd, an Indian corporation wholly owned by the Government of India that is under the administrative control of DOS and purports to operate as the commercial marketing arm of ISRO and DOS. Antrix was created to promote the commercial exploitation of India's space program. |
| **ASG** | The Additional Solicitor-General of India, one of the law officers of the Republic of India who represents the Government of India in the Supreme Court and provides it with legal advice. |
| **AV** | Audio-video. |
| **Balachandhran Report** | Report issued by Mr. G. Balachandhran on January 9, 2011. |
| **BIT(s)** | Bilateral investment treaty (or treaties). |
| **BSS** | Broadcast satellite services. |
| **BWA** | Broadband wireless access. |
| **CC/Devas** | CC/Devas (Mauritius) Ltd., the first Claimant, which was formed in 2006 and has its registered office in Port Louis, Mauritius. It is affiliated with Columbia Capital LLC, a venture capital firm based in Alexandria, Virginia. Shareholder of Devas. |
| **CCS** | The Indian Cabinet Committee on Security, a select Cabinet committee that, among other matters, deals with all defence related issues, issues relating to law and order, and internal security and economic and political issues impinging on national security. It is composed of the Prime Minister, the Minister of Home Affairs, the Minister of External Affairs, the Minister of Finance, and the Minister of Defence. |
| **CGC** | Complementary Ground Components, which would constitute the terrestrial segment of the hybrid communication system planned by Devas. Also referred to as ATC (Ancillary Terrestrial Components). |
| **Chandrasekhar Report** | Report issued by Mr. K.M. Chadrasekhar on April 12, 2011. |
| **Chaturvedi Committee** | High Powered Review Committee constituted by the Indian Prime Minister on February 9, 2011, chaired by Mr. B.K. Chaturvedi. |
| **Chaturvedi Report** | Report issued by the Chaturvedi Committee on March 12, 2011. |
| **COAI** | Cellular Operators Association of India. |
| **DEMPL** | Devas Employees Mauritius Private Limited, the second Claimant, which was formed in 2009 and has its registered office in Port Louis, Mauritius. It is a subsidiary of Devas Employees Fund US, |

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page vi of xi

|  |  |
|---|---|
|  | LLC, a Delaware limited liability company with membership units owned by certain non-Indian Devas employees pursuant to an Equity Incentive Plan. Shareholder of Devas. |
| **Devas** | Devas Multimedia Private Limited, an Indian company incorporated in Karnataka, Bangalore, India on December 17, 2004, with its registered office at 2nd Floor, Prema Gardenia, 357/6, 1st Cross, I Block, Jayanagar, Bangalore, India. The three Claimants hold shares in Devas and made their alleged investments in India through this company. |
| **Devas Agreement/The Agreement** | Agreement for the Lease of Space Segment Capacity on ISRO/ANTRIX S-band Spacecraft between Antrix Corp. Ltd. and Devas Multimedia Private Ltd. (Agreement No. ANTX/203/DEVAS/2005), dated January 28, 2005. |
| **Devas Services** | BWA and AV services to be offered by Devas to mobile users across India under the terms of the Devas Agreement. |
| **DOS** | The Indian Department of Space, the government department responsible for the development of India's space policy and the implementation of the decisions of the Space Commission. Since its establishment in 1972 under Prime Minister Indira Ghandi, DOS has formed part of the Prime Minister's portfolio and has reported to the PMO. |
| **DOT** | The Indian Department of Telecommunications. |
| **DRDO** | Defence Research and Development Organization. |
| **DT Asia** | Deutsche Telekom Asia, shareholder of Devas. |
| **EGoM** | Empowered Group of Ministers of the Government of India. |
| **FET** | Fair and Equitable Treatment. |
| **Forge Advisors** | Forge Advisors LLC, a U.S. company headed by Mr. Ramachandran Viswanathan. |
| **ICC** | Indian Satellite Coordination Committee (also referred to as INSAT Coordination Committee). |
| **ICC Arbitration** | Arbitration under the rules of the International Chamber of Commerce captioned Devas Multimedia (Private) Limited v. Antrix Corp. Ltd. (No. 18051/CYK). |
| **ICJ** | International Court of Justice. |
| **ILC Articles** | International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts 2001, Yearbook Of The International Law Commission (2001), Vol. II, Part Two. |
| **IPTV** | Internet Protocol Television. |

Case 1:21-cv-05601-PGG  Document 1-1  Filed 06/28/21  Page 9 of 154

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page vii of xi

| | |
|---|---|
| **ISP** | Internet Service Provider. |
| **ISRO** | The Indian Space Research Organization, a body of the Government of India under the direction of DOS and the Space Commission that engages in research and testing in order to encourage the rapid development of activities connected with space science, space technology and space applications with responsibility in the entire field of science and technology of outer space. ISRO builds, launches, operates and leases satellites for various uses, including telecommunications, television and radio broadcasting. |
| **ITU** | International Telecommunications Union. |
| **JCB** | Joint Chronological Core Hearing Bundle, provided by the Parties to the Tribunal on August 16, 2014. |
| **Leased Capacity** | Transponder capacity to be leased to Devas in PS1 and PS2 pursuant to Article 2 of the Devas Agreement. |
| **MFN** | Most Favored Nation. |
| **MHz** | Megahertz. |
| **MOD** | Ministry of Defence of the Republic of India. |
| **MSS** | Mobile satellite services. |
| **NFAP** | National Frequency Allocation Plan. |
| **Note for the CCS** | Note from DOS to the Space Commission, dated February 16, 2011. |
| **Note for the EGoM** | Note for the Empowered Group of Ministers on Vacation of Spectrum, authored by the Department of Space, dated March 1, 2012. |
| **Opinion of the ASG** | Opinion issued by the ASG on July 12, 2010. |
| **PMO** | Office of the Prime Minister of India, including his staff. |
| **PS (PS1 and PS2)** | Primary and Secondary Satellite System, respectively. Also referred to as GSAT-6 and GSAT-6A. |
| **S-band** | Portion of the electromagnetic spectrum found at 2500-2690 MHz. |
| **S-BSS** | Portion of the S-band allocated for BSS. |
| **S-MSS** | Portion of the S-band allocated for MSS. |
| **Serbia-India BIT** | Agreement between The Government of The Republic Of India and The Federal Government of The Federal Republic of Yugoslavia |

Case 1:21-cv-05601-PGG   Document 1-1   Filed 06/28/21   Page 10 of 154

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page viii of xi

| | |
|---|---|
| | for The Reciprocal Promotion and Protection of Investments, dated January 31, 2003. |
| **Shankara Committee** | High Power Committee constituted in May 2004 at the direction of the Chairman of ISRO to review the technical feasibility, risk mitigation, time schedule, financial and organizational aspects of the Devas project, chaired by Dr. K.N Shankara. |
| **Space Commission** | The Indian Space Commission, which formulates the policies and oversees the implementation of the Indian space program to promote the development and application of space science and technology for the socioeconomic benefit of the country. The Space Commission is composed of appointees from across the Government of India, including the Minister of State, the National Security Advisor (who reports to the Prime Minister), the Cabinet Secretary, the Principal Secretary to the Prime Minister, the Secretary for Economic Affairs in the Ministry of Finance, the Secretary Department of Expenditure, Secretary to the Government of India, and senior directors of ISRO centers. |
| **Suresh Committee** | Committee instituted by DOT on December 8, 2009 to perform a comprehensive review of all aspects of the Devas Agreement. |
| **Suresh Report** | Report issued by the Suresh Committee in May 2010. |
| **TAG** | Technical Advisory Committee of the Indian Satellite Coordination Committee. |
| **Telcom Devas** | Telcom Devas Mauritius Limited, the third Claimant, which was formed in 2006 and has its registered office in Port Louis, Mauritius. It is affiliated with Telcom Ventures LLC, a United States venture capital firm owned by Dr. Rajendra Singh. Shareholder of Devas. |
| **Term Sheet** | 'Definitive binding term sheet' proposed by Devas to Antrix on September 20, 2004. Precursor of the Devas Agreement. |
| **TRAI** | Telecom Regulatory Authority of India. |
| **Treaty** | Agreement Between The Government Of The Republic Of Mauritius And The Government Of The Republic Of India For The Promotion And Protection Of Investments Entering Into Force June 20, 2000. |
| **VCLT** | Vienna Convention on the Law of Treaties. |
| **WPC** | Wireless Planning and Coordination Wing, an organ of DOT. |
| **WPC License** | Operating license issued by the WPC to operators of terrestrial electromagnetic spectrum. |

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page ix of xi

**DRAMATIS PERSONAE**

| | |
|---|---|
| **Alex, Dr. T.K.** | Member of Space Commission (from March 2010); Director of ISRO Satellite Centre (June 01, 2008 to June 30, 2012). |
| **Anand, Mr. A. Vijay** | Joint Secretary of Department of Space and Chief Vigilance Officer beginning July 2009 (subsequently became Additional Secretary of Department of Space). *Has submitted a witness statement in support of Respondent's Statement of Defence.* |
| **Babbio, Mr. Larry** | Former Vice-Chair of Verizon Communications, Inc. who became a director of Devas Multimedia Private Limited ("**Devas**") in 2007. *Has submitted witness statement in support of Claimants' Statement of Claim.* |
| **Balachandran, Mr. G.** | Additional Secretary (from April 1, 2009 to January 11, 2011), Department of Space. |
| **Bhaskaranarayana, Dr. A.** | Scientific Secretary (from August 27, 2007 to December 29, 2009) and Director, Satellite Communications Program Office, ISRO (from 2003 to 2009). |
| **Chandrasekhar, Dr. M.G.** | Former Scientific Secretary, ISRO, Member-Secretary of the Apex Management Council of ISRO and Director, Earth Observations Programme. Left ISRO in December 1997. Became Chief Operating Officer and Executive Vice President of WorldSpace in 2000; then Vice President, International Sales for GeoEye LLC in 2005; and subsequently joined Devas as Chairman of the Board of Directors in 2005. *Has submitted a witness statement in support of Claimants' Statement of Reply.* |
| **Chaturvedi, Mr. B.K.** | Member, Planning Commission; former Cabinet Secretary (from June 6, 2009 to May 26, 2014). |
| **Gupta, Mr. Arun** | Partner of Columbia Capital LLC; Devas board member from May 2006. *Has submitted witness statements in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| **Kasturirangan, Dr. Krishnaswamy** | Chairman of (a) the Space Commission, (b) ISRO, and (c) Antrix, and (d) Secretary of DOS from April 1994 to August 2003; Member (Science), Planning Commission, from 2009 to March 2014. |
| **Katti, Mr. Vadiraj R.** | Program Director, GEOSAT, ISRO (from December 31, 1997 to October 31, 2010); joined Devas board in April 2008 and submitted resignation in October 2010. |

Case 1:21-cv-05601-PGG   Document 1-1   Filed 06/28/21   Page 12 of 154

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page x of xi

| | |
|---|---|
| **Kibe, Dr. S.V.** | Program Director, SATNAV, Associate Director, INSAT Programme Office (from June 7, 2000 to December 31, 2009). |
| **Lewis, Mr. John** | Electrical engineer who has worked at or with the International Telecommunications Union ("**ITU**") since 1981 related to the use of electromagnetic spectrum, including by satellite system operators, and the coordination of such use among nations. <br><br> *Has submitted expert reports in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| **Madhusudhana, Mr. H.N.** | Associate Scientific Secretary, ISRO (from July 2011); Executive Director, Antrix (August 2010 to July 2011). |
| **Menon, Mr. Shivshankar** | National Security Advisor to Prime Minister Manmohan Singh (from January 2010 to May 2014). |
| **Murthi, Mr. K.R. Sridhara** | Executive Director, Antrix (from August 23, 2001 to January 16, 2008) and Managing Director, Antrix (from January 17, 2008 to September 30, 2010). |
| **Nair, Dr. G. Madhavan** | Chairman of (a) the Space Commission, (b) ISRO, and (c) Antrix; and (d) Secretary of DOS from September 2003 to October 2009. |
| **Parasaran, Mr. Mohan** | Additional Solicitor-General of India (from 2004 to 2013) and Solicitor General of India (from 2013 to 2014). |
| **Parsons, Mr. Gary** | Founder of SkyTerra LP ("**SkyTerra**") and XM Satellite Radio Holdings, Inc. Former CEO and President of American Mobile Satellite Corporation, which had a number of subsidiaries, including TerreStar Networks, Inc. ("**TerreStar**"). Devas board member from September 2007 and shareholder in Devas. <br><br> *Has submitted witness statements in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| **Pitroda, Mr. Sam** | Prime Minister Manmohan Singh's Public Information Infrastructure and Innovation Advisor (from October 2009 to June 2014). |
| **Radhakrishnan, Dr. K.** | Beginning in October 2009, (a) Chairman of the Space Commission, (b) Chairman of ISRO, and (c) Secretary of DOS, and (d) Chairman of Antrix through July 2011. |
| **Sayeenathan, Mr. S.** | Associate Director, Satellite Communication and Navigation Program Office, ISRO (from February 2010); prior to February 2010 Deputy Director, Frequency Management Office, ISRO. |
| **Sethuraman, Mr. K.** | Associate Director, Satellite Communication Program at the Satellite Communication and Navigation Program Office, ISRO (from April 6, 2009). <br><br> *Has submitted witness statements in support of Respondent's Statement of Defence and Respondent's Rejoinder.* |

Case 1:21-cv-05601-PGG   Document 1-1   Filed 06/28/21   Page 13 of 154

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page xi of xi

| | |
|---|---|
| **Shankara, Dr. K.N.** | Director, ISRO Space Applications Centre (from October 31, 2002 to July 4, 2005); Head of Shankara Committee that issued the "Report of the ISRO/Antrix Committee on lease of space segment capacity on ISRO/Antrix S-band spacecraft to Devas Multimedia Pvt Ltd for delivery of video, multimedia and information services to mobile receivers in vehicles and mobile phones" (the "**Shankara Report**"). |
| **Singh, Dr. Manmohan** | Prime Minister of India from 2004-14; among other things, was head of the Union Government, head of the executive branch, and the Minister of Space. |
| **Singh, Dr. Rajendra** | Founder, President and Chairman of the Board of Telcom Ventures LLC; Devas board member from May 2006.<br><br>*Has submitted witness statements in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| **Suresh, Dr. B.N.** | Director of the Indian Institute of Space and Technology (from 2007 to 2010), Thiruvananthapuram; member of Space Commission (from November, 2005 to August, 2008). Author of "*Report on GSAT-6*" delivered to Chairman, ISRO/Secretary, Department of Space on June 7, 2010 (the "**Suresh Report**"). |
| **Venugopal, Mr. D.** | Devas co-founder and Chief Technical Officer. Electronics and communications engineer specializing in satellite communications; worked at ISRO from 1980-98.<br><br>*Has submitted a witness statement in support of Claimants' Statement of Reply.* |
| **Viswanathan, Mr. Ramachandran** | CEO of Devas.<br><br>*Has submitted witness statements in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| **Viswanathan, Mr. T.K.** | Advisor to the Minister for Law and Justice (from November 1, 2009 to September 30, 2010). |

## CHAPTER I - INTRODUCTION

### A.   THE PARTIES

1.   The Claimants in this matter are CC/Devas (Mauritius) Ltd. ("CC/Devas"), Devas Employees
     Mauritius Private Limited ("DEMPL") and Telcom Devas Mauritius Limited ("Telcom Devas"),
     three companies incorporated in Mauritius. The Claimants bring their claims under the Agreement
     between the Government of the Republic of Mauritius and the Government of the Republic of
     India for the Promotion and Protection of Investments entering into force June 20, 2000 (the
     "Mauritius-India BIT" or "Treaty").

2.   The Claimants are represented in this arbitration by Mr. John L. Gardiner and Mr. Timothy G.
     Nelson of Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036-
     6522, United States of America, and by Mr. David Kavanagh, of Skadden, Arps, Slate, Meagher
     & Flom LLP, 40 Bank Street, Canary Wharf, London E14 5DS, United Kingdom.

3.   The Respondent in this matter is the Republic of India.

4.   The Respondent is represented in this arbitration by Mr. George Kahale III and Mr. Benard V.
     Preziosi, Jr., of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, 35th Floor, New
     York, New York 101178, United States of America, and by Mr. Shri S. Srinivasan, Government
     of India, Department of Space, Antariksh Bhavan, New BEL Road, Bangalore 560 231, India.
     Between March 14, 2013 and May 9, 2014, the Respondent was also represented by Mr. Sanjeev
     Kapoor of Khaitan & Co, 1105 Ashoka Estate, 24 Barakhamba Road, New Delhi, India.

### B.   THE DISPUTE

5.   The dispute concerns the annulment of a contract, entitled Agreement for the Lease of Space
     Segment Capacity on ISRO/ANTRIX S-Band Spacecraft (the "Devas Agreement" or the
     "Agreement"),[1] concluded on January 28, 2005 between Devas Multimedia Private Limited
     ("Devas"), an Indian company, and Antrix Corporation Limited ("Antrix"), an Indian State-
     owned company. The annulment of the Devas Agreement followed a policy decision taken by the
     Government of India to reserve a part of the electromagnetic spectrum known as the S-band "for

---

[1]   Agreement for the Lease of Space Segment Capacity on ISRO/ANTRIX S-Band Spacecraft between Antrix
      Corp. Ltd. and Devas Multimedia Private Ltd. (Agreement No. ANTX/203/DEVAS/2005), January 28,
      2005 (the "**Devas Agreement**") (Ex. C-16/JCB-37).

national needs, including for the needs of defence, para-military forces, railways and other public utility services as well as for societal needs, and having regard to the needs of the country's strategic requirements."[2] Part of that spectrum had originally had been leased to Devas under the Devas Agreement for the purpose of offering broadband wireless access and audio-video services throughout India.

6.   The Claimants, who are shareholders of Devas, maintain that this policy decision taken by the Government of India amounted to an expropriation of the Claimants' investments in India and was not accompanied by payment of fair and equitable compensation, in breach of the Treaty. They also allege other breaches under Articles 3 and 4 of the Treaty.

7.   The Respondent argues that its policy decision was intended to satisfy the national security needs of the nation; that Devas had no right to proceed with the Devas Agreement uninterrupted by any governmental action; and that the Claimants have no claim under the Treaty.

## CHAPTER II - PROCEDURAL HISTORY

### A.   COMMENCEMENT OF THIS ARBITRATION

8.   By a Notice of Arbitration dated July 3, 2012, the Claimants commenced arbitration proceedings against the Respondent pursuant to Article 3 of the Arbitration Rules of the United Nations Commission on International Trade Law (1976) (the "UNCITRAL Rules") and Article 8 of the Mauritius-India BIT.

### B.   CONSTITUTION OF THE ARBITRAL TRIBUNAL

9.   On July 3, 2012, the Claimants appointed Professor Francisco Orrego Vicuña as Co-arbitrator.

10.  On December 26, 2012, the Respondent appointed the Honorable Shri Justice Anil Dev Singh as Co-arbitrator.

11.  On January 24, 2013, the Co-arbitrators selected the Honorable Marc Lalonde, P.C., O.C., Q.C., as Presiding Arbitrator. On January 26, 2013, the Hon. Marc Lalonde accepted his appointment as Presiding Arbitrator, which was notified to the Parties on February 4, 2013.

---

[2]   Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220). *See also Prime Minister Manmohan Singh's Interaction with Editors of the Electronic Media*, The Hindu, February 16, 2011, pp. 6-7 (Ex. R-36/JCB-218).

### C.   ADOPTION OF THE TERMS OF APPOINTMENT AND THE FIRST PROCEDURAL MEETING

12.   By letter dated February 4, 2013, the Tribunal invited the Parties to comment on certain matters, including, inter alia, the need for the Respondent to appoint counsel; administration of the arbitration by the Permanent Court of Arbitration ("PCA"); and an outline of steps to be taken in the conduct of the proceedings.

13.   In response, the Claimants urged the Tribunal, by letter dated February 5, 2013, to convene an initial conference whereas the Respondent, by letter dated February 13, 2013, sought to defer addressing these issues until the process of engaging counsel was concluded.

14.   By letter dated February 14, 2013, the Claimants noted that the Respondent's position was "completely unsatisfactory and appears purposefully calculated to compound the already extensive delays that the Respondent's conduct has engendered in this proceeding," by reference to the case record. In any case, the Claimants stated that there was "no basis for further delay," citing the Respondent's good faith obligations to promptly participate, and proposed possible venues for an initial conference on a date to be fixed by the Tribunal.

15.   On March 14, 2013, the Respondent notified the appointment of Khaitan & Co. as counsel.

16.   By letter dated April 2, 2013, the Tribunal requested that the Parties advance an initial deposit and designated the PCA to administer the initial case deposit. The Tribunal further proposed that the PCA act as registry and administer the arbitral proceedings, which was accepted by the Parties.

17.   On April 16, 2013, the PCA wrote to the Parties regarding the details of the first procedural meeting to be held on May 15, 2013, at the Peace Palace in The Hague.

18.   Following an exchange of views upon the Tribunal's invitation, the Parties submitted a draft Proposed Terms of Appointment and a draft Proposed Procedural Timetable on May 10, 2013.

19.   On May 10, 2013, the Respondent informed that it had engaged Curtis, Mallet-Prevost, Colt & Mosle LLP as counsel along with M/s Khaitan & Co.

20.   On May 15, 2013, a first procedural meeting was held at the Peace Palace in The Hague, the Netherlands ("First Procedural Meeting"), in which the Parties agreed to and signed the Terms of Appointment.

## D.   CHALLENGES TO THE APPOINTMENT OF ARBITRATORS

21.   By e-mail dated May 11, 2013, the Respondent notified the Claimants and the Tribunal of its intention to challenge the appointments of the Hon. Marc Lalonde as Presiding Arbitrator and Professor Francisco Orrego Vicuña as Co-arbitrator.

22.   Following the First Procedural Meeting, at which the Respondent again raised its intention to bring the challenge, the Tribunal circulated an unsigned Procedural Order No. 1 "to be used as a guide for the Parties in their preparation of their upcoming submissions during the pendency of the challenge."

23.   By letter dated May 20, 2013, the Respondent submitted the challenge to H.E. Judge Peter Tomka, then President of the International Court of Justice and Appointing Authority pursuant to Article 8(2)(d)(i) of the Mauritius-India BIT.

24.   On June 3, 2013, the Appointing Authority made two disclosures and invited the Parties to submit their comments on them by June 10, 2013. By letters dated June 5, 2013, the Claimants and the Respondent indicated that they had no comments with regard to the Appointing Authority's disclosures.

25.   Between May and June 2013, the Claimants and the Respondent made submissions in respect of the challenge in accordance with the agreed timetable. The Hon. Marc Lalonde and Professor Orrego Vicuña also submitted comments on the challenge by letters dated June 5 and 6, 2013, respectively.

26.   On September 30, 2013, the Appointing Authority issued his decision on the challenge— upholding the Respondent's request to disqualify Professor Orrego Vicuña, and rejecting the Respondent's request to disqualify the Hon. Marc Lalonde.

27.   Following the Appointing Authority's decision on the challenge, the Claimants appointed Mr. David R. Haigh, Q.C., as Co-arbitrator on October 9, 2013. The Tribunal issued Procedural Order No. 1 on October 16, 2013.

28.   By letter dated May 23, 2015, the Respondent submitted a challenge to Mr. David R. Haigh, Q.C. to H.E. Judge Ronny Abraham, the current President of the International Court of Justice and Appointing Authority pursuant to Article 8(2)(d)(i) of the Mauritius-India BIT. By letter dated June 3, 2015, the Claimants opposed the challenge.

29.    On June 11, 2015, pursuant to the schedule set forth by the Appointing Authority on June 5, 2015, the Respondent provided its comments to the Claimant's letter of June 3 2015. On June 19, 2015, the Claimants provided their comments on the Respondent's submissions. By letter dated June 25, 2015, Mr. Haigh responded to the submissions of the Parties.

30.    On August 3, 2015, the Appointing Authority issued his decision on the Challenge rejecting the Respondent's request to disqualify Mr. David R. Haigh Q.C.

**E.    THE PARTIES' WRITTEN SUBMISSIONS**

31.    On July 1, 2013, the Claimants submitted their Statement of Claim (the "Statement of Claim").

32.    On December 2, 2013, the Respondent submitted its Statement of Defence (the "Statement of Defence").

33.    On March 18, 2014, the Claimants submitted their Statement of Reply on Jurisdiction and Liability (the "Statement of Reply").

34.    On July 1, 2014, the Respondent submitted its Rejoinder (the "Respondent's Rejoinder").

**F.    THE PARTIES' REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

35.    On January 14, 2014, the Parties submitted their respective requests for the production of documents in accordance with paragraph 4 of Procedural Order No. 1.

36.    On January 31, 2014, the Tribunal issued Procedural Order No. 2 concerning the Parties' Document Production Requests of January 14, 2014, setting out its determinations and a timetable for the Parties to produce documents.

37.    By letter dated May 16, 2014, the Claimants submitted that the Respondent had not complied fully with Procedural Order No. 2. Accordingly, the Claimants requested: (i) the production of additional documents in response to the Claimants' document production requests Nos. 16 and 17; (ii) a statement by the Respondent certifying the names of the entities, agencies and departments whose records were searched in response to the Tribunal's Order; (iii) the disclosure "of every page of every document" improperly redacted by the Respondent, "indicating the reason for every instance in which text has been redacted;" and (iv) the disclosure of all redacted names of people involved in a transaction or communication reflected in a document produced by the Respondent.

38. By letter dated June 6, 2014, the Respondent requested that the Claimants' application be denied. Notwithstanding this, the Respondent stated that, in connection with the Claimants' application, it had located "a few additional documents that [were] arguably responsive" to their requests. Also, by reference to an ongoing related ICC case and document production decisions made by the tribunal in that case, the Respondent noted that it was "prepared to provide the same materials regarding the redacted documents that Antrix will be providing Devas in the ICC case."

39. In a further communication dated June 9, 2014, the Respondent provided the Tribunal with the text of the direction given by the ICC tribunal in respect of the redacted documents, which was confirmed by the Claimants on the same day.

40. By e-mail dated June 12, 2014, the Respondent indicated that it had produced to the Claimants the newly located documents referenced in its June 6, 2014 letter.

41. On June 16, 2014, the Tribunal issued Procedural Order No. 3 concerning the Claimants' Document Production Request of May 16, 2014, setting out the procedure and timetable for the Respondent to revert on outstanding issues.

42. In accordance with Procedural Order No. 3, on July 12, 2014, the Respondent produced a key corresponding to individual's names that were redacted, which was verified by the PCA on June 24, 2014; and confirmed on August 1, 2014 that there were no additional documents meeting the Claimants' document production requests Nos. 16 and 17.

## G.   HEARING ON JURISDICTION AND LIABILITY

43. On August 4, 2014, the Parties and the Tribunal held a telephone conference in preparation for the Hearing on Jurisdiction and Liability, scheduled on September 1-5, 2014.

44. On September 1-5, 2014, a Hearing on Jurisdiction and Liability was held at the Peace Palace in The Hague, the Netherlands. The following persons attended:

**The Tribunal**

The Honorable Marc Lalonde, P.C, O.C., Q.C. (Presiding Arbitrator)
Mr. David R. Haigh, Q.C.
The Honorable Shri Justice Anil Dev Singh

**The Claimants**

Mr. Ramachandran Viswanathan
Dr. Rajendra Singh
Mr. Arun Gupta

Mr. Lawrence T. Babbio
Mr. John Lewis
Mr. D. Venugopal
Dr. M.G. Chandrasekhar
Mr. Gary Parsons
*(Representatives and Witnesses)*

Mr. John L. Gardiner
Mr. David Kavanagh
Mr. Timothy G. Nelson
Ms. Elizabeth A. Hellmann
Ms. Sharmistha Chakrabarti
Ms. Jennifer Huang
Mr. Gunjan Sharma
Ms. Angela Leonard
Mr. Kvehl McDermott
Mr. Aaron Shorr
*(Skadden, Arps, Slate Meagher & Flom LLF)*

Mr. Harish Salve, Q.C.
Mr. Ciccu Mukhopadhaya
Mr. Kripa Pandit

**The Respondent**

Mr. S. Srinivasan
Mr. A. Vijay Anand
Ms. Kalyani Sethuraman
Mr. M.S. Krishnan
Mr. K. Sethuraman
*(Representatives and Witnesses)*

Mr. George Kahale III
Mr. Benard V. Preziosi
Mr. Fernando A. Tupa
Mr. Kabir A.N. Duggal
Mr. Fuad Zarbiyev
Ms. Gloria Bujan-Diaz
Mr. Philip M. Hwang
Mr. Christopher Grech
*(Curtis, Mallet-Prevost, Colt & Mosle LLF)*

**The Permanent Court of Arbitration**

Ms. Fiona Poon
Mr. José Luis Aragón Cardiel

**Court reporters**

Ms. Diana Burden
Ms. Laurie Carlisle

45.     During the hearing, examination of fact and expert witnesses occurred in the following order:

**For the Claimants**

Mr. Ramachandran Viswanathan
Dr. Rajendra Singh
Mr. Arun Gupta
Mr. Gary Parsons
Mr. Lawrence T. Babbio
Dr. M.G. Chandrasekhar
Mr. D. Venugopal
Mr. John Lewis

**For the Respondent**

Mr. K. Sethuraman
Mr. A. Vijay Anand

## H.   THE NEW DOCUMENTS PRODUCED BY THE RESPONDENT ON DECEMBER 20, 2014

46.   On September 22, 2014, the Tribunal informed the Parties that it would not be necessary for them to produce post-hearing briefs on the questions raised by the Tribunal during the Hearing on Jurisdiction and Liability. The Tribunal also stated that, if it wished "to obtain additional information, it [would] communicate with the Parties in due course."

47.   On December 20, 2014, the Respondent submitted two additional exhibits that had been referred to in a related ICC arbitration: (i) the "Norms, Guidelines and Procedures for Implementation of the Policy Frame-work for Satellite Communications in India" (the "Norms, Guidelines and Procedures"); and (ii) the Technical Statement from the Joint Wireless Advisor posted on the official website of the Wireless Planning & Coordination Wing of the Department of Telecommunications (the "JWA Technical Statement", and, together, the "**New Documents**").

48.   On December 23, 2014, the Claimants argued, inter alia, that the Respondent's December 20, 2014 submission was unsolicited and thus contravened the Tribunal's September 22, 2014 directive. It further submitted that it would be procedurally unfair to allow the record to be added to.

49.   On December 26, 2014, the Respondent submitted a response to the Claimants' objection on the Additional Documents.

50.   On January 6, 2015, the Claimants submitted a further response to the Respondent's December 26, 2014 communication.

51.   On January 7, 2015, the Respondent submitted some brief comments to the Claimants January 6, 2015 communication.

52.     On January 28, 2015, the Tribunal issued Procedural Order No. 4, Concerning the Respondent's Documents Submitted on December 20, 2014. The Tribunal admitted the Norms, Guidelines and Procedures into the record, while the JWA Technical Statement was admitted into the record by a majority, with reservations. The Tribunal also invited the Claimants to submit a written statement with their views on the New Documents, and granted the Respondent an opportunity to provide responsive comments.

53.     On March 2, 2015, the Claimants submitted a written statement as directed by Procedural Orders No. 1 and 4.

54.     On March 28, 2015, the Respondent submitted a response to the Claimants' March 2, 2015 written statement pursuant to Procedural Order No. 4.

## I.     THE LAUNCHING OF GSAT-6

55.     On August 31, 2015, the Respondent submitted six news articles and a video by public service broadcaster *Doordarshan* reporting the launch of a satellite named "GSAT-6" on August 27, 2015.

56.     On September 21, 2015, the Tribunal issued Procedural Order No. 5. In that Order, the Tribunal conditionally accepted the Respondent's submission of August 31, 2015 without ruling on the significance or probative value of the Respondent's submission. The Tribunal also invited the Respondent to explain, within two weeks from the Order, the relevance and probative value of its submission and invited the Claimants to submit, within two weeks of the receipt of the Respondent's explanation, any comment they may wished to make.

57.     The Respondent, on October 5, 2015, submitted a further article published by the Institute of Defence Studies and Analyses entitled "GSAT-6: India's Second Military Satellite Launched" in Annex A, "which reviewed the launch and its significance for the military." In its letter, the Respondent stated *inter alia* that "the video of the event and accompanying press reports attest to the event's significance and leave no doubt that what Respondent told this Tribunal about the reconfiguration of the satellite for military use and the reservation of the S-band capacity for non-commercial, strategic use was completely accurate."

58.     On October 19, 2015, the Claimants submitted to the Tribunal their comments on the documents newly submitted by India relating to satellite launch. The Claimants argued that the Tribunal should focus on contemporaneous evidence to the events of February 2011 and that the new

materials do not provide evidence that in 2011 a policy decision was made to reserve the S-band for military needs.

## J.    THE ICC FINAL AWARD IN *DEVAS MULTIMEDIA PRIVATE LIMITED V. ANTRIX CORPORATION LIMITED*

59.    On June 29, 2011, Devas had commenced an arbitration under the ICC rules pursuant to Article 20 of the Devas Agreement, captioned *Devas Multimedia (Private) Limited v. Antrix Corp. Ltd.* (No. 18051/CYK) ("**the ICC arbitration**"), in which Devas had sought both specific performance of the Devas Agreement and/or damages.[3]

60.    On September 14, 2015, the ICC tribunal issued its award, ordering Antrix to pay USD 562.5 million to Devas Multimedia Private Limited for damages caused by Antrix's wrongful repudiation of the Devas Agreement, plus interest.

61.    On October 1, 2015, the Claimants, with the consent of the Respondent, informed the Tribunal that it wished to provide the *ICC Final Award* to the members of the present Tribunal and that the Parties would make simultaneous submissions concerning the impact on this arbitration of the Final Award on October 9, 2015 and reply submissions on October 19, 2015.

62.    On October 2, 2015, the Tribunal approved the approach agreed between the Parties. The ICC Final Award was communicated to the Tribunal on the same day.

63.    On October 9, 2015, the Parties made submissions pursuant to the agreed approach, and on October 19, 2015, the Parties made reply submissions pursuant to the agreed approach. The content of the Parties' submissions is briefly discussed below.

## CHAPTER III - FACTUAL BACKGROUND

64.    The following summary draws on the Parties' submissions to provide context to the alleged violations of the Treaty by the Respondent in respect of the Claimants' investments in India that are at issue in this arbitration. The Parties differ in significant respects concerning the characterization and relevance of the factual developments; such differences are noted as they arise.

---

[3]    Notice of Arbitration, paras 7, 51-55; Statement of Claim, para. 146; Statement of Defence, para. 61.

A.    **THE KEY ACTORS - CORPORATE AND STATE ENTITIES AND ORGANS OF THE STATE**

65.    The Claimants provide a useful and largely uncontested outline of the key actors involved in the present case, which is reproduced below in relevant part.[4]

66.    The key actors on the Claimants' side are as follows:

(a)    The First Claimant, CC/Devas, was formed in 2006 and has its registered office in Port Louis, Mauritius. It is affiliated with Columbia Capital LLC, a venture capital firm based in Alexandria, Virginia;

(b)    The Second Claimant, DEMPL, was formed in 2009 and has its registered office in Port Louis, Mauritius. It is a subsidiary of Devas Employees Fund US, LLC, a Delaware limited liability company with membership units owned by certain non-Indian Devas employees pursuant to an Equity Incentive Plan;

(c)    The Third Claimant, Telcom Devas, was formed in 2006 and has its registered office in Port Louis, Mauritius. It is affiliated with Telcom Ventures LLC, a United States venture capital firm;

(d)    Devas Multimedia Private Limited, an Indian company incorporated in Karnataka, Bangalore, India on December 17, 2004, with its registered office at 2nd Floor, Prema Gardenia, 357/6, 1st Cross, I Block, Jayanagar, Bangalore, India.[5] This is the vehicle through which the three Claimants hold shares in Devas;

(e)    Mr. Ramachandran Viswanathan, the CEO of Devas;

(f)    Dr. Rajendra Singh, the founder and owner of Telcom Ventures LLC and a Devas board member. According to the Claimants, Dr. Singh is also a pioneer in the field of hybrid satellite-terrestrial communications systems;

(g)    Mr. Arun Gupta, a partner of Columbia Capital, a Devas board member and Chairman of DEMPL;

---

[4]    Statement of Claim, paras 23-30.

[5]    *Id.*, fn. 32; Certificate of Incorporation, Devas Multimedia Private Ltd., December 17, 2004 (Ex. C-14/JCB-33).

(h)    Mr. Gary Parsons, a Devas board member, and, according to the Claimants, a pioneer in hybrid satellite-terrestrial systems; and

(i)    Mr. John Lewis, an expert on ITU coordination and satellite communications systems.

67.    The key actors on the Respondent's side, which the Claimants assert are emanations of the Respondent, are as follows:

(a)    The Prime Minister of India, who is the head of the Union Government, head of the executive branch, and the chief advisor to the President (who is the head of State). At all relevant times, the Prime Minister was also the Minister of Space and a member of the Cabinet Committee on Security. From 2004 to May 25, 2014, the office of Prime Minister was held by Dr. Manmohan Singh, member of the Congress Party and leader of the then government (of which the Congress Party was the senior coalition partner). Following an election in 2014, Shri Narendra Damodaras Modi became Prime Minister on May 26, 2014;

(b)    The Office of the Prime Minister of India ("**PMO**"), which includes the Prime Minister's staff;

(c)    The Union Cabinet, or the Union Council of Ministers, a core decision-making body of the Government of India;

(d)    The Indian Cabinet Committee on Security ("**CCS**"), a select Cabinet committee that, among other matters, "deal[s] with all Defence related issues," "issues relating to law and order, and internal security" and "economic and political issues impinging on national security."[6] It comprises the Prime Minister, the Minister of Home Affairs, the Minister of External Affairs, the Minister of Finance, and the Minister of Defence;[7]

(e)    The Indian Space Commission (the "**Space Commission**"), which "formulates the policies and oversees the implementation of the Indian space programme to promote the development and application of space science and technology for the socioeconomic benefit of the country."[8] The Space Commission comprises appointees from across the

---

[6]    Composition and Functions of the Cabinet Committees, August 30, 2011 (Ex. C-148/JCB-235).

[7]    *Id*.

[8]    Introduction, About ISRO, Indian Space Research Organization, viewed June 12, 2013 (Ex. C-190/JCB-267).

Government of India, including the Minister of State, the National Security Advisor (who reports to the Prime Minister), the Cabinet Secretary, the Principal Secretary to the Prime Minister, the Secretary for Economic Affairs in the Ministry of Finance, the Secretary Department of Expenditure, Secretary to the Government of India, and senior directors of ISRO centres;

(f)     The Department of Space ("**DOS**"), the government department responsible for the development of India's space policy and the implementation of the decisions of the Space Commission. Since its establishment in 1972 under Prime Minister Indira Ghandi, DOS has formed part of the Prime Minister's portfolio and has reported to the PMO;[9]

(g)     The Indian Space Research Organization ("**ISRO**"), a body of the Government of India under the direction of DOS and the Space Commission that engages in research and testing in order to encourage the "rapid development of activities connected with space science, space technology and space applications" with "responsibility in the entire field of science and technology of outer space."[10] ISRO builds, launches, operates and leases satellites for various uses, including telecommunications, television and radio broadcasting;[11]

(h)     Antrix, a corporation wholly owned by the Government of India[12] that is under the administrative control of DOS and that purports to operate as the commercial marketing arm of ISRO and DOS. Antrix was created to promote the commercial exploitation of India's space program. Antrix is expected to seek out "[v]enture capital funding" from private partners and to promote the transfer of technology from such commercial entities to ISRO[13] in order to develop India's space-related, industrial capabilities.[14] Among other things, Antrix leases transponder capacity on satellites to companies that provide satellite communications and broadcasting services. Antrix was Devas' counterparty in the Devas Agreement; and

---

[9]      *See* PM's Team, Prime Minister of India, viewed on June 12, 2013 (Ex. C-189).

[10]     Report of the High Powered Review Committee on Various Aspects of the Agreement between Antrix & M/S. Devas Multimedia Pvt. Ltd., March 12, 2011, paras 1.4-1.5 ("**Chaturvedi Report**") (Ex. C-137/JCB-227).

[11]     Chaturvedi Report, March 12, 2011, paras 2.16-2.18.1 (Ex. C-137/JCB-227).

[12]     Antrix Articles of Association, September 28, 1992 (Ex. C-2/JCB-4).

[13]     Chaturvedi Report, March 12, 2011, paras 1.11-1.13 (Ex. C-137/JCB-227).

[14]     Antrix Corporation, Creating Value from Space (undated), p. 9 (Ex. C-192/JCB-289).

(i)    The Additional Solicitor-General (the "**ASG**"), one of the law officers of the Republic of India who represents the Government of India in the Supreme Court and provides it with legal advice. The highest legal officer in India is the Attorney General, who holds a constitutional post. By statute, the Attorney General is assisted by the Solicitor-General of India (the second highest law officer in India), who in turn is assisted by the Additional Solicitor-General.

68.   The Claimants also provide the following chart indicating the relationships among some of these emanations, which was reproduced from the ISRO website:[15]



69.   According to the Claimants, at all times relevant to this dispute, the Space Commission, DOS, ISRO and Antrix operated in an integrated manner, with the same person serving as the Chairman of the Space Commission, Secretary of DOS, Chairman of ISRO, and Chairman of Antrix. Specifically, Dr. K. Kasturirangan served in these positions until August 2003. He was succeeded by Dr. G. Madhavan Nair, who served in these positions from September 2003 to October 2009; and thereafter from November 2009 until around July 2011, Dr. K.R. Radhakrishnan held these

---

[15]    Statement of Claim, para. 29; Introduction, About ISRO, Indian Space Research Organization, viewed June 12, 2013 (Ex. C-190/JCB-267).

positions.[16] The Claimants characterize Dr. Radhakrishnan as the "central actor in these proceedings."[17]

70.   The Respondent denies this allegation and maintains that Antrix remained distinct from the other entities at all times.[18]

## B.   BACKGROUND TO THE DEVAS PROJECT

71.   The Devas Agreement forms the contractual framework to enable and facilitate the Devas project, which proposed to utilize part of the S-band capacity previously allocated to India by the International Telecommunications Union ("**ITU**").[19]

### 1.   The S-band and Its Allocation within India

72.   The S-band is a portion of the electromagnetic spectrum found at 2500-2690 MHz (the "S-band").[20] The S-band is a scarce and highly desirable spectrum due to its specific characteristics— its frequencies have low attenuation (i.e. the signal does not fade) and the signal can be sent and received by small units, such as mobile phones and laptop computers, without requiring the antenna on such units to be pointed directly at the satellite.[21]

73.   Of the capacity allocated to India, further allocations were made internally by India pursuant to its national planning, for example, to enable mobile satellite services ("**MSS**")[22] and broadcast satellite services ("**BSS**").[23]

74.   The Parties disagree with regard to the allocation and utilization of S-band capacity in India. According to the Respondent, both the S-MSS and the S-BSS frequencies, from the outset of India's space program until the early part of the last decade, were utilized solely for non-

---

[16]   Statement of Claim, para. 30.

[17]   Transcript, Day 1, 51:10-11.

[18]   Statement of Defence, para. 8.

[19]   Statement of Claim, para. 3; Statement of Reply, para. 21. India was allocated a total of 190 MHz of capacity in the portion of the S-band encompassing frequencies between 2500 MHz and 2690 MHz.

[20]   Statement of Claim, paras 3, 41; Statement of Defence, para. 32.

[21]   Statement of Defence, para. 33.

[22]   The portion of the S-band allocated for mobile satellite services, amounting to 110 MHz, is referred to as "**S-MSS**" (*see* Witness Statement of Mr. A. Vijay Anand, dated December 2, 2013, para. 2 ("**Anand I**")).

[23]   The portion of the S-band allocated for broadcast satellite services, amounting to 80 MHz, is referred to as "**S-BSS**" (*see* Anand I, para. 2). *See* Transcript, Day 1, 18:1-7.

commercial, national strategic and societal purposes at all relevant times.[24] It adds that, in the early 2000s, 40MGz of S-MSS capacity were assigned to the Department of Telecommunications for use in the terrestrial communications industry, leaving the Department of Space with 80MGz of S-BSS and 70MGz capacity. The Claimants, however, contend that in 2001, the DOS was left with that latter capacity, which was not utilized at the time and that it needed to find ways of making commercial use of its allocated S-band spectrum in order to retain that allocation which would otherwise, under the ITU regulations, expire by September 2010 if it remained unused.[25]

## 2.    The Proposed Devas Satellite-Terrestrial Communications System

75.    Early discussions concerning the proposed Devas project took place in 2003 between Antrix and Forge Advisors LLC ("**Forge Advisors**"), a U.S. company headed by Mr. Ramachandran Viswanathan,[26] which led to a signed Memorandum of Understanding "to explore mutually beneficial opportunities in the area of digital multimedia services."[27]

76.    The Devas project envisaged the establishment of a hybrid satellite-terrestrial communications system involving both satellite and terrestrial transmission[28] due to certain perceived advantages over a satellite-only communications system.[29] This system would enable Devas to offer two main services to customers in India: broadband wireless access ("BWA") and audio-video ("AV") services, to facilitate the delivery of video, multimedia and information services across India to mobile users (together, "Devas Services").[30]

77.    According to the Claimants, this hybrid communications system required the construction of a network of Complementary Ground Components ("CGC"), often referred to as 'towers' or 'repeaters', on the surface of the earth that use the same frequency as a satellite.[31] Satellite

---

[24]    Statement of Defence, para. 32; Witness Statement of Mr. K Sethuraman, dated December 2, 2013, para. 6 ("**Sethuraman I**").

[25]    Statement of Defence, para. 32; Statement of Reply, paras 21-24; Witness Statement of Ramachandran Viswanathan, dated June 29, 2013, paras 26-27 ("**Viswanathan I**"); Transcript, Day 1, 20:19-21:18.

[26]    Statement of Claim, para. 55.

[27]    Memorandum of Understanding between Forge Advisors and Antrix, July 28, 2003 (Ex. C-6/JCB-14).

[28]    Statement of Claim, paras 37, 38.

[29]    Statement of Claim, para. 37, noting that one key advantage is that satellite-only systems require the 'end-user' on the surface of the earth to have a direct line of sight to the satellite in order to send and receive radio signals.

[30]    Notice of Arbitration, para. 31; Statement of Claim, paras 4, 37.

[31]    Statement of Claim, paras 38-41.

transmission would be augmented by terrestrial transmission to enable the reuse of satellite signals seamlessly.[32]

78.   It was proposed that ISRO would be responsible for developing the satellite segment by building, launching and operating two satellites and leasing transponder capacity on these satellites to Devas.[33] In turn, Devas would be responsible for the terrestrial segment by, among other things, building the CGC elements of the network,[34] notwithstanding the fact that the Devas Agreement did not address this latter aspect.[35]

79.   The following is a diagrammatic representation of how the Devas System would provide services, which was prepared for a presentation by Devas to Columbia Capital LLC and Telcom Ventures LLC in 2005:[36]

---

[32]   *Id.*, para. 38; *Report on GSAT-6*, Submitted by Dr. B.N. Suresh, Director, Indian Institute of Space and Technology, Thiruvananthapuram, Submitted to: Chairman, ISRO/Secretary, Department of Space, delivered June 7, 2010, para. 5 ("**Suresh Report**") (Ex. C-94/JCB-146); Witness Statement of Dr. Rajendra Singh, dated June 26, 2013, para. 16 ("**Singh I**").

[33]   Statement of Claim, para. 44; Statement of Defence, para. 16.

[34]   Statement of Claim, para. 37; Statement of Defence, paras 8, 35-36.

[35]   Statement of Defence, para. 8.

[36]   Presentation by Devas to Columbia Capital & Telcom Ventures, December 9, 2005 (Ex. C-20/JCB-45).



80. One critical component of the hybrid communications system was sufficient S-band capacity, since the S-band signal could be received and sent from units in motion using compact omni-directional antennae.[37] As a practical matter, any S-band capacity allocated for Devas' use could not be simultaneously used by another operator as this could cause significant interference with the system or the total unavailability of the service.[38]

### 3.    Negotiations Leading to the Devas Agreement

81. In May 2004, at the direction of the chairman of ISRO, a High Power Committee was constituted to review the "technical feasibility, risk mitigation, time schedule, financial and organizational aspects" of the Devas project. This committee was chaired by Dr. K.N. Shankara (the "**Shankara Committee**").[39]

82. The Shankara Committee concluded that the contemplated system of "satellite transmission [...] augmented by terrestrial transmission so as to reuse the signals seamlessly in Indian environment"

---

37   Statement of Defence, para. 34.

38   Statement of Claim para. 41; *see also* Statement of Claim, para. 102.

39   *Id*., para. 55.

was "technically sound and reliable" as well as "quite attractive." After further discussions, the Antrix Board "approved the draft agreement negotiated with Devas [and recommended by the Shankara Committee]."[40]

83.    The Respondent attaches significance to a "definitive binding Term Sheet" proposed by Devas on September 20, 2004 (the "**Term Sheet**"),[41] particularly with respect to the grounds for termination and its consequences, which will be addressed in greater detail below. The Claimants, however, emphasize that the provisions of the Devas Agreement have superseded these negotiations, and consider them irrelevant as a matter of law.[42]

## C.    THE DEVAS AGREEMENT

84.    The operative version of the Devas Agreement between Devas and Antrix was concluded on January 28, 2005.[43]

85.    As a preliminary matter, the Claimants emphasize that this is not a case based on a breach of contract, but rather a treaty claim.[44] Accordingly, the Claimants focus on the rights ensuing to Devas from the Agreement. The Respondent also closely examines the nature of Devas' rights but place additional significance on Antrix's corresponding obligations—arguing that they are limited in nature. The Parties discuss at length the following aspects of the Devas Agreement:

### 1.    Leased Capacity

86.    The Devas Agreement provided for the lease of transponder capacity on a first satellite (identified as "PS1" or "GSAT-6") and it also gave Devas the option to lease transponders on a second satellite ("PS2" or "GSAT-6A"), which it exercised.[45]

---

[40]    *Id.*, paras 55-56.

[41]    *See* E-mail from Mr. R. Viswanathan, Forge Advisors, to Mr. K.R. Sridhara Murthi, Antrix Corporation Ltd., and Dr. A. Bhaskaranarayana, ISRO, with Attachment, September 20, 2004 (Ex. R-12/JCB-23); Draft of "Binding Term Sheet" presented on or about September 12, 2004 (Ex. R-13/JCB-20). The Respondent notes that the Claimants submitted a witness statement of Mr. Viswanathan that references the proposed "binding term sheet" without introducing it. *See* Viswanathan I, paras 48-49; Statement of Defence, para. 22.

[42]    Transcript, Day 1, 33:23-34:1.

[43]    Notice of Arbitration, para. 27; Statement of Claim, para. 58; Statement of Defence, para. 43; *see* Devas Agreement (Ex. C-16/JCB-37).

[44]    Transcript, Day 1, 91:1-12.

[45]    *See* Notice of Arbitration, para. 27; Statement of Claim, paras 44, 46; Statement of Defence, para. 16.

87.   In essence, the Devas Agreement provided for the lease of 75% of India's S-BSS allocation (30 MHz for each satellite, for a total of 60 MHz of India's total of 80 MHz of S-BSS) and 10 MHz of the S-MSS allocated for use by DOS.[46] Overall, it was agreed that 90% of the total bandwidth of the satellites was allocated to Devas, and the other 10% was allocated to DOS.[47]

88.   The Claimants stress that the Devas Agreement provided that the Leased Capacity would be a "Non-Preemptible service, except as specifically provided for in Article 7,"[48] which gave Devas the exclusive right to the Leased Capacity.[49] The Claimants also highlight that, under the Devas Agreement, Devas could assign the Leased Capacity at its sole discretion upon sixty days' advance notice to Antrix,[50] which enabled Devas to undertake a range of transactions with investors.[51]

## 2.   Upfront Capacity Reservation Fees

89.   Under the Devas Agreement, Devas was required to pay Antrix an upfront capacity reservation fee of the INR equivalent of USD 20 million, to be paid in three equal instalments, in order to reserve transponder capacity on the first satellite.[52] The first such instalment was due upon notice from Antrix that it had received all necessary approvals for the capacity lease service for the satellite.[53]

90.   Within 30 months of payment of the first installment of that fee (with a 6-month grace period), ISRO was required to deliver a fully operational and ready PS1.[54] Devas had to pay an upfront capacity reservation fee of the INR equivalent of USD 20 million to reserve transponder capacity on the second satellite as well.[55] In addition to these upfront fees, Devas was also required to pay

---

[46]   Statement of Defence, para. 36.

[47]   Statement of Claim, para. 45.

[48]   Devas Agreement, Article 2 (Ex. C-16/JCB-37).

[49]   Statement of Claim, para. 48.

[50]   Devas Agreement, Article 17 (Ex. C-16/JCB-37).

[51]   Statement of Claim, para. 50.

[52]   *Id.*, para. 46; Statement of Defence, para. 19.

[53]   Statement of Defence, para. 19; Devas Agreement, Exhibit B, Article 2.1.1 (Ex. C-16/JCB-37).

[54]   Statement of Claim, para. 46; Devas Agreement, Articles 2 and 3(b) (Ex. C-16/JCB-37).

[55]   *Id.*

Antrix an ongoing annual lease fee for the transponders of the INR equivalent of USD 9 million, rising to the INR equivalent of USD 11.25 million once Devas became cash flow positive.[56]

### 3.   *Regulatory Approvals*

91.   The activities contemplated by the Devas Agreement were subject to a number of approvals and licenses to be obtained in part by Devas and in part by Antrix. Under the Devas Agreement, Antrix was obligated to acquire "all necessary Governmental and Regulatory Approvals relating to orbital slot and frequency clearances, and funding for the satellite to facilitate DEVAS services."[57] Antrix also undertook "through ISRO/DOS" to obtain clearances of all relevant international and national agencies"[58] and to "provide appropriate technical assistance to Devas on a best effort basis for obtaining required operating licenses and Regulatory Approvals."[59]

92.   What is significant in the Respondent's view is that no governmental body of India was party to the Devas Agreement or gave any commitment to grant the necessary approvals to Devas.[60] The role of the Government of India in connection with the Devas Agreement was limited to that of a regulator,[61] and, accordingly, the Devas Agreement contained a comprehensive set of provisions allocating risks and responsibilities in the event that the governmental approvals required for full implementation of the project were not obtained.[62]

### 4.   *Delay Damages*

93.   The Devas Agreement provided for "Delay Damages" of USD 416,666 per month (for a cap of USD 5 million after 12 months' delay) if Antrix failed to deliver PS1 within three years of the

---

[56]   Statement of Claim, para. 46; Devas Agreement, Articles 4 and 5, Exhibit B (Ex. C-16/JCB-37).

[57]   Statement of Claim, para. 47; Devas Agreement, Articles 2 and 3(c) (Ex. C-16/JCB-37).

[58]   Statement of Claim, para. 47; Devas Agreement, Articles 9 and 12(a)(ii) (Ex. C-16/JCB-37).

[59]   Statement of Claim, para. 47; Devas Agreement, Articles 2 and 3(c) (Ex. C-16/JCB-37).

[60]   The Respondent submits that this is an undisputed material fact in this case; *See* Transcript, Day 1, 123:15-124:4; Day 5, 1277:19-1278:15.

[61]   Statement of Defence, paras 8, 17. The Respondent submits that this is an undisputed material fact in this case; *See* Transcript, Day 1, 112:21-114:22; 1274:16-1275:13.

[62]   Statement of Defence, para. 20. The Respondent emphasizes that the implementation of the project was subject to government approvals, and submits that this is an undisputed material fact in this case. *See* Transcript, Day 1, 114:23-118:13; Day 5, 1273:5-13.

first upfront capacity reservation payment.[63] It also provided that the failure to deliver PS1 within four years from the first payment would be a material breach of the agreement.[64]

### 5.   *Termination*

94.   The Respondent places special emphasis on Article 7 of the Devas Agreement, setting forth the rights and obligations of the parties upon termination, which could be triggered by either party to the Agreement on a series of grounds:[65]

> Article 7. Termination
>
> a. Termination for convenience by DEVAS
>
> DEVAS may terminate this Agreement in the event DEVAS is unable to get and retain the Regulatory Approvals required to provide the Devas Services on or before the completion of the Pre Shipment Review of PS1. In the event of such termination, DEVAS shall forfeit the Upfront Capacity Reservation Fees made to ANTRIX and any service or other taxes paid by DEVAS and those outstanding to be paid to ANTRIX till such date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement.
>
> b. Termination by DEVAS for fault of ANTRIX
>
> DEVAS may terminate this Agreement at any time if ANTRIX is in material breach of any provisions of this Agreement and ANTRIX has failed to cure the breach within three months after receiving notice from DEVAS setting out the nature of breach and reasons for considering the same as material breach. In such event, ANTRIX shall immediately reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding taxes if applicable, received by ANTRIX till that date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called).
>
> c. Termination for convenience by ANTRIX
>
> ANTRIX may terminate this Agreement in the event ANTRIX is unable to obtain the necessary frequency and orbital slot coordination required for operating PS1 on or before the completion of the Pre Shipment Review of the PS1. In the event of such termination, ANTRIX shall immediately reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding service taxes received by ANTRIX till that date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called).
>
> d. Termination by ANTRIX for fault of DEVAS
>
> ANTRIX may terminate this Agreement at any time if:

---

[63]   Statement of Claim, para. 52; Devas Agreement, Articles 2 and 3(c) (Ex. C-16/JCB-37).

[64]   Statement of Claim, para. 52; Devas Agreement, Exhibit B, paras 2.1., 2.2 (Ex. C-16/JCB-37).

[65]   *See* Statement of Defence, paras 20, 21; Devas Agreement, Article 7 (Ex. C-16/JCB-37).

i.   DEVAS is in material breach of any provisions of this Agreement and DEVAS has failed to cure the breach within three months after receiving notice from ANTRIX regarding such breach or,

ii.  Non payment of (a) the Lease Fees and other charges (such as spectrum monitoring charges) by DEVAS for a continued period of twelve (12) months, or if such accumulated delays from recurrent non payments exceed 60 (sixty) months, whichever occurs earlier or, (b) Upfront Capacity Reservation Fees, already due

iii. In the event that:

a.   A liquidator trustee or a bankruptcy receiver or the like is appointed by a competent court and such appointment remains un-stayed or un-vacated for a period of 90 (ninety) days after the date of such order by a competent court in respect of DEVAS, or

b.   If a receiver or manager is appointed by a competent court in respect of all or a substantial part of the assets of DEVAS and such appointment remains un-stayed or unvacated for a period of 90 (ninety) days after the date of such appointment, or

c.   If all or a substantial part of the assets of DEVAS have been finally confiscated by action of any Governmental Authority, against which no appeal or judicial redress lies.

It is expressly agreed that ANTRIX shall have no right to terminate this Agreement if DEVAS enters into any scheme or arrangement with its creditors, a corporate re-organization or restructuring of its debt and liabilities as long as DEVAS continues to make the Annual Lease Payments to ANTRIX.

In the event of such termination, DEVAS shall forfeit the Upfront Capacity Reservation Fees made to ANTRIX and DEVAS shall be liable to pay any outstanding dues to be paid to ANTRIX by DEVAS. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called).

95.   The Respondent emphasizes that, under these provisions, the only consequence arising from the termination of the Devas Agreement is either the retention or the refund of the upfront capacity reservation fees paid by Devas to Antrix.[66]

96.   The Respondent notes that the termination provisions of the Devas Agreement were heavily negotiated.[67] The Respondent relies on the Term Sheet,[68] which contains a set of termination provisions that are, in the Respondent's view, substantially different from those agreed by the parties in Article 7 of the Devas Agreement.[69] The Term Sheet provided (i) that Antrix would

---

[66]   Statement of Defence, para. 21.

[67]   *Id*., paras 22-28.

[68]   *See* E-mail from Mr. R. Viswanathan, Forge Advisors, to Mr. K.R. Sridhara Murthi, Antrix Corporation Ltd., and Dr. A. Bhaskaranarayana, ISRO, with Attachment, September 20, 2004 (Ex. R-12/JCB-23); Draft of "Binding Term Sheet" presented on or about September 12, 2004 (Ex. R-13/JCB-20). The Respondent notes that the Claimants submitted a witness statement of Mr. Viswanathan that references the proposed "binding term sheet" without introducing it; *See* Viswanathan I, paras 48-49; Statement of Defence, para. 22.

[69]   Statement of Defence, para. 22.

"not be entitled to terminate [the agreement] except for non-payment of fees by DEVAS;"[70] and (ii) that Antrix would have to pay liquidated damages, in addition to refunding amounts that may have been paid by Devas to Antrix, in case of termination for any reason other than Devas' non-payment of fees.[71]

97. Moreover, the Respondent points out that there was nothing in Devas' proposed binding term sheet that provided for liquidated damages running from Devas to Antrix in the event that Devas were to terminate the agreement for its convenience, or in the event of breach by Devas.[72]

98. Ultimately, the Term Sheet was never executed, and Article 7 of the Devas Agreement, which provides for a single remedy in the event of termination for any reason, was agreed instead.[73]

99. The Respondent argues that this difference between the termination provisions proposed by Devas and those agreed to by the parties in Article 7 of the Devas Agreement is significant. As a result of the negotiations, the parties' mutual intention and agreement at the time of entry into the Devas

---

[70]  *Id.*, para. 23; E-mail from Mr. R. Viswanathan, Forge Advisors, to Mr. K.R. Sridhara Murthi, Antrix Corporation Ltd., and Dr. A. Bhaskaranarayana, ISRO, with Attachment, September 20, 2004, para. 2.7.1 (Ex. R-12/JCB-23).

[71]  Statement of Defence, paras 23-24; E-mail from Mr. R. Viswanathan, Forge Advisors, to Mr. K.R. Sridhara Murthi, Antrix Corporation Ltd., and Dr. A. Bhaskaranarayana, ISRO, with Attachment, September 20, 2004, paras 2.7.2-2.7.5 (Ex. R-12/JCB-23), which provides:

    2.  In the event that ANTRIX terminates the Definitive Agreement for any other reason following signature of Definitive Agreements and prior to DEVAS raising its institutional financing, ANTRIX shall refund to DEVAS all the amounts paid by DEVAS to ANTRIX for any reason whatsoever, plus liquidated damages of INR 460 million for investment in the business and related losses including but not limited to investments, capital raising costs, lost business opportunities, reputation loss, penalties, development costs, mobile receiver and terrestrial repeater development, infrastructure costs, severances, and vendor and dealer negotiation costs[.]

    3.  In the event that ANTRIX terminates the Definitive Agreement for any other reason following signature of Definitive Agreements and after DEVAS has raised its first institutional round of funding, ANTRIX shall refund to DEVAS all the amounts paid by DEVAS to ANTRIX for any reason whatsoever, plus liquidated damages of INR 6.9 billion for investment in the business and related losses including but not limited to investments, capital raising costs[,] lost business opportunities, reputation loss, penalties, development costs, mobile receiver and terrestrial repeater development, infrastructure costs, severances, and vendor and dealer negotiation costs[.]

    5.  DEVAS may terminate this binding Term Sheet or Definitive Agreements for cause, which shall include failure of ANTRIX to meet its obligations, or breach of Agreement, or withdrawal of approvals and licenses controlled by ANTRIX. In the event of such termination, DEVAS shall be entitled to a refund of all the amounts paid by DEVAS to ANTRIX for any reason whatsoever plus liquidated damages of INR 6.9 billion for investment in the business and related losses, including but not limited to investments, capital raising costs, lost business opportunities, reputation loss, penalties, development costs, mobile receiver and terrestrial repeater development, infrastructure costs, severances, and vendor and dealer negotiation costs."

[72]  Statement of Defence, para. 25.

[73]  *Id.*, para. 26.

Agreement was to limit liability in the event of a termination. The maximum liability was either the retention (or refund, as the case may be) by Antrix of the upfront capacity reservation fees paid to date.[74]

100. The Claimants contend that Antrix never properly invoked the termination regime in Article 7 of the Devas Agreement. Moreover, it argues, even if those provisions operated to shield Antrix from damages for its unlawful renunciation and/or repudiation of the Agreement (which is denied), Article 7 still would not provide a 'safe harbor' for India in this proceeding.[75]

### 6.   *Force Majeure*

101. Article 11 of the Devas Agreement provided that neither Devas nor Antrix was "liable for any failure or delay in performance of its obligations" in the event of a *force majeure* as defined in this Article.[76]

102. A *force majeure* event was limited to matters "beyond reasonable control of the party affected" which prevented performance "despite all efforts of the Affected Party to prevent it or mitigate its effects."[77] In the Claimants' view, this notion of *force majeure* cannot be reconciled with Antrix's eventual declaration of *force majeure*, which was premised upon a Union Cabinet policy decision and was purposefully procured by Antrix/ISRO/DOS in an effort to extricate Antrix from the Devas Agreement.[78]

103. In turn, the Respondent highlights that Article 11 of the Devas Agreement defined "Force Majeure event" to include "acts of or failure to act by any governmental authority acting in its sovereign capacity."[79] It is obvious, in the Respondent's view, that the Government of India had the power to take action to prevent the performance by either or both parties to the Devas Agreement.[80]

---

[74]   *Id.*, para. 22.

[75]   Statement of Reply, paras 15, 129-37.

[76]   Statement of Claim, para. 53; Statement of Defence, para. 29; Devas Agreement, Article 11 (Ex. C-16/JCB-37).

[77]   Statement of Claim, para. 53; Devas Agreement, Articles 8-9, 11(b) (Ex. C-16/JCB-37).

[78]   Statement of Claim, paras 53, 178-84.

[79]   Statement of Defence, para. 29; Devas Agreement, Article 11(a) (Ex. C-16/JCB-37).

[80]   Statement of Defence, para. 29. The Respondent submits that this is an undisputed material fact in this case. *See* Transcript, Day 1, 118:14-119:6; Day 5, 1273:14-1274:15.

## D.    THE INITIAL DEVELOPMENT OF THE DEVAS PROJECT

### 1.    Establishment of Corporate Infrastructure and Initial Financing

104.   According to the Claimants, shortly after the conclusion of the Devas Agreement in early 2005, Devas formed its management team and established its company infrastructure, including an office in Bangalore.[81]

105.   On December 1, 2005, the Union Cabinet formally approved the construction and launch of satellite PS1,[82] and the Devas Agreement became effective on February 2, 2006, upon the issuance of a letter by Antrix informing Devas that it had obtained all required approvals for the Devas project[83] including all the necessary frequencies and the orbital slots in which the satellites PS1 and PS2 were to operate.[84]

106.   The Claimants consider as significant that the Government of India worked continuously to protect its rights at the ITU in furtherance of the Devas Agreement after it came into effect.[85]

107.   On March 16, 2006, CC/Devas and Telcom Devas made a first round of investment of approximately USD 7.5 million each,[86] part of which was used by Devas to pay the first instalment of the upfront capacity reservation fee for PS1 on June 21, 2006, pursuant to the Devas Agreement.[87]

108.   A second round of investment, of approximately the same amount, was made on June 18, 2007, to pay the first instalment of the upfront capacity reservation fee for PS2.[88] The Claimants also

---

[81]    Statement of Claim, para. 58.

[82]    Notice of Arbitration, para. 36; Statement of Claim, paras 60, 61.

[83]    Notice of Arbitration, para. 37; Statement of Claim, paras 62, 63; Letter from Antrix (Murthi) to Devas (Viswanathan), February 2, 2006 (Ex. C-24/JCB-51).

[84]    Statement of Claim, para. 62.

[85]    *Id.*, para. 60 with respect to protecting its orbital slot and Statement of Claim, para. 64; Respondent's Rejoinder, para. 9.3; Expert Report of John Lewis, dated June 25, 2013, para. 68 ("**Lewis I**"); *See* Notice of Arbitration, para. 35 and Transcript, Day 1, 42:22-43:5 with respect to securing a grandfathered right to use higher allowable amounts of power in a satellite beam operating in the S-band.

[86]    Statement of Reply, para. 19(b); Respondent's Rejoinder, para. 9.1.

[87]    Statement of Claim, para. 65; Statement of Reply, para. 19(b); Respondent's Rejoinder, para. 9.2; Share Subscription Agreement among Devas, the Devas Founders and CC/Devas and Telcom Devas, March 16, 2006 (Ex. C-31/JCB-59); Minutes of Devas Board Meeting, May 19, 2006 (Ex. C-34/JCB-60); Receipt for Payment of First Installment of Upfront Capacity Reservation Fee from Devas to Antrix, June 21, 2006 (Ex. C-35/JCB-61).

[88]    Notice of Arbitration, para. 38; Statement of Claim, para. 65; Statement of Reply, para. 19(c); Respondent's Rejoinder, para. 9.2; Share Subscription Agreement among Devas, the Devas Founders and CC/Devas and

procured an additional investment from Deutsche Telekom Asia ("**DT Asia**") that gave Devas approximately USD 75 million of additional capital as well as access to some of DT Asia's business resources.[89]

109.   In April 2008, representatives of Devas and Antrix attended the first of the nine design reviews of PS1, which continued until August 2010.[90] Devas also secured licenses to deliver internet services throughout India[91] and to conduct experimental trials,[92] a first round of which successfully took place in Bangalore in September 2009 in the presence of Dr. Radhakrishnan.[93]

### 2.   *Delays to the Delivery of Satellites*

110.   Although the Devas Agreement imposed a deadline for the launch of the satellites by June 2009 at the latest,[94] Antrix was unable to meet the contractual deadline, but promised that the launch would take place in late 2009 or early 2010.[95] Delivery of PS1 was subjected to further delays until September 1, 2010,[96] despite efforts by Devas to supervise the completion of satellites.[97]

111.   Irrespective of these delays, Claimants continued to meet financial obligations and technical and strategic milestones, including a further capital injection of USD 25 million in Devas by

---

Telcom Devas, March 16, 2006 (Ex. C-39/JCB-59); Receipt for Payment of First Installment of Upfront Capacity Reservation Fee for PS2 from Devas to Antrix, June 18, 2007 (Ex. C-40/JCB-70); Singh I, paras 39-40; Witness Statement of Arun Gupta, dated June 26, 2013, paras 20-21 ("**Gupta I**").

[89]   Statement of Claim, para. 67; Statement of Reply, para. 19(f); Respondent's Rejoinder, para. 9.5. Reply Witness Statement of Arun Gupta, dated March 14, 2014, paras 14-17 ("**Gupta II**").

[90]   Statement of Claim, para. 68; GSAT-6 Design Reviews, April 16, 2008, onwards (Ex. C-46/JCB-82); Witness Statement of Gary Parsons, dated June 26, 2013, para. 39 ("**Parsons I**").

[91]   Statement of Claim, para. 66; Statement of Reply, para. 19(g); Viswanathan I, para. 97.

[92]   Statement of Claim, para. 69; Statement of Reply, para. 19(i); Viswanathan I, paras 120-26. *See also* GSAT-6A Spacecraft Project Report by ISRO (draft), July 2009, paras 1, 3 (Ex. C-67/JCB-108); License to Import Wireless Transmitting and/or Receiving Apparatus into India, March 26, 2009 (Ex. C-61/JCB-100).

[93]   Statement of Claim, para. 69; Statement of Reply, para. 19(j); Respondent's Rejoinder, para. 9.8; Viswanathan I, paras 130-33; Singh I, paras 52-54; Reply Witness Statement of Dr. Rajendra Singh, dated March 14, 2014, para. 12 ("**Singh II**"); Gupta I, para. 27; Gupta II, paras 11-12; Witness Statement of Lawrence T. Babbio, Jr., dated June 26, 2013, para. 26 ("**Babbio I**"); Suresh Report, para. 9 (Ex. C-94/JCB-146).

[94]   Statement of Claim, para. 70, quoting Devas Agreement, Articles 2 and 3(b) (Ex. C-16/JCB-37).

[95]   Statement of Claim, para. 71; Compilation of Presentations by ISRO to Devas, April 11, 2009 onwards (Ex. C-64/JCB-103).

[96]   Statement of Claim, paras 80-83; Viswanathan I, para. 161; Gupta I, para. 32; Singh I, para. 59.

[97]   Statement of Claim, para. 75; Viswanathan I, para. 157; GSAT-6 Overview (Pratap), November 12, 2009, p. 32 (Ex. C-85/JCB-131).

CC/Devas, Telcom Devas, and DT Asia[98] and purchase of Devas shares by DEMPL in 2009 and 2010.[99] With respect to the technical and strategic aspects of the Devas project, Devas duly reported its progress to the Director of the Satellite Communication and Navigation Programs at ISRO[100] and continued to successfully conduct phase II experimental trials in the summer of 2010.[101]

112. Around May 2010, the Claimants allege that "the Indian press began to publish recklessly erroneous allegations about Devas and the Devas Agreement."[102] In an attempt to dispel the negative reports, Devas held numerous meetings with various Indian governmental ministries in the summer and autumn of 2010, in which no concerns about the Devas Project or about Devas' allocation in the S-band were raised.[103]

113. Moreover, Devas kept pressing for delivery of PS1,[104] as evident from communications with Dr. Radhakrishnan;[105] relevant parties at Antrix[106] and the Space Commission[107] spanning from July 2010 to October 2010.

114. According to the Claimants, the last meeting between Devas and officials of ISRO, DOS and Antrix occurred on January 10, 2011,[108] after which the Government of India ceased all communications.[109]

---

[98]   Statement of Claim, para. 73; Viswanathan I, paras 135-37; Singh I, para. 56; Gupta I, paras 29-31.

[99]   Statement of Claim, para. 74; Viswanathan I, paras 138-43; Amendment No. 5 to FIPB approval No. FC.II. 107(2006)/43(2006), September 29, 2009 (Ex. C-82/JCB-124).

[100]  Statement of Claim, para. 85; Presentation by Devas to Director, SCNP, ISRO, April 21, 2010, p. 16 (Ex. C-93/JCB-140).

[101]  Notice of Arbitration, para. 38; Statement of Claim, para. 84; Statement of Reply, para. 19(k); Viswanathan I, para. 162.

[102]  Viswanathan I, para. 165; *see* Statement of Claim, paras 86, 110.

[103]  Statement of Claim, para. 87; Viswanathan I, para. 167; Babbio I, para. 31.

[104]  Statement of Claim, paras 102-06.

[105]  Letter from Devas (Viswanathan) to DOS/ISRO/Antrix (Radhakrishnan), October 11, 2010 (Ex. C-108/JCB-180); *See also* Viswanathan I, para. 181.

[106]  Letter from Devas (Viswanathan) to Antrix (Murthi), July 20, 2010 (Ex. C-98/JCB-166).

[107]  Letter from Devas (Viswanathan) to Space Commission (Alex), September 2, 2010 (Ex. C-106/JCB-177). *See also* Viswanathan I, para. 176.

[108]  Statement of Claim, para. 107; Viswanathan I, para. 186.

[109]  Statement of Claim, paras 107-09.

115.    The Claimants maintain that, as of February 2011, Devas was in a position to deliver state-of-the-art hybrid satellite and terrestrial telecommunication services across India.[110]

116.    The Respondent dismisses the Claimants' recitation of these factual matters as irrelevant or unhelpful to the Claimants' case, stating that none of these facts relied upon give rise to a legal claim or an acquired right of the Claimants to implement the Devas project.[111]

E.    THE PARALLEL REVIEW PROCESS OF THE DEVAS AGREEMENT AND ITS SUBSEQUENT ANNULMENT

117.    Both Parties acknowledge that several Indian authorities undertook a unilateral review of the terms of the Devas Agreement in parallel with the initial performance of its provisions, ultimately culminating in its annulment. What follows is a summary of key events that were unbeknownst to the Claimants at the time, but occurred in parallel to the initial performance of the Devas Agreement, from 2005 to February 2011.

1.    *India's Internal Discussions on Security Needs for S-band Capacity*

118.    In 2005, India's military and paramilitary agencies started expressing a demand for S-band capacity for non-commercial purposes.[112] In the period 2005-2007, these demands took the form of reviews and projections of future S-bandwidth requirements.[113] However, in September 2007, a concern emerged that if S-band spectrum was "not safeguarded against the bid of commercial operators in India, this spectrum [would] not be available for any future utilization for the military applications…," which would "severely jeopardize the future Defence services plans of providing SATCOM connectivity."[114]

---

[110]    Statement of Reply, para. 20.

[111]    Respondent's Rejoinder, paras 8-9. *See*, generally, Transcript, Day 1, 139:8-146:22.

[112]    HQ Integrated Defence Staff, Note, October 14, 2005 (App. VA-2/JCB-42).

[113]    Minutes of Third Task Force Meeting with DoS Held on February 21, 2006 at HQ IDS New Delhi, March 6, 2006 (App. VA-3/JCB-56); HQ Integrated Defence Staff ops Branch/IW & IT Dte, Note, *Bandwidth Requirements- Satellite Commn*, August 9, 2006 (App. VA-4/JCB-64); Minutes of the Integrated Space Cell Meeting Held on February 19, 2007 at HQ IDS, March 26, 2007 (App. VA-5/JCB-66); HQ Integrated Defence Staff, Convening Order, *Constitution of an Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 GHz to 2.69 GHz (S-Band) by Defence Services*, August 30, 2007 (App. VA-6/JCB-73).

[114]    Report of the Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 to 2.69 GHz (S-band) by Defence Services, September 2007, paras 10-12 (App. VA-7/JCB-92).

119. The armed forces' needs for S-band spectrum continued to be reviewed in the following years.[115] The Claimants remained unaware of the existence of any needs for S-band spectrum of the Indian military until the Government of India announced that the CCS had decided to annul the Devas Agreement in February 2011. According to Claimants, they were not made aware of "competing demands for S-band capacity" until the date of Antrix's termination notice."[116]

### 2.    The Suresh Report

120. The Respondent explains that, in November 2009, Mr. A. Vijay Anand, the new Joint Secretary of the Department of Space and Chief Vigilance Officer, learned of possible irregularities relating to the Devas Agreement.[117] These irregularities, notably the allegedly unauthorized amendment to the minutes of a January 6, 2009 meeting of a review committee of the Technical Advisory Committee ("**TAG**") of the Indian Satellite Coordination Committee ("**ICC**"), had the effect of eliminating significant comments that had been made by the representatives of the Wireless Planning and Coordination Wing (the "**WPC**"), a body responsible for the issuance of an operating license and frequency allocation.[118]

121. The Respondent contends that the disclosure of potential irregularities and the information obtained at the preliminary stage of this internal investigation led Dr. Radhakrishnan to institute a comprehensive review of the Devas Agreement on December 8, 2009. The review was to be conducted by a committee established through the Department of Telecommunications ("**DOT**") and chaired by Dr. B.N. Suresh, Director of the Indian Institute of Space and Technology (the "**Suresh Committee**").[119]

---

[115] Minutes of the Special ISC Meeting Between Reps of ISRO & Reps of Three Services to Address Satellite Based Communication Related Issues, November 25, 2008 (App. VA-8/JCB-92); Office Order of ISRO, May 20, 2009 (App. VA-9/JCB-105); Minutes of Meeting held on December 15, 2009 at ISAC, Bangalore between ISC of HQ IDS, MOD and ISRO, January 25, 2010 (App. VA-10/JCB-134).

[116] Statement of Reply, para. 29; Respondent's Rejoinder, para. 114.

[117] Statement of Defence, para. 39.

[118] According to the Respondent the statement that was allegedly omitted from the transcript implied, in essence, that Devas would not be permitted to use the S-BSS frequencies for terrestrial transmission under existing policy, yet that is precisely what it wanted to do; *See* Statement of Defence, para. 39; Anand I, paras 8-11.

[119] Statement of Defence, para. 42; Anand I, para. 12; Memorandum from K. Radhakrishnan, Chairman, ISRO, to Dr. B. N. Suresh, Former Member, Space Commission & Director, ISST, Shri. S.K. Jha, Director, Department of Space, Shri S. Sayeenathan, Dy. Director, FMO, and Shri Parameshwaran, Director, BD, ACL, Constitution of a Committee to Look into Devas Multimedia Contract and Terms of Reference, December 8, 2009 (App. VA-17/JCB-133). *See also* Notice of Arbitration, para. 41; Statement of Claim, para. 78; Statement of Reply, para. 90.

122. The Suresh Committee acted on its mandate to review the "legal, commercial, procedural and technical aspects" of the Devas Agreement[120] and produced a report dated May 2010 (the "**Suresh Report**").[121] However, its existence was not made public until the February 8, 2011 press conference.[122]

123. While the Suresh Report made certain suggestions concerning future contractual negotiations by Antrix and ISRO, the Claimants highlight that it did not find any fault in Devas' conduct in reaching the Agreement.[123] In particular, the Suresh Report noted that there was "absolutely no doubt on the technical soundness of the digital multimedia services as proposed in this hybrid satellite and terrestrial system."[124] Nor did the Suresh Report suggest that the Devas Agreement should be annulled because there was an overwhelming military need for S-band spectrum.[125] Instead, say the Claimants, the report contradicts India's case that there was a military need for all available S-band:

> Considering the fact ISRO/DOS has developed these complex technologies to start a new service in the national interest it is noted that the agreement does not make any mention of preference being offered explicitly to ISRO **in case there is a demand on ISRO/DOS for use of this service under emergent conditions for strategic or any other essential applications**.[126]

124. In response, the Respondent submits, Dr. Suresh remarked that only 10% of the capacity to be leased under the Devas Agreement would be available for ISRO, which "would bring in certain limitations on the availability of spectrum for any essential demands in future." Moreover, he recommended that:

> The utilization of the S-band frequency spectrum allotted for satellite based services to ISRO/DOS for satellite communications is extremely important. Therefore this aspect has to be critically examined considering all usages including GSAT-6 and GSAT-6A by a

---

[120] Statement of Claim, para. 78; Statement of Defence, para. 42; Suresh Report, enclosure 1 (Ex. C-94/JCB-146); Memorandum from K. Radhakrishnan, Chairman, ISRO, to Dr. B. N. Suresh, Former Member, Space Commission & Director, ISST, Shri. S.K. Jha, Director, Department of Space, Shri S. Sayeenathan, Dy. Director, FMO, and Shri Parameshwaran, Director, BD, ACL, Constitution of a Committee to Look into Devas Multimedia Contract and Terms of Reference ISRO, Memorandum, Constitution of a Committee to Look into Devas Multimedia Contract and Terms of Reference, December 8, 2009 (App. VA-17/JCB-133).

[121] Suresh Report (Ex. C-94/JCB-146).

[122] Statement of Claim, paras 77-78; Transcript, ISRO press conference, CNN-IBN special telecast, February 8, 2011, p. 4 (Ex. C-125/JCB-206).

[123] Statement of Claim, para. 88.

[124] *Id*., para. 88, citing Suresh Report, p.1 (Ex. C-94/JCB-146).

[125] Statement of Reply, paras 33-34.

[126] *Id*., para. 33, citing Suresh Report, para. 14(vii) (Ex. C-94/JCB-146) (emphasis by the Claimants).

competent technical team on high priority. **The strategic and other essential needs of the country should also be considered.**[127]

125. In any event, the Respondent notes that the Devas Agreement was ultimately cancelled for national security reasons based on the nation's strategic requirements for the spectrum, which had crystallized by the end of 2009.[128]

### 3. The Space Commission's Determination to Annul the Devas Agreement

126. The Parties disagree as to why DOS decided to pursue the review of the Devas Agreement after the Suresh Report was issued.

127. In this regard, the Claimants emphasize that, towards the end of May 2010, the media in India had begun making assertions that DOS had given away valuable S-band spectrum to Devas "on the quiet" and calling on the Government of India to annul the Agreement.[129] However, according to the Claimants, despite the negative press reports, in the numerous meetings held with various Indian governmental ministries during the summer and autumn of 2010, in particular with the Advisor to the Prime Minister and the National Security Advisor where Devas delivered presentations on its history, accomplishments and progress on collaboration with the Government of India,[130] no concerns about the Devas Project or about Devas' allocation in the S-band were raised.[131]

128. In the Claimants' perspective, it was the prospect of a further government scandal that caused Dr. Radhakrishnan to seek to cancel the Devas Agreement and execute his "termination plan," and not any "crystalized" need of the military.[132] To support this contention, the Claimants rely on a number of communications from DOT to Mr. Balachandhran, Additional Secretary of ISRO, and to Dr. Radhakrishnan dated June 4, 2010 and June 14, 2010, respectively enclosing two

---

[127] Statement of Defence, para. 42, citing Suresh Report, para. 15.1 (Ex. R-24/JCB-146) (emphasis by the Respondent). The Claimants interpret this remark of the Suresh Report as merely suggesting that "a competent technical team should take a look at whether the spectrum is being optimized through these systems"; See Transcript, Day 1, 64:25-65:3.

[128] Statement of Defence, para. 43.

[129] Statement of Claim, para. 110; Viswanathan I, para. 165; Statement of Reply, para. 36.

[130] See Presentation by Devas to Advisor to the Prime Minister of India on Public Information, Infrastructure & Innovations (Pitroda), June 10, 2010 (Ex. C-95/JCB-147); Presentation by Devas to the National Security Advisor, June 22, 2010 (Ex. C-271/JCB-159).

[131] Statement of Claim, para. 87; Viswanathan I, para. 167; Babbio I, para. 31.

[132] Statement of Reply, paras 36-38; Transcript, Day 1, 68:13-14; See Statement of Reply, para. 37(a)-(c).

newspaper articles and asking both officials to expedite their comments on them.[133] Following such communications, Mr. Balachandhran requested Antrix immediately to provide six copies of the Devas Agreement, which was done the same day.[134] The allegation of the Claimants is that, "within two days of receiving the unwelcome news of another potential government scandal,"[135] on June 16, 2010, Dr. Radhakrishnan sought ways of annulling the Devas Agreement by sending two memoranda to the DOT and the Ministry of Law and Justice seeking advice as to how to annul the Devas Agreement.[136]

129.   In reply, the Respondent produces a letter from the Ministry of Defence addressed to the ISRO dated April 23, 2010 in which the latter provided its estimated bandwidth requirements in respect of Army, Airforce and Navy up to year 2022.[137] In accordance with the letter, the demand for S-band in particular would increase up to 52.5 MHz by 2017 and to 102.5 MHz by 2022. The Respondent further cites the letter from Dr. Suresh to Dr. Radhakrishnan dated June 7, 2010 to prove the delivery of the Suresh Report to the latter on the same date.[138]

130.   The Respondent explains that the two memoranda from Dr. Radhakrishnan on June 16, 2010 only followed the letter from the Ministry of Defence and the receipt of the Suresh Report, rather than the two newspaper articles as the Claimants assert.[139] The purpose of these memoranda, contrary to the Claimant's allegation, was to consult DOT and the Ministry of Law and Justice regarding whether, rather than how, the Devas Agreement needed to be annulled in order firstly, to preserve

---

[133]   *See* Letter from Dr. Ashok Chandra to ISRO (Balachandhran), June 4, 2010 (Ex. C-210/JCB-144); Letter from DOT (P.J. Thomas) to DOS/ISRO (Radhakrishnan), June 14, 2010 (Ex. C-211/JCB-149).

[134]   Statement of Reply, para. 37(c); *See* Letter from DOS (Balachandhran) to Antrix (Murthy), June 14, 2010 (Ex. C-212/JCB-150); Letter from Antrix (Parameswaran) to DOS (Balachandran), June 14, 2010 (Ex. C-213/JCB-151).

[135]   Statement of Reply, para. 4.

[136]   *See* Memorandum from Dr. Radhakrishnan, Secretary, Department of Space, to Secretary, Department of Telecommunications, June 16, 2010 (Ex. R-25/JCB-153); Memorandum from Dr. Radhakrishnan, Secretary, Department of Space, to Mr. Viswanathan, Advisor to the Minister for Law and Justice, Ministry of Law and Justice, June 16, 2010 (Ex. R-26/JCB-154).

[137]   *See* Letter from the Ministry of Defence to ISRO/Department of Space (Redacted), April 23, 2010 (Ex. R-150/JCB-141).

[138]   *See* Letter from Dr. Suresh, ISRO to Dr. Radhakrishnan, ISRO (enclosing *Report on GSAT-6*, Submitted by Dr. Suresh, Director, Indian Institute of Space and Technology, Thiruvananthapuram, Submitted to: Chairman, ISRO/Secretary, Department of Space), June 7, 2010 (Ex. R-125/JCB-145).

[139]   Respondent' Rejoinder, para. 10.

the S-band spectrum for the strategic requirements of the nation and, secondly, to ensure a level playing field for the other service providers using terrestrial spectrum.[140]

131.   In a note responding to Dr. Radhakrishnan's memorandum, Mr. Viswanathan, Advisor to the Minister for Law and Justice, indicated that, during a discussion with Dr. Radhakrishnan, it was mentioned that after the conclusion of the Devas Agreement new strategic needs emerged which required accommodation in the S-band.[141] He noted that, given that Devas Agreement would give Devas 90% of the capacity of the satellites in the S-band, the result was that there would be little space available in the satellite for catering for strategic demands.[142] The Advisor also gave his opinion as to how the Agreement could be annulled through the invocation of its termination provisions.[143]

132.   On the other hand, DOT advised Dr. Radhakrishnan that "the spectrum planned by DOS for strategic use is not to be shared with commercial applications as in the case of [Devas]."[144] Considering that the Devas Agreement would allow Devas to offer BWA services in India, DOT further noted that in India, in accordance with the 2008 National Frequency Allocation Plan, only a part of the S-band "has been enabled for BWA applications in view of the satellite based strategic requirement projected by DOS."[145] Regarding the potential terrestrial use of the S-band,

---

[140]   Statement of Defence, para. 44; *See* Anand I, paras 14-16; Memo from K. Radhakrishnan, Secretary, Department of Space, to Secretary, Department of Telecommunications, June 16, 2010 (Ex. R-25/JCB-153); Memo from K. Radhakrishnan, Secretary, Department of Space, to T.K. Viswanathan, Advisor to Law Minister, Ministry of Law and Justice, June 16, 2010 (Ex. R-26/JCB-154). The Ministry of Law and Justice noted that "[t]he Central Government (Department of Space)[,] in exercise of its sovereign power and function…may take a policy decision that due to the needs of strategic requirements, the Central Govt/ISRO would not be able to provide orbital slot in S band for operating PS1 to the Antrix for commercial activities," whereas DOT stated that "[t]he spectrum planned by DOS for strategic use is not to be shared with commercial applications as in the case of M/s Devas Multimedia."; *See* Note from T. K. Viswanathan, Advisor to the Minister for Law and Justice, Ministry of Law and Justice, to the Department of Space, June 18, 2010, para. 12 (App. VA-18/JCB-156); Memorandum from P. J. Thomas, Secretary, WPC Wing, to Secretary, Department of Space, July 6, 2010, para. 2(i) (App. VA-19/JCB-163), respectively.

[141]   *See* Note from Viswanathan, Advisor to the Minister for Law and Justice, Ministry of Law and Justice, to the Department of Space, June 18, 2010 (Ex. VA-18/JCB-156).

[142]   *Id.*

[143]   *Id.*

[144]   *See* Memorandum from P.J. Thomas, Secretary, WPC Wing, to Secretary, Department of Space, July 6, 2010 (Ex. R-138/VA-19/JCB-163).

[145]   *Id.*

DOT mentioned the recommendation of the Telecom Regulatory Authority of India (the "**TRAI**") that "spectrum other than the band 800, 900 and 1900 should be auctioned."[146]

133.  Following DOS' consultations with DOT and the Ministry of Law and Justice, DOS requested from Antrix the reports of its financials since inception and those of Devas and was provided therewith.[147] Through Dr. Radhakrishnan, DOS brought the Devas Agreement to the attention of the Space Commission, in the form of a note during a regularly scheduled meeting,[148] and sought guidance on a further course of action.[149] In this note, DOS referred to three reasons for examining the Devas Agreement—the demands of strategic requirements; the opaqueness of the Agreement, which did not observe the principle of non-exclusiveness when allotting S-band to private players; and the lack of consultation with DOT over a service that includes terrestrial connectivity.[150] The Claimants point to a statement in this note to the effect that, on June 16, 2010, when Dr. Radhakrishnan approached the Ministry of Law and Justice for the above reasons, he did so "to request Ministry of Law and Justice to give its opinion as to how to annul the contract."[151]

134.  After its deliberations, the Space Commission concluded that DOS, "in view of priority to be given to nation's strategic requirements including societal ones may take actions necessary and instruct [Antrix] to annul the [Devas Agreement],"[152] and that "Department may evolve a revised utilization plan for GSAT-6 and GSAT-6A satellites, taking into account the strategic and societal imperatives of the country."[153]

### 4.  *The Opinion of the Additional Solicitor-General*

135.  Subsequent to the determination of the Space Commission, DOS sought the opinion of Mr. Mohan Parasaran, the ASG of India, on whether the Devas Agreement could "be annulled by invoking any of the provisions of the contract in order to (i) preserve precious S-band spectrum

---

[146]   *Id.*

[147]   *See* Letter from Antrix (Krishnan) to DOS, June 17, 2010 (Ex. C-214/JCB-155); Letter from DOS (Rajamma) to Antrix, June 19, 2010 (Ex. C-215/JCB-157); Letter from Antrix (Murthi) to DOS (Balachandhran), June 21, 2010 (Ex. C-216/JCB-158).

[148]   Note to the Space Commission, July 2, 2010 (Ex. C-219/JCB-160); *See* Statement of Reply, para. 37(i).

[149]   Statement of Defence, para. 45.

[150]   Note to the Space Commission, July 2, 2010, para. 14.1 (Ex. C-219/JCB-160).

[151]   *See* Statement of Reply, para. 37(i).

[152]   *See* Minutes of 117th Meeting of the Space Commission Held at DOS Branch Secretariat, New Delhi, on July 2, 2010, signed July 21, 2010 (Ex. R-23/JCB-161).

[153]   *See* Statement of Defence, para. 47; Statement of Reply, para. 37(i).

for strategic requirements of [India] and (ii) to ensure a level playing field for other service providers using terrestrial spectrum."[154] The ASG issued his Opinion on July 12, 2010 (the "**Opinion of the ASG**").[155]

136.    The Opinion of the ASG revisited the background of the Devas Agreement and India's need of the S-band spectrum "for strategic and societal applications" of several Indian agencies, including the armed forces and Indian Railways.[156] Thereafter, the Opinion of the ASG reviewed the terms of the Devas Agreement to identify "justifiable or legal grounds existing for [its] termination,"[157] namely Article 11(b) of the Agreement, containing the *force majeure* clause.

137.    The Opinion of the ASG concluded that "any policy taken by the Government of India with regard to allocation and use of S bandwith [sic] [...] would fall within the doctrine of force majeure, as envisaged in the [Devas Agreement]," and it considered "more prudent" that such decision be taken by means of "a policy decision having the seal and approval of the Cabinet," and not by DOT, since "to disable one of the parties to perform its obligations under the contract, the act must be an act by the governmental authority acting in its sovereign capacity."[158]

138.    In the Claimants' view, the Opinion of the ASG suggests that the Respondent was to concoct a *force majeure* event based on a "policy" decision having the "seal and approval of the Cabinet,"[159] and on India's new alleged needs for national strategic requirements for the S-band spectrum that had been allocated to Devas, even though no such need was ever expressed to Devas in its many meetings with India's government agencies and officials.[160]

139.    The Respondent rejects the Claimants' characterization of the Opinion of the ASG, maintaining that there is no indication that the security reasons motivating the decision were contrived, concocted, engineered or fabricated or that the Devas Agreement should be terminated for commercial reasons. According to the Respondent, the Opinion of the ASG merely reflects the

---

[154]    Opinion of Mr. Mohan Parasaran, Additional Solicitor General of India, to Secretary, Department of Space, July 12, 2010 (the "**Opinion of the ASG**"), p. 3 (Ex. R-30/JCB-165).

[155]    Opinion of the ASG (Ex. R-30/JCB-165).

[156]    *Id.*, pp. 1-2.

[157]    *Id.*, p. 2.

[158]    *Id.*, p. 5.

[159]    Statement of Claim, paras 95-101; Statement of Reply, paras 37(k)-(m).

[160]    Notice of Arbitration, para. 5; Statement of Claim, para. 101.

view that the Government of India had the absolute right to terminate the Devas Agreement for legitimate security grounds.[161]

### 5.   DOS' Note for the CCS and the CCS' Decision to Annul the Devas Agreement

140.   The Respondent explains that, as mandated by the Space Commission in its decisions taken at its July 2, 2010 meeting, the Additional Secretary of the Department of Space, Mr. G. Balachandran, was asked to review the Suresh Report and provide his comments so that appropriate internal actions could be taken.[162]

141.   Mr. Balachandran issued his report on January 9, 2011 (the "Balachandran Report").[163] According to the Balachandran Report, the allocation of S-band spectrum to Devas under the Devas Agreement would not "leave enough spectrum for ISRO/DOS use if required"[164] and expressed views that "[s]trategic and other essential needs of [India] should be the first priority"[165] in any such allocation. In this regard, the Balachandran Report noted that Antrix had failed to consult with the ICC regarding the national needs of S-band spectrum prior to the conclusion of the Devas Agreement.[166] The Balachandran Report concluded that the termination of the Devas Agreement ordered by the Space Commission "need[s to] be expedited."[167]

142.   On February 8, 2011, at a press conference initiated by Dr. Radhakrishnan together with Dr. Kasturirangan, then senior member of Antrix, the Space Commission's decision to annul the Devas Agreement was announced.[168] Dr. Radhakrishnan revealed that DOS had instituted a review of the Devas Agreement in December 2009, and that the decision to cancel the Devas Agreement had been taken in July 2010 by the Space Commission in light of the "high priority

---

[161]   Statement of Defence, para. 48.

[162]   *Id.*, para. 50.

[163]   *Report on Dr. Suresh Committee Report on ANTRIX-DEVAS Agreement & Issues Arising From Therein*, Submitted by Mr. G. Balachandran, Additional Secretary, Department of Space, January 9, 2011 (the "**Balachandran Report**") (Ex. R-31/JCB-194).

[164]   Balachandran Report, p. 18 (Ex. R-31/JCB-194).

[165]   *Id.*, pp. 10, 13-14.

[166]   *Id.*, p. 20.

[167]   *Id.*, p. 25.

[168]   Statement of Claim, para. 111; Transcript, ISRO press conference, CNN-IBN special telecast, February 8, 2011, p. 4 (Ex. C-125/JCB-206).

for the country's strategic requirements and the societal applications which have to be met using the S-band spectrum that is in the possession of ISRO."[169]

143. DOS also commissioned Mr. Balachandhran with the preparation of a Note for the CCS, which was finalized on February 16, 2011 (the "**Note for the CCS**").[170]

144. The stated purpose of the Note for the CCS was to seek approval of the CCS for the annulment of the Devas Agreement "in view of priority to be given to nation's strategic requirements including societal ones."[171] This Note also identified a number of demands for S-band spectrum from several defence and security agencies in India[172] and summarized the deliberations of the July 2010 meeting of the Space Commission.[173]

145. On February 9, 2011, the Indian Prime Minister constituted a "High Powered Review Committee" chaired by Mr. B.K. Chaturvedi (the "**Chaturvedi Committee**").[174] The Chaturvedi Committee's mandate was the same as for the Suresh Committee (i.e. "review the technical, commercial, procedural and financial aspects of the [Devas Agreement]"),[175] but it was also required to "tak[e] into account the report of internal review conducted by [DOS]," as well as the "review mandated by the Space Commission at its [...] meeting, held on July 2, 2010."[176]

146. On February 17, 2011, the CCS took the decision to annul the Devas Agreement. On the same day, the Government of India issued a press release announcing that the CCS had decided to annul the Devas Agreement. The press release reads in full:

---

[169]   Transcript, ISRO press conference, CNN-IBN special telecast, February 8, 2011, p. 4 (Ex. C-125/JCB-206).

[170]   Department of Space, Note for the Cabinet Committee on Security, *Annulling the "Agreement for the Lease of Space Segment Capacity on ISRO/Antrix S-Band Spacecraft by Devas Multimedia Pvt Ltd."* , February 16, 2011 (the "**Note for the CCS**"), paras 44.1-44.7 (Ex. C-229/JCB-219).

[171]   Note for the CCS, para. 1 (Ex. C-229/JCB-219).

[172]   *Id.*, paras 20-22.

[173]   *Id.*, paras 34-35.

[174]   Statement of Claim, para. 114; Statement of Defence, para. 67; Report of the High Powered Review Committee on Various Aspects of the Agreement between Antrix & M/S. Devas Multimedia Pvt. Ltd., March 12, 2011 (the "**Chaturvedi Report**") (Ex. C-137/JCB-227).

[175]   Chaturvedi Report (Ex. C-137/JCB-227).

[176]   *Id.*

### CCS Decides to Annul Antrix-Devas Deal

Cabinet Committee on Security (CCS) has decided to annul the Antrix-Devas deal. Following is the statement made by the Law Minister, Shri M. Veerappa Moily on the decision taken by the CCS which met in New Delhi today:

"Taking note of the fact that Government policies with regard to allocation of spectrum have undergone a change in the last few years and there has been an increased demand for allocation of spectrum for national needs, including for the needs of defence, para-military forces, railways and other public utility services as well as for societal needs, and having regard to the needs of the country's strategic requirements, the Government will not be able to provide orbit slot in S band to Antrix for commercial activities, including for those which are the subject matter of existing contractual obligations for S band.

In the light of this policy of not providing orbit slot in S Band to Antrix for commercial activities, the 'Agreement for the lease of space segment capacity on ISRO/Antrix S-Band spacecraft by Devas Multimedia Pvt. Ltd.' entered into between Antrix Corporation and Devas Multimedia Pvt. Ltd. on 28th January, 2005 shall be annulled forthwith."[177]

Citing the decision of the CCS, Antrix, on February 25, 2011, gave notice to Devas that the Devas Agreement was terminated.[178]

147. On March 12, 2011, the Chaturvedi Committee issued its report (the "Chaturvedi Report").[179]

148. According to the Claimants, the Chaturvedi Report implies that the foreign ownership of Devas was a further motivating factor in the Government of India's decision to annul the Devas Agreement.[180]

149. The Respondent submits that two further commissions of enquiry reviewed the Devas Agreement.

150. First, following the issuance of the Chaturvedi Report, Mr. K.M. Chandrasekhar of the Cabinet Secretariat was asked to examine its findings and to submit recommendations to DOS, which took the form of a report issued on April 12, 2011 (the "**Chandrasekhar Report**").[181]

---

[177] Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220). *See also Prime Minister Manmohan Singh's Interaction with Editors of the Electronic Media*, The Hindu, February 16, 2011, pp. 6-7 (Ex. R-36/JCB-218).

[178] Letter from Antrix (Madhusudhan) to Devas, February 25, 2011 (Ex. C-135/JCB-223).

[179] Chaturvedi Report, (App. KS-10/JCB-227).

[180] Statement of Claim, paras 133-34, citing Chaturvedi Report, para. 3.5.9 (App. KS-10/JCB-227), which reads: "The shareholding in Devas and changes in it subsequently have also been a serious cause of concern…. The original proposal, which had envisaged development and innovation by some former ISRO scientists, seem to have been diluted with the entry of major foreign players. While technically this was permitted, the entry of foreign telecom companies with huge premiums indicated that they had used this as an opportunity for entering the telecom market, which had in the meanwhile expanded rapidly in India during 2005-10. This was not an intended purpose of the original agreement."

[181] Report by Mr. K.M. Chandrasekhar, Cabinet Secretariat Doc No. 601/1/4/2011-TS, Rashtrapati Bhavan, *Report of the High Powered Review Committee (HPRC) on various aspects of the agreement between*

151.  The Respondent notes that the Chandrasekhar Report questioned Devas' need for "such a huge bandwidth;" and mentioned that the Chaturvedi Report characterized the allocation of S-band to Devas as "an unjustified risk from the security point of view;" and signaled that full discussion of Devas' proposal at the ICC[182] would have enabled a well-considered assessment of how the national interests of India could have been best served.[183]

152.  Second, in accordance with a recommendation of the Chaturvedi Committee, a High Level Team Committee was constituted by the Government of India to review the technical, commercial, procedural and financial aspects of the Devas Agreement, which noted, in its September 2, 20011 report, several irregularities with Devas' financing and recommended consideration of sanctions against some officials.[184]

## F.    THE PERIOD FOLLOWING THE ANNULMENT OF THE DEVAS AGREEMENT

### 1.    *Initial Reactions of Devas and Antrix to the Annulment of the Devas Agreement*

153.  According to the Claimants, following the announcement regarding the annulment of the Devas Agreement,[185] Devas attempted to communicate several times with Dr. Radhakrishnan without success.[186]

154.  On February 25, 2011, Antrix issued a letter to Devas giving notice of termination of the Devas Agreement.[187]

---

*ANTRIX and M/s Devas Multimedia Pvt. Ltd.*, April 12, 2011 (the "**Chandrasekhar Report**") (Ex. R-44/JCB-229).

[182]   The Indian Satellite Coordination Committee is referred to by the Parties as "ICC", not to be mistaken with the International Chamber of Commerce.

[183]   Statement of Defence, para. 71, referring to Chandrasekhar Report, para. 11(iii) (Ex. R-44/JCB-229).

[184]   Statement of Defence, para. 70; Government of India, *Conclusions and Recommendations from The Report of the High Level Team on the Agreement between M/s Antrix Corporation Limited and M/s Devas Multimedia Private Limited*, September 2, 2011, para. 6.10 (Ex. R-43/JCB-236).

[185]   *See supra*, para. 142.

[186]   Statement of Claim, paras 117-19; Viswanathan I, paras 192-93; Letter from Devas (Viswanathan) to Antrix (Radhakrishnan), February 11, 2011 (Ex. C-132/JCB-214); Letter from Dua Associates to Chairman, Antrix Corporation Limited (Radhakrishnan), February 11, 2011 (Ex. C-130/JCB-212); Letter from Devas (Viswanathan) to DOS/ISRO/Antrix (Radhakrishnan) February 14, 2011 (Ex. C-133/JCB-216).

[187]   Letter from Antrix (Madhusudhan) to Devas, February 25, 2011 (Ex. C-135/JCB-223).

155. In response, Devas objected to the validity of the termination notice[188] and attempted, unsuccessfully, to hold "senior management" consultations in conformity with the pre-dispute procedures in Article 20 of the Devas Agreement.[189]

156. On April 15, 2011, Antrix tendered Devas a check for the INR equivalent of USD 13 million as reimbursement of the upfront capacity reservation fees that Devas had already paid to Antrix pursuant to Article 7(c) of the Devas Agreement.[190] In a matter of days, Devas returned Antrix's check, arguing that Antrix had failed to state a proper basis for terminating the Devas Agreement and that the events allegedly giving rise to Antrix's claim of *force majeure* were self-induced.[191]

157. Finally, the Claimants allege that, since 2011, Devas has been subject to a range of harassing measures from various parts of the Indian government, including its Registry of Companies, India's enforcement directorate, tax authorities and other government entities.[192] The Claimants characterize these measures as retaliation in response to the exercise of rights by Devas and the Claimants, respectively.[193]

## 2. *The Satellites*

158. According to the Respondent, DOS has made alterations to the two satellites to conform them to defence needs,[194] and the GSAT-6 satellite was scheduled to be launched at the end of 2014.[195] A successful launch was achieved on August 27, 2015.[196]

159. On August 31, 2015, the Respondent submitted a set of documents in connection with the launch of the GSAT-6 satellite. The documents consist of five newspaper articles and a note from Mr. V.K. Pant, Assistant Wireless Adviser, in DOT. The articles refer to the launch of a military satellite but simultaneously indicate that the satellite is utilized to serve the "strategic sector" and

---

[188]  *Id.*

[189]  Statement of Claim, para. 130; Statement of Defence, para. 60.

[190]  Statement of Claim, para. 131; Letter from Antrix (Madhushudhana) to Devas, April 15, 2011 (Ex. C-138/JCB-230). The Respondent submits that this is an undisputed material fact in this case; *see* Transcript, Day 1, 138:9-139:7; Day 5, 1287:6-9.

[191]  Statement of Claim, para. 132; *see* Statement of Defence, para. 60.

[192]  Statement of Claim, para. 148; Viswanathan I, paras 216-33.

[193]  Statement of Claim, para. 148.

[194]  Statement of Defence, para. 74; Anand I, para. 24.

[195]  Respondent's Rejoinder, para. 23; Supplemental Witness Statement of Mr. K. Sethuraman, dated June 30, 2014, paras 11-12 ("**Sethuraman II**"); Transcript, Day 4, 847:14-848-11.

[196]  Press reports submitted by the Respondent on August 31, 2015.

"various government purposes". The note contains an extract of the document issued by the Cabinet to the Ministry of Defence on March 12, 2015 which reads: "The band segments (a) 2500-2635 MHz (35MHz) (b) 2555-2535 MHz (80 MHz) and (c) 2655-2690 MHz (35 MHz) will be used for Defence, security and societal applications."

160. The Respondent further submitted an article published by the Institute of Defence Studies and Analyses on October 5, 2015 which, according to the Respondent, "reviewed the launch and its significance for the military."

### 3. *Related Arbitration Proceedings*

161. As noted above, on June 29, 2011 Devas commenced an arbitration under the ICC rules pursuant to Article 20 of the Devas Agreement, captioned *Devas Multimedia (Private) Limited v. Antrix Corp. Ltd.* (No. 18051/CYK), in which Devas sought both specific performance of the Devas Agreement and/or damages.[197] On 14 September 2015, a final award was issued in this Arbitration, which was communicated, by agreement of the Parties, to the present Tribunal on October 2, 2015. Under that award, Antrix was ordered to pay USD 562.5 million to Devas Multimedia Private Limited for damages caused by Antrix's wrongful repudiation of the Devas Agreement, plus interest.

162. The Respondent also notes that DT Asia (Devas' other major shareholder together with the Claimants) has instituted a third arbitration against India arising out of the same facts but under the bilateral investment treaty between Germany and India.[198]

163. Pursuant to mutual agreement, the Parties made simultaneous submissions on October 9 and 19, 2015 as to what significance, if any, the ICC final award might have on the deliberations of this Tribunal. While drawing different conclusions from various parts of the ICC award, both Parties recognized that the two arbitrations involve distinct claims, parties, and remedies.

164. Reference was made by the Claimants to the final award of the ICSID tribunal in *Mobil v. Venezuela.*[199] In that instance, one of the claimants, Mobil Cerro Negro, had brought separate ICC

---

[197] Notice of Arbitration, paras 7, 51-55; Statement of Claim, para. 146; Statement of Defence, para. 61.

[198] Statement of Defence, para. 4, fn. 3.

[199] *Venezuela Holdings B.V. et al* (case formerly known as *Mobil Corporation, Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd., Mobil Venezolana de Petroles Holdings, Inc., Mobil Cerro Negro, Ltd., and Mobil Venezolana de Petroles Inc.) v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/07/27, Award, 2014.

proceedings against two State-owned companies, under one of their agreements providing for indemnity in the event of certain alleged discriminatory government measures.

165. When considering the effects of the prior ICC arbitration, the ICSID tribunal observed:

> It is clear that the ICC Award and the present case concern the liability of different parties under different normative regimes. The State was not a party to the ICC arbitration. Neither are PDVSA and PDVSA-CN parties to this case. These proceedings concern the responsibility of the State for breach of the Treaty and international law, a matter that was not (and could not) have been resolved by the ICC tribunal, which jurisdiction was limited to the contractual dispute.[200]

166. Similarly, in the present case, there are major differences with the ICC case. First of all, the parties are different; neither Devas Multimedia (Private) Limited (the claimant in the ICC case) nor Antrix (the respondent) are parties to this case. Secondly, the proceedings in this case relate to the responsibility of the State of India for alleged breaches of the Treaty and international law, while the ICC tribunal was strictly concerned with Antrix's contractual liability under the Agreement. It dealt more specifically with the actions of Dr. Radhakrishnan in his capacity as Chairman of Antrix. It also referred to some of his activities in his other functions. In that respect, it considered some of the same facts as those submitted to this Tribunal; in fact, the Tribunal was informed by the Claimants in their response of October 19, 2015 that, during the ICC proceedings, the Respondent had provided the tribunal with the whole transcript of the hearing in this case. However, what this Tribunal is called upon to address is not whether Antrix breached its contractual obligations but whether the State of India, acting in its sovereign capacity and through the appropriate authority, properly invoked the protection of its essential security interests when it decided to annul the Devas Agreement or whether, in doing so, it breached its obligations under the Treaty and international law. This is the issue which this Tribunal will be addressing in the rest of this award. While the Tribunal should "attempt to avoid inconsistent outcomes whenever possible,"[201] one can readily conceive situations where Antrix's liability would be incurred under the Agreement and some where the Respondent's would be exempt of liability under the Treaty and *vice-versa*.

## CHAPTER IV - REQUESTS FOR RELIEF

167. The Claimants request that the Tribunal issue an award:

(a)    Declaring that the Tribunal has jurisdiction over all of Claimants' claims;

---

[200]    *Id.*, para. 216

[201]    *Id.*, para. 217

(b)  Declaring that Respondent has unlawfully expropriated Claimants' investments, in breach of Articles 6 and 7 of the Mauritius-India BIT;

(c)  Declaring that Respondent has failed to accord fair and equitable treatment to the Claimants' investments, in violation of Article 4(1) of the Mauritius-India BIT;

(d)  Declaring that Respondent has engaged in unreasonable and/or discriminatory measures with respect to Claimants' investments, in violation of Article 4(1) of the Mauritius-India BIT;

(e)  Declaring that Respondent has failed to provide full legal protection and security with respect to Claimants' investments, in violation of the "most favored nation" provisions of Articles 4(2) and 4(3) of the Mauritius-India BIT, which incorporate Article 3(2) of the Serbia-India BIT;

(f)  Declaring that Respondent is liable to pay the costs of these proceedings to date; and

(g)  Ordering that these proceedings continue for the purposes of determining the reparations due to Claimants, including a determination of the damages owed to Claimants, and the allocation of costs and other matters related to quantum.[202]

168.  The Respondent requests that "all claims raised by [the] Claimants should be dismissed and all costs arising of this proceeding should be assessed against [the] Claimants."[203]

169.  In addition, the Respondent raises a series of objections to the Tribunal's consideration of the merits of the Parties' dispute. First, the Claimants' alleged investments fail to meet the definition of an investment under the Treaty and constitute "pre-investment" activities that are not protected by the Treaty. Secondly, the Respondent submits that the Tribunal lacks jurisdiction over the claims in this case by operation of the "essential security interests" ("**ESI**") provision of the Treaty. The Claimants reject all of these objections and submit that the Tribunal has jurisdiction over its claims.

# CHAPTER V - THE MEANING OF "INVESTMENT" FOR THE PURPOSES OF THE TREATY

## A.  THE PARTIES' ARGUMENTS

170.  Article 1(1)(a) of the Treaty defines an "investment" as "every kind of asset established or acquired under the relevant laws and regulations of the Contracting Party in whose territory the investment is made." Moreover, Article 2 of the Treaty restricts the scope of the Treaty to "investments made by investors of either Contracting Party in the territory of the other Contracting Party, accepted as such in accordance with its laws and regulations."

---

[202]  Statement of Claim, para. 229; Statement of Reply, para. 188.

[203]  Statement of Defence, para. 173; Respondent's Rejoinder, para. 145.

### 1.   *The Respondent's Position*

171.   The Respondent's primary contention is that this case "only involves pre-investment activities that are outside the scope of protection afforded by the [Treaty]."[204] In support, the Respondent relies on the "admission clause model" adopted in its BITs, which only extends protection to "assets invested and admitted in accordance with the laws and regulations of the host State," and not to "pre-investment activities,"[205] and advances authorities to that effect.[206]

172.   According to the Respondent, the Devas Agreement is clear that certain essential governmental licences and approvals were prerequisites to the project, including the orbital slot frequency allocation for the satellites and the WPC License.[207] Accordingly, Devas' failure to apply for the WPC License rendered all activities conducted by Devas as being properly characterized as "pre-investments."[208]

173.   The Respondent refers to the WPC, the body within DOT from which, it says, Devas would have been required to seek its operating license and frequency allocation (the "**WPC License**").[209] According to the Respondent, the policy decision of the CCS not only meant that the Devas Agreement would be terminated, but it also left no doubt that no license could be issued to Devas to operate the Devas System and therefore Devas would be unable to obtain the requisite licenses under the Devas Agreement.[210]

174.   The Respondent focuses on a terrestrial spectrum license to be issued by the WPC.[211] In this regard, the Respondent refers to Devas' Statement of Claim in the ICC arbitration, wherein Devas acknowledges that it "fully expected that it would be granted a [WPC License] once the GSAT-6 satellite had been launched," that Devas was preparing a license application to the WPC and that

---

[204]   Statement of Defence, para. 90; *See* generally Transcript, Day 1, 167:15-174:7. Day 5, 1288:5-1297:15.

[205]   Statement of Defence, paras 91-93.

[206]   *Id*., paras 94-97; *See, for instance, Mihaly International Corporation v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/00/2, Award, 2002, paras 60-61; *William Nagel v. Czech Republic (Ministry of Transportation and Telecommunications)*, SCC Case No. 49/2002, Final Award, 2003, paras 17, 45, 326, 328-29; *Petrobart Ltd. V Kyrgyz Republic*, SCC Case No. 126/2003, Award, 2005, p. 69; *Zhinvali Development Limited v. Republic of Georgia*, ICSID Case No. ARB/00/1, Award, 2003, para. 388 (Ex. R-60).

[207]   Statement of Defence, para. 98; *See* Devas Agreement, Articles 3(c), 12(b)(vii) (Ex. C-16/JCB-37).

[208]   Statement of Defence, para. 98.

[209]   *Id*., para. 39; Anand I, paras 8-11 (*see supra*, para. 120).

[210]   Statement of Defence, para. 62.

[211]   The Respondent submits that this is an undisputed material fact in this case; *See* Transcript, Day 1, 121:7-123:14; Day 5, 1276:15-1277:18.

Devas "was [...] in a position to submit this application just as soon as the satellite launch date and vehicle were identified by ISRO."[212]

175.   In this regard, the Respondent argues that any preparatory steps cannot be equated with the grant of a license, which Devas needed, did not have, and had no legal right to obtain, as it was for the Government of India to determine whether a license could be issued.[213]

176.   The Respondent submits that the Statement of Claim plainly demonstrates Devas' awareness that it had no right to obtain the WPC License.[214] The Respondent claims that Devas was deliberately deferring the submission of its WPC License application until after the satellites were launched in order to place itself in the position of being the only alternative, "as a practical matter," capable of using the S-band spectrum allocated to it.[215] Devas would have then been in a position to force the Government of India (i.e. the TRAI) to change its policy[216] regarding BSS, which would have been necessary to obtain the specific WPC License for BSS that Devas needed in order to provide Devas Services.[217]

177.   According to the Respondent, other items in the record also demonstrated Devas' knowledge that it had no acquired right to obtain the WPC License.[218] First, the negotiating history of the Devas Agreement shows that Antrix went from being required to obtain "clearances, licenses, and other approvals" for "frequency allocation" (including terrestrial augmentation) in the Term Sheet,[219] to providing "appropriate technical assistance…on a best efforts basis" in the Devas

---

[212]   Statement of Defence, para. 63, referring to *Devas Multimedia Private Limited v. Antrix Corporation Limited*, ICC Case No. 18051/CYK; Claimant's Statement of Claim, February 20, 2012, paras 93-95 (Ex. R-2).

[213]   Statement of Defence, para. 64; Sethuraman II, para. 22.

[214]   Statement of Defence, paras 65-66, referring to Statement of Claim, para. 102, which reads: "Immediately upon launch of PS1, Devas would have been in a position to commence its A/V broadcasting. In addition, Devas (as the only entity with the right to lease transponder capacity on that satellite, or to use the 70 MHz of S-Band spectrum allocated to it in the Devas Agreement) would, immediately upon launch of PS1, have filed for a WPC license. As the sole holder of the Leased Capacity, as a practical matter, Devas was the only operator capable of using the S-band allocated to it, and because Antrix had promised to assist in obtaining any needed governmental license necessary for the Devas System, Devas had every reason to expect to obtain a WPC license promptly, and, indeed, expected to receive such license for a nominal fee." (emphasis by the Respondent).

[215]   Statement of Defence, para. 66.

[216]   In particular, the NFAP of India (*see infra*, fn. 391).

[217]   Statement of Defence, para. 66, fn. 161; Sethuraman I, paras 4, 6-10, Transcript, Day 5, 1258:18-1265:13.

[218]   Respondent's Rejoinder, paras 26-27.

[219]   E-mail from Forge Advisors to Antrix and ISRO, September 20, 2004, with attached "binding term sheet," para. 1.3.2 (Ex. R-12); *See supra*, para. 96.

Agreement.[220] Also, Devas itself acknowledged that ISRO's support would be critical in the license application,[221] which suggests that obtaining such authorization was not a matter of certainty.[222]

178. Moreover, regardless of the policy decision of the CCS and of the fact that Devas had no acquired right to obtain the WPC License, the Respondent notes that Devas would still have had to participate in a public auction of all the S-band spectrum to be used for terrestrial services, as the TRAI recommended in July 2008 and the WPC confirmed in 2010.[223] According to the Respondent, this poses a significant hurdle as the auction price for the terrestrial use of the spectrum would have been USD 1.24 billion, which would have substantially diminished the net present value of Devas.[224]

179. Also, the Respondent alleges that, under a long-standing TRAI policy, new terrestrial services such as those proposed by Devas would have been subjected to review and analysis by the TRAI. Moreover, other stakeholders would have been notified and given an opportunity to comment,[225] including the terrestrial operators of telecommunication services who, as conceded by the Claimants, had been clamoring for more spectrum—including the S-band—for the expansion of their services.[226]

180. In this regard, the Respondent rejects the Claimants' argument that, had the satellites been launched, and assuming that the Devas Agreement had not been annulled, terrestrial operators

---

[220]   Devas Agreement, Articles 3(c), 12(b)(vii) (Ex. C-16/JCB-37). The Respondent also notes that Devas was told during the negotiations leading to the Devas Agreement that Antrix "cannot take the responsibility for obtaining clearances and approvals from statutory bodies and departments of the Government of India." E-mail from Mr. M.N. Sathyanarayana, ISRO, to Dr. M.G. Chandrasekar, Devas Multimedia Pvt. Ltd., September 20, 2004 (Ex. R-15/JCB-24); *See also* Respondent's Rejoinder, para. 26.

[221]   Statement of Defence, fn. 161; Respondent's Rejoinder, para. 27; Presentation by Devas to Chairman of ISRO (Radhakrishnan) February 4, 2010, slide 13 (Ex. C-89/JCB-137); Presentation by Devas to Director, SCNP, ISRO, April 21, 2010, slide 31 (Ex. C-93/JCB-140); Presentation by Devas to Minister of State & Member, Space Commission (Chavan), October 26, 2010, slide 11 (Ex. C-110/JCB-182); Presentation by Devas to Space Commission (Narasimha) November 30, 2010, slide 16 (Ex. C-115/JCB-187).

[222]   Respondent's Rejoinder, para. 27.

[223]   Statement of Defence, fn. 161; Respondent's Rejoinder, para. 28; Sethuraman I, paras 11-15; Transcript, Day 1, 122:4-12.

[224]   Statement of Defence, fn. 161; Respondent's Rejoinder, para. 28; *Devas Multimedia Private Limited v. Antrix Corporation Limited,* ICC Case No. 18051/CYK, Expert Report on Valuation, Vladimir Brailovsky & Daniel Flores, November 15, 2013, p. 17 (Ex. R-4/JCB-271).

[225]   Respondent's Rejoinder, para. 28.

[226]   *Id.*, para. 28.

would not have been able to use the S-band frequencies that Devas would have been using for its space-to-earth transmissions because of interference.[227] In Mr. Sethuraman's words:

> If Devas was using a 10 MHz segment of S-band, say 2560-2570 MHz, in a particular region for space-to-earth transmissions, a terrestrial operator could certainly use a different 10 MHz segment (as in the CGC of the Devas system), say 2600-2610 MHz, in the same region. So long as there is enough of a separation between the frequencies, interference is not an issue for diverse services. It is only if Devas had been using these two 10 MHz segments in the region, the first for space-to-earth transmissions and the second in its CGC, that terrestrial operators could be "'boxed-out' of that spectrum," as Mr. Parsons claims.[228]

181. The Respondent denies that Devas could have rolled out any satellite-based service without the WPC License.[229] According to the Respondent, Mr. Sethuraman detailed during the Hearing on Jurisdiction and Liability, how, even on the basis of the ISP and IPTV licenses, Devas would still have required additional licenses or additional telecommunications media to provide any kind of service,[230] and how, in any event, obtaining the WPC License would have been the last step of a well-structured process that Devas still had to follow.[231] For instance, the ISP License makes clear that it could not prevail over national security concerns, and that its effectiveness would be subject to any government regulation on satellite communication policy.[232]

182. In addition to the failure of the Claimant to obtain the WPC License, the Respondent also criticizes the Claimants' failure to "identify precisely the investment in question," which it argues is not the Claimants' shares in Devas,[233] but the allegedly binding right to proceed with the Devas project pursuant to the Devas Agreement.[234] To this end, the Respondent considers that the critical and dispositive issue is that the relevant approvals were not obtained; without them the project could not proceed; and that Devas had no contractual right to obtain those approvals.[235]

---

[227]   Sethuraman I, para. 10.

[228]   *Id.*, para. 10, referring to Parsons I, para. 18.

[229]   Transcript, Day 5, 1212:16-24; 1213: 21-25.

[230]   Transcript, Day 4, 867:10-869:13.

[231]   *Id.*, 869:18-870:14; *See also* Transcript, Day 5, 1260:19-1266:6; Letter from Respondent to Claimants, February 3, 2014 (Ex. R-130/JCB-278).

[232]   Transcript, Day 5, 1263:20-1266:6; ISP License, May 2, 2008, p. 39, Articles 10.1, 10.4-5 (Ex. C-48/JCB-84).

[233]   Respondent's Rejoinder, paras 75-77.

[234]   *Id.*, para. 78.

[235]   *Id.*, para. 79, citing Venugopal I, para. 30.

2.    *The Claimants' Position*

183.   According to the Claimants, the Respondent misconstrues both Articles 1 and 2 of the Treaty and fails to take into account the actual facts concerning the Claimants' investments.[236] The Claimants argue that "the facts show that the investments indeed were admitted in accordance with Indian law."[237]

184.   The Claimants recall that the relevant "investments" comprise their respective shareholding interests in Devas; and partial indirect ownership of Devas' business assets.[238] In arguing that their shareholding interests qualified as "investments" falling within the scope of Articles 1 and 2, the Claimants rely on the general and specific definitions of "investment" pursuant to Article 1(a)(1) and the prior approval obtained from the Foreign Investment Promotion Board as evidencing acceptance "in accordance with [India's] laws and regulations."[239] On the Claimants' submission, the statement in Article 2 of the Treaty that an investment must be "accepted as such" under Indian law means only that the investment must comply with laws governing admission of foreign investments.[240]

185.   Turning to the indirect ownership of Devas' assets, the Claimants assert that the contractual rights under the Devas Agreement and the proprietary Devas System satisfy the general and specific definitions of "investment" contained in Article 1(a)(1).[241] The Claimants do not dispute the need for a license from the WPC in order for Devas to operate the terrestrial portion of the hybrid Devas System.[242] However, the Claimants reject India's attempt to characterize its activities as "pre-investment" by reference to the approvals obtained from DOS officials and the Shankara

---

[236]   Statement of Reply, para. 108; *See* generally Transcript, Day 5, 1142:19-1147-24.

[237]   Statement of Reply, para. 108.

[238]   Statement of Claim, para.156; Statement of Reply, para. 109.

[239]   *Id.*, para. 110.

[240]   *Id.*, para. 110, fn. 212; *See,* for instance, *Churchill Mining PLC v. Republic of Indonesia*, ICSID Case No. ARB/12/14, Decision on Jurisdiction, 2014, paras 287, 289-90, 295, 313; *Desert Line Projects LLC v. Yemen*, ICSID Case No. ARB/05/17, Award, 2008, paras 92, 102, 104 (Ex. CL-7).

[241]   Statement of Reply, para. 111; *See,* for instance, *Fedax N.V. v. The Republic of Venezuela,* ICSID Case No. ARB/96/3, Decision on Jurisdiction, 1997, paras 18, 43 (Ex. CL-13); *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award, 2005, paras 144-45.

[242]   Transcript, Day 5, 1138:2-10; 1163:4-8.

Committee and confirmation by Antrix dated February 2, 2006, that ISRO had the "necessary approval for building, launching and leasing the capacity of S-band satellite."[243]

186.   In the Claimants' view, the record shows that India—including through Antrix, DOS, ISRO and the WPC—had consistently and proactively supported the Devas Agreement and System for approximately six years. Had India continued to deliver on Antrix's commitment, the Claimants consider it inconceivable that the WPC License would not have been granted.[244] In this regard, the Claimants point out that Devas started preparing its application for the Licence; however it did not receive any answer.[245] Relevantly, the Claimants point to the obligation of DOS/ISRO/Antrix to provide technical assistance under the Devas Agreement, which included jointly approaching the WPC with Devas when applying for this license.[246]

187.   The Claimants also reject the Respondent's argument that a BSS license in the S-band was not authorized under Indian policy and therefore could not have been granted to Devas.[247] Neither the 2002 nor the 2008 NFAP prohibited BSS licenses outright, as claimed by Mr. Sethuraman.[248] According to the Claimants, the text of the NFAP is clear: there is no *per se* rule precluding the WPC from granting terrestrial licenses in the S-band.[249] Even more so, the license to re-use satellite spectrum terrestrially for which Devas would have applied was perfectly consistent with the 2002, 2008 and 2011 NFAPs.[250] If such a re-use license could never have been granted without a change in policy, the Claimants contend that there would have been prior mention and experimental licenses would not have been granted to Devas.[251] In this regard, it bears noting the complete absence of any reference in the Note to the CCS that the terrestrial component was not authorized under existing Indian policy.[252]

---

[243]   Statement of Reply, para. 112, referring to Letter from Antrix (Murthi) to Devas (Viswanathan), February 2, 2006 (Ex. C-24/JCB-51).

[244]   Statement of Reply, para. 62; Reply Witness Statement of D. Venugopal ("**Venugopal I**"), paras 17-22; 30-34.

[245]   Letter from Devas (Viswanathan to Antrix (Murthi), July 20, 2010 (Ex. C-98).

[246]   Venugopal I, para. 34; Transcript, Day 5, 1111:3-19; 1136:7-21.

[247]   Statement of Reply, para. 63.

[248]   *Id.*, para. 63, referring to Sethuraman I para. 7. *See* Reply Expert Report of John Lewis, dated March 14, 2014, paras 17-22 ("**Lewis II**"); Venugopal I, para. 55; Note for the EGoM, p. "10 of 59" (Ex. C-232/JCB-247).

[249]   Statement of Reply, para. 63.

[250]   *Id.*, para. 64.

[251]   *Id.*, para. 63; *see* Venugopal I, paras 23-24.

[252]   Statement of Reply, para. 64, referring to Note for the CCS, para. 38 (Ex. C-229/JCB-219).

188. The Claimants also rely on the practice of other countries, including the United States, Europe and Korea, which impose low or no fees for re-use of satellite spectrum.[253] Devas expected that the advantages of efficiency and public benefit acknowledged by regulators in other countries would also persuade the WPC to issue a frequency authorization and operating license to Devas, and would be fully supported by ISRO/Antrix due to their "best efforts" obligation. Moreover, the Claimants expected that such license would be issued to Devas for a reasonable fee in line with international norms that had by then been established in other countries.[254]

189. In any event, the Claimants do not accept that the auction rule applicable to the allocation of terrestrial spectrum would be indiscriminately applied to satellite spectrum that is used terrestrially since the two types of spectrum are not comparable.[255] In particular, the potential for interference as a result of uncoordinated spectrum use would not have been completely disregarded. Devas' terrestrial re-use of the allocated S-band satellite spectrum would have "boxed-out" any other potential user of terrestrial S-band spectrum.[256] In such circumstances, the Claimants submit, the reality is that an auction of S-band terrestrial spectrum would have been moot as Devas would have been the sole bidder and operator capable of using the relevant portion of S-band satellite.[257]

190. Finally, the Claimants argue that, even if Devas had not obtained the WPC License, it still had an absolute right to receive the Leased Capacity from the ISRO satellites under the Devas Agreement.[258] Upon launching the satellites, Devas would have been in a position to roll out satellite-only services, therefore providing the very societal applications proposed by India.[259]

191. All this shows, the Claimants submit, that Devas had secured a binding contract, obtained capital and was established as a company in India at all relevant times from 2005 to 2011.[260]

---

[253] Parsons I, para. 24.

[254] *Id.*, para. 29; *See also* Transcript, Day 2, 420:24- 425:21.

[255] Transcript, Day 5, 1172:9-24.

[256] Parsons I, para. 18; Reply Witness Statement of Gary Parsons, dated March 14, 2014, paras 4-13 ("**Parsons II**").

[257] Transcript, Day 2, 421:25-423:12; Day 5, 1172:3-24.

[258] *Id.*, 1116:21-1117:9.

[259] Transcript, Day 2, Testimony of Mr. Vishwanathan, 307:12-309:2 (referring to Ex. C-80/JCB-116); Day 3, 204:13-16; 384:15-19; Day 5, 1120:5-23. According to the Claimants, the services that they refer to are satellite-based services which fall under the provision of the ISP license that Devas had already received, including streaming video and audio services.

[260] Statement of Reply, para. 114.

## B.   THE TRIBUNAL'S ANALYSIS

192.   The Tribunal will first address this threshold question to determine whether it has jurisdiction over the present dispute between the Parties.

### 1.   The Devas Agreement

193.   There is no disagreement between the Parties with regard to the fact that the Devas Agreement was concluded on January 25, 2005,[261] nor with regards to the fact that, at the Respondent's insistence, the Agreement was signed by Antrix, "the marketing arm of [the] Department of Space and [...] the entity through which ISRO engages in commercial activities."[262] Under the Agreement, a number of approvals and licenses had to be obtained in part by Devas and in part by Antrix.

194.   The Respondent argues that no governmental body was party to the Agreement or gave any commitment to grant the necessary approvals and licenses required under the Agreement.[263] In its view, as long as the WPC License was not obtained, the only recourses that the Claimants might have were the ones against Antrix provided for under the Agreement.[264]

195.   The present case is not a recourse against Antrix but a recourse against the State of India for alleged breaches of the applicable Treaty. It is under the provisions of that Treaty that the Tribunal must determine whether the Claimants qualify as investors.

### 2.   Investment Under the Treaty

196.   The question that the Tribunal has to address is a double-barreled one. It is whether the Claimants are investors under the Treaty and, if so, whether they have made qualifying investments under it.

197.   The Respondent does not dispute that the Claimants are "investors" as defined under Article 1(1)(b) of the Treaty, being corporations "incorporated or constituted in accordance with the law of [a] Contracting Party," i.e. Mauritius.

---

[261]   Devas Agreement (Ex. C-16/JCB-37).

[262]   *Id.*, p. 1.

[263]   Statement of Defence, para. 8.

[264]   *Id.*, para. 98.

198.  The disagreement between the Parties is whether the dispute is in relation to an investment as defined in Article 1(1)(a) of the Treaty. This Article, as in many other investment protection treaties, contains a very broad definition of "investment." It covers:

> every kind of assets established or acquired under the relevant laws and regulations of the Contracting Party in whose territory the investment is made, and, in particular, though not exclusively, includes:
>
> (i)    movable and immovable property as well as other rights in rem such as mortgages, liens or pledges;
>
> (ii)   shares, debentures and other form of participation in a company;
>
> (iii)  claims to money, or to any performance under contract having an economic value;
>
> (iv)   intellectual property rights, goodwill, technical processes, know-how, copyrights, trade-marks, trade-names and patents in accordance with the relevant laws of the respective Contracting Parties;
>
> (v)    business concessions conferred by law or under contract, including any concessions to search for, extract or exploit natural resources.

199.  The Tribunal does not agree with the Respondent's contention that this case "only involves pre-investment activities that are outside the scope of protection afforded by [the Treaty]."

200.  First, the Claimants' "shares, debentures and any other form of participation" in Devas and their indirect partial ownership of Devas business assets are assets "established or acquired under the relevant laws and regulations" of the Respondent. The Claimants received the approval of the Foreign Investment Promotion Board prior to their share subscriptions.[265] Moreover, the Tribunal has received no evidence to the effect that the Claimants' investment was not properly made "under the relevant laws and regulations."

201.  Secondly, the Tribunal finds deficient the Respondent's argument that the Claimants' activities were "only pre-investment activities" because their investment was the alleged right to proceed with the Devas project pursuant to the Devas Agreement and because said project could not

---

[265]  *See* Statement of Claim, para. 36; Amendment No. 5 to FIPB approval No. FC.II. 107(2006)/43(2006), September 29, 2009 (Ex. C-82/JCB-124); FIPB approval No. FC II. 107(2006)/43(2006) from the Department of Economic Affairs, Indian Ministry of Finance to Devas, May 18, 2006 (Ex. C-33); Amendment No. 1 to FIPB approval No. FC.II. 107(2006)/43(2006), May 19, 2008 (Ex. C-49/JCB-85); Amendment No. 2 to FIPB approval No. FC.II. 107(2006)/43(2006), August 7, 2008 (Ex. C-51/JCB-87); Amendment No. 3 to FIPB approval No. FC.II. 107(2006)/43(2006), October 28, 2008 (Ex. C-55); Amendment No. 4 to FIPB approval No. FC.II. 107(2006)/43(2006), December 17, 2009 (Ex. C-78/JCB-114).

proceed without the WPC License, which Devas had no right to receive under the Devas Agreement.[266]

202. The Devas Agreement was a valid contract between Devas and Antrix, a State-owned commercial corporation. It provided that Antrix was leasing to Devas space segment capacity on ISRO/Antrix S-band spacecraft. That leased capacity was on a non-pre-emptible basis, which meant that it could not be "utilized or repurposed for use by another party during life of the satellite and when this Agreement is effective and when Devas is not in default of its obligations or payments."[267]

203. The Agreement spelled out, among other provisions, the period of the lease and its terms and conditions, the contributions to be made as well as the circumstances and consequences of termination by each party, including in the case of *force majeure*. It also provided that it would become effective "on the date that ANTRIX is in receipt of all required approvals and communicates to DEVAS in writing regarding the same."[268]

204. On February 2, 2006, Antrix informed Devas that "it has received the necessary approval for building, launching and leasing capacity of S-band satellite, henceforth designated as INSAT-4E," adding that it "is now in a position to go ahead with the building and launch of the INSAT 4-E spacecraft and lease the capacity on the same to Devas Multimedia Pvt. Ltd, as per Agreement No. Antrix/2003/DEVAS/2005 dated 28 January 2005."[269] The Agreement thereby became effective on February 2, 2006.

205. Under the Agreement, the Claimants had to pay Upfront Capacity Reservation fees for the first and the second satellites. They paid the first instalments as per the Agreement on June 21, 2006 for the first satellite (GSAT-6)[270] and on June 18, 2007[271] for the second satellite (GSAT-6A); these payments represented a total of about USD 13 million.

---

[266]  Statement of Defence, para. 98; Respondent's Rejoinder, para. 26.

[267]  Devas Agreement, p. 20 (Ex. C-16/JCB-37).

[268]  *Id.*, p. 17.

[269]  Letter from Antrix (Murthi) to Devas (Viswanathan), February 2, 2006 (Ex. C-24/JCB-51).

[270]  Receipt for Payment of First Installment of Upfront Capacity Reservation Fee from Devas to Antrix, June 21, 2006 (Ex. C-35/JCB-61).

[271]  Receipt for Payment of First Installment of Upfront Capacity Reservation Fee for PS2 from Devas to Antrix, June 18, 2007 (Ex. C-40/JCB-70)

206. The Agreement also provided that Antrix was responsible for obtaining certain governmental authorizations[272] (which it did) and that Devas was responsible for obtaining others, with best effort support from Antrix[273] (which it obtained for two licenses but did not reach the point of obtaining the third). But there is nothing in the Agreement which makes its validity dependent on Devas obtaining such permits, and at no time during the course of the Agreement or at the time of its annulment by Antrix was it argued by Antrix or any governmental authority that it was not in full effect. The non-issuance of a governmental license may pertain to the quantum of damages that may be claimed against the Respondent, if there was a breach of the Treaty, but it does not pertain to the validity of the Agreement or whether an investment was made by the Claimants.

207. The lease was binding on both Antrix and Devas and, by itself, it was an investment with significant value as was shown by the additional investment of some US$ 75 million in March 2008.[274]

208. It has been established that the Claimants made significant investments in time and money in Devas and that Devas honoured its obligations under the Agreement until its annulment by Antrix, including the payment of Upfront Capacity Reservation Fees of some US$ 13 million.

209. As to the Respondent's argument that the Claimants had no acquired right to obtain the WPC License and that they had no guarantee that they would obtain such license, it is a matter that does not go to the definition of investment for jurisdictional purpose but rather to the value of that investment. On the basis of the evidence received by the Tribunal, it is satisfied that, even without a WPC license, Devas could have rolled out satellite-only services. The Tribunal also notes that it has been satisfactorily established that, because of problems of interference, it would not have been possible for competing services to operate in the same spectrum. The lack of a WPC license would be a matter to be considered when deciding on the quantum of damages, if the Respondent is found in breach of the Treaty.

210. The Tribunal therefore concludes that not only were the Claimants qualified investors under Article 1(1)(b) of the Treaty but that they also made qualifying investments under Article 1(1)(a) of that Treaty.

---

[272] Devas Agreement, Article 12(a)(ii) (Ex. C-16/JCB-37).

[273] *Id.*, Article 3(c).

[274] Share Subscription Agreement between Devas and DT Asia, March 19, 2008 (Ex. C-45/JCB-81); Viswanathan I, para. 108, Singh I, para. 50.

# CHAPTER VI - THE "ESSENTIAL SECURITY INTERESTS" PROVISION

## A. INTERPRETATION OF ARTICLE 11(3) OF THE TREATY IN CONTEXT

211. Article 11(3) of the Treaty provides:

> The provisions of this Agreement shall not in any way limit the right of either Contracting Party to apply prohibitions or restrictions of any kind or take any other action which is directed to the protection of its essential security interests, or to the protection of public health or the prevention of diseases in pests or animals or plants.

212. The Respondent's defence in this case rests on the "essential security interests" of the State, as defined in this Article. The Parties have raised both legal and factual issues in connection with this defence and before analyzing the facts relating to this issue, the Tribunal will first set out its views on the legal interpretation to be given to Article 11(3) of the Treaty and other matters raised by the Claimants relating to Articles 11(1) and 11(4), which can be summarized in the following questions:

(a) What constitutes "essential security interests"?

(b) Does Article 11(1) of the Treaty allow for the introduction of customary international law restrictions imposed on a state of necessity defence?

(c) Can the Claimant invoke Article 11(4) of the Treaty?

(d) Does Article 11(3) preclude an entitlement to compensation?

### 1. What Constitutes "Essential Security Interests"?

#### a. Can "Essential Security Interests" Be Construed as a Matter of Self-judgment by the Respondent?

##### i. The Respondent's Position

213. The Respondent submits that Article 11(3) of the Treaty is of "central importance [...] on the facts of this case"[275] as it entitles India "to take measures directed to the protection of its essential security interests without incurring responsibility under any substantive provision of the [...] Treaty otherwise providing protection to investors."[276]

---

[275] Statement of Defence, para. 76.

[276] *Id.*, para. 76.

214.   The Respondent considers that the Tribunal may only examine whether a measure is related to national security matters. The Respondent argues that the Tribunal may not "sit as a supranational regulatory or policy-making body to review the policy decisions of the Cabinet Committee on Security" as national authorities "are uniquely positioned to determine what constitutes a State's essential security interests in any particular circumstance and what measures should be adopted to safeguard those interests."[277]

215.   The Respondent refers to an UNCTAD study on a clause of the Peru-Singapore investment treaty which contains language identical to Article 11(3) of the Mauritius-India BIT. That study considers that this provision "establishes objective conditions for invoking the (security) exception, (but its) practical effect comes very close to a self-judging clause."[278]

ii.     The Claimants' Position

216.   The Claimants do not accept India's argument, which is premised on a characterization of Article 11(3) of the Treaty as "self-judging,"[279] by reference to the consistent and emphatic rejection of this notion by the International Court of Justice,[280] and universally reaffirmed by arbitral tribunals.[281]

217.   Moreover, the Claimants submit that the language of this provision affords no basis for inferring that its application is self-judging. Such an application, according to the Claimants, requires "clear and specific language,"[282] which is notably absent in the present case.

---

[277]   *See Id.*, paras 78-83; Rejoinder, para. 34.

[278]   UNCTAD, The Protection of national security in IIAs, UNCTAD Series on International Investment Policies for Development, 2009, pp. 94-95 (Ex. R-168).

[279]   Statement of Reply, para. 66.

[280]   Statement of Reply, paras 67-73. *See, inter alia, Military and Paramilitary Activities in and against Nicaragua* (Nicaragua v. United States of America), Jurisdiction and Admissibility, Judgment, I.C.J. Reports 1984, p. 392, paras 221-22; *Oil Platforms* (Islamic Republic of Iran v. United States of America), Preliminary Objection, Judgment, I.C.J. Reports 1996, p. 803, para. 20; *Oil Platforms* (Islamic Republic of Iran v. United States of America), Judgment, I.C.J. Reports 2003, p. 16, para. 73.

[281]   Statement of Reply, para. 74; s*ee*, for instance, *Gabčikovo-Nagymaros Project* (Hungary v. Slovakia), Judgment, I.C.J. Reports 1997, p. 7, para. 51; *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, paras 370, 373; *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007, paras 331, 332; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 561 (Ex. CL-11).

[282]   Statement of Reply, paras 75-76.

iii.    The Tribunal's Analysis

218.    This first question can be disposed of quickly in this case as the Respondent itself has stated that it is not arguing that "India (or Peru, or any other State having a treaty with a similar provision [to Article 11(3) of the Treaty]) can dismiss any case simply by saying that it considers the actions forming the basis of the claim to be in its 'essential security interests.'"[283]

219.    Indeed, it is well established by judgments of the International Court of Justice (the "**ICJ**")[284] and investment arbitration awards[285] that, unless a treaty contains specific wording granting full discretion to the State to determine what it considers necessary for the protection of its security interests,[286] national security clauses are not self-judging. Turning to the text of Article 11(3) of the Treaty, it plainly does not contain any explicit language that the Tribunal would regard as granting discretion of that nature to the State.

---

[283]    Respondent's Rejoinder, para. 36.

[284]    *Military and Paramilitary Activities in and against Nicaragua* (Nicaragua v. United States of America), Jurisdiction and Admissibility, Judgment, I.C.J. Reports 1984, p. 392, para. 282; *Oil Platforms* (Islamic Republic of Iran v. United States of America), Judgment, I.C.J. Reports 2003, p. 16, para. 43; *Gabčíkovo-Nagymaros Project* (Hungary v. Slovakia), Judgment, I.C.J. Reports 1997, p. 7, para. 51.

[285]    *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, paras 370, 373; *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007, paras 331, 332; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 561 (Ex. CL-11).

[286]    Self-judging "essential security interests" provisions are far from being unknown in international law. *See*, for instance, Article XXI of the General Agreement on Tariffs and Trade 1947 ("**GATT**"): "Nothing in this Agreement shall be construed: (a) to require any contracting party to furnish any information the disclosure of which it considers contrary to its essential security interests; or (b) to prevent any contracting party from taking any action which it considers necessary for the protection of its essential security interests…" (emphasis added); Article 6.12 of the Comprehensive Economic Cooperation Agreement between the Republic Of India and the Republic of Singapore, signed on June 29, 2005: "1. Nothing in this Chapter shall be construed: (a) to require a Party to furnish any information, the disclosure of which it considers contrary to its essential security interests; or (b) to prevent a Party from taking any action which it considers necessary for the protection of its essential security interests…" (emphasis added); Article 18 of the Treaty between The United States of America and The Oriental Republic of Uruguay Concerning the Encouragement and Reciprocal Protection of Investments, signed on November 4, 2005: "Nothing in this Treaty shall be construed: 1. to require a Party to furnish or allow access to any information the disclosure of which it determines to be contrary to its essential security interests; or 2. to preclude a Party from applying measures that it considers necessary for the fulfilment of its obligations with respect to the maintenance or restoration of international peace or security, or the protection of its own essential security interests" (emphasis added); Article 18 of the Treaty between The Government of The United States of America and The Government of The Republic of Rwanda Concerning the Encouragement and Reciprocal Protection of Investment, signed on February 19, 2008: "Nothing in this Treaty shall be construed: 1. to require a Party to furnish or allow access to any information the disclosure of which it determines to be contrary to its essential security interests; or 2. to preclude a Party from applying measures that it considers necessary for the fulfillment of its obligations with respect to the maintenance or restoration of international peace or security, or the protection of its own essential security interests" (emphasis added).

220. However, while the Parties agree that the Tribunal may examine whether the preconditions to invoke the essential security clause have been met, they disagree as to the meaning or content of the preconditions laid down in the clause. The Tribunal must therefore address the following question.

### b.   What Conditions Must the Respondent Meet to Show that its Measures Were "Directed to the Protection of its Essential Security Interests"?

#### i.   The Respondent's Position

221. The Respondent argues that the determinations by national authorities as to what constitutes "essential security interests" should be afforded "a wide measure of deference"[287]—a view that it says is supported by commentators and international jurisprudence.[288] Essentially, the Respondent cautions against "second-guessing" by international tribunals of national security determinations made by national authorities.[289] The Respondent refers again, in that respect, to the UNCTAD study on the Peru-Singapore investment and notes that "only in extreme cases will an arbitral tribunal conclude that the host country measure has no relation whatsoever to the national security interests of a party."[290]

222. In the present case, the Respondent contends that the policy decision of the CCS, in its capacity as the highest authority in India for matters of internal and external security and defence, takes into consideration the growing demands of the Indian military for S-band capacity, which undoubtedly form part of the Respondent's essential security interests.[291] Furthermore, the Respondent refers to the express terms of the decision of the CCS and the extensive record, which plainly reflect the strategic needs for spectrum capacity.[292] Moreover, the fact that the Claimants

---

[287]   Statement of Defence, para. 78.

[288]   *Id.*, paras 78-82; *See, inter alia, Recent Cases on "Automatic" Reservations to the Optional Clause*, Robert Y. Jennings, p. 362. (Ex. R-45); *Council of Civil Service Unions v. Minister for Civil Service*, 22 November 1984, pp. 374, 412 (Ex. R-46); *J.R.C. v. Costa Rica*, United Nations Human Rights Committee, Communication No. 296/1988, CCPR/C/35/D/296/1988, Decision on Admissibility, April 3, 1989, para. 8.4; *Protocol No. 7 to the Convention for the Protection of Human Rights and Fundamental Freedoms*, Council of Europe, Explanatory Report, para. 15 (Ex. R-48).

[289]   Statement of Defence, para. 83; Transcript, Day 1, 153:3-13.

[290]   UNCTAD, The Protection of national security in IIAs, UNCTAD Series on International Investment Policies for Development, 2009, pp. 94-95 (Ex. R-168).

[291]   Statement of Defence, para. 84.

[292]   *Id.*, paras 39-61, 84.

were not included in the national security deliberations, of which the Claimants complain, is not significant given the sensitive nature of such issues.[293]

223. The Respondent criticizes the Claimants' failure to engage directly on this provision and characterizes its only submission as a suggestion that the Tribunal "disregard all [...] evidence and hold that the entire national security establishment of the Government acted in bad faith and with no motive other than to cause damage to Devas and its shareholders."[294] Such an argument, the Respondent contends, "cannot be countenanced under well-established principles of both Indian and international law."[295]

ii.      The Claimants' Position

224. Given that India's claim to essential security is not self-judging, the Claimants submit that an international tribunal has the power to conduct "an objective inquiry into whether an essential security clause was validly invoked and whether its conditions are satisfied."[296] The Claimants do not accept that India has made out the requisite elements by reference to the evidentiary record, which has not established that the measures were "directed at *any* security interest"[297] and, in any event, the "disproportionate and gratuitous nature" of these measures "fails to meet the standard of necessity observed by customary international law."[298]

225. As to the Claimants, they consider that two objective preconditions need to be fulfilled for the essential security clause to be triggered.

- The Tribunal must first verify whether a measure was aimed at the protection of the Respondent's security interests. In their view, the measure must be specifically directed at the State's essential security interests.[299]

- Additionally, the Claimants construe a requirement of necessity from the words "essential security interests." In other words, the Tribunal must verify that the security interest in question is so "vital...absolutely necessary; extremely important" that protection must be

---

[293]    *Id.*, para. 85.

[294]    *Id.*, paras 86-88.

[295]    Respondent's Rejoinder, para. 38.

[296]    Statement of Reply, para. 80.

[297]    *Id.*, paras 89-90 (emphasis by the Claimants).

[298]    *Id.*, paras 91-96; *See* generally Transcript, Day 5, 1188:14-1190:18.

[299]    Statement of Reply, para. 84.

warranted, and that such interest is actually under a threat that warranted the asserted measures of protection.[300]

226. The Claimants engage in a word-by-word analysis of the essential security clause to define the meaning of the objective conditions that are required to invoke the security exception.

227. First, according the Claimants, the use of the words "directed to" in the Article 11(3) implies that the Respondent's measures in question must have been "aimed at the protection of India's security interests." Measures that are not actually directed at the protection of such interests do not qualify.[301]

228. Second, the use of the word "essential" implies that the security interest in question must be so "vital…absolutely necessary; extremely important" such that protection is warranted. According to the Claimants, the literal meaning of the term "essential" is "important…absolutely necessary, indispensably requisite…unavoidable;"[302] The Claimants invoke several legal authorities in support of this statement, including the following:

- In the *Nicaragua* case, it had been claimed that the various actions directed against the Nicaraguan government were justified on "essential security" grounds. Rejecting this claim, the ICJ held that:

  No evidence at all is available to show how Nicaraguan policies had in fact become a threat to "essential security interests" in May 1985, when those policies had been consistent, and consistently criticized by the United States, for four years previously, the Court is unable to find that the "embargo" was necessary to protect those interests.[303]

- In a similar vein, the Claimants rely on the *Oil Platforms*[304] and the *Total v. Argentina*[305] cases to argue that the nature of the security interest to be protected must be "absolutely necessary, extremely important," and that such interest was actually under a "threat" that warranted the asserted measures of "protection."[306]

---

[300]   *Id.*, para. 85.

[301]   *Id.*, para. 84.

[302]   *Id.*, fn.174, citing, *inter alia,* Oxford English Dictionary (2014).

[303]   *Military and Paramilitary Activities in and against Nicaragua* (Nicaragua v. United States of America), Jurisdiction and Admissibility, Judgment, I.C.J. Reports 1984, p. 392, paras 125 and 282.

[304]   *Oil Platforms* (Islamic Republic of Iran v. United States of America), Preliminary Objection, Judgment, I.C.J. Reports 1996, p. 803, paras 811, 820.

[305]   *Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010.

[306]   Statement of Reply, para. 86, fn. 179.

- Finally, the Claimants argue that, in any event, the customary standard of necessity appearing in Article 25 of the Articles on State Responsibility adopted by the International Law Commission (the "**ILC Articles**") applies to Article 11(3) of the Treaty by operation of Article 11(1).[307] In the Claimants' view, there exists in customary international law a regime governing the same issue dealt with by Article 11(3), i.e. the extent to which a State may respond to the alleged threats to the "essential interests" of the State. And, if these customary rules impose a "stricter" set of requirements on the host State, then the customary rules also qualify under Article 11(1) because they afford the Claimants treatment more favourable than that provided for by Article 11(3).

    iii.    The Tribunal's Analysis

229. The Tribunal faces two distinct issues. The first issue concerns the interpretation of the terms of Article 11(3) of the Treaty, which vies to determine the exact conditions that are required by this provision to trigger an "essential security interests" exception, including in particular, whether Article 11(3) includes a requirement of necessity to display its effects. A separate question concerns whether the standard of necessity under customary international may apply, regardless of the terms of the Treaty, in invoking the "essential security interests" clause.

230. As to the first issue, the Tribunal is faced with elucidating the meaning of Article 11(3) of the Treaty within the framework of Articles 31 and 32 of the Vienna Convention on the Law of Treaties (the "**VCLT**").

231. Article 31 of the VCLT makes clear that any interpretation must rest primarily on the ordinary meaning of the text of the treaty, only to be supplemented by considerations of content, object and purpose if the ordinary meaning of the text is not clear. In performing this exercise of interpretation, the Tribunal must be particularly cautious not to rephrase or otherwise alter the plain meaning of the text, which is considered to reflect the common intention of the Contracting

---

[307]    *Id.*, para. 92.

Parties.[308] In the words of the *El Paso v. Argentina* tribunal, "the content of the treaty's provisions is paramount, and what is not there cannot be read into them."[309]

232.  Also, pursuant to Article 32 of the VCLT, the Tribunal may only resort to supplementary means of interpretation if the outcome of an interpretation conducted under Article 31 of the VCLT "leaves the meaning ambiguous or obscure, or…leads to a result which is manifestly absurd or unreasonable."

233.  The first condition laid down in Article 11(3) of the Treaty that the Tribunal must consider concerns the nexus that must exist between the State measures at stake and the essential security interests of the State for the exception to be triggered, which is embodied in the terms "directed to."

234.  In that respect, the Tribunal is mindful of the broad terms of Article 11(3) of the Treaty. It clearly provides that the Treaty "<u>shall not in any way</u> limit the right of either Contracting Party to apply prohibitions or restrictions <u>of any kind</u> or to <u>take any action</u> which is directed to the protection of its essential security interests…" [Tribunal's underlining.]

235.  In the Tribunal's view, while these terms provide the State with considerable freedom as to the action it can take, it is important to note that such action must be directed not to any security interest but only to "essential security interests." Measures that would not actually be directed to the protection of the essential security interests would not qualify.

236.  This parameter will guide the Tribunal when applying the law to the facts of this case.

237.  However, the Parties disagree on the existence of a requirement of necessity in Article 11(3) of the Treaty, such that the "essential security interests" exception could only be triggered when the State measures are "necessary" for the protection of the State's national security.

238.  It is worth noting that the word "necessity" or any reference thereof is absent in the ESI clause. By contrast, all of the cases on which the Claimants rely to advance a requirement of necessity are based on a Treaty in which the relevant ESI clause expressly contains the word "necessary"

---

[308]  *See* R.K. Gardiner, *Treaty Interpretation* (Oxford University Press 2008), p. 145, citing R.H. Berglin, 'Treaty Interpretation and the Impact of Contractual Choice of Forum Clauses on the Jurisdiction of International Tribunals: the Iranian Forum Clause Decisions of the Iran-United States Claims Tribunal' (1986) 21 Texas International Law Journal 39, p. 44.

[309]  *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 590 (Ex. CL-11).

and therefore included necessity as an objective precondition for provoking the exception. In particular, *CMS*,[310] *Enron*,[311] *Sempra*,[312] *LG&E*,[313] *Continental Casualty*[314] and *El Paso*[315] were all brought under the aegis of the 1991 Argentina-U.S. BIT which reads at Article XI: "(t)his treaty shall not preclude the application by either Party of <u>measures necessary</u> [Tribunal's underlining] for the maintenance of public order, the fulfilment of its obligations with respect to the maintenance or the restoration of international peace or security, the protection of its own essential security interests."

239.   The UNCTAD study mentioned above identifies four basic approaches relating to the issue of necessity in international investment agreements ("IIAs"): (1) self-judging clauses; (2) necessity as objective precondition; (3) no reference to necessity; and (4) exclusion of judicial review.

240.   That study clearly brings the Mauritius-India BIT under the third category where there is no mention of the requirement of necessity and it is sufficient that the measures be "directed to the protection of its essential security interests." As an example, it refers specifically to the Hungary-India BIT (2003) which contains a national security clause practically identical with the present one. Article 12 of that BIT reads in part as follows: "[…] nothing in this Agreement precludes the host Contracting Party <u>from taking action for the protection of its essential security interests</u> or in circumstances of extreme emergency in accordance with its laws normally and reasonably applied on a non-discriminatory basis." [Tribunal's underlining.] The Study also mentions the Peru-Singapore BIT (2003) which uses wording similar to the Mauritius-India BIT. Its Article 11 reads as follows: "The provisions of this Agreement shall not in any away limit the right of either Contracting Party to <u>apply prohibitions or restrictions of any kind or to take any other action which is directed to the protection of its essential security interests,</u> or to the protection of public health or the prevention of diseases and pests in animals or plants." [Tribunal's underlining.]

241.   The UNCTAD study concludes as follows: "Although the two examples above establish objective conditions for invoking the exception, their practical effect comes very close to a self-judging clause. Only in extreme cases will an arbitral tribunal conclude that the host country measure has no relation whatsoever to the national security interests of a party." This would caution against

---

[310]   *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005.

[311]   *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007.

[312]   *Sempra Energy International v. Argentina*, ICSID Case No. ARB/02/16, Award, 2007.

[313]   *LG&E Energy Corporation v. Argentina*, ICSID Case No ARB/02/1, Decision on Liability, 2006.

[314]   *Continental Casualty Co. v. Argentina*, ICSID Case No. ARB/03/9, Award, 2008.

[315]   *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011.

imposing a requirement of necessity in ESI clauses unless it can be clearly inferred from the terms of the clause. In the words of the *El Paso v. Argentina* tribunal: "… the content of the treaty's provision is paramount, and what is not there cannot be read into them."[316]

242.  The study would appear however to go too far in stating that such clauses are "very close to self-judging clauses." In situations like the one in this case or in those mentioned in the UNCTAD study, a tribunal is called upon to assess whether the measure adopted by the State is not only directed to the protection of its security but that it must also be for the protection of its essential security interests. In the case of self-judging clauses, it suffices for the State to declare, in its discretion, that it considers the adopted measure necessary for the protection of its security interests.[317]

243.  While, in the present case, the Respondent does not have to demonstrate necessity in the sense that the measure adopted was the only one it could resort to in the circumstances, it still has to establish that the measure related to its essential security interests; it cannot therefore be any security interest but it has to be an "essential" one. In that respect, the Tribunal has no difficulty endorsing the definition of that word proposed by the Claimants and taken from the following dictionaries: "Essential" definition (meanings 3(b), 4(a)), *Oxford English Dictionary* (2014) ("important (…) absolutely necessary, indispensably requisite (…) unavoidable");[318] "Essential" definition (meaning 1), *The Random House Dictionary of the English Language* (1966) ("absolutely necessary; indispensable")[319] "Essential" definition (meanings 2(a), 2(b)), *Webster's Third New Int'l Dictionary* (1976) ("necessary, indispensable, or unavoidable").[320]

244.  In performing this analysis, however, the Tribunal has also no difficulty in recognizing the "wide measure of deference" mentioned by the Respondent.[321]

245.  An arbitral tribunal may not sit in judgment on national security matters as on any other factual dispute arising between an investor and a State. National security issues relate to the existential core of a State. An investor who wishes to challenge a State decision in that respect faces a heavy

---

[316]   *Id.*, Award, 2011, para. 590 (Ex. CL-7).

[317]   *See supra*, para. 219 and fn. 286.

[318]   Oxford English Dictionary (2014) (excerpt) (Ex. CL-61).

[319]   The Random House Dictionary of the English Language (1966) (excerpt) (Ex. CL-62).

[320]   Webster's Third New Int'l Dictionary (1976) (excerpt) (Ex. CL-64).

[321]   *See supra*, para. 221.

burden of proof, such as bad faith, absence of authority or application to measures that do not relate to essential security interests.

### 2. Does Article 11(1) of the Treaty Allow for the Introduction of Customary International Law Restrictions Imposed on a State of Necessity Defence?

#### a. The Claimants' Position

246. In addition to invoking a "necessity" requirement into Article 11(3) of the Treaty, the Claimants argue that, by virtue of Article 11(1), the Respondent must demonstrate that it meets the conditions of a state of necessity defence under customary international law.

Article 11(1) of the Treaty reads as follows:

> If the provisions of the law of either Contracting Party or obligations under international law existing at present or established hereafter between the Contracting Parties, in addition to the present Agreement, contain rules, whether general or specific, entitling investments and returns of investors of the other Contracting Party to treatment more favourable than that provided for by the present Agreement, such rules shall, to the extent that they are more favourable, prevail over the present Agreement.

247. According to the Claimants,[322] Article 11(1) applies to Article 11(3), thereby allowing them to claim the more restrictive standards imposed upon the Respondent by Article 25 of the ILC Articles on State Responsibility concerning a state of necessity defence. These Articles are considered as a consolidation of current customary international law.

248. Article 25 reads as follows:

> 1. Necessity may not be invoked by a State as ground for precluding the wrongfulness of an act not in conformity with an international obligation of that State unless the act:

> (a) is the only way for the State to safeguard an essential interest against a grave and imminent peril; and

> (b) does not seriously impair an essential interest of the State or States towards which the obligation exists, or of the international community as a whole.

> 2. In any case, necessity may not be invoked by a State as a ground for precluding wrongfulness if:

> (a) the international obligation in question excludes the possibility of invoking necessity; or

---

[322]   Statement of Reply, paras 91-96.

(b) the State has contributed to the situation of necessity.[323]

249. In the Claimants' view, these strict requirements on a host State invoking a state of necessity must be applied in the interpretation of Article 11(1) of the Treaty which allows them to make a claim on the basis that they are entitled to a "treatment more favorable than that provided for by the present Agreement," including Article 11(3). Relying in particular on *EDF International*,[324] *Suez/AWG*[325] and *Gabčíkovo-Nagymaros*,[326] they argue that the Respondent must demonstrate that "the wrongful act was the only way to safeguard (India's) essential interest under Article 25(1)."[327]

### b.    The Respondent's Position

250. The Respondent argues that Article 11(1) of the Treaty is not a vehicle which allows bringing Article 25 of the ILC Articles into this case. According to it, Article 11(1) is nothing but a "preservation of rights" clause—which provides that the Treaty is not designed to take away substantive protections offered by international law—but "has nothing to do with the state of necessity defence incorporated in Article 25 of the ILC Articles, which does not confer benefits on private investors, but rather outlines a defence available to States under customary international law."[328]

251. Moreover, pointing out the clear and categorical text of Article 11(3) which states that "(t)he provisions of this Agreement shall not limit in any way the right" of the State to protect its essential security interests, the Respondent argues that Article 11(1) cannot negate the applicability of Article 11(3).[329]

---

[323]   International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts 2001, Yearbook Of The International Law Commission (2001), Vol. II, Part Two, p. 28 (Ex. R-116 and R-117).

[324]   *EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, para. 1171.

[325]   *Suez, Sociedad General de Aguas de Barcelona, S.A. and Vivendi Universal, S.A. v. Argentina*, ICSID Case No. ARB/03/19, Decision on Liability, 2010; *AWG Group Ltd. v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 260.

[326]   *Gabčíkovo-Nagymaros Project* (Hungary v. Slovakia), Judgment, I.C.J. Reports 1997, p. 7, para. 57.

[327]   Statement of Reply, para. 95, quoting *EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, para. 1171.

[328]   Respondent's Rejoinder, para. 55.

[329]   *Id.*, para. 56.

c.    The Tribunal's Analysis

252. The Tribunal is of the view that Article 11(1) does not result in a restrictive application of Article 11(3). It is true that, when a State was invoking a "state of necessity" defence, the ICJ and a number of arbitral tribunals[330] have recognized the right of international investors to challenge such defence under customary international law, on the basis that it was not the only way for a State to safeguard its essential interests or that the State was at least partly responsible for the situation which led a State to invoke a state of necessity situation (These are the only two restrictions mentioned in Article 25 of the Articles that might apply in this case).

253. However, in face of the very clear and strong wording of Article 11(3), it would be strange to give Article 11(1) preponderance over it. Indeed, Article 11(3) provides that "(t)he provisions of this Agreement shall not <u>in any way</u> limit the right of either Contracting Party to apply <u>prohibitions or restrictions of any kind or take any other action</u> which is directed to the protection of its essential security interests [...]" [Tribunal's underlining.]

254. Secondly, the Respondent is right in pointing out that the "preservation of rights" under Article 11(1) of the Treaty has nothing to do with the "state of necessity" defence which, under customary international law, is available to a State as a ground for precluding the wrongfulness of an act which would otherwise be in breach of an international obligation of that State.

255. Finally, the Respondent in the present case is not invoking a state of necessity defence under customary international law but, instead, the specific provision of Article 11(3) of the Treaty concerning the protection of its essential security interest and it is the analysis of that provision which will guide the Tribunal in determining whether or not the Respondent is in breach of the Treaty.

256. The Tribunal therefore concludes that the conditions attached to the state of necessity defence under customary international law are not applicable in the present situation. The Tribunal

---

[330]   *EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, para. 1176; *Suez, Sociedad General de Aguas de Barcelona, S.A. and Vivendi Universal, S.A. v. Argentina*, ICSID Case No. ARB/03/19, Decision on Liability, 2010, paras 259-260; *Gabčíkovo-Nagymaros Project* (Hungary v. Slovakia), Judgment, I.C.J. Reports 1997, p. 7, paras 49-59; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras 613-620 (Ex. CL-7).

observes that this approach is consistent with that taken by the tribunal in *Continental Casualty v. Argentina*[331] and the annulment committee in *CMS v. Argentina.*[332]

### 3.   Can the Claimants Invoke Article 11(4) of the Treaty?

257.   Article 11(4) of the Treaty provides:

> Each Contracting Party shall, however, honour any obligation it may have entered into with regard to investments of investors of the other Contracting Party.

### a.   The Claimants' Position

258.   The Claimants advance two arguments based on Article 11(4) to preclude the Respondent from invoking the "essential security interests" provision. First, the Claimants argue that the language of Article 11(4) is intended to restrain the Respondent from acting inconsistently with its own obligations. According to the Claimants, the Respondent owes obligations under the Devas Agreement, which preclude the Respondent from now terminating its contractual commitments.[333]

259.   The Claimants maintain that the policy decision resulting in the annulment of the Devas Agreement is affirmed by the Opinion of the ASG as "an act by the governmental authority acting in its sovereign capacity." In view of this statement, the Claimants do not consider it necessary to reach the issue of whether Antrix' actions are attributable to the State in order to conclude that there has been an expropriation by India.[334] Yet, the Claimants advance a notion of agency and rely on the "inseparability" of Antrix, DOS and ISRO in practice.[335]

260.   Secondly, in the Claimants' view, India is also precluded from invoking "essential security" to "excuse situations of its own making" as evidenced by statements of a rule of general international

---

[331]   *Continental Casualty Company v. Argentine Republic,* ICSID Case No. ARB/03/9, Award, 2008, para. 167.

[332]   *CMS Gas Transmission Company v Argentina,* ICSID Case No ARB/01/8, Decision on Application for Annulment, 2007, paras 128-136.

[333]   Statement of Reply, para. 98.

[334]   Statement of Claim, para. 172.

[335]   *Id.*, para. 214. *See supra*, para. 69.

law to that effect in *El Paso*,[336] *Continental Casualty*[337] and *LG&E*.[338] In the present case, the Claimants interpret the factual record as showing that "the allocation of the S-band to DOS for 'commercial operations—the scenario that led to Devas signing the Devas Agreement—was the result of conscious and deliberate policy-making on its part.'"[339] Having recalled India's assessment of its national priorities from 1999 to 2008[340] and its conduct in allowing the Devas Agreement to proceed, the Claimants submit that the Respondent cannot now "claim that it was 'essential' that these commercial uses be terminated" because it "supposedly formed a different assessment of its "national needs at a later time."[341]

### b.     The Respondent's Position

261.   The Respondent contends that the Claimants' first argument proceeds on the flawed basis that "the obligations under the Devas Agreement are the obligations of the Government, not Antrix" when the factual record establishes that the Government had no such obligations.[342]

262.   The Respondent argues that Devas knew that the Government of India was not a party to the Devas Agreement and maintained a distinct personality from Antrix for the purposes of the Devas Agreement.[343] As to allegations that Antrix and the Government of India are "inseparable,"[344] the very fact that the Claimants identify Antrix as the entity which entered into and annulled the Devas Agreement upon the instructions of several governmental bodies shows that Antrix and the Government of India are not "inseparable," and Antrix did not enter into the Devas Agreement "on behalf of the Government." Rather, the negotiating history of the Devas Agreement shows

---

[336]   *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras 614-15, 620, 624 (Ex. CL-11).

[337]   *Continental Casualty Co. v. Argentina*, ICSID Case No. ARB/03/9, Decision on Annulment, 2011, paras 139-43.

[338]   Statement of Reply, para. 101. *See LG&E Energy Corporation v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 2006, para. 212.

[339]   Statement of Reply, para. 104.

[340]   *Id.*, para. 104.

[341]   *Id.*, para. 105.

[342]   Respondent's Rejoinder, paras 59-62.

[343]   Statement of Defence, para. 155.

[344]   *Id.*, para. 145; *See* Statement of Claim, para. 214.

that Devas wanted ISRO to be its counterparty in the deal, which was not accepted and Antrix ultimately signed the Agreement.[345]

263. The Respondent then refers to what it characterizes as a "unanimous line of Indian authority" rejecting conflation of the legal personalities of State-owned companies and the government,[346] as well as international authorities following the same trend.[347] These authorities suggest that a clear distinction must be drawn between Antrix, a "private company limited by shares" within the meaning of the Indian Companies Act,[348] and the Government of India. The Respondent notes the Claimants' failure to bring any Indian authority to support their position.[349] Moreover, international authorities such as the ILC Articles lend further support to the Respondent's position that the acts of Antrix are not attributable to the State, save in certain circumstances that are inapplicable in the present case.[350]

---

[345] *See* Transcript, Day 5, 1223:11-1224:22; 1227:15-20; Term Sheet (Ex. R-12/JCB-23). According to the Respondent, the fact that Devas and Antrix (and not ISRO or DOS) were the parties to the Devas Agreement is an undisputed material fact of the case; *See, inter alia,* Transcript, Day 5, 1268:20-1269:15.

[346] Statement of Defence, paras 148-51, citing *Electronics Corporation of India Ltd. and Ors. v. Secretary, Revenue Department, Govt. of Andhra Pradesh and Ors.*, Supreme Court of India, Judgment, 5 1999, AIR 1999 SC 1734, para. 15 (Ex. R-106); *Western Coalfields Limited v. Special Area Development Authority, Korba and Anr. And Bharat Aluminum Company Limited v. Special Area Development Authority, Korba and Ors.*, Supreme Court of India, Judgment, 1981, AIR 1982 SC 697, para. 21 (Ex. R-107); *Steel Authority of India Ltd. v. Shri Ambica Mills Ltd. and Ors., Supreme Court of India*, Judgment, 1997, AIR 1998 SC 418, paras 16-18 (Ex. R-108); *Dr. S.L. Agarwal v. The General Manager, Hindustan Steel Ltd.*, Supreme Court of India, Judgment, 1969, AIR 1970 SC 1150, para. 10 (Ex. R-109); *The State Trading Corporation of India Ltd. and Ors. v. The Commercial Tax Officer, Visakhapatnam and Ors*, Supreme Court of India, Judgment, 1963, AIR 1963 SC 1811, paras 152, 154 (Ex. R-110); *Heavy Engineering Mazdoor Union v. State of Bihar and Ors., Supreme Court of India*, Judgment, 1969, AIR 1970 SC 82, para. 4 (Ex. R-111); *Principles Of Administrative Law*, M.P. Jain and S.N. Jain, pp. 1018-1019 (Ex. R-112).

[347] Statement of Defence, para. 152, citing, *inter alia, Amoco International Finance Corporation v. The Government of Islamic Republic of Iran et al*., Iran-U.S.C.T. Case No. 56, Partial Award No. 310-56-3, 1987, paras 161-162, 164 (Ex. R-113); *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005 (ECT), Final Award, 2008, para. 110; M. Feit, 'Responsibility of the State under International Law for the Breach of Contract Committed by State-Owned Entity' (2010) 28 Berkeley Journal of International Law 132, p. 154 (Ex. R-114).

[348] *See* Indian Companies Act, Section 3(1)(iii) (Ex. R-105).

[349] Statement of Defence, para. 146. According to the Respondent, the relevance of Indian law at this level derives from the fact that "[i]n determining whether a company possesses independent and distinct legal personality, international law looks to the rules of the relevant domestic law." *Ahmadou Sadio Diallo* (Republic of Guinea v. Democratic Republic of the Congo), Preliminary Objections, Judgment, I.C.J. Reports 2007, p. 582, para. 61.

[350] International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts 2001, Yearbook Of The International Law Commission (2001), Vol. II, Part Two, p. 26 and p. 48 (Ex. R-116 and R-117).

264. In any case, even if Article 11(4) was applicable (which the Respondent denies), the Respondent argues that the "essential security interests" provision would prevail on its clear and unambiguous terms.[351]

265. As to the Claimants' second argument, the Respondent submits that the authorities and principle relied upon, even if accepted as correct, are "totally irrelevant" for two reasons: India had no contractual commitment of any kind to Devas nor did it "contribute" to any "crisis."[352]

### c.    The Tribunal's Analysis

266. In order to invoke Article 11(4), two requirements must be satisfied. First, the obligation mentioned in Article 11(4) has to be one which the Respondent has itself entered into. Second, the Respondent must fail to honour such an obligation.

267. The task of the Tribunal will therefore be to determine whether the Agreement constitutes such an obligation and whether the annulment of the Agreement constitutes failure of the Respondent to honour the obligation.

268. The Tribunal notes that, although stating that it is not necessary to decide on the attribution of Antrix's actions to the Respondent in order to conclude that there has been an expropriation, the Claimants nonetheless rely on the "inseparability" of Antrix, DOS and ISRO in practice. This latter claim is made particularly in connection with a breach of the FET standard, the Claimants arguing that the Respondent cannot evade liability for its various bad faith actions by claiming that they were solely attributable to Antrix.

269. Articles 4, 5 and 8 of the ILC Articles containing the applicable principles of attribution read as follows:

> Article 4. Conduct of organs of a State
>
> 1.   The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.
>
> 2.   An organ includes any person or entity which has that status in accordance with the internal law of the State.

---

[351]    Respondent's Rejoinder, para. 63.

[352]    *Id.*, paras 65-66.

#### Article 5. Conduct of persons or entities exercising elements of governmental authority

The conduct of a person or entity which is not an organ of the State under Article 4 but which is empowered by the law of that State to exercise elements of the governmental authority under international law, provided the person or entity is acting in the capacity in the particular instance.

#### Article 8. Conduct directed or controlled by the State

The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of that State in carrying out the conduct.

270.  Article 4(2) of the ILC Articles makes clear that the legal personality of a State-owned company is governed by domestic law. The acts of such a company can only be attributed *en bloc* to the State when it is considered a governmental body under domestic law.

271.  This view was confirmed by the ICJ in the *Ahmadou Sadio Diallo* case. The Court ruled that:

> As the Court recalled in the Barcelona Traction case, "(t)here is …no need to investigate the many different forms of legal entity provided for by the municipal laws of States (I.C.J. Reports 1970, p.34, para.40). What matters, from the point of view of international law, is to determine whether or not these have a legal personality independent of their members. (…). In determining whether a company possesses independent and distinct legal personality, international law looks to the rules of the relevant domestic law."[353]

272.  In the present instance, the Respondent has provided clear evidence that Antrix cannot be considered an organ of the State under Indian law. Antrix's constituent documents make clear that it is a "private company limited by shares" within the meaning of the Indian Companies Act.[354]

273.  Even if the determination of the legal status of a State-owned company is a matter governed by domestic law, the actions of such company may still engage the international responsibility of the State. The acts of the company will have to be examined on a case-by-case basis, in light of ILC Articles 5 and 8, to determine whether they constitute a breach of international law that may be attributed to the State.

274.  The Claimants however hold a different position. They rely on a notion of agency to argue that "in assessing the Respondent's liability, Antrix's various actions … should be directly attributed to India."[355] However, most of the authorities relied upon by the Claimants do not support the

---

[353]  *Ahmadou Sadio Diallo* (Republic of Guinea v. Democratic Republic of the Congo), Preliminary Objections, Judgment, I.C.J. Reports 2007, p. 582, para. 61.

[354]  Statement of Defence, para. 147; Indian Companies Act, Section 3(1)(iii) (Ex. R-105).

[355]  Statement of Claim, para. 214.

existence of a notion of agency in international law, such that every act of an agent (including the repeated assurances of Antrix's support for the Devas System, referred to by the Claimants) may be attributed to the State.

275. Thus, the Claimants rely on the *Wintershall* arbitration, in which the tribunal decided that the State-owned company at stake operated "as an arm or agent of the Government" but only "as a matter of Qatari law,"[356] i.e. agency was found to exist on the basis of domestic law. The ICC case *Deutsche Schachtbau v. United Arab Emirates* was a purely commercial case that concerned the extension of an arbitration clause from a contract signed by a State entity to the State itself through a multiplicity of contracts.[357] Moreover, in the *Nykomb* ICSID award, the tribunal decided that, in the circumstances of the case, Latvia had to "be considered responsible for (the State's entity) actions under the rules of attribution in international law."[358] Finally, in *Maffezini v. Spain*, the tribunal concluded that, for the exclusive purpose of determining the jurisdiction of ICSID, it is sufficient if the investor is able to make a *prima facie* case that the relevant company/entity is a State-entity acting on behalf of the Respondent State.[359] Attribution matters were actually left to be decided for the merits phase.[360]

276. Suffice it to say that ILC Articles 4, 5 and 8 do not provide general rules of attribution meaning that any act can be attributed to the State if the requirement of structure, function or control is met. The scope of these provisions is, rather, limited to conduct which constitutes a violation of international law, and should not be confused with rules on agency as they exist under private law.[361]

277. There remains the provision of Article 8 of the ILC Articles concerning the conduct of a person or group of persons directed or controlled by the State. In that circumstance, that conduct "shall be considered as an act of a State under international law if the person or group of persons is in

---

[356] *Wintershall et al. v. Government of Qatar,* UNCITRAL, Partial Award on Liability, 1988, 28 International Legal Materials 798 (1989), pp. 812 (Ex. CL-39).

[357] *Deutsche Schachtbau- und Tiefbohrgesellschaft v. United Arab Emirates,* ICC Case No. 3572, Final Award, 1982, Yearbook of Commercial Arbitration 111 (1989), para. 23-27.

[358] *Nykomb Synergetics Techonology Holding A.B. v. The Republic of Latvia,* SCC, Award, 2003, para. 4.2 (Ex. CL-26).

[359] *Emilio Agustín Maffezini v. Kingdom of Spain,* ICSID Case No. ARB/97/7, Decision on Jurisdiction, 2000, para. 75.

[360] *Id.*, para. 89.

[361] M. Feit, 'Responsibility of the State under International Law for the Breach of Contract Committed by State-Owned Entity' (2010) 28 Berkeley Journal of International Law 132, p. 154 (Ex. R-114).

fact acting on the instructions of, under the direction or control of that State in carrying out the conduct."

278. The Tribunal is of the view that "a person or group of persons" includes any corporation legally created. One may wonder why Article 5 of the ILC Articles refers to "conduct of a person or entity" while Article 8 mentions instead "persons or group of persons" but it is generally recognized in modern legal systems that "person" includes not only a natural person but also a legal person, such as a corporation. Moreover, the Mauritius-India BIT itself defines "investor" as covering both a natural person[362] and a legal person.[363]

279. The Tribunal notes in this regard that treaties concluded in the area of international investment protection appear generally to include juridical entities, such as corporations, within the definition of a "person." To cite only two conspicuous examples, pursuant to Article 25(2) of the ICSID Convention a "national of another Contracting State" is defined to include "any natural person" and "any juridical person."[364] Similarly, Article 13 of the MIGA Convention includes "any natural person" and "any juridical person" within the ambit of "eligible investors."[365]

280. Finally, it would make no sense to impose a restrictive interpretation that would allow a State to circumvent the rules of attribution by sending its direction or instruction to a corporate entity rather than a physical person or group of physical persons. Even when addressed to a corporation, the direction or instruction has to be received and acted upon by a person or a group of persons, be they the chairman, the president or the board of directors of that corporation.

281. In the present case, having regard to the circumstances leading to the Devas Agreement as they emerge from the pleadings of the Parties, the Tribunal concludes that, when entering into the Agreement, Antrix was not acting as an organ of the Respondent, whether under the provisions of Articles 4 and 5 of the ILC Articles. The Agreement itself does not constitute an obligation the Respondent has entered into within the meaning of Article 11(4).

---

[362] Article 1(1)(b)(i) of the Treaty.

[363] *Id*.

[364] Convention on the Settlement of Investment Disputes between States and Nationals of Other States, March 18, 1965.

[365] Convention establishing the Multilateral Investment Guarantee Agency, October 11, 1985.

282.  A question arises however as to whether, when Antrix served the Claimants with a notice of *force majeure*, Antrix was acting "on the instructions of, or under the direction or control" of the Respondent,[366] as described in Article 8 of the ILC Articles.

283.  It is important to note that Article 2 of the ILC Articles states that two conditions must be met for the attribution to a State of an internationally wrongful act: (i) the act must be attributable to the State under international law; and (ii) it must constitute a breach of an international obligation of the State. The answer to these questions has nothing to do with the liability of Antrix for breach of its contractual obligations under Indian law, a matter which has been dealt with by the ICC tribunal referred to in the present award.

284.  As stated by James Crawford and Simon Olleson:

> It is important that international law, and in particular the law of State responsibility, should not be made to do too much. In particular, international law should not be applied to decide issues to which it is not properly applicable and a fortiori, should not be applied to decide issues which, on analysis, are properly governed by a particular system of domestic law. As will be seen, this is a particular danger with the rules of attribution, which are often prayed in aid in relation to issues which in reality have nothing to do with questions of State responsibility.[367]

285.  A similar line of thought was expressed by Michael Feit when he observed:

> The basic difference between the principle of "piercing the corporate veil" and the rules of attribution as reflected in the ILC Articles is that under the former, the contract itself is attributed to the state, while under the latter, only the act which constitutes the breach of international law is attributed for the purpose of state responsibility.[368]

286.  The interpretation of Article 8 of the ILC Articles has been the subject of helpful analysis in the recent award and the decision on annulment relating to the *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey* case.[369] In that case, the tribunal, by majority, ruled that "while Emlak (the Turkish joint-venture partner of the claimant) was subject to TOKI's (a State entity) corporate and managerial control, Emlak's conduct with respect to the execution,

---

[366]  The Claimants specifically raised this issue in the Statement of Claim (para. 214), where they argue that "Antrix purportedly also undertook to terminate the Devas Agreement upon the instructions of the Space Commission and under the direction of the Department of Space." *See* Letter from B.S. Anantharamu, Deputy-Secretary, Department of Space to Executive Director, M/s. Antrix Corporation, Ltd., 23 February 2011 (Ex. R-37/JCB-221).

[367]  J. Crawford and S. Olleson, 'The Application of the Rules of State Responsibility', in M. Bungenberg, J. Griebel, S. Hobe and A. Reinisch (eds), *International Investment Law* (Nomos 2015), p. 414-415.

[368]  M. Feit, 'Responsibility of the State under International Law for the Breach of Contract Committed by State-Owned Entity' (2010) 28 Berkeley Journal of International Law 132, p. 151 (Ex. R-114).

[369]  *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Award, 2014, paras 301-326 and Decision on Annulment, 2015, paras 186-202.

maintenance and termination of the Contract is not attributable to the State under Article 8 of the ILC Articles due to an absence of proof that the State used its control as a vehicle directed towards achieving a particular result in its sovereign interests."[370] The tribunal also concluded that purely contractual claims were not covered by the relevant BIT.[371] Moreover, it unanimously decided that the challenged actions, including those of TOKI, the Supreme Audit Board, the Prime Ministry and the police, did not constitute violations of the relevant BIT.[372]

287.  Quoting the award approvingly, the annulment committee had this to say:

> Relying thus on Article 8 and its Commentary, the Tribunal stated that:
>
> The relevant enquiry remains whether Emlak was being directed, instructed or controlled by TOKI with respect to the <u>specific activity</u> of administering the Contract with Tulip JV in the sense of sovereign direction, instruction or control rather than the ordinary control by a majority shareholder in the company's perceived commercial interests.
>
> The Committee has no doubt that the Tribunal correctly interpreted Article 8 of the ILC Articles and applied the relevant test, that of effective control."[373]

288.  The Tribunal endorses the analysis of Article 8 contained in the *Tulip* case; however, based on the factual situation, the end result is quite different. While in the *Tulip* case, the tribunal concluded that there was no evidence supporting attribution of Emlak's acts to the State, there can be no doubt that, in the present case, Antrix, in invoking *force majeure*, was "acting on the instructions of, or under the direction or control of that State in carrying out the conduct," to quote Article 8.

289.  The text of the press release issued by the Government of India on February 17, 2011 confirmed the decision of the CCS to annul the Devas Agreement "forthwith"[374] and authorized the DOS to "instruct ANTRIX to annul the ANTRIX-DEVAS contract."[375] On February 23, 2011, the Deputy

---

[370]  *Id.*, Award, para. 326.

[371]  *Id.*, para. 361.

[372]  *Id.*, para. 368-369 and Decision on Annulment, para. 35.

[373]  *Id.*, Decision on Annulment, paras.188-189 (emphasis in original).

[374]  Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011. (Ex. C-134/JCB-220).

[375]  Minutes of 117th Meeting of the Space Commission Held at DOS Branch Secretariat, New Delhi, on July 2, 2010, signed July 21, 2010, para. 117.6.12 (Ex. R-23/JCB-161)

Secretary of DOS advised Antrix that it would be unable to lease any transponders in the S-band and that the Agreement "shall be annulled forthwith."[376]

290. Having found that Antrix's notice of annulment is attributable to the Respondent under Article 8 of the ILC Articles, it remains however to be determined whether, in the continuum of activities which led to the annulment of the Devas Agreement, the Respondent breached the provisions of the BIT—a question that the Tribunal will address in Chapters VII, VIII, IX and X of this Award.

### 4.   *Does Article 11(3) Prevent Entitlement to Compensation?*

#### a.   **The Claimants' Position**

291. The Claimants argue that "Article 11(3) merely provides that certain sovereign powers are unimpaired; it does not purport to suspend compliance with co-existent obligation of international law (including as stated in Articles 4, 6 and 7) regarding the treatment of investors nor does it override other obligations of international law. Accordingly, even if the annulment of the contract was authorized by Article 11(3)," the Claimants submit that their right of—and India's corresponding obligation to provide—compensation as a result of measures supposedly authorized by Article 11(3) "remains fully operative."[377]

#### b.   **The Respondent's Position**

292. The Respondent, however, argues that there could be no basis for compensation if the "essential security interests" provision of Article 11(3) is found to apply in this case. To support its argument, the Respondent refers to the *Continental Casualty* case[378] and the *CMS* annulment committee decision,[379] which in effect conclude that there is no possibility of compensation when the "essential security interests" provisions are invoked.[380]

---

[376]   Letter from B.S. Anantharamu, Deputy-Secretary, Department of Space to Executive Director, M/s. Antrix Corporation, LTD. (Ex. R-37/JCB-221).

[377]   Statement of Reply, para. 106; *See EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, para. 1178.

[378]   *Continental Casualty Company v. Argentine Republic,* ICSID Case No. ARB/03/9, Award, 2008, para.164.

[379]   *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, para. 146.

[380]   Respondent's Rejoinder, paras 69-72. *See Continental Casualty Co. v. Argentina*, ICSID Case No. ARB/03/9, Award, 2008, para. 164; *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, para. 146.

c.  **The Tribunal's Analysis**

293.  The Tribunal has no doubt that, if a State properly invokes a national security exception under an investment treaty, it cannot be liable for compensation of damages going forward. This is made clear in the *CMS* annulment committee decision when it opines in relation to the Article of the relevant treaty relating to state of necessity: "Article XI [*NB:* the security interests clause under the Argentina-United States BIT], if and for so long as it applied, excluded the operation of the substantive provisions of the BIT. That being so, there could be no possibility of compensation being payable during that period."[381] It added: "Article XI is a threshold requirement: if it applies, the substantive obligations under the Treaty do not apply."[382] Similarly, the *Continental v. Argentina* award noted that "if Art. XI is applicable because the measure at issue was necessary in order to safeguard essential security interest, then the treaty is inapplicable to such measure."[383] It has to be noted that, in the *CMS* case, Argentina argued that the economic measures adopted by Argentina were to be of a temporary nature and, as such, did not imply a permanent expropriation. However, the fact that in the present case the expropriation was of a permanent nature does not justify a different conclusion.

294.  However, this does not resolve the question as to what happens if a State has engaged in treaty breaches during the period preceding the invocation of national security. In such a case, a State could not, by invoking national security at a certain moment, simply erase the effect of previous wrongful actions.

295.  It will therefore be for the Tribunal to decide whether, even if national security interests were properly invoked by the Respondent, the Respondent breached provisions of the Treaty during the period previous to the invocation of Article 11(3) and, if so, whether damages resulted from such action.

**B.  APPLICATION OF THE LAW TO THE FACTS**

296.  The Parties fundamentally disagree as to whether there was a real need on the part of the military and security agencies of India to reserve S-band capacity, such that the intended uses could not be reconciled with the terms of the Devas Agreement.

---

[381]  *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, para.146.

[382]  *Id.*, para. 129.

[383]  *Continental Casualty Co. v. Argentina*, ICSID Case No ARB/03/9, Award, 2008, fn. 236.

1.    *The Parties' Arguments*

  a.    **Historical Analysis of Demands for S-band Spectrum in India**

  i.    The Claimants' Position

297.   The Claimants first note that at all times prior to Dr. Radhakrishnan's announcement of the annulment of the Devas Agreement on February 8, 2011 they remained unaware of any claim that any governmental user had a need for the S-band spectrum that had been allotted to Devas.[384]

298.   According to the Claimants, it was partly because DOS/ISRO was not making effective use of the allocated S-band spectrum that India caused DOS to give back 40 MHz of S-MSS spectrum to DOT.[385] The Claimants contend that in 2003, when Mr. Viswanathan first met Dr. Kasturirangan, the then Chairman of the Space Commission, Secretary of DOS and Chairman of ISRO and Antrix, Dr. Kasturirangan, indicated that DOS/ISRO was looking to explore ways of making commercial use of its allocated S-band spectrum in order to ensure that it retained that spectrum.[386]

299.   In the Claimants' view, India conveniently ignores that by 2008 terrestrial cellular operators had their eyes firmly fixed on the S-band, and were seeking to have DOS vacate the S-band spectrum that had been allocated to it for space services.[387] These claims were reviewed by the TRAI, which recommended that "DOT/WPC should coordinate with [DOS] and ascertain the feasibility of vacation of additional spectrum" in the S-band.[388] Nonetheless, India's policy in this regard

---

[384]   Statement of Claim, paras 87, 123; Statement of Reply, para. 29.

[385]   Statement of Reply, para. 21.

[386]   *Id.*, para. 23, Viswanathan I, paras 36-39. The Claimants also rely on a note from DOS to the Space Commission, which reads: "ISRO initiated serious discussions in early 2003 for introduction of Satellite-based Digital Multimedia in the country, especially taking note of the fact that the allocation of the S-Band spectrum for ISRO/DOS [...]. would expire by September 2010 unless [DOS/ISRO] placeS-Band Satellites in the orbit and demonstrate that necessary advance actions to build the Satellites have been taken." Note to Space Commission dated July 2, 2010 (Ex. C-219/JCB-160) (emphasis by the Claimants).

[387]   Statement of Claim, paras 135-37; Statement of Reply, paras 26-28. The Claimants note that, in March 2008, the Cellular Operators Association of India (the "**COAI**") has requested DOT that India's National Frequency Allocation Plan ("**NFAP**") be revised to reorient the S-band for purely terrestrial cellular operations; *See* COAI's Proposal for Review of Draft NFAP 2008, March 10, 2008, pp. 4-5 (Ex. C-43/JCB-80).

[388]   Statement of Reply, para. 28, citing Telecom Regulatory Authority of India, *Recommendations on Allocation and Pricing for 2.3-2.4GHz, 2.5-2.69 GHz & 3.3-3.6 GHz bands*, July 11, 2008, p. 16 (Ex. C-50/JCB-86).

remained unchanged, and there was no suggestion that the performance of the Devas Agreement might be interrupted because of alleged competing demands for S-band capacity.[389]

300. Notwithstanding the fact that Devas was never informed of competing demands from the Ministry of Defence, the Claimants reject the Respondent's claims that India's military needs for all available S-band capacity started to emerge in 2003[390] and had crystallized by December 2009. According to the Claimants, the only evidence of early "competing demands" is that DOS/ISRO/Antrix willingly pursued an agreement with Devas with full knowledge of these competing "demands", and that Antrix represented to Devas that it could provide 70 MHz of S-band through the satellites on a "Non-Preemptible" basis.[391]

301. According to the Claimants, if the military had genuine demands for the S-band allocated to Devas under the Devas Agreement, then this fact would prominently feature in key documents produced during the review of the Devas Agreement by several Indian governmental agencies and officials.[392] Instead, Dr. Radhakrishnan's Note for the CCS does not mention any "crystallized" military needs,[393] and the policy decision of the CCS merely notes that Antrix was not going to use an orbital slot for commercial purposes. Moreover, it makes no decision regarding spectrum.[394] In any event, the Claimants contend that the CCS did not have the power to reserve S-band spectrum for the "crystallized needs" of the military, which would have had to be taken up at the ICC.[395]

302. In the Claimants' view, the formulations used in these documents to refer to these "national needs" are intentionally non-exhaustive and indeterminate, and are drafted in order for the

---

[389]   Statement of Reply, para. 29.

[390]   *Id.*, para. 52.

[391]   *See supra*, Chapter III - BC.

[392]   *See* Statement of Reply, paras 50, 53 referring to Suresh Report, May 2010, (Ex. C-94/JCB-146); Memo from K. Radhakrishnan, Secretary, Department of Space, to T.K. Viswanathan, Advisor to Law Minister, Ministry of Law and Justice, June 16, 2010 (Ex. R-26/JCB-154); Note for the CCS, paras 44.1-44.7 (Ex.C-229/JCB-219); Note to the Additional Solicitor General (Parasaran) by DOS (Radhakrishnan) July 8, 2010 (Ex. C-220/JCB-164); Opinion of the ASG, pp. 1-2 (Ex. R-30/JCB-165); HQ Integrated Defence Staff, Note, October 14, 2005 (App. VA-2/JCB-42).

[393]   Statement of Reply, para. 37(j), referring to Note for the CCS (Ex. C-229/JCB-219).

[394]   Transcript, Day 1, 89:6-17.

[395]   *Id.*; Day 5, 1204:13-21.

Government of India to "back and fill" whatever *post-hoc* justification might suit its convenience in subsequent litigation that surely would follow.[396]

303.    The true motivation behind the cancelation of the Devas Agreement, in the Claimants' view, was the prospect of a government scandal, which could end up lying at the feet of the Prime Minister (and Minister of Space) himself, and not any "crystallized needs" of the military.[397]

ii.    The Respondent's Position

304.    The Respondent contends that, even prior to the conclusion of the Devas Agreement, the need for S-band had already been the subject of discussion within the agencies charged with national security and defence.[398] The Respondent recounts a lengthy record of facts to support this contention,[399] spanning from 2003 to 2011. What emerges from this record, the Respondent submits, is that the needs and demands arising from military and defence purposes were consistently emphasized by statements of the India Air Force,[400] senior military officers,[401] the

---

[396]    Statement of Reply, para. 49.

[397]    *Id.*, para. 36; *See* Statement of Claim, paras 86-87; Statement of Reply, para. 37; Viswanathan I, para. 165; Letter from Dr. Ashok Chandra to ISRO (Balachandhran), June 4, 2010 (Ex. C-210/JCB-144); Letter from DOT (P.J. Thomas) to DOS/ISRO (Radhakrishnan), June 14, 2010 (Ex. C-211/JCB-149); *Madhumathi D.S. & Thomas K Thomas, Devas gets preferential allocation of ISRO's spectrum,* The Hindu Business Line, May 31, 2010 (Ex. C-208/JCB-142); *Another Spectrum Sold in the Quiet,* The Hindu Business Line, June 1, 2010 (Ex. C-209/JCB-143).

[398]    Statement of Defence, paras 37-38; Respondent's Rejoinder, paras 12-13; *See also* Anand, paras 4-6; *We Need Military Satellite: Air Chief,* The Hindu, June 28, 2003 (Ex. R-20/JCB-12); Directorate of Naval Signals, *Draft Naval Staff Qualitative Requirements for Naval Communications Satellite,* April 5, 2004, paras 9, 11 (App. VA-1/JCB-16).

[399]    *See* Statement of Defence, para. 37; Respondent's Rejoinder, para. 12. The Respondent submits that the fact that the record is replete with documents tracing the needs of the military and security agencies for S-band spectrum is an undisputed material fact in this case; *See* Transcript, Day 1, 125:4-136:14; Day 5, 1281:8-1286:18.

[400]    Rajat Pandit, *IAF is Keen on Aerospace Command, Says New Chief,* Times of India, January 7, 2005 (Ex. R-21/JCB-35).

[401]    HQ Integrated Defence Staff, Note, October 14, 2005 (App. VA-2/JCB-42).

Ministry of Defence,[402] and warranted the creation of expert committees of military leaders,[403] and a taskforce at the ISRO[404] to address these issues.

305.   The Respondent avers that, as a consequence of a detailed review of capacity requirements for strategic purposes, it became clear that the national security requirements far exceeded India's S-band capacity, assuming that the orbital slot and frequency allocations necessary for the Devas Agreement were to be granted to Devas.[405] It was this fact that motivated the policy decision to reserve the S-band for strategic use, and not a bad faith conspiracy, as argued by the Claimants.[406] In any event, the Respondent notes, referring to a meeting that took place in 2014, that "the reservation of S-band capacity for strategic purposes was made in 2011 and continues in effect today, with the satellites being configured for strategic use and the defence agencies picking up the tab."[407]

### b.   MSS Demands Versus BSS Demands

#### i.   The Claimants' Position

306.   The Claimants assert that India's defence suffers a fatal lacuna: the military's stated desires all involved MSS frequency, whereas the Devas Agreement pertained to the use of the BSS spectrum.[408] In the Claimants' view, this fact disproves the Respondent's contention that there

---

[402]   Minutes of the Integrated Space Cell Meeting held on February 19, 2007 at HQ IDS, March 26, 2007 (App. VA-5/JCB-66).

[403]   HQ Integrated Defence Staff, Convening Order, Constitution of Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 GHz to 2.69 GHz (S-band) by Defence Services, August 30, 2007 (App. VA-6/JCB-73).

[404]   Office Order from G. Madhavan Nair, Chairman, ISRO/Secretary, Department of Space, Task Team for Configuring an S-band Communication Satellite for HQ IDS, May 20, 2009 (App. VA-9/JCB-105).

[405]   In particular, the Respondent notes that, in addition to the 8 MHz of S-band that were to be utilized by the satellite for the Navy that was ordered in 2004 and launched in August 2013, a number of additional military and paramilitary needs had been identified, including 17.5 MHz for immediate requirements of the armed forces, another 40 MHz during the five year period from 2012 to 2017, another 50 MHz during the subsequent five year period (2017-2022) and requirements for security agencies and India Railways. *See* Statement of Defence, para. 38; Anand I, paras 5-6, fn. 21; Minutes of Meeting held on December 15, 2009 at ISAC, Bangalore between ISC of HQ IDS, MOD and ISRO, p. 3 (App. VA-10/JCB-134); Note for the CCS, paras 20-21 (Ex.C-229/JCB-219); Minutes of 117th Meeting of the Space Commission held at DOS Branch Secretariat, New Delhi, on July 2, 2010, signed July 21, 2010 (Ex. R-23/JCB-161).

[406]   Respondent's Rejoinder, para. 11. The Respondent emphasizes that it is not disputed that the CCS reserved the S-band for strategic purposes. *See* Transcript, Day 1, 124:5-125:3.

[407]   Transcript, Day 1, 136:15-138:8. *See* Minutes of 128th Meeting of Space Commission held on April 12, 2014 at DoS Branch Secretariat, New Delhi (Redacted), May 16, 2014 (App. KS-17/JCB-288).

[408]   Statement of Reply, para. 54.

were genuine military or strategic needs for the portion of the S-band spectrum that had been allocated to Devas.

307.  To support this contention, the Claimants rely on a "Note for the Empowered Group of Ministers ("**EGoM**")[409] on Vacation of Spectrum," authored by DOT and dated March 1, 2012 (the "**Note for the EGoM**").[410] This note and its annexures were all issued more than a year after the Devas Agreement was annulled.

308.  First, the Note for the EGoM clarifies that the "strategic and government" need of S-band spectrum is for MSS, and that DOS was seeking to convert the existing BSS spectrum (including the 60 MHz of BSS spectrum allocated to Devas) to MSS.[411] In the Claimants' view, this demonstrates that there was no existing military need for BSS spectrum.[412] The Claimants also note that the EGoM and DOT were aware that this conversion would contravene the ITU's regulations.[413]

309.  Secondly, the Note for the EGoM and Annexure 10 thereto, as well as a letter dated February 21, 2012 from Mr. Chandrashekhar to Dr. Radhakrishnan,[414] state that DOS was requested to vacate part of the 80 MHz of S-BSS spectrum assigned to it if DOS had no plan for BSS applications in this band. The Claimants argue that such a recommendation would not have been made to the EGoM, of which the Minister of Defence is a member, if the crystallized military plans for BSS existed. A similar remark is made with regard to the minutes of the EGoM meeting held on March 5, 2012, which reflect that DOS was asked to apprise the EGoM as to its plans for using BSS spectrum.[415]

310.  In the Claimants' view, the documents above disprove Mr. Anand's unsupported statement that the military demanded BSS spectrum "due to the limitations of the MSS."[416]

---

[409]  According to the Claimants, an EGoM is "virtually a mini cabinet" that may decide on issues normally reserved to the Indian Union Cabinet. *See* Transcript, Day 1, 86:15-87:8.

[410]  Note for the Empowered Group of Ministers on Vacation of Spectrum March 1, 2012 (the "**Note for the EGoM**") (Ex. C-232/JCB-247).

[411]  Statement of Reply, para. 56; Note for the EGoM, pp. "52/59", "54/59" (Ex. C-232/JCB-247).

[412]  Statement of Reply, para. 56.

[413]  *Id.*, para. 57; Note for the EGoM, pp. "10 of 59", "58/59" (Ex. C-232/JCB-247).

[414]  Statement of Reply, para. 57; Note for the EGoM, March 1, 2012, pp. "10 of 59", "58/59" (Ex. C-232/JCB-247).

[415]  Statement of Reply, para. 59.

[416]  *Id.*, para. 55, referring to Anand I, fn. 5.

ii.      The Respondent's Position

311.  The Respondent emphasizes the intensifying discussions within the Government of India over the use of the S-band as the military learned of the limitations of MSS frequency for their data communication.[417] These limitations arose from the fact that two-way communications such as MSS cannot support sending large amounts of data to multiple users simultaneously, as opposed to satellite broadcasting, which is the case of BSS.[418]

312.  The Respondent characterizes the Claimants' argument that the Note for the EGoM disproves the existence of genuine military needs for the S-band[419] as a "quantum leap" that suffers a twofold deficiency:

313.  First, it is undisputed that the CCS reserved the S-band for non-commercial, strategic use, and such reservation remains in effect.[420] This is true notwithstanding any debates taking place before, during or after the policy decision of the CCS, which are legitimate and inherent to the democratic spirit of India.[421] The Note for the EGoM proves nothing as to the continued effectiveness of the policy decision of the CCS.[422]

314.  Secondly, the Claimants overlook a number of documents produced to them together with the Note for the EGoM, including:

i.      A March 1, 2012 letter from Dr. Radhakrishnan, as Secretary of DOS, to the Secretary of DOT,[423] referring to the letter dated February 21, 2012 from Mr. Chandrashekhar to Dr. Radhakrishnan,[424] which makes clear that the strategic, non-commercial needs for S-band continued to exist and that, in light of those needs, it would not be possible to vacate S-band spectrum for commercial BWA purposes;[425] and

---

[417]   Statement of Defence, para. 38.

[418]   *Id.*, para. 38; *see* Anand I, para. 4; Sethuraman I, paras 6, 17, fn. 37.

[419]   Respondent's Rejoinder, paras 20-23, referring to Statement of Reply, para. 56.

[420]   The Respondent submits that this is an undisputed material fact in this case. *See* Transcript, Day 1, 119:7-121:6; Day 5, 1278:16-1281:1.

[421]   Respondent's Rejoinder, para. 21.

[422]   *Id.*, para. 22.

[423]   Letter from DOS to DOT, March 1, 2012 (Ex. C-233).

[424]   Note for the EGoM, March 1, 2012, pp. "10 of 59", "58/59" (Ex. C-232) (*see supra*, para. 309).

[425]   Letter from DOS (Radhakrishnan) to DOT (Chandrasekhar), March 1, 2012 (Ex. C-233/JCB-248), which reads, in relevant part: "Hence, considering the national imperatives for space-based communication

ii.   A Note produced by DOS on March 28, 2014, in preparation for the 128th Space
Commission Meeting, regarding the revised cost estimates and revised utilization plan
for GSAT-6 and GSAT-6A. This note explains that the Defence Research and
Development Organisation (the "DRDO"), which works under the Ministry of Defence,
is responsible for the development of the ground segment related to the operations of
the satellites.[426] That segment involves "a) Design and Development of Hub Station, b)
Development and realization of Ground Terminals, c) Design and Development of
Scalable Network Management System for Network Resource Management."[427]

## 2.   The Tribunal's Analysis

315.   The Tribunal will first consider whether there was a genuine need on the part of the military and
security agencies of India to reserve S-band capacity. The Respondent contends that that is the
case. The Claimants, on the other hand, question that the S-band demands expressed by the Indian
military between 2003 and 2009 were genuine. They insist that all the references to "national
needs" featuring in the documents produced during the review of the Devas Agreement are
intentionally non-exhaustive and indeterminate, and were merely used as a pretext by India to
concoct a *force majeure* event that would enable Antrix to terminate said Agreement on
advantageous terms.

316.   The Tribunal did not have the benefit of testimonies from senior officials who were directly
involved in the process leading to the CCS decision of February 17, 2011, such as Dr. K.
Radhakrishnan who, since late 2009, was Chairman of the Space Commission, Chairman of
ISRO, Secretary of DOS and, until July 2011, Chairman of Antrix, or Mr. G. Balachandran,
Additional Secretary of DOS from April 1, 2009 to January 11, 2011, or Mrs. Geeta Varadhan,
Director of Special Projects at DOS, who appears to have had long exposure to the needs of the
military concerning the S-band and who, according to Mr. Anand, was the person who, at a
meeting of senior officials of DOS in June 2010, raised the issue of the needs of the military over
the S-band.[428] Nor was the Tribunal provided with any testimony from any member of the
Department of Defence.

---

systems for strategic applications, it will not be possible or be prudent to vacate this 80 MHz (2555-2635
MHz) of the S-band for BWA applications. The EGOM may kindly be briefed accordingly."

[426]   Department of Space, Note to Space Commission for the 128th Space Commission Meeting, March 28,
2014, paras 4.6 and 4.7 (Ex. KS-15/JCB-287).

[427]   *Id.*, paras 4.6 and 4.7.

[428]   Transcript, Day 4, 913:6-15.

317.   Messrs. Sethuraman and Anand were cooperative and helpful witnesses but a large part of their testimony consisted in presenting their interpretation of many documents in the preparation of which they had no participation whatsoever.

318.   As far as the Claimants are concerned, they produced a number of witnesses and experts who provided considerable information concerning the negotiation and the implementation of the Agreement as well as expertise on the allocation and management of spectrum. However, in spite of over a dozen meetings with government officials between June 2010 and the end of January 2011, none of the Claimants was informed of the internal government process which led to the CCS decision of February 17, 2011, until Dr. Radhakrishnan's press conference of February 8, 2011 at which he announced for the first time the Space Commission's decision of 2 July 2010 to annul the Agreement. They therefore were in no position to shed light on the deliberations of governmental authorities during the most relevant period.

319.   The Tribunal finds itself having to rely very much on the documents submitted by the Parties in reaching its own conclusion as to the Respondent's decision to annul the Agreement and reserve the GSAT-6 and 6A satellites "having regard to the needs of [India's] strategic requirements."[429]

320.   The Tribunal has summarized above the events surrounding the decision to annul the Agreement. The Tribunal is faced with the difficult task of assessing whether that decision was based on genuine security needs of the State or whether these alleged needs were a mere pretext to annul a contract which was becoming a political embarrassment and to meet the wishes expressed by other groups in the communications industry providing terrestrial services.

321.   The Tribunal is left with no doubt that, inside the Indian administration, during the discussions leading to the request to the CCS for the annulment of the Devas Agreement, a mix of factors was at play.

322.   First and foremost, the fear of a political scandal similar to the previous one relating to the attribution of G2 licenses and arising out of the publication of some articles on the subject in Indian media is a likely explanation of the sudden frenzy in June 2010 of the DOS, and of Dr. Radhakrishnan in particular, in agitating for and obtaining from the Space Commission in less than a month the decision to annul the Devas Agreement.

---

[429]   Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220).

323.   All this occurred in a context where at no time between the signing of the Agreement in 2006 and the decision to annul it in 2011, and in spite of alleged repeated requests since 2006 by the military for the allocation to it of at least part of the S-band, did the Respondent give any indication to the Claimants that the Agreement might be in jeopardy because of such needs.

324.   After the publication of press articles on May 31 and June 1, 2010[430] suggesting that there might have been some inappropriate dealings in connection with the Agreement, DOT, by letter of June 4, 2010[431] requested the Additional Secretary of ISRO "to provide your comments […] immediately;" this was followed by another letter of June 14, 2010[432] to the same effect addressed to Dr. Rhadakrishnan. These letters initiated a flurry of actions by ISRO aimed at annulling the Agreement.

325.   On the same date, Dr. Rhadakrishnan requested from Antrix six copies of the Agreement which were immediately provided.[433] On June 16, 2010 in a letter to DOT, after pointing out that two issues were confronting the Respondent, he sought DOT's "opinion on whether ANTRIX-Devas contract need be annulled invoking any of the provisions of the contract in order (i) to preserve the precious S band for the strategic requirements of the nation and (ii) to ensure a level playing field for the other service providers using terrestrial spectrum."[434] On the same date, Dr. Rhadakhrisnan wrote to the Advisor to the Law Minister, raising the same two issues and seeking a legal opinion "on whether ANTRIX-Devas contract need be annulled invoking any of the provisions of the contract […]."[435] He also flew from Bangalore to New Delhi to discuss the matter with the Advisor. Two days later, on June 18, 2010 the Advisor produced a note[436] stating that "the Central Government (Department of Space), in exercise of its sovereign power and function, if so desire and feel appropriate, may take a policy decision to the effect that due to the needs of strategic requirements, the Central Govt/ISRO would not be able to provide orbit slot in S-band for operating PS1 to the ANTRIX for commercial activities. In that event, ANTRIX in

---

[430]   Madhumathi D.S. & Thomas K. Thomas, *Devas gets preferential allocation of ISRO's spectrum*, The Hindu Business Line, May 31, 2010 (Ex. C-208); *Another spectrum sold on the quiet*, The Hindu Business Line June 1, 2010 (Ex. C-209/JCB-143).

[431]   Letter from Dr. Ashok Chandra to ISRO (Balachandhran), June 4, 2010 (Ex. C-210/JCB-144).

[432]   Letter from DOT (Thomas) to DOS/ISRO (Radhakrishnan), June 14, 2010 (Ex. C-211/JCB-149).

[433]   Letter from Antrix (Parameswaran) to DOS (Balachandran), June 14, 2010 (Ex. C-213/JCB-151).

[434]   Memo from K. Radhakrishnan, Secretary, Department of Space, to Secretary, Department of Telecommunications, June 16, 2010 (Ex. R-25/JCB-153).

[435]   Memo from K. Radhakrishnan, Secretary, Department of Space, to T.K. Viswanathan, Advisor to Law Minister, Ministry of Law and Justice, June 16, 2010 (Ex. R-26/JCB-154).

[436]   Note from T.K. Viswanathan, Advisor to the Minister for Law and Justice, Ministry of Law and Justice, to the Department of Space, June 18, 2010 (App. VA-18/JCB-156).

terms of Article 7(c) read with Article 11, of the agreement may terminate the agreement and inform M/s Devas accordingly."[437] He added: "As far as the second issue relating to terrestrial supplementation and level playing field since the Department of Telecom is administratively concerned that Department may also be consulted."[438]

326. Following the submission of an extensive note by DOS to the Space Commission, that Commission decided, among other things, at its meeting of 2 July 2010, that the Department of Space "in view of priority to be given to nation's strategic requirements including societal ones may take the actions necessary and instruct Antrix to annul the ANTRIX-Devas contract" and "may evolve a revised utilization plan for GSAT-6 and GSAT-6A satellites, taking into account the strategic and societal imperatives of the country."[439]

327. Subsequent to that decision and following a request from DOS, the Additional Solicitor General stated in a letter of 12 July 2010 that his opinion had been sought as to whether the Agreement "can be annulled by invoking any provisions of the contract in order to (i) preserve precious S band spectrum for strategic requirements of the nation and (ii) to ensure a level playing field for other service providers using terrestrial spectrum."[440] He advised that, instead of a mere decision by the Department of Space, "it would be more prudent that a decision is taken by the Government of India, as a matter of policy, in exercise of its executive power or in other words, a policy decision having the seal and approval of the Cabinet and duly gazetted as per the Business Rules of the Government of India."[441]

328. Finally, in its Note for the Cabinet Committee on Security of February 16, 2011, DOS, after describing the need of "S-band spectrum for vital and societal applications,"[442] again refers to its concerns about ensuring "a level-playing field for the other service providers using terrestrial spectrum."[443]

---

[437]   *Id.*, para. 12.

[438]   *Id.*, para. 13.

[439]   Minutes of 117th Meeting of the Space Commission Held at DOS Branch Secretariat, New Delhi, on July 2, 2010, signed July 21, 2010, para. 117.6.12 (Ex. R-23/JCB-161).

[440]   Opinion of the ASG, p. 2 (Ex. R-30/JCB-165).

[441]   *Id.*, p. 4.

[442]   Note for the CCS, para. 19-22 (Ex.C-229/JCB-219).

[443]   *Id.*, para. 24.

329.  This, by itself, however cannot be a basis for the Tribunal to conclude that the decision of the Respondent to annul the Agreement was invalid.

330.  First, it is a regular phenomenon in public administration that decisions are influenced by a number of factors including, sometimes, purely political ones.

331.  Second, and more important, while records of deliberations at senior levels of the Respondent's public administration might be helpful to understand the context in which a particular decision was reached, what should guide the Tribunal is the actual decision taken by the highest authority of the Government, i.e. its Cabinet, which had delegated to the Cabinet Committee on Security decisions concerning that subject, a Committee which was presided by the Prime Minister himself, who was also the Minister responsible for the DOS.

332.  The decision of the CCS concerning the Devas Agreement was communicated in the form of a press release of February 17, 2011 which reads:

> Cabinet Committee on Security (CCS) has decided to annul the Antrix-Devas Deal. Following is the statement made by the Law Minister, Shri M. Veerappa Moily on the decision taken by the CCS which met in New Delhi today:
>
> Taking note of the fact that the Government policies with regard to the allocation of spectrum has undergone a change in the last few years and there has been an increased demand for allocation of spectrum for national needs, including the needs of defence, para-military forces and other public utility services as well as for societal needs, and having regard to the needs of the country's strategic requirements, the Government will not be able to provide orbit slot in S band to Antrix for commercial activities, including for those which are the subject matter of existing contractual obligations for S band.
>
> In the light of this policy of not providing orbit slot in S band to Antrix for commercial activities, the "Agreement for the lease of space segment capacity on ISRO/Antrix S-Band spacecraft by the Devas Multimedia Pvt. Ltd" entered into between Antrix Corporation and Devas Multimedia Pavt. Ltd. on 28th January, 2005 shall be annulled forthwith.[444]

333.  In fact, the decision of the CCS as reported in the statement of the Law Minister replicates word for word the approval sought by the DOS in its Note to the CCS of February 16, 2011.[445]

---

[444]   Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220).

[445]   Note for the CCS, para. 45(1) and (2) (Ex. C-229/JCB-219).

334. Nothing in that decision implies that it was reached in whole or in part to accommodate the concerns expressed by other service providers using terrestrial spectrum or to deal with the risk of a political scandal in connection with the Antrix-Devas Agreement.[446]

335. Moreover, the fact that the CCS did not make a specific allocation of the spectrum cannot be considered as a deciding element in considering whether the CCS decision was taken for the protection of the Respondent's essential security interests. As the Claimants themselves have argued, such function came under the authority of the ICC. This fact does not restrict the power of the CCS to decide that any particular activity be "directed to the protection of (the) essential security interests" of the State. In the present case, if such a decision was taken, there was nothing inappropriate in leaving it to the proper administrative authorities to decide how the spectrum would be allocated between the various interested parties.

336. The Tribunal has received uncontroverted evidence that, starting as early as 2004, officials in the Ministry of Defence were concerned about the needs of the Indian military for S-band capacity.

337. On April 5, 2004, the Naval Headquarters wrote to ISRO regarding the requirement of the Navy for a dedicated satellite. In this communication it was stated as follows:

> The importance of reliable, secure, real time and uninterrupted tactical as well as strategic communications, in the Navy can never be over emphasised. Ship shore communications serve command and control functions, need to be global in nature and are therefore termed strategic communications.[447]

338. The importance of space capabilities for the Defence forces was brought out in a note of the Vice Admiral, Headquarters Integrated Defence Staff dated October 14, 2005. The relevant extract of the note reads:

> 1. Space Systems are beginning to become an integral component of the total combat potential of many nations. It is but imperative that our Defence Forces do not lack in the exploitation of Space for War fighting. Till 2008 Indian Space capability and programmes have been defined and there is no alternative but to exploit available assets except for minor up gradations where feasible, during this time frame.

---

[446] In a note of April 12, 2011 to the Prime Minister (Ex.R-44/JCB-229, para.36) concerning the Report of March 11, 2011 by the High Powered Review Committee which was appointed after the CCS decision to study various aspects of the Agreement (Ex.C-137/JCB 227), Mr.Chandrashekhar, the Cabinet Secretary, writes as one of his conclusions that "seem to emerge from the analysis of the HPRC report and other evidences" is that "[…] since the agreement has now had to be cancelled on account of reasons related to non-transparency and one-sided skew in risk sharing arrangements, ISRO/DOS are left with a satellite […] which has no immediate commercial application.". However, there is no indication in the HPRC Report that such concerns were a factor in the CCS decision; such concerns do not appear either in the reasons invoked by the CCS in support of its February 17, 2011 decision.

[447] Directorate of Naval Signals, Draft Naval Staff Qualitative Requirements for Naval Communications Satellite, April 5, 2004, p. 2 (Ex. VA-1/JCB-16).

However, beyond that period our Defence Forces should be able to examine and specify the needs to enable our technologists to support our requirements. Space capabilities are vital tools of the Information Revolution and critical to activities of the Defence Forces. Space is emerging as a centre of gravity for information dependent forces and it is highly probable that continued and assured access to Space will be a major determinant of national power [...].

2.  Lack of Policy with respect to exploitation of Space Systems, which are now a universally accepted phenomenon, by the Armed Forces, could lead to a void in Space related research and the Defence Forces, could miss the opportunity for early involvement and influence over Space Programmes. This has possibly occurred till 2008 as a fait accompli and we must plan our strategy for space asset accruels beyond 2008. This document would prima facie address our broad technology requirements based on mission statements of our Defence Forces.

3.  [...].

4.  Defence Space Vision 2020 is intended to be futuristic in content and would be the Base Document for formulating the Space Strategy and Space Doctrine for the Armed Forces, after approval of the COSC, which was eventually accorded on October 14, 2005.[448]

339.  Para. 2 of the aforementioned note talks about planning strategy for space. Para. 4 refers to the Defence Space Vision, 2020, intended for formulating the space strategy. An appendix to the document, *inter-alia*, reflects the requirement of S-band for strategic use:

| 2010 | 86 MWZ |
|------|--------|
| 2015 | 151 MWZ |
| 2020 | 208 MWZ |

340.  The minutes of the third task force meeting between various representatives of the Army, Air Force, Navy and Department of Space held on February 21, 2006 recorded a concern about the rapid build-up of the Chinese Space Programme and need to take cognisance of this aspect and develop a space programme to effectively combat the proliferation. The minutes also point out the inescapable necessity of S-band for the armed forces for interference free communications. The required projection of S-band required for armed forces was mentioned as under:

86MHZ-151 MHZ-208 MHZ for short, medium and long term respectively.[449]

341.  HQ Integrated Defence Staff in its note of August 9, 2006, sent to Ms. Geeta Vardan PD(SP) ISRO HQ and three officers of the Defence establishment, referred to the Bandwidth Projections of Service HQs for Satellite communications mentioned in Defence State Vision 2020 (DSV) dated October 14, 2005 and requested that the matter be taken up with the DOT for blocking the

---

[448]   HQ Integrated Defence Staff, Note, October 14, 2005 (Ex. VA-2/JCB-42).

[449]   Minutes of Third Task Force Meeting with DoS held on February 21, 2006 at HQ IDS New Delhi, March 6, 2006 (Ex, VA-3/JCB-56).

bandwidth in the S-band and in some other bands specified therein for satellite communications of the three services as per requirements envisaged in DSV 220.[450]

342. The minutes of the integrated space cell meeting held on February 19, 2007 projected the requirement of S-band based on the number of satellite projects already operational and planned in the future. From the bandwidth projections worked out, it was expressed that the present series "INSAT" and "GSAT" cannot meet the army's futuristic requirement of bandwidth and it was proposed to have a Dedicated Army Communication Satellite.[451]

343. On August 30, 2007, the Chiefs of Staff Committee directed that an Expert Committee be formed by HQ Integrated Defence Staff, which was to be guided by the following terms of reference:

    a.    Spectrum uses by various services in Band 2.5GHz and 2.69 GHZ.

    b.    Present and planned satellite uses by the services on satellite bands by DoS.

    c.    Defence services support to DoS or otherwise at various national and international forums for protection of band 2.5GHz and 2.69GHz in favour of DoS without laying under constitution to satellite services."[452]

344. While directing that the Expert Committee be formed, it was recorded that the Defence Services had present and future applications in the band from 2.5 GHz to 2.69 GHz on various satellites launched by the DOS and representatives of the DOS were actively involved in the protection of said bands at various national and international forums.

345. Pursuant to the direction of the Chiefs of Staff Committee, the Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 to 2.69 GHz (S-band) was constituted. The following observations of the Expert Committee dated September 7, 2007 need to be noticed:

    11.    If this spectrum (2.5-2.69 GHz) is lost to commercial operators, it would severely jeopardize the future Defence services plans, of providing mobile SATCOM connectivity.

    12.    In view of the above, it is strongly recommended that the 'S' band Spectrum be safeguarded from being poached by the commercial operators for meeting the future requirements of the Defence Services. Proposal from the IAF for a dedicated satellite to utilize the 'S' Band spectrum, which is under finalization, would also strengthen

---

[450]   HQ Integrated Defence Staff Ops Branch/IW & IT Dte, Note, Bandwidth Requirements - Satellite Commn, August 9, 2006 (Ex. VA-4/JCB-64).

[451]   Minutes of the Integrated Space Cell Meeting held on February 19, 2007 at HQ IDS, March 26, 2007 (Ex. VA-5/JCB-66).

[452]   HQ Integrated Defence Staff, Convening Order, Constitution of Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 GHz to 2.69 GHz (S-band) by Defence Services, August 30, 2007 (Ex. VA-6/JCB-73).

> the case for retention of spectrum. The non availability of the Spectrum could stymie the future operational plans of the Defence services.[453]

346.  On November 19, 2008 a special meeting was held, which was attended by representatives of the Army, Air Force, Navy and ISRO to address satellite-based communication issues. A representative of ISRO proposed that the HQ Integrated Defence Staff need to consolidate the requirement of S-band for various services to enable an optimal utilisation by way of the dedicated S-band-specific satellite.[454]

347.  On December 15, 2009 at a meeting in ISAC, Bangalore, between ISC, HQ Integrated Defence Staff, Ministry of Defence and ISRO, the military presented details concerning the national security requirements for satellite services. At this meeting, the armed forces set forth their requirements for S-band as follows: "(i) to cater for requirements up to 2012—120 Carriers, 17.5 MHz. out which 50 Carriers are being used by the armed forces;(ii) Additional in 12th Plan—40 MHz.; (iii) Additional in 13[th] Plan—50 MHz."[455]

348.  Joint Communications Electronic Staff of HQ Integrated Defence Staff, by its letter dated April 23, 2010[456] informed ISRO of the bandwidth requirements of the Army, Navy and Airforce. As per the Appendix attached to the letter, the requirement of the three wings of the armed forces for S-band were specified:

|  | *Addl.* | *Total* |
|---|---|---|
| *2012* | *17.5* | *120* |
| *2012 to 2017* | *50* | *52.5* |

349.  The note of the Additional Secretary, Department of Space dated June 30, 2010 referred to the meeting between the Integrated Space Cell and ISRO. The note not only projected the need for S-band by the armed forces but it also referred to the demands of other security agencies such as

---

[453]  Report of the Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 to 2.69 GHz (S-band) by Defence Services, September 2007 (Ex. VA-7/JCB-74).

[454]  Minutes of the Special ISC Meeting between Reps of ISRO & Reps of Three Services to Address Satellite Based Communication Related Issues, November 25, 2008 (Ex. VA-8/JCB-92).

[455]  Minutes of Meeting held on December 15, 2009 at ISAC, Bangalore between ISC of HQ IDS, MOD and ISRO, January 25, 2010 (Ex. VA-10/JCB-134).

[456]  Letter from the Ministry of Defence to ISRO/Department of Space, April 23, 2010 (Redacted) (Ex. R-150/JCB-141).

the BSF, CISF, CRPF and the police for S-band transponders. The requirement for S-band was also projected by the railways for tracking of trains.[457]

350. The Tribunal has also received evidence that, subsequently to the CCS decision of February 2011, significant changes have been made to GSAT-6 to accommodate the specific needs of the armed forces[458] and that the Defence Research and Development Organization was made responsible for the ground segment development of GSAT-6 and GSAT-6A.[459]

351. But this is not the end of the matter. While the events related above provide helpful information concerning the administrative process followed both before and after the CCS decision, what is the determinant factor for the Tribunal is that decision itself and whether it was directed to the protection of the Respondents essential security interests.

352. The Tribunal does not question the right of the Respondent to terminate the Agreement and to decide that the S-band would be reserved in the future for non-commercial activities. Two avenues were opened to it; one under Article 6 of the Treaty whereby the Respondent could expropriate for public purposes the rights of the Claimant under the conditions enunciated in that Article and the other one under Article 11(3) when, among other things, the Respondent's decision was "directed to the protection of the essential security interests" of the State. Each of these avenues however leads to very different conclusions in terms of liability and compensation.

353. Article 11(3) constitutes an important exception to the provisions of the Treaty and, while proper deference must be given to State authority in defining what its essential security interests are, it must be interpreted in accordance with the provisions of the VCLT.

354. The problem in the present case is that the decision of the CCS itself contains a mix of objectives. Even though there is nowhere in the CCS decision any specific reference to the Respondent's "essential security interests," the Tribunal, by majority, has no difficulty concluding that the reservation of spectrum for the needs of defence and para-military forces can be classified as "directed to the protection of its essential security interests", coming under the exclusion covered in Article 11(3) of the Treaty; however, the same cannot be said when it comes to taking over the spectrum allocated to the Claimants for "railways and other public utility services as well as for

---

[457]   Department of Space, Note to Space Commission, Agenda Item No. 4: GSAT-6/6A - Contract between M/s. Antrix Corporation Limited (ACL) and M/s. Devas Multimedia Pvt. Ltd., signed July 2, 2010, paras 8.1, 8.2 and 8.3 of the Note and para. 7 of Annex III (Ex. C-219, exhibited in part as R-29/JCB-160).

[458]   Testimony of Mr. Sethuraman, Transcript Day 4, pp. 839-840.

[459]   Department of Space, Note to Space Commission for the 128th Space Commission Meeting, March 28, 2014, paras 4.6 and 4.7 (Ex. KS-15/JCB-287) and Testimony of Mr. Anand, Transcript Day 4, 1082:20-25.

societal needs, and having regard to the needs of the country's strategic requirements,"[460] as stated in the CCS decision.

355. While it could quite properly expropriate the Claimants' rights under Article 6 of the Treaty for "public utility services as well as for societal needs," it could not have recourse to Article 11(3) for such purposes and confiscate their rights.

356. Even the reference to "the country's strategic requirements," unless made specific, such as for the military and para-military needs, would not be restricted to the meaning of the provisions of Article 11(3). That Article does not refer to strategic needs but to essential security interests and the expression "strategic requirements" can cover a whole range of government activities; governments all over the world pursue a number of different policies which they describe as strategies essential to the attainment of public interest objectives (economic strategies, public health strategies, energy strategies, etc.) and the situation does not appear to be different in the case of the Respondent. That expression can be found not only in the CCS decision of February 17, 2011, but also in a number of documents produced by the Respondent, such as the Space Commission Note to the CCS of February 16, 2011 and in the Suresh Committee Report and there is no indication in the evidence received by the Tribunal, except the say-so of Messrs. Sethuraman and Anand, that this expression should be interpreted exclusively for "the protection of essential security interests."

357. Messrs. Sethuraman and Anand, in their oral testimony,[461] argued that, in India, "strategic" means the armed forces. However, their interpretation appears to be contradicted by the words of the Space Commission itself which, in its direction of July 2, 2010, read: "Department, in view of priority to be given to nation's strategic requirements including societal ones may take action necessary and instruct ANTRIX to annul the ANTRIX-DEVAS contract." Similarly, in its Note to the CCS of February 16, 2011, the Space Commission stated that the purpose of the Note was "to seek approval of the Cabinet Committee on Security for Annulling" the Devas Agreement, "in view of priority to be given to nation's strategic requirements including societal ones."[462] The same document, in the Approval Sought from the Cabinet Committee on Security, states that due to an "increased demand for allocation of spectrum for national needs, including for the needs of defence, para-military forces, railways and other public utility services as well as for societal

---

[460]   Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220).

[461]   Testimonies of Mr. Sethuraman (Transcript Day 3, p. 712) and of Mr. Anand (Transcript Day 4, p. 932).

[462]   Note for the Cabinet Committee on Security, para. 1 (Ex. C-229/JCB 220).

needs, and having regard to the needs of the country's strategic requirements, the Government will not be able to provide orbit slot in S band to Antrix for commercial activities (…)."[463]

358. It is therefore clear to the Tribunal that the expressions "strategic needs" or "strategic requirements" covered a range of activities which went far beyond the military or paramilitary sectors or the "essential security interests" of the Respondent.

359. As to the reference to railways mentioned in the DOS Note to the CCS, the Tribunal was told that it had to do with train tracking (train safety and signaling).[464] The Tribunal does not see how such function could come within the ambit of essential security interests.

360. As to "societal needs," the Respondent itself has recognized that these words cover a wide range of government activities which clearly have no relationship with the essential security interests of the State. When asked by the Claimants to describe the meaning of these words, Mr. Anand, appearing on behalf of the Government of India, stated: "I told you that societal requirements is a pretty wide spectrum. It covers the whole gamut of services which goes under societal tele education, telemedicine, crop forecasting, disaster management, rural communications—there is a huge gamut of activity which goes on the societal applications".[465] The DOS Note to the Space Commission also refers to "other national societal requirements for emergency communication, dissemination of disaster warnings, tele-education, tele-health and rural communication".[466]

361. In the view of the Tribunal, the inclusion of "other public utility services and for societal needs" covers a lot more than the "essential security interests" mentioned in Article 11(3) of the Treaty.

362. It is important to note that the CCS, in its February 17, 2011 decision, did not proceed to any allocation of the spectrum but referred the matter to the ICC, a dormant institution which was revived for the purpose. The Tribunal was informed that, by the time of the hearing, that no decision had been taken by the ICC.[467] The Tribunal received no information that a decision was taken in that regard even subsequently to the hearing.

---

[463] *Id.*, para. 45.1
[464] Testimony of Mr. Anand (Transcript Day 4, p. 959).
[465] Transcript Day 4, p. 1000: 9-15.
[466] Department of Space, Note to Space Commission, July 2, 2010, paras. 8.1-8.4 (Ex. R-29/JCB-160).
[467] Transcript, Day 4, 1014:24-25; 1015:1-7; 1059:8-19.

363. It is striking in this respect that the uncertainty in that respect has continued right up to the time of the launch of GSAT-6 on August 27, 2015.

364. In a note of March 28, 2014, to the Space Commission for its 128th meeting of April 12, 2014, Mr. Prahlad Rao, Director SCNP, mentions that, following discussions by the Department of Space "with the user agencies to arrive at a revised utilization plan for GSAT-6/6a," it was now proposed to utilize the space segment capacity of GSAT-6 and GSAT-6A spacecrafts for meeting the communication needs (Broadcast and Mobile Applications) of strategic sector including Defence, Paramilitary forces and societal sector including Disaster Management Support and Indian Railways."[468]

365. At the meeting of the Space Commission on April 12, 2014, the Chairman "stated that there is an issue of spectrum (BSS) for GSAT-6/6A[.] DOT wants ISRO to vacate the spectrum and auction it. The subject matter was discussed in EGoM and ISRO was asked to provide S-BSS usage to DOT."[469]

366. Subsequently, in a letter to the Tribunal on August 31, 2015, the Respondent submitted a group of documents in connection with the launch of GSAT-6, the submission of which the Tribunal conditionally accepted. Although there are occasional references to the launch of a military satellite in the headlines or the core of some newspaper articles, none of these assertions are based on any reported statement by a public official and the Tribunal cannot consider such references as reliable evidence; in fact, the submitted documents tend to demonstrate that the GSAT-6 satellite continues to be planned for a multiplicity of purposes.

367. Thus, the Chairman of ISRO, Mr. Kiran is quoted as saying that "(t)he users for this will be the strategic sector as it gives a tremendous opportunity for using very small handheld devices in the remotest places."[470] The same person is reported by the Times of India to have said on the same day that the satellite would be used for various government purposes.[471] The Respondent, who

---

[468]   Note to Space Commission for the 128th Space Commission Meeting, March 28, 2014, para. 4.2 (App. KS-15/JCB-287).

[469]   Minutes of the 128th Meeting of Space Commission held on April 12, 2014, para. 128.4.1 (App. KS-17/JCB-288).

[470]   *ISRO's Big Launch: Military Communications Satellite GSAT-6,* NDTV, August 27, 2015, available at www.ndtv.com (Annex 3 submitted by the Respondent on August 31, 2015).

[471]   Janani Sampath, *ISRO's GSLV-D6 with Indigenous Cryo Engines Successfully Places GSAT-6 in Orbit,* The Times of India, August 27, 2015, available at timesofindia.indiatimes.com (Annex 5 submitted by the Respondent on August 31, 2015).

produced these press articles, gave no indication to the effect that the statements attributed to the Chairman of ISRO were not accurate.

368.   Even more significant is Annex 6 of the documents submitted by the Respondent on August 31, 2015.[472] The note from Mr. V.K. Pant, Assistant Wireless Adviser, in DOT, states that "(b)ased on the decisions of the Cabinet a document on Defence Band and Defence Interest Zone has been issued to Ministry of Defence on 12th March 2015. The relevant extract relating to the S band is enclosed, as desired." That extract reads as follows: "The band segments (a) 2500-2635 MHz (35MHz) (b) 2555-2535 MHz (80 MHz) and (c) 2655-2690 MHz (35 MHz) will be used for Defence, security and societal applications." It therefore appears that, right up to the time of the launch of the satellite, GSAT-6 was destined to a mixed application, some of it coming under wording of Article 11 (3) and some of it being clearly for the pursuit of a public purpose under Article 6 of the Treaty.

369.   The Respondent has submitted evidence showing substantial requirements by the Department of Defence for S-band spectrum (17.5 MHz up to 2012, an additional 40 MHz up to 2017 and 50MHz up to 2022).[473] The evidence submitted to the Tribunal demonstrates that these requests covered both the MSS and the BSS parts of the spectrum. As to the Claimants' argument that, in reallocating a BSS part of the spectrum to MSS spectrum, the Respondent would have contravened the ITU's Radio Regulations[474], Mr. John Lewis, an expert retained by the Claimants, has clearly answered in his oral testimony that, once a particular international frequency table has been allocated to a country by the ITU, the decision as to the re-allocation between BSS and MSS applications is a matter of "national decision, and the ITU has no role to monitor or overview decisions of this nature."[475] In addition, Mr. Sethuraman testified that the two satellites 6 and 6A would not be sufficient to meet the requirements of the military.[476] However, if the Respondent was willing to approve the large allocation requests of the armed forces, it would have simply done so by reserving the S-band to meet its essential security needs. The Tribunal has received no evidence of any specific assignment of spectrum to the military and paramilitary sectors and, as indicated above, there were even debates inside the administration in 2014 as to the possible

---

[472]   Memo from V.K. Pant, Department of Telecommunications, to Member (Finance), Department of Space, April 1, 2015 (Annex 6 submitted by the Respondent on August 31, 2015).

[473]   *See supra*, para. 347.

[474]   Claimants' Statement of Reply, para. 57,

[475]   Testimony of Mr. John Lewis, Transcript Day 3, p. 568:12-14.

[476]   Testimony of Mr. Sethuraman, Transcript Day 4, p. 848:15-25.

auctioning of some part of the S-band spectrum to the private sector, notwithstanding the CCS decision of 2011 to exclude commercial activities from that spectrum.

370. Although the requests of the military for part of the S-band spectrum are large, the Tribunal notes that no specific allocation has been made by the Respondent, and the Tribunal cannot assume that such requests will be approved in full by the Respondent. All around the world, governments are faced every year with very large demands for funds for various projects from their military establishment and, just as regularly, governments grant only a percentage of such requests.

371. The Tribunal, by majority, therefore concludes that, although the CCS decision of 2011 appears to have been in part "directed to the protection of its essential security interests," that part remained undefined and several other objectives were included in that decision, which had nothing to do with national security. In the circumstances, the Tribunal rules that, although the Respondent was fully entitled to reassign the S-spectrum to non-commercial use, the part which was not reserved for military or paramilitary purposes would be subject to the provisions of Article 6 of the Treaty concerning expropriation.

372. Moreover, in the present case, the request by the armed forces for the attribution of spectrum is spread over a number of years (up to 2022) and, looking at the past performance of the space program, it is extremely doubtful that the envisaged schedule could be realistic. In fact, the requirement of 17.5 MHZ up to 2012 had not even been allocated by the time of the launch of GSAT-6 in 2015.

373. On the basis of the evidence submitted to it as described above and bearing in mind that the Respondent had already reserved to itself 10% of the spectrum in question,[477] the Tribunal, by majority, is of the view that a reasonable allocation of spectrum directed to the protection of the Respondent's essential security interests would not exceed 60% of the S-band spectrum allocated to the Claimants, the remaining 40% being allocated for other public interest purposes and being subject to the expropriation conditions under Article 6 of the Treaty. It will be up to the Tribunal, in the next phase of this arbitral process (damages), to establish the compensation due to the Claimants in that respect.

374. This is independent of any liability Antrix may have incurred for contractual breach of the Devas Agreement.

---

[477]   Statement of Claim, para. 45; Statement of Defence, para. 42.

## CHAPTER VII - EXPROPRIATION

### A.   THE PARTIES' ARGUMENTS

375.   The Claimants contend that, as a result of the measures of India's various governmental agencies leading to the annulment of the Devas Agreement, the Respondent has unlawfully expropriated their investments in India in violation of Articles 6 and 7 of the Treaty.[478]

376.   The Respondent's primary contention is that no identifiable right or asset of the Claimants was expropriated,[479] but in any event, rejects the Claimants' analysis of this claim.[480]

377.   Article 6 of the Treaty provides as follows:

(1)   Investments of investors of either Contracting Party in the territory of the other Contracting Party shall not be nationalised, expropriated or subjected to measures having effects equivalent to nationalisation or expropriation except for public purposes under due process of law, on a non-discriminatory basis and against fair and equitable compensation. Such compensation shall amount to the market value of the investment expropriated immediately before the expropriation or before the impending expropriation became public knowledge, whichever is the earlier, shall include interest at a fair and equitable rate until the date of payment, shall be made without unreasonable delay and shall be effectively realizable and be freely transferable.

(2)   The investor affected by the expropriation shall have the right, under the law of the Contracting Party making the expropriation, to review, by a judicial or other independent authority of that Party, of his or its case and of the valuation of his or its investment in accordance with the principles set out in this paragraph.

(3)   Where a Contracting Party expropriates, nationalises or takes measures having effect equivalent to nationalisation or expropriation against the assets of a company which is incorporated or constituted under the laws in force in any part of its own territory, and in which investors of the other Contracting Party owns shares, it shall ensure that the provisions of paragraph (1) of this Article are applied to the extent necessary to ensure fair and equitable compensation as specified therein to such investors of the other Contracting Party who are owners of those shares.

378.   Article 7, which deals with transfer of investment capital and returns, provides that "(a)ll transfers shall be effected without reasonable delay in any freely convertible currency at the market rate of exchange prevailing on the date of transfer."

---

[478]   Notice of Arbitration, paras 57-61; Statement of Claim, paras 160-98; Statement of Reply, paras 116-41; Transcript, Day 5, 1149:12-1150-17.

[479]   Statement of Defence, paras 99-120; Respondent's Rejoinder, paras 91-103.

[480]   Respondent's Rejoinder, paras 113-15. *See* generally Transcript, Day 1, 174:4-180:7; Day 5, 1298:18-1299:24.

### 1. *The Existence of an Expropriation*

#### a. **The Claimants' Position**

379.   According to the Claimants, whether or not there is an expropriation for the purpose of Articles 6 and 7 of the Treaty turns on whether an investment is "subjected to measures having effects equivalent to nationalisation or expropriation."[481] In this context, the Claimants argue that "expropriation" includes "covert or incidental interference with the use of property which has the effect of depriving the owner, in whole or in significant part, of the use or economic benefit of property;"[482] and "direct or indirect interference with intangible assets including contract rights."[483]

380.   Accordingly, the Claimants' assets and rights, such as its interest in Devas, indirect ownership of the Devas Agreement and indirect ownership of the Devas system and business and pre-emptive right to an allocation of the S-band under the Devas Agreement were capable of being and, in fact were, directly and indirectly expropriated and/or nationalized by the Government of India.[484] Such an expropriation, the Claimants submit, is evident from the factual record demonstrating that the coordinated measures adopted by the CCS, DOS, the Space Commission and ISRO/Antrix during the review process of the Devas Agreement,[485] which led to the annulment of the Devas Agreement and rights therein, plainly had the deliberate and objective effect of depriving the Claimants of the use or reasonably-to-be-expected economic benefit of their investments in Devas.[486]

---

[481]   Statement of Claim, para. 163, referring to Agreement between the Government of the Republic of Mauritius and the Government of the Republic of India for the Promotion and Protection of Investments, September 4, 1998, Article 6(2) (Ex. C-1/JCB-8).

[482]   Statement of Claim, para. 163, referring to *Metalclad Corp. v. Mexico*, ICSID Case No. ARB(AF)/97/1, Award, 2000, para. 103 (Ex. CL -23). The Claimants note that other arbitral decisions have upheld a similar notion of expropriation, including *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 606 (Ex. CL-5); *Gemplus S.A. v. Mexico; Talsud S.A. v. Mexico*, ICSID Cases Nos. ARB(AF)/04/3 & ARB(AF)/04/4, Award, 2010, paras 8-23 (Ex. CL-15); or *RosInvestCo. UK Ltd. v. Russia*, SCC, No. 079/2005, Final Award, 2010, para. 624 (Ex. CL-28).

[483]   Statement of Claim, para. 164; *Deutsche Bank AG v. Sri Lanka*, ICSID Case No. ARB/09/02, Award, 2012, para. 506 (Ex. CL-8); *Occidental Petroleum Corp. v. Ecuador*, ICSID Case No. ARB/06/11, Award, 2012, para. 455 (Ex. CL-27).

[484]   Statement of Claim, paras 165, 173.

[485]   *See supra*, Chapter III - E; Statement of Claim, para. 166.

[486]   Statement of Claim, paras 122, 167; Statement of Reply, paras 117, 125.

### b.    The Respondent's Position

381.   According to the Respondent, the Claimants' expropriation claim is fundamentally flawed in that no identifiable right or asset was expropriated,[487] a point which the Respondent says the Claimants do not dispute.[488]

382.   The Respondent criticizes the Claimants' failure to identify precisely the scope of the rights or assets at issue, but in any event, argues that the Claimants' claim is deficient as they seek compensation for rights that they never had. Notably, the assets and interests identified by the Claimants as being expropriated are (i) not rights or assets of any kind belonging to the Claimants themselves; and (ii) entirely dependent on Devas acquiring rights under the Devas Agreement that could not be affected by governmental action.[489]

383.   The Respondent denies that the Claimants' shareholdings in Devas have been expropriated[490] and insofar as Claimants' investments derive from the Devas Agreement,[491] the Respondent argues that the only right acquired by Devas was the right to a refund of the upfront capacity reservation fees paid prior to the date of termination of the agreement.[492]

384.   Moreover, the Claimants are not assisted by their survey of expropriation cases, which the Respondent submits are not applicable as they have no bearing on the issues in this case.[493]

---

[487]    Statement of Defence, para. 99.

[488]    Respondent's Rejoinder, para. 93.

[489]    Statement of Defence, para. 101.

[490]    *Id.*, para. 102.

[491]    *Id.*, para. 104.

[492]    *Id.*, paras 104-05; *Devas Multimedia Pvt. Ltd. v. Antrix Corp. Ltd.*, Antrix's Statement of Defence, November 15, 2013, paras 12-20, 138-54 (Ex. R-3); *see supra*, para. 95.

[493]    Respondent's Rejoinder, para. 93, referring to Statement of Reply, para. 116.

### 2. Lawfulness of the Expropriation

385. The Claimants argue that India's expropriation was unlawful because it does not satisfy the four conditions set out in Article 6 of the Treaty.[494] In fact, they say, none of those conditions are satisfied, such that India's expropriation was unlawful in every respect.[495]

386. The Respondent, by contrast, maintains its primary argument that the Claimants did not possess any "acquired rights" such that no expropriation occurred,[496] and, in any case, rejects the Claimants' allegation of unlawful expropriation.[497]

### a. Public Purpose

#### i. The Claimants' Position

387. The Claimants contend that the "public purpose" condition within the Treaty[498] requires the Respondent to demonstrate that (i) its measures were actually for public purposes, and not based on a mere assertion;[499] (ii) the expropriation was proportional to the purported public purpose;[500] and (iii) the expropriatory measures must not be "financially motivated," either in favor of the State itself or other investors.[501]

388. In the Claimants' view, the facts of the case dispel any notion of a taking for "public purposes,"[502] especially as the "purpose" admitted by Dr. Radhakrishnan was to terminate the contract "without

---

[494] Statement of Claim, para. 174; Statement of Reply, para. 139, both referring to Agreement between the Government of the Republic of Mauritius and the Government of the Republic of India for the Promotion and Protection of Investments, September 4, 1998, Article 6(1) (Ex. C-1/JCB-8) (emphasis by the Claimants).

[495] Statement of Claim, paras 174-98.

[496] Statement of Defence, paras 99-20; Respondent's Rejoinder, paras 113-14.

[497] Statement of Defence, fn. 258; Respondent's Rejoinder, paras 113-15.

[498] Statement of Claim, paras 176-77; Statement of Reply, paras 139-41.

[499] Statement of Claim, para. 176; *ADC Affiliate Ltd. v. Hungary*, ICSID Case No. ARB/03/16, Award, 2006, paras 430-32 (Ex. CL-1).

[500] Statement of Claim, para. 176; *James v. United Kingdom*, (Eur. Ct. H.R.) App. No. 8793/79, Judgment (Merits), 1986, para. 50 (Ex. CL-19); *Occidental Petroleum Corp. v. Ecuador*, ICSID Case No. ARB/06/11, Award, 2012, para. 456 (Ex. CL-27).

[501] Statement of Claim, para. 177; *Deutsche Bank AG v. Sri Lanka*, ICSID Case No. ARB/09/02, Award, 2012, para. 523 (Ex. CL-8)

[502] Statement of Claim, paras 178-84.

causing much of embarrassment and damage and financial loss to the government."[503] As a matter of law, the Claimants do not accept that a desire to escape a commercial arrangement, or avoid political outcomes, is a "public purpose."[504]

389.   Furthermore, the Claimants rely on the following to challenge the alleged "public purposes:"

(a)   the lack of involvement of any agencies that purportedly had "needs" of S-band spectrum throughout Dr. Radhakrishnan's process to annul the Devas Agreement;[505]

(b)   the state of disuse of the S-band spectrum for any purpose, including for those purported "needs" of any agencies;[506]

(c)   the continuing call for the S-band spectrum to be made available to other commercial operators,[507] which first began in 2008 and were evident at the time of Dr. Radhakrishnan's "review" of the Devas Agreement;[508]

(d)   the contrast[509] between India's covert and *ad hoc* "policy" to extricate itself from the Devas Agreement in 2011[510] and the careful analysis performed by the Shankara Committee prior to the initial decision to enter into the Devas Agreement in 2004.[511]

390.   Even if a "public purpose" could be ascribed to the expropriation, the Claimants contend that the Respondent's actions were not "proportional" to that purpose.[512] In support, the Claimants refer

---

[503]   *Id.*, para. 179, Transcript, ISRO press conference, CNN-IBN special telecast, February 8, 2011, p. 4 (Ex. C-125/JCB-206). The Claimants explain that Dr. Radhakrishnan consulted with DOT and the Department of Law and Justice, but does not refer to any agencies concerned with "defence, paramilitary forces, railways or other public utility services," whose "needs" supposedly animated the policy decision of the CCS.

[504]   Statement of Claim, paras 177, 182, fn. 236; Statement of Reply, para. 140(a).

[505]   Statement of Claim, paras 178-79, referring to Opinion of the ASG (Ex. R-30/JCB-165).

[506]   Statement of Claim, para. 178.

[507]   *Id.*, para. 180.

[508]   *Id.*, paras 135-37; *see* Economic Times, *Pitroda asks PM to reactivate GoM on spectrum vacation*, May 17, 2013 (Ex. C-186/JCB-265), which reads, in relevant part: "Pitroda is of the view that 80 megahertz of airwaves frequencies for 4G services can be freed from the spectrum held by the Department of Space (DoS)."

[509]   Statement of Claim, para. 181.

[510]   *Id.*, para. 181.

[511]   The Claimants refer to India securing a "grandfathered" right for Devas at the ITU (*see supra*, para. 106) and to the SATCOM policy that was enacted. *See* Statement of Claim, para. 181.

[512]   Statement of Claim, para. 183.

to the categorical nature of the decision of the CCS to annul the Devas Agreement for unspecified and vaguely-described "needs,"[513] and the manner in which India took action covertly and unilaterally, in circumstances where Devas would have been willing to work with the Government of India to accommodate those needs (within the context of the Devas Agreement) if they had been approached.[514]

> ii.   The Respondent's Position

391.   According to the Respondent, the termination of the Devas Agreement was based on national security grounds, constituting a quintessential public purpose.[515] Even more so, the Claimants cannot cite any authority to the contrary to this effect.[516] The Respondent criticizes the Claimants' failure to explain the relevance of their submission that the policy decision of the CCS "was grossly disproportionate to any supposed 'purpose.'"[517]

> **b.   Due Process**

> i.   The Claimants' Position

392.   The Claimants submit that the concept of "due process" in Article 6 of the Treaty requires more than mere compliance with local law; it also incorporates principles of international due process.[518] These include: (i) the obligation of the host State to notify the investor of the proposed expropriatory measure and give it the opportunity to be heard and/or mitigate the impact of the threatened measures;[519] and (ii) the conduct of the expropriation with "reasonable advance notice and a fair hearing" and not "in a manner that can at best be described as opaque." Due process

---

[513]   *Id.*, para. 183.

[514]   *Id.*, para. 183; Parsons I, paras 35-37, 49-51.

[515]   Statement of Defence, fn. 258, referring to *Goetz and Others v. Republic of Burundi*, ICSID Case No. ARB/95/3, Decision on Liability, 1998 (6 ICSID Reports 5-2004), para. 126 (Ex. R-70).

[516]   Respondent's Rejoinder, para. 114(1).

[517]   *Id.*, para. 114(2), referring to Statement of Reply, para. 140(a).

[518]   Statement of Claim, para. 186; *Kardassopoulos v. Georgia; Fuchs v. Georgia*, ICSID Cases. Nos. ARB/05/18 & ARB/07/15, Award, 2010, para. 394 (Ex. CL-20).

[519]   Statement of Claim, para. 187, referring to *Siag v. Egypt*, ICSID Case No. ARB/05/15, Award, 2009, paras 36, 442 (Ex. CL-32); *Middle East Cement Shipping & Handling Co. S.A. v. Egypt*, ICSID Case No. ARB/99/6, Award, 2002, para. 143 (Ex. CL-24).

can also be denied substantively, i.e. when a host State ignores and violates its own and/or international law in the conduct of an expropriation.[520]

393. According to the Claimants, India's clandestine conduct leading up to the cancellation of the Devas Agreement is a classical denial of due process.[521] The whole review process of the Devas Agreement and the decision to cancel it[522] were made behind closed doors, and were presented without any prior notice to Devas or Claimants as a *fait accompli*, with no opportunity to present objections to India's decisions[523]—a fact acknowledged by the Respondent.[524] All this is exacerbated by India's public indications of support for the Devas system and Devas' performance of the Devas Agreement, in reliance upon those indications of support.[525] As the *Kardassopoulos* tribunal remarked, "[b]ack-door press reports are the opposite of due process."[526]

394. Moreover, the Claimants aver that the decision to fabricate a *force majeure* event was carried out in contravention of the contractual requirement that a *force majeure* event must be "beyond the reasonable control of the party affected" and have only have occurred "despite all efforts of the Affected Party to prevent it or mitigate its effects."[527]

ii.  The Respondent's Position

395. The Respondent argues unequivocally that due process does not require consultation with the Claimants as to national security matters, and the Claimants simply had no vested right to be consulted on this issue.[528]

---

[520] Statement of Claim, para. 188, referring to *Kardassopoulos v. Georgia; Fuchs v. Georgia*, ICSID Cases. Nos. ARB/05/18 & ARB/07/15, Award, 2010, para. 441 (Ex. CL-20).

[521] Statement of Claim, paras 189-91.

[522] *See supra*, Chapter III - E.

[523] Statement of Claim, para. 189.

[524] Statement of Reply, para. 140(c).

[525] Statement of Claim, para. 190; *see supra*, Chapter III - D.

[526] Statement of Claim, para. 191, referring to *Kardassopoulos v. Georgia; Fuchs v. Georgia*, ICSID Cases. Nos. ARB/05/18 & ARB/07/15, Award, 2010, para. 402 (Ex. CL-20).

[527] Statement of Claim, para. 189, referring to Devas Agreement, Article 11 (Ex. C-16).

[528] Statement of Defence, para. 85, fn. 258; Respondent's Rejoinder, para. 114(4).

### 3.   Potential Discrimination in the Expropriation

#### a.   The Claimants' Position

396. In the Claimants' view, discrimination in the expropriation context occurs when an investment is nationalised "for reasons unrelated to the host State's legitimate regulatory objectives;" such that expropriation of a foreign investment solely due to foreign ownership would violate this condition.[529]

397. According to the Claimants, the measures in question were discriminatory because they were aimed exclusively at extinguishing the interests of Devas, and were motivated in part by the fact that Devas had foreign ownership interests by the Claimants and DT Asia.[530]

#### b.   The Respondent's Position

398. The Respondent denies that the Government of India's policy decision to reserve the S-band for non-commercial, strategic use was discriminatory in any way, as there was no differentiation in the treatment accorded to the Claimants as compared to other entities or sectors.[531] Regarding the Claimants' argument that India's "attacks" on the Devas Agreement "were motivated in part by the fact that the Claimants were non Indian," the Respondent points out that the CCS did not reserve S-band for commercial use of Indians; it reserved S-band for non-commercial, strategic use, preventing any private use of S-band by anyone, irrespective of nationality or ownership.[532]

---

[529]   K.J. Vandevelde, *Bilateral Investment Treaties* (OUP 2010), p. 273 (Ex. CL-45); *see also ADC Affiliate Ltd. v. Hungary*, ICSID Case No. ARB/03/16, Award, 2006, para. 443 (Ex. CL-1); *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 612 (Ex. CL-5).

[530]   Statement of Claim, para. 194, citing Chaturvedi Report, March 12, 2011, para. 3.5.9 (App. KS-10), which reads: "The shareholding in Devas and changes in it subsequently have also been a serious cause of concern…. The original proposal, which had envisaged development and innovation by some former ISRO scientists, seem to have been diluted with the entry of major foreign players. While technically this was permitted, the entry of foreign telecom companies with huge premiums indicated that they had used this as an opportunity for entering the telecom market, which had in the meanwhile expanded rapidly in India during 2005-10. This was not an intended purpose of the original agreement." *See also* Statement of Claim, paras 135-37; *see supra*, fn.391.

[531]   Statement of Defence, para. 164, fn. 258.

[532]   Respondent's Rejoinder, para. 114(3).

### 4.   *Fair and Equitable Compensation*

#### a.   **The Claimants' Position**

399.   The Claimants note that Article 6(1) of the Treaty mandates that "fair and equitable compensation" "made without unreasonable delay" is a condition of any expropriation.[533] The failure to pay "market value" compensation alone constitutes a breach of the Treaty, and is no different from a complete failure to make any payment.

400.   In this instance, the Claimants emphasize that the Respondent has not even attempted to pay the Claimants the fair market value of their lost investment,[534] and has in fact repudiated its duty to do so.[535] The purported tender by Antrix of a refund of the upfront capacity reservation fee, even assuming that the tender could be attributed to India, manifestly does not correlate to the fair market value of the Devas system and business at the time of the taking.[536]

#### b.   **The Respondent's Position**

401.   The Respondent argues that India did not offer to pay compensation because the Claimants had no right to compensation.[537] Antrix tendered a check to Devas to reimburse the upfront capacity reservation fees paid by Devas prior to the termination of the Devas Agreement, which was rejected by Devas.[538] The Respondent characterizes this conduct by the Claimants as an unjustified attempt to claim additional compensation from the State in circumstances where their claim is dependent on and limited by the Devas Agreement.[539] In any event, the Respondent submits that the fair market value would be less than the amount tendered to and rejected by Devas.[540]

---

[533]   Statement of Claim, para. 195, referring to Agreement between the Government of the Republic of Mauritius and the Government of the Republic of India for the Promotion and Protection of Investments, September 4, 1998, article 6(1) (Ex. C-1/JCB-8).

[534]   Statement of Claim, paras 131-32; *see supra*, para. 89.

[535]   Statement of Claim, para. 198; Statement of Reply, para. 140(d).

[536]   Statement of Reply, para. 140(d). *See supra*, para. 89.

[537]   Respondent's Rejoinder, para. 114(5).

[538]   *See supra*, para. 156.

[539]   Respondent's Rejoinder, para. 114(5).

[540]   *Id.*, para. 114(5); referring to *Devas Multimedia Pvt. Ltd. v. Antrix Corp. Ltd.*, Expert Report on Valuation, Vladimir Brailovsky & Daniel Flores, November 15, 2013 (Ex. R-4).

### 5.   *The Pendency of a Breach of Contract Claim*

#### a.   **The Claimants' Position**

402.   The Claimants aver that, regardless of the outcome of the ICC arbitration, the provisions of the Devas Agreement do not preclude a finding of expropriation or obviate the Respondent's obligation to pay damages for such expropriation.[541]

403.   According to the Claimants, "the fact that a breach may give rise to a contract claim does not mean that it cannot also—and separately—give rise to a treaty claim. Even if the two perfectly coincide, they remain analytically distinct, and necessarily require different enquiries."[542] Accordingly, although "a mere failure to comply with a contractual obligation [would not] constitute expropriation," a violation of a contract "which was the result of use of sovereign power, such as a decree annulling the contractual rights, may amount to an expropriation."[543] Therefore, the Respondent cannot escape liability for expropriation by relying on the provisions of the Devas Agreement.[544]

404.   In this instance, the Claimants assert that the *force majeure* clause[545] of the Devas Agreement cannot justify the expropriation. Notwithstanding the results of the contractual dispute in the ICC arbitration,[546] nothing in this agreement or in the Treaty insulates the Respondent from its own State responsibility under the Treaty for the action it took *qua* sovereign to "annul" a contract.[547]

405.   In the same vein, the Respondent cannot escape liability for expropriation by relying upon Article 7(b) and (c) of the Devas Agreement, governing the termination of this contract.[548] To accept the Respondent's position would give "Antrix *carte blanche* to terminate the contract on any basis it

---

[541]   Statement of Reply, para. 137.

[542]   *Id.*, para. 126, citing *Impregilo S.p.A. v. Pakistan*, ICSID Case No. ARB/03/3, Decision on Jurisdiction, 2005, para. 258 (Ex. CL-17). The Claimants note that the Respondent's own authorities recognize this distinction; *See* Statement of Reply, paras 126-27, referring to *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 2009, para. 444; *AWG Group v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 184; *Malicorp Ltd. v. Egypt*, ICSID Case No. ARB/081/18, Award 2011, para. 103(c).

[543]   Statement of Reply, para. 127, citing M. Feit, 'Responsibility of the State under International Law for the Breach of Contract Committed by State-Owned Entity' (2010) 28 Berkeley Journal of International Law 132, p. 160 (Ex. R-114).

[544]   Statement of Reply, paras 128-136.

[545]   Devas Agreement, Article 11 (Ex. C-16). *See supra*, para. 101.

[546]   *See supra*, para. 161.

[547]   Statement of Reply, paras 128, 134.

[548]   *Id.*, paras 129-33; *See supra*, para. 94.

wanted and then cap its contractual liability by refunding Devas the Upfront Capacity Reservation Fees."[549]

406.   In any event, the Claimants argue that the Respondent acknowledges that the provisions of Article 7(b) and (c) are not operative.[550] The ASG recognized that Article 7(c) was inoperative by July 2010, once the frequency and orbital slot coordination was obtained.[551] The Respondent's invocation of Article 7(b) fares no better, as its effects could have only been triggered if Devas had exercised its option to terminate the contract under this Article—and not Antrix, as it actually happened.[552]

407.   Finally, even if, as the Respondent asserts,[553] Article 7 were construed as limiting Antrix's contractual damages in the event of improper termination, the Claimants submit that this cannot operate to insulate the Respondent from liability for violations of the Treaty, especially in light of the fact that Antrix would have been obliged to perform the contract had the expropriation not occurred.[554]

### b.      The Respondent's Position

408.   The Respondent submits that the Claimants' argument regarding the pendency of a breach of contract claim responds to a non-issue in this arbitration.[555] The Respondent agrees that a distinction exists between a breach of contract by a State acting in a commercial capacity and a breach effected through the exercise of sovereign powers.[556] Nonetheless, in the Respondent's view, the Claimants' discussion is relevant only to a case where the State has breached its contractual obligations through the exercise of sovereign authority, whereas no claim has been raised that India breached the Devas Agreement.[557] Rather, the issue is whether the State exercised its sovereign authority to abrogate any commitment it had to the Claimants, and, on that score,

---

[549]   Statement of Reply, para. 129, referring to Statement of Defence, para. 8. *See supra*, para. 94.

[550]   Statement of Reply, paras 129-32.

[551]   *Id.*, paras 130-31, referring to Opinion of the ASG, p. 3 (Ex. R-30/JCB-165).

[552]   Statement of Reply, para. 133.

[553]   *Id.*, para. 136, referring to Statement of Defence, fn. 5.

[554]   Statement of Reply, para. 136 (emphasis by the Claimants).

[555]   Respondent's Rejoinder, para. 104.

[556]   *Id.*, para. 105, referring to Statement of Reply, para. 127.

[557]   Respondent's Rejoinder, paras 105, 108 (emphasis by the Respondent).

there can be no genuine dispute.[558] The Respondent contends that, in a case where the State has no contractual obligation, adopting the Claimants' theory would mean that any exercise of sovereign authority having an adverse impact on a private party would constitute an expropriation, which is untenable.[559]

409.   In the Respondent's view, nothing in the Claimants' discussion on the *force majeure* clause and the termination provisions of the Devas Agreement has any bearing on these basic points.[560] The Respondent first denies that it could have ever stated, as the Claimants submit, that "the expropriation was justified merely because the contract contemplated a 'Force Majeure Event,'"[561] since it has always been the Respondent's position that no expropriation occurred in this case.[562] The relevance of the *force majeure* clause, as well as all other provisions of the Devas Agreement reviewed in the Statement of Defence,[563] is that they all make clear that Devas did not have an acquired right to proceed with the Devas Agreement uninterrupted by any governmental action, and that implementation of the project required a number of governmental approvals which the Government of India had no commitment whatsoever to issue.[564]

## B.   THE TRIBUNAL'S ANALYSIS

410.   The Tribunal will address seriatim the arguments raised by the Parties. In light of the above conclusion of the Tribunal establishing the Respondent's partial liability, any liability under Article 6 of the Treaty would only apply to the 40% of the value of the Agreement resulting from the application of the CCS decision to matters other than the essential security interests of the State.

### 1.   The Existence of an Expropriation

411.   The Tribunal has already ruled above[565] that the Claimants were qualifying both as investors and having made an investment under the Treaty, and that part of the CCS decision opened the door

---

[558]   *Id.*, para. 107.

[559]   *Id.*, paras 106, 112.

[560]   *Id.*, paras 109-11.

[561]   *Id.*, para. 110, referring to Statement of Reply, para. 128.

[562]   Respondent's Rejoinder, para. 110.

[563]   *See supra* Chapter III - C.

[564]   Statement of Defence, paras 8-9; Respondent's Rejoinder, para. 111.

[565]   *See supra*, para. 210.

to claims for expropriation under the Treaty. There is no need to repeat here the considerations which led the Tribunal to that conclusion. The Claimants therefore had property which could be the subject of expropriation.

### 2.    *The Lawfulness of the Expropriation*

412.  The Tribunal will proceed to analyze the five elements covered by the Parties in that respect.

### a.    Public Purpose

413.  The Tribunal is of the view that the expropriation by the Respondent was made for a public purpose. Even leaving aside the military and paramilitary needs which the Tribunal has found to come under Article 11(3) of the Treaty, the reference by the Respondent in the CCS decision to "other public utility services as well as for societal needs" clearly indicate that the annulment of the Devas Agreement was made for public purposes. Article 6 of the Treaty does not require the Respondent to spell out in detail what these specific public purposes are but, in any event, Mr. Anand, in his testimony referred to above,[566] has described the wide spectrum of services which could come under that definition and which are clearly coming under the public purpose condition mentioned in Article 6.

414.  As to the Claimants' argument that the Respondent's actions were not "proportional" to that purpose, the Tribunal recognizes that, as stated in *Deutsche Bank AG v. Sri Lanka*,[567] "(a) number of tribunals, including *Tecmed v. Mexico, Azurix v. Argentina and LG&E v. Argentina* have adopted a proportionality requirement in relation to expropriatory treatment." On the basis of the evidence submitted, the Tribunal is of the view that the measure adopted by the CCS was justified by a substantial public interest.

### b.    Due Process

415.  The difficulty in the present case is the dual purpose of the decision of the CCS, which acted in part for reasons of national security under Article 11(3) and for general public purposes covered by Article 6 of the Treaty.

---

[566]    *See supra,* para. 360, fn. 467.

[567]    *Deutsche Bank AG v. Sri Lanka*, ICSID Case No. ARB/09/02, Award, 2012, para. 522

416.  As to the argument of the Respondent that due process does not require consultation as to national security matters, the Tribunal agrees that such circumstances absolve the Respondent from following the principles of international due process enunciated above by the Claimants.

417.  As to the non-security purposes of the CCS decision, the Tribunal considers that the principles of international due process mentioned by the Claimants should apply. In that respect, the Respondent breached that condition of Article 6 of the Treaty.

### c.      Potential Discrimination in the Expropriation

418.  Although there is passing reference to foreign parties or foreign investment in the DOS Note for the Cabinet Committee on Security of February 16, 2011, none of these references give any indication that the participation of foreign parties or foreign investment was a factor that played any role in the recommendation of DOS to the CCS. Furthermore, nothing in the decision of the CCS can lead to the conclusion that such factors were taken into account in any way.

419.  The argument of the Claimants in this respect is therefore rejected.

### d.      Fair and Equitable Compensation

420.  The Tribunal, by majority, has concluded that the Claimants would be entitled to compensation for the part of the decision of the CCS that does not relate to "the essential security interests" of the State.

421.  The fact that Antrix tendered a check to Devas to reimburse the upfront capacity reservation fees paid by Devas under the Agreement is irrelevant for this matter. As indicated above, the Parties agree that a distinction must be made between the contractual obligations between Devas and Antrix and the obligations of the Respondent under the Treaty.

422.  In the present instance, it is uncontested that the Respondent paid no compensation whatsoever to the Claimants when it expropriated the Claimants' investment for purposes other than its "essential security interests."

### e.      The Pendency of a Breach of Contract Claim

423.  The debate between the Parties on this subject has been in good part been overtaken by events, the ICC tribunal having found that Antrix was in breach of its contractual obligations and that it must pay USD 535 million plus interest to Devas.

424. In the present case, there was no contractual obligation between the Claimants and the Respondent and the Tribunal is only called upon to decide whether there has been a breach of obligations under the Treaty.

### 3.   *Conclusion*

425. On the basis of the above analysis, the Tribunal has come to the conclusion that the Claimants are entitled to claim compensation under Article 6 of the Treaty for the expropriation of their investment for the part of the Respondent's decision which relates to matters other than national security, as discussed above.

## CHAPTER VIII - FAIR AND EQUITABLE TREATMENT

## A.   THE PARTIES' ARGUMENTS

426. Article 4(1) of the Treaty provides, in relevant part:

> (1) Investments and returns of investors of either Contracting Party shall at all times be accorded fair and equitable treatment in the territory of the other Contracting Party.

427. According to the Claimants, the expropriatory nature of the Respondent's actions, as well as its violation of the Claimants' "legitimate expectations" as investors in India mandate the conclusion that the Respondent has breached the fair and equitable treatment ("**FET**") standard embodied in Article 4(1) of the Treaty. According to the Claimants, such breach exists regardless of the actual content of the FET standard applicable under the Treaty.[568]

428. The Respondent's primary contention is that the FET standard embodied in the Treaty does not go beyond the minimum standard required by customary international law, and, even if an expansive FET standard were applicable, the Claimants' claims would still be untenable.[569]

---

[568]   Statement of Claim, paras 199-215; Statement of Reply, paras 142-68; *See* Notice of Arbitration, paras 65-67; Transcript, Day 5, 1150:18-1155:18.

[569]   Statement of Defence, paras 121-56; Respondent's Rejoinder, paras 116-33; Transcript, Day 1, 180:8-184:25; Day 5, 1299:25-1301:22.

*1.  The Applicable Standard of Treatment*

     **a.  The Claimants' Position**

429.  The Claimants' position is that a broad standard of FET applies to the present case. This standard
of treatment is construed as "an obligation to treat a foreign investor's investment in a way that
does not frustrate the investor's underlying legitimate and reasonable expectations,"[570] and not in
a way that is manifestly inconsistent, non-transparent, unreasonable…or discriminatory…."[571]
This standard also includes "the exercise of good faith or the absence of manifest irrationality,
arbitrariness or perversity by [the host State],"[572] and "a proportionate relationship" between the
supposed governmental aims and the State measures in question.[573]

430.  For the Claimants, the Respondent's argument that no broad FET standard applies is negated by
the *White Industries* award,[574] in which the equivalent clause in the Australia-India BIT was
interpreted as "a mainstream treaty FET clause, protecting an investor's 'legitimate
expectations.'"[575] Accordingly, the Respondent's submission that the FET clause in India's BITs
should be interpreted differently than other similarly-worded clauses fails.[576]

431.  Moreover, the Respondent's invocation of the "customary minimum treatment" standard,[577] is at
odds with two decades of jurisprudence and commentary.[578] The Claimants note that "[t]he

---

[570]  Statement of Claim, para. 201, citing *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial
Award, 2006, para. 309 (Ex. CL-31).

[571]  *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 309 (Ex. CL-31).

[572]  Statement of Claim, para. 200, citing *Gemplus S.A. v. Mexico; Talsud S.A. v. Mexico*, ICSID Cases Nos.
ARB(AF)/04/3 & ARB(AF)/04/4, Award, 2010, paras 7-2, 7-72 (Ex. CL-15).

[573]  Statement of Claim, para. 203, citing *Occidental Petroleum Corp. v. Ecuador*, ICSID Case No. ARB/06/11,
Award, 2012, para. 416 (Ex. CL-27); *See also MID Equity Sdn Bhd, v. Chile*, ICSID Case No. ARB/01/7,
Award, 2004, para. 113; *Parkerings-Compagniet A.S. v. Lithuania*, ICSID Case No. ARB/05/8, Award,
2007, para. 8.1.4.1, para. 333; *Ioan Micula v. Romania*, ICSID Case No. ARB/05/20, Award, 2013, para.
667; *AWG Group v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 223; *Bayindir Insaat Turizm
Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 2009, para.
163; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 2009, para. 240; *CMS Gas
Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, para. 85. In the
Claimants' view, these cases, providing for the protection of the legitimate expectations of the investor,
embody the FET standard applicable under Article 4(1) of the Treaty.

[574]  Statement of Reply, paras 143-44, referring to *White Industries Australia Ltd. v. India*, UNCITRAL, Final
Award, 2011 (Ex. CL-38).

[575]  *White Industries Australia Ltd. v. India*, UNCITRAL, Final Award, 2011, paras. 4.3, 5.2, 10.3 (Ex. CL-38).

[576]  Statement of Reply, para. 144.

[577]  *Id.*, para. 150, referring to Statement of Defence, para. 127.

[578]  Statement of Reply, para. 142.

customary international law minimum standard of treatment may evolve in accordance with changing State practice, manifesting to some degree expectations within the international community."[579] In this regard, the Claimants contend that there is presently no material distinction in practice between the FET standard and the obligations owed by India under customary international law.[580]

432. Even if the 1969 OECD Draft Convention on the Protection on Foreign Property (the **"OECD Draft Convention"**)[581] treats a treaty-based FET clause as equivalent to the customary international law level of protection,[582] the Claimants contend that the manifest intention of this Draft Convention was to buttress the customary international law minimum standard by emphasizing that it already required FET.[583]

433. The Claimants also consider the excerpts and authorities relied upon by the Respondent to reject an expanded FET standard beyond the minimum standard of treatment provided by customary international law and argue that they do not support the Respondent's case.[584] According to the Claimants, these are all post-2001 NAFTA authorities, which are not useful in an analysis of the FET provision in the Treaty[585] because of specific Notes of Interpretation by the three NAFTA

---

[579] *Id.*, fn. 320, citing *Cargill, Inc. v. Mexico*, ICSID Case No. ARB(AF)/05/2, Award, 2009, para. 282.

[580] Statement of Reply, paras 150-57 (emphasis by the Claimants). *See CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, para. 284; *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 2002, para. 125; *Thunderbird Gaming Corporation v. The United Mexican States*, NAFTA/UNCITRAL, Award, 2006, para. 194; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras 335-37, 364 (Ex. CL-11).

[581] Draft Convention on the Protection of Foreign Property, OECD, Article 1 and Notes and Comments to Article 1, para. 4(a) (Ex. R-73). *See* Statement of Reply, para. 151, referring to Statement of Defence, paras 123-24.

[582] Statement of Reply, para. 151, referring to Statement of Defence, paras 123-24.

[583] Statement of Reply, fn. 296 (emphasis by the Claimants); C. McLachlan, 'Investment Treaties and General International Law' (2008) 57 International and Comparative Law Quarterly 361, p. 382 (Ex. CL-71). The Claimants make a similar argument regarding the Respondent's reliance on Swiss government policy (*see* Statement of Reply, para. 124, fn. 265, citing *Opinions of the Public International Law Directorate of the Swiss Federal Political Department* (*Mémoire de la Direction du Droit International Public du Département Politique Fédéral*), in L. Caflisch, *La pratique suisse en matière de droit international public*, p. 178 (Ex. R-74). According to the Claimants, if read in context, the Swiss government's statements equating FET with the customary standard appear to be an attempt to promote both standards, not weaken them.

[584] Statement of Reply, paras 156-57, referring to Statement of Defence, paras 125-27.

[585] Statement of Reply, para. 156. At Statement of Reply, para. 157, the Claimants make a similar argument regarding India's reliance on the U.S. and Canadian Model BITs and on resolutions of European institutions, as they expressly limit, or purport to limit, their FET standard to customary minimum treatment standard (*see supra*, fn. 603).

States pursuant to which the NAFTA FET standard was defined as not requiring "treatment in addition to or beyond that which is required by the customary minimum standard of treatment."[586]

434. Whatever the answer to the relationship between the FET standard and customary international law, the Claimants argue that the *Neer* standard cited by India is inapposite to the present case.[587] Notably, (i) *Neer* is not an investment protection case, as it concerned the host State's alleged failure to punish criminals responsible for the killing of a U.S. citizen;[588] (ii) *Neer* does not discuss the words "fair and equitable" that the Tribunal must interpret;[589] (iii) the so-called *Neer* test—which turns on whether conduct has fallen below "international standards"—is ultimately a circular standard that leaves those standards undefined.[590] Finally, even under NAFTA's 2001 revision, only *Glamis Gold* has expressed the "customary international law minimum" in terms of the *Neer* standard.[591] A majority of cases follows the *Mondev* view that customary international law has moved on since *Neer* and now sustains a broader concept of FET.[592]

b.    **The Respondent's Position**

435. The Respondent submits that the applicable standard is the minimum standard of FET under customary international law, the content of which is to be construed from a number of decisions following the 1926 *Neer v. Mexico* decision,[593] which provides that "the threshold [for the

---

[586]    NAFTA Free Trade Commission, Notes of Interpretation of Certain Chapter 11 Provisions, para. 2(2), July 31, 2002.

[587]    Statement of Reply, para. 158, referring to *L.F.H. Neer and Pauline E. Neer v. Mexico*, Mexico-U.S. General Claims Commission, Docket No. 136, Opinion, 15 October 1926 (1927) 21 American Journal Of International Law 555, p. 556 (Ex. R-88) (*see supra*, para. 437).

[588]    Statement of Reply, para. 159(c).

[589]    *Id.*, para. 159(d).

[590]    *Id.*, para. 159(e). *See Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 2002, para. 116, noting that "[t]o the modern eye, what is unfair or inequitable need not equate with the outrageous or the egregious."

[591]    *Glamis Gold, Ltd. v. The United States of America*, NAFTA/UNCITRAL, Award, 2009, paras. 22, 614, 616.

[592]    Statement of Reply, para. 160, referring to *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 2002, para. 116.

[593]    The Tribunal in *Neer v. Mexico* held that in order to violate this standard, the treatment of an alien "should amount to an outrage, to bad faith, to wilful neglect of duty, or to insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency." *See L.F.H. Neer and Pauline E. Neer v. Mexico*, Mexico-U.S. General Claims Commission, Docket No. 136, Opinion, 15 October 1926 (1927) 21 American Journal Of International Law 555, p. 556 (Ex. R-88).

application of the standard] is extremely high" and "outrageous or egregious conduct is required before a violation is established."[594]

436. Moreover, attempts to expand the FET concept beyond the minimum standard of treatment provided by customary international law in the absence of evidence evincing such intention of the Contracting Parties have been severely and widely criticized.[595] The Respondent also notes that neither the language of the Treaty nor its *travaux préparatoires* indicates that anything beyond the minimum standard of treatment under customary international law applies.[596]

437. As a general proposition, the Respondent further argues that the FET clause of Indian BITs was inspired by the OECD Draft Convention,[597] which provides for the application of this minimum standard of treatment.[598] The Respondent submits that this position is reinforced by other countries, such as the three NAFTA States by their interpretive statement confirming that the concept of FET has never been intended to reach beyond this minimum standard of treatment,[599]

---

[594] Statement of Defence, para. 128, referring to *Alex Genin, Eastern Credit Limited, Inc. and A.S. Baltoil v. Republic of Estonia*, ICSID Case No. ARB/99/2, Award, 2001, para. 367; *International Thunderbird Gaming Corporation v. The United Mexican States*, NAFTA/UNCITRAL, Award, 2006, para. 194; *Glamis Gold, Ltd. v. United States of America*, NAFTA/UNCITRAL, Award, 2009, para. 824; *Cargill, Incorporated v. United Mexican States*, ICSID Case No. ARB(AF)05/02, NAFTA, Award, 2009, paras 284, 286.

[595] Statement of Defence, paras 125-27. *See* J.R. Picherack, 'The Expanding Scope of the Fair and Equitable Treatment Standard: Have Recent Tribunals Gone Too Far?' (2008) 9(4) The Journal of World Investment and Trade 255, p. 272 (Ex. R-75); Marcos Orellana, 'International Law on Investment: The Minimum Standard of Treatment (MST)' (2004) 1(3) Transnational Dispute Management, p. 7 (Ex. R-76); G. Van Harten, *Investment Treaty Arbitration And Public Law* (OUP 2007), p. 89 (Ex. R-77); *Suez, Sociedad General de Aguas de Barcelona S.A. and Interagua Servicios Integrales de Agua S.A. v. Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Liability, Separate Opinion of Arbitrator Pedri Nikken, 2010, para. 3; *Public Statement on the International Investment Regime*, 31 August 2010, para. 5 (Ex. R-80); Description of the U.S. Model BIT, Submitted by the State Department, July 30, 1992, Hearing before the Committee on Foreign Relations, United States Senate, 102nd Congress, 2d Session, 1992, S. HRG 102-795, p. 62 (Ex. R-81); *Resolution on the Future European International Investment Policy* (2010/2203(INI)), European Parliament, 2011 (Ex. R-86).

[596] Statement of Defence, paras 121-22; Respondent's Rejoinder, para. 118.

[597] Draft Convention on the Protection of Foreign Property, OECD, Article 1 and Notes and Comments to Article 1, para. 4(a) (Ex. R-73). Regarding the Respondent's contention that the FET clause in India's BITs was inspired upon the OECD Draft Convention, *see* Fax from the Indian Embassy in Moscow to Ministry of Finance of India, November 15, 1994 (Ex. R-71); S.P. Subedi, 'India's New Bilateral Investment Promotion and Protection Treaty with Nepal: A New Trend in State Practice' (2013) 28(2) ICSID Review 384, p. 393 (Ex. R-72).

[598] *See* A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment* (Kluwer Law International 2009), p. 268-69 (Ex. R-57); *Opinions of the Public International Law Directorate of the Swiss Federal Political Department* (*Mémoire de la Direction du Droit International Public du Département Politique Fédéral*), in L. Caflisch, *La pratique suisse en matière de droit international public*, p. 178 (Ex. R-74).

[599] Respondent's Rejoinder, paras 119, 126. At Respondent's Rejoinder, para. 120, the Respondent also responds to the Claimants' interpretation of Swiss government policy, under which both the customary and

and that arbitral tribunals upholding an expansive interpretation of FET were acting contrary to their intentions.[600] In the Respondent's view, its authorities[601] disprove the Claimants' contention that "customary international law has moved on considerably since *Neer*…and the modern customary minimum now approaches, if not equals, the full scope of the modern FET standard."[602] First and foremost, the Claimants' view is not supported by the consensus necessary to constitute a rule of customary international law as established in the *North Sea Continental Shelf* case.[603] Also, the Respondent explains that if there was no difference between the Claimants' broad concept of FET and the minimum customary standard, there would have been no reason for the NAFTA countries to enter an interpretive statement clarifying that such is not the case.[604]

438. According to the Respondent, even if the Claimants' broader FET standard applied, in the absence of a specific commitment by the State, this could not deprive the State of its inherent sovereign right to regulate the conduct of business within its borders, and an investor cannot assume that there will be no adverse changes in law or policy affecting its investment.[605] A similar approach

---

the broad FET standards are promoted, by highlighting that no such affirmation is made (*see* Statement of Reply, fn. 296, citing *Opinions of the Public International Law Directorate of the Swiss Federal Political Department* (*Mémoire de la Direction du Droit International Public du Département Politique Fédéral*), in L. Caflisch, *La pratique suisse en matière de droit international public*, p. 178 (Ex. R-74). Likewise, the Respondent is critical about the Claimants' reliance on Professor Mann to contend that the minimum treatment envisaged by FET goes beyond the minimum standard (*see* Statement of Reply, para. 153, citing F.A. Mann, 'British Treaties for the Promotion and Protection of Investments' (1981) 52 The British Yearbook of International Law 241, p. 244 (Ex. CL-56). According to the Respondent, Professor Mann's subsequent writings directly contradict this view. *See* Respondent's Rejoinder, para. 121, citing F.A. Mann, *The Legal Aspect of Money* (5th Edition, OUP 1992), p. 510 (Ex. R-161).

[600]   Respondent's Rejoinder, para. 119.

[601]   *See supra*, fn. 599.

[602]   Respondent's Rejoinder, paras 123-27, referring to Statement of Reply, para. 159(b).

[603]   Respondent's Rejoinder, paras 126-27, citing North Sea Continental Shelf, Judgment, I.C.J. Reports 1969, p. 3, paras 74 and 77, which notes that "[n]ot only must the acts concerned amount to a settled practice, but they must also be such, or be carried out in such a way, as to be evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it."

[604]   Respondent's Rejoinder, para. 122.

[605]   *See* Statement of Defence, para. 130; Respondent's Rejoinder, para. 129, citing, *inter alia*, *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, paras. 284, 305 (Ex. CL-31); *Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010, paras. 117, 309(b) (Ex. CL-36); *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras. 368, 371 (Ex. CL-11); *Parkerings-Compagniet A.S. v. Lithuania*, ICSID Case No. ARB/05/8, Award, 2007, paras. 332, 344; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 2009, para. 217; Restatement (Third) on Foreign Relations Law, 1987, para. 712(g) (Ex. CL-46); A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment* (Kluwer Law International 2009), p. 282 (Ex. R-57); J. Crawford, 'Treaty and Contract in Investment Arbitration' (2008) 24(3) Arbitration International 351, p. 373 (Ex. R-92).

is taken by Indian law,[606] which governs the Devas Agreement.[607] As the Supreme Court of India has held, there is a distinction between "legitimate expectations" and "a wish, a desire or a hope."[608] Accordingly, no claim for violation of legitimate expectations can be made where the Government's decision is a matter of policy in accordance with public interest[609] "unless, in a given case, the decision or action taken amounts to an abuse of power."[610]

### 2.   *The Alleged Violation of the FET Standard*

#### a.   **The Claimants' Position**

439.   The Claimants argue that, throughout DOS' approval and repeated endorsement of the Devas Agreement, which carried the full imprimatur of the Government of India,[611] the Respondent created the legitimate expectation that Devas had a non-pre-emptible, exclusive right to use the S-band and operate the Devas system, and therefore that the State would not seek to undermine the Devas Agreement.[612] Many of these assurances were made directly to the Claimants, and were thus plainly intended to induce the Claimants to inject capital.[613]

440.   According to the Claimants, the Respondent thereafter fabricated a *force majeure* decision to try to mask a deliberate revocation of the Devas Agreement,[614] making only abrupt, "ambush" announcements regarding its intentions.[615] The Claimants allege that their legitimate expectations

---

[606]   Statement of Defence, paras. 131-32.

[607]   Devas Agreement, Article 19 (Ex. R-1/JCB-37).

[608]   *Union of India and others v. Hindustan Development Corpn. and others*, Supreme Court of India, Order, 1993, AIR 1994 SC 998, para. 29 (Ex. R-94); *Monnet Ispat and Energy Ltd. v. Union of India (UOI) and Ors*, Judgment, 2012, 11 SCC 1, para. 153(iii) (Ex. R-96).

[609]   *PTR Exports (Madras) Pvt. Ltd. and others v. The Union of India and others*, Supreme Court of India, Order, 9 May 1996, AIR 1996 SC 3461, paras 3-5 (Ex. R-95); *Monnet Ispat and Energy Ltd. v. Union of India (UOI) and Ors*, Judgment, 2012, 11 SCC 1, para. 153(iv) (Ex. R-96). *See also* Respondent's Rejoinder, para. 129, citing *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 305 (Ex. CL-31).

[610]   *Union of India and others v. Hindustan Development Corpn. and others*, Supreme Court of India, Order, 1993, AIR 1994 SC 998, para. 34 (Ex. R-94).

[611]   Statement of Claim, para. 210; Statement of Reply, para. 163, citing *White Industries Australia Ltd. v. India*, UNCITRAL, Final Award, 2011, para. 10.3.7 (Ex. CL-38).

[612]   Statement of Reply, para. 164.

[613]   Statement of Claim, para. 210; Statement of Reply, para. 163.

[614]   Statement of Reply, para. 166.

[615]   *See supra*, Chapter III - E.

in connection with their investment in Devas were completely subverted by these actions.[616] Such conduct, the Claimants argue, constitutes an abuse of regulatory discretion seeking to destroy the agreed legal framework for the investment,[617] not only in violation of the duty to act transparently and consistently[618] but also against good faith.[619]

441.   The Claimants also argue that the Respondent's conduct unjustly enriched the State at the expense of the investor—a recognized indicia of unfair and inequitable conduct.[620] The Claimants underline that the bad faith conduct of the Government of India has been compounded by harassing measures in order to punish Devas and the Claimants for exercising their respective rights.[621] All of these actions undertaken by the Respondent constitute a violation of the FET standard embodied in Article 4(1) of the Treaty.[622]

### b.    The Respondent's Position

442.   The Respondent's stance is that the Claimants' FET claims would not have merit even under their broad interpretation of the FET provision of the Treaty[623] and are an attempt to fill *pro forma* the hole in their expropriation case.[624]

443.   The Respondent avers that the Claimants' "legitimate expectations" are based on a number of mistaken assumptions[625] and ignore various key facts. First, the Government of India was not a party to the Devas Agreement, but a regulator, and no commitment or stabilization clause prevented it from taking policy decisions that might affect the Devas Agreement.[626] Second, the

---

[616]   Statement of Claim, para. 209; Statement of Reply, para. 165.

[617]   Statement of Reply, para. 168, citing *AWG Group v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 236.

[618]   Statement of Claim, para. 212, citing *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 309 (Ex. CL-31). *See also* Statement of Reply, para. 163.

[619]   Statement of Reply, para. 167.

[620]   Statement of Claim, para. 211, citing *Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010, para. 112 (Ex. CL-36).

[621]   Statement of Claim, para. 213, citing *Desert Line Projects LLC v. Yemen*, ICSID Case No. ARB/05/17, Award, 2008, paras. 186-94 (Ex. CL-7). *See supra*, para. 157.

[622]   Statement of Claim, paras 208-13; Statement of Reply, paras 162-72.

[623]   Statement of Defence, paras 130-42; Respondent's Rejoinder, paras 129-33.

[624]   Respondent's Rejoinder, para. 133.

[625]   *See* Statement of Defence, para. 134.

[626]   Statement of Defence, para. 138; Respondent's Rejoinder, paras 129, 131-32, citing, *inter alia*, *Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010, para. 117 (Ex. CL-36); *EDF (Services)*

S-band spectrum could not be used for terrestrial communications under current Indian regulations and policies.[627] Third, the Government of India could not issue a license for the terrestrial component of the proposed Devas Services without auction, in contravention of TRAI policy.[628] Finally, the Devas Agreement itself set forth a comprehensive scheme for its potential termination, which had been thoroughly negotiated and provided for nothing but the refund of the paid upfront capacity reservation fees if it were invoked.[629]

444. The Respondent then denies that the Government of India fabricated "a sham '*force majeure*' decision to try to mask a deliberate revocation of the [Devas Agreement]."[630] Such an allegation ignores the extensive documentary record recalling the extensive deliberation process[631] establishing the basis for the Government of India's decision to reserve S-band for national security purposes,[632] as well as the terms and conditions of the Devas Agreement itself.[633] It would also require the Tribunal to assume the *mala fide* of the Government of India when acting in its official capacity, which is improper as a matter of law.[634]

445. Furthermore, the Respondent notes that the Claimants do not point to any fact to support the allegation that its conduct "unjustly enriched the state at the expense of the investor."[635] The Claimants stance cannot prevail because (i) the Claimants had no acquired rights in this case; and (ii) the State did not take the policy decision to enrich itself, as the S-band was reserved for non-commercial, strategic purposes.[636]

---

*Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 2009, para. 217; *Parkerings-Compagniet A.S. v. Lithuania,* ICSID Case No. ARB/05/8, Award, 2007, para. 332.

[627] *See supra,* paras 177-179.

[628] *See supra,* paras 177-179.

[629] Devas Agreement, Article 7 (Ex. R-1). *See* Statement of Defence, para. 136; *see supra*, para. 95.

[630] Statement of Defence, para. 137, referring to Statement of Claim, para. 209.

[631] *See supra*, Chapter III - E.

[632] *See supra*, para. 304.

[633] *See* Devas Agreement, Article 11 (Ex. R-1).

[634] Statement of Defence, para. 137, fn. 323; Respondent's Rejoinder, para. 130; Transcript, Day 5, 1301:23-1308:13. *See,* for instance, *Lake Lanoux Arbitration (France v. Spain)*, Award, 1957, p. 126 (Ex. R-98); *Tacna-Arica Question (Chile, Peru)*, Opinion and Award, 1925, p. 930 (Ex. R-99).

[635] Statement of Defence, para. 139, referring to Statement of Claim, para. 211.

[636] Statement of Defence, para. 139. *See Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010, para. 112 (Ex. CL-36); *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 368 (Ex. CL-11).

446. The Respondent finally argues that Government officials requesting corporate information or conducting tax audits cannot be legitimately said to be acting "in bad faith."[637] Also, the Claimants have shown that they are perfectly capable of exercising the right to seek a remedy for such allegedly improper investigations in the appropriate courts of India.[638]

## B.    THE TRIBUNAL'S ANALYSIS

447. The Tribunal has concluded that the Claimants made a qualifying investment under the Treaty but that the Respondent was partly justified in invoking Article 11(3) of the Treaty and thereby ordering Antrix to annul its contract with Devas.

448. This being said, Devas had between February 7, 2006 and February 17, 2011 a valid and effective contract with Antrix, and the Claimants were entitled to the protections of the Treaty.

449. Article 4(1) of the Treaty reads:

> Investments and returns of investors of either Contracting Parties shall at all times be accorded fair and equitable treatment in the territory of the other Contracting Party. Neither Contracting Party shall in any way impair by unreasonable or discriminatory measures the management, maintenance, enjoyment or disposal of investments in its territory by investors of the other Contracting Party.

450. For the purpose of this section of this Award, the Tribunal will concentrate on the first sentence of this Article. The question therefore is: were the Claimants granted fair and equitable treatment between February 7, 2006 and February 17, 2011?

451. The Parties spent some considerable time debating whether the FET clause under Article 4(1) was limited to the minimum standard of treatment under customary international law.

452. According to the Respondent, there is nothing in the language of the Treaty or in its *travaux préparatoires* which would incorporate anything beyond the minimum standard of treatment under customary international law. It refers to the 1969 OECD Draft Convention on the Protection of Foreign Property which in one of its comments states that "the standard required conforms in effect to the 'minimum standard' which forms part of customary international law."[639] The Respondent also quotes a number of commentators and arbitral awards criticizing an expansive interpretation of the FET concept beyond the minimum standard provided under customary

---

[637]    Statement of Defence, para. 141, fn. 323.

[638]    *Id.*, para. 141, referring to Viswanathan I, paras 218-19, 222; Respondent's Rejoinder, para. 130.

[639]    Draft Convention on the Protection of Foreign Property, OECD, Article 1 and Notes and Comments to Article 1 (Ex. R-73).

international law.[640] It also notes that some countries have introduced a clear statement in their model BITs to the effect that FET is to be determined in accordance with the customary international law minimum standard.

453.   In the Respondent's view, the standard expressed in the 1926 Opinion of the Mexico-US General Claims Commission in the *Neer v. Mexico* case[641] remains valid at least in terms of requiring an extremely high threshold.[642] The *Neer* standard was to the effect that, in order to constitute a breach of customary international law, the treatment of an alien "should amount to an outrage, to bad faith, to wilful neglect of duty, or to insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency." It quotes, in support, a few (mainly NAFTA) arbitral awards.[643]

454.   In any event, says the Respondent, no violation of the FET standard occurred in this case, even under an expansive interpretation of it. Citing a number of authors, arbitral awards and Indian judgments, it argues that (i) an FET obligation cannot, absent a specific commitment by the State, deprive the State of its inherent sovereign right to regulate the conduct of business within its borders; (ii) the mere existence of a BIT is no substitute for such a commitment; (iii) absent such a specific commitment, an investor cannot assume that there will be no adverse changes in law or policy affecting its investment; and (iv) hopes and dreams are not legitimate expectations.[644]

455.   As to the Claimants, they counter, referring also to a number of arbitral awards and commentaries that (i) the FET obligation means more than the minimum standard of treatment under customary international law as presented by the Respondent;[645] (ii) that the Respondent's invocation of the customary minimum treatment standard is unavailing, as it assumes a material distinction in practice between the FET standard and the obligations it owes under customary international

---

[640]   Statement of Defence, para. 125.

[641]   *See L.F.H. Neer and Pauline E. Neer v. Mexico*, Mexico-U.S. General Claims Commission, Docket No. 136, Opinion, 15 October 1926 (1927) 21 The American Journal Of International Law 555, p. 556 (Ex. R-88).

[642]   Statement of Defence, para. 128.

[643]   *Id.*, para. 128.

[644]   *Id.*, para. 130.

[645]   Statement of Reply, paras 142-149.

law;[646] and (iii), on any view, Article 4(1) creates a higher level of investment protection than the 1926 *Neer* standard invoked by the Respondent.[647]

456.  On this debate, the Tribunal shares the view expressed in *El Paso:*

> The Tribunal considers this discussion to be somewhat futile, as the scope and content of the minimum standard of international law is as little defined as the BIT's FET standard, and as the true question is to decide what substantive protection is granted to foreign investors through the FET. The issue is not one of comparing two undefined or weakly defined standards; it is to ascertain the content and define the BIT standard of fair and equitable treatment.[648]

457.  The Tribunal does not subscribe to the view that, today, a violation of the customary minimum standard was frozen as defined in *Neer* "to an outrage, to bad faith, to wilful neglect of duty, or to insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency."[649] It is now generally recognized that customary international law has evolved since 1926, some awards giving the required minimum treatment a wider interpretation than others.[650] FET in the Treaty, as in most other treaties, is not defined and the Treaty contains no wording limiting its scope and content to some external standard, whether it be international customary law or something else. In determining that scope and content, the Tribunal must rely on Article 31 of the VCLT,[651] which requires a treaty to be "interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

---

[646]  *Id.*, paras 150-157.

[647]  *Id.*, paras 158-161.

[648]  *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 335 (Ex. CL-11).

[649]  *L.F.H. Neer and Pauline E. Neer v. Mexico*, Mexico-U.S. General Claims Commission, Docket No. 136, Opinion, 15 October 1926 (1927) 21 The American Journal Of International Law 555, p. 556 (Ex. R-88).

[650]  The formulation may vary somewhat (e.g., *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, para. 284: "The Treaty standard of fair and equitable treatment (...) is not different from the international law minimum standard and its evolution under customary international law"; *Azurix v. Argentina*, ICSID Case No. ARB/01/12, Award, 2006, para. 361, after stating that FET and full protection and security permits an interpretation setting "higher standards than required by international law," goes on to say that the Tribunal "considers that its content is substantially similar whether the terms are interpreted in their ordinary meaning, as required by the Vienna Convention, or in accordance with customary international law." However, it is now well established that the concept of the minimum standard of customary law cannot be equated with the *Neer* description of it.

[651]  Vienna Convention on the Law of Treaties, Article 31(1), done on May 23, 1969, 1155 U.N.T.S., 331.

458.  As stated in *El Paso*, "the legitimate expectations of the investors have generally been considered central in the definition of FET, whatever its scope."[652] There is an overwhelming trend to consider the touchstone of fair and equitable treatment to be found in the legitimate and reasonable expectations of the parties, which derive from the obligation of good faith. This has been aptly stated by the tribunal in *Waste Management II:* "In applying this standard it is relevant that the treatment is in breach of representations made by the Host State which were reasonably relied on by the claimant."[653] And the tribunal in *Saluka* reiterated the same idea, when stating: "The standard of 'fair and equitable treatment' is therefore closely tied to the notion of legitimate expectations which is the dominant element of that standard."[654]

459.  A number of cases mentioned by each Party (quoting different sections) reached a similar conclusion.

460.  In *Suez/AWG*,[655] the tribunal, by majority, held that the FET standard is breached when a State "frustrates or thwarts" the "legitimate expectations" on which an investment was based.

461.  In *Bayindir*,[656] the tribunal stated that the FET imposes the "obligation to act transparently and grant due process, to refrain from taking arbitrary or discriminatory measures, from exercising coercion or from frustrating the investor's legitimate expectations with respect to the legal framework affecting the investment."

462.  In *CMS*,[657] the tribunal described the FET standard as "inseparable from stability and predictability" and held that "this is an objective requirement unrelated to whether the Respondent had any deliberate intention or bad faith in adopting the measures in question." The annulment committee in that case[658] addressing this part of the award, declared that "it was adequately

---

[652]  *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 348 (Ex. CL-11).

[653]  *Waste Management, Inc. v. Mexico* ("Number 2"), ICSID Case No. ARB(AF)/00/3, Award, 2004, para. 98.

[654]  *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 302 (Ex. CL-31).

[655]  *Suez, Sociedad General de Aguas de Barcelona, S.A. and Vivendi Universal, S.A. v. Argentina*, ICSID Case No. ARB/03/19, Decision on Liability, 2010; *AWG Group Ltd. v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 223.

[656]  *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 2009, para. 178.

[657]  *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, paras. 276-280.

[658]  *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, paras 85, 89.

founded on the applicable law and the relevant facts" and added that "legitimate expectations …
may be relevant to the application of the fair and equitable treatment clause."

463. The Tribunal need not enter into a lengthy discussion of the concept and scope of the FET standard
in general. Suffice it to say for the purpose of this case that, whatever the scope of the FET
standard, the legitimate expectations of the investors have generally been considered central to its
definition. That concept however is not unlimited. Thus, the Claimants could not have had
legitimate expectations that Article 11(3) of the Treaty would never be invoked. That provision
was in full effect at the time of the signing of the Agreement in 2006 and no clause in that
Agreement or any subsequent statement by the Respondent would indicate that the Claimants
would be protected from the invocation of that provision of the Treaty. In that respect, the Tribunal
has already found that 60% of the Respondent's decision validly relied on the protection of its
essential security interests under Article 11(3) of the Treaty, while 40% would come under the
expropriation provision of its Article 6.

464. As mentioned in the *El Paso* case,[659] FET is an objective concept; it is the result of interests and
rights of both the investor and the State and the result of such balancing may vary with the
circumstances. In that context, transparency and good faith are key factors.

465. Independently of the text of the Devas Agreement,[660] the Claimants were entitled to legitimate
expectations that, in accordance with the text of the Treaty as well as under a general obligation
under international law, the Respondent would deal with them in good faith.

466. The preamble of the Treaty mentions the desire of the Contracting Parties "to create favourable
conditions for greater flow of investments." In Article 3(2), it states that "[e]ach Contracting Party
shall in accordance with its laws render assistance to the investors of the other Contracting Party,
whose investments were made in its territory, for obtaining the required clearances and
permissions." To these general statements must be added the provisions of Articles 4 and 6 of the

---

[659] *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras 356-365
(Ex. CL-11).

[660] Article 21 of the Devas Agreement states: "The Parties hereby agree that they intend to discharge their
obligations in utmost good faith. They therefore agree that they will, at all times, act in good faith and make
all attempts to resolve all differences however arising out of or in connection with this Agreement by
discussion." Similarly, Exhibit B of the Devas Agreement states in Articles 3.1.1.1 and 3.1.1.2: "However,
immediately following the launch failure or total satellite failure, if ANTRIX has sufficient reasons to
believe that the implementation of accelerated schedule is not feasible, both parties will discuss in good
faith to arrive at a mutually acceptable solution." (Ex R-1/JCB -37).

Treaty dealing with the treatment of investments and expropriation which have already been extensively considered in this award.

467.   If one searches for a general obligation of good faith under international law, one need not go further than the Vienna Convention on the Law of Treaties in which one can find no less than five mentions of the requirement of good faith.[661] This principle of good faith is not only self-standing, but it also stems from the concept of FET. In this regard, the Tribunal agrees with the *Tecmed* panel that "the commitment of fair and equitable treatment... is an expression and part of the bona fide principle recognized in international law."[662] However, this does not mean that every violation of FET by a State requires bad faith.[663] The good faith principle may simply require that the foreign investment must be treated in a manner such that it "will not affect the basic expectations that were taken into account by foreign investor to make the investment."[664]

468.   Reviewing the facts of this case, the Tribunal must conclude that, if the Respondent had acted in good faith, it would have informed the Claimants about the decision of the Space Commission of 2 July 2010 to annul the Agreement. Unfortunately, nothing of the sort occurred; in fact, the evidence shows that right up to February 8, 2011, the Claimants were completely left in the dark about the Space Commission's decision and the alleged growing needs of the military and their possible impact on the Agreement; apart from notices that there were delays in the launching of the satellite, there were no signals from the Respondent, all along, that the Agreement might be challenged or modified. This includes a number of meetings with senior officials (including one with the National Security Advisor to the Prime Minister on June 22, 2010) and Government Ministers and various correspondence, as well as the assurance given by Dr. Radhakrishnan during a meeting in Prague on September 29, 2010, that the GSAT-6 satellite would be shipped

---

[661]   VCLT, Preamble, Articles 26, 31, 46(2), 69. India has not acceded to the VCLT; nonetheless, it is recognized that Articles 31 and 32 of the VCLT reflect the customary international law regarding international treaty provisions. See *Dispute Regarding Navigational & Related Rights (Costa Rica v. Nicaragua),* Judgment, 2009 I.C.J. Rep. 213, at 237, para. 47 and *Saluka Invs. B.V. v. Czech Republic,* UNCITRAL, Partial Award, 2006, para. 296.

[662]   *Técnicas Medioambientales Tecmed, S.A. v. Mexico,* ICSID Case No. ARB (AF)/00/2, Award, 2003, para. 153.

[663]   See *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB (AF)/99/2, Award, 2002, para. 116; *Occidental Exploration and Production Company v. Ecuador*, LCIA Case No. UN3467, Award, 2004, para. 186; *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, para. 280; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 372 (Ex. CL-11).

[664]   *Técnicas Medioambientales Tecmed, S.A. v. Mexico,* ICSID Case No. ARB (AF)/00/2, Award, 2003, para. 154; *Sempra Energy International v. The Argentine Republic*, ICSID Case No. ARB/02/16, Award, 2007, para. 298.

in early December 2010.[665] The Tribunal has unchallenged evidence that at none of those meetings did the Respondent indicate that the Space Commission had decided to annul the Devas Agreement or that that there were competing military or other societal needs for the S-band spectrum which had been allocated to Devas.

469.  It would be to no avail for the Respondent to argue that such strategic information could not be communicated to the Claimants. Indeed, the required disclosure would not entail informing the Claimants of the nature of those needs or revealing any secret information. The Respondent could and should have simply informed the Claimants that the Agreement was in jeopardy because of societal and strategic needs; it would then have been up to the Claimants to decide how much financial and other resources they were willing to put at risk in that context or to propose to the Respondent possible alternative solutions.

470.  Leaving aside the requirement of "utmost good faith" contained in the Agreement, the Respondent's conduct constitutes a clear breach of the simple good faith required under international law and the FET clause of Article 2 of the Treaty; the Respondent must be liable for this wrongful behavior and must compensate the Claimants for damages that they may have suffered thereby from July 2, 2010 to February 17, 2011, the date of the CCS decision. The Respondent's liability subsequent to that decision has been addressed earlier in this award.

471.  As to the Claimants' argument that, by its conduct, the Respondent's unjustly enriched itself, it need not be separately addressed, taking into account the Tribunal's decision concerning expropriation and the breach of good faith under the FET provision of the Treaty.

472.  As to the alleged harassing measures that the Respondent would have taken, the Tribunal has not received sufficient evidence to conclude that these measures were taken to punish the Claimants or Devas for exercising their respective rights. There is a world of difference between this case and the *Desert Line Projects LLC v. Yemen* upon which the Claimants rely, where the Tribunal held that a settlement agreement "was imposed onto the Claimant under physical and financial duress."[666]

---

[665]   Singh I, para. 64.

[666]   *Desert Line Projects LLC v. Yemen*, ICSID Case No. ARB/05/17, Award, 2008, para. 186.

# CHAPTER IX - UNREASONABLE OR DISCRIMINATORY MEASURES

## A.   THE PARTIES' ARGUMENTS

473.   Article 4(1) of the Treaty provides, in relevant part:

> (1) ….Neither Contracting Party shall in any way impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of investments in its territory by investors of the other Contracting Party.

### 1.   The Claimants' Position

474.   The Claimants aver that "the determination of reasonableness is in its essence a matter for the arbitrator's judgment,"[667] but they also identify a number of elements from which unreasonableness may be derived. First, a finding of unfair and inequitable treatment may derive in unreasonableness.[668] Second, reasonableness requires that the State's conduct "bears a reasonable relationship to some rational policy."[669] Third, "withdrawal of undertakings and assurances given in good faith to investors as an inducement to [them] making an [investment] is by definition unreasonable…."[670] Fourth, unreasonableness is a synonym for arbitrariness, as is also pleaded by the Respondent.[671] On these grounds, the Respondent's measures—consisting of the nullification of an investment on specious grounds through a fabricated and self-made *force majeure* in direct contravention of numerous prior State approvals and assurances of support— are plainly "unreasonable."[672]

475.   The Claimants further argue that, separately and independently, the Respondent's measures also violated Article 4(1) of the Treaty because they were "discriminatory," in that they deliberately targeted investors[673] precisely on the grounds of them being foreigners standing to gain from the

---

[667]   *BG Group Plc. v. Argentina*, UNCITRAL, Final Award, 2007, paras 342-43 (Ex. CL-3); *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 612 (Ex. CL-5).

[668]   *Rumeli Telekom A.S. v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 2008, para. 679 (Ex. CL-29).

[669]   *Id.*

[670]   *BG Group Plc. v. Argentina*, UNCITRAL, Final Award, 2007, para. 343 (Ex. CL-3).

[671]   *National Grid plc v. Argentina*, UNCITRAL, Award, 2008, para. 197.

[672]   Statement of Claim, para. 221.

[673]   *Id.*, para. 223; *see CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 612 (Ex. CL-5); *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 347 (Ex. CL-31); *Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 2010, para. 261 (Ex. CL-21).

investment.[674] The Claimants stress that the Respondent has failed to respond to the documented evidence that has been submitted in support of this contention.[675]

### 2.   The Respondent's Position

476.   The Respondent submits that the term "unreasonable" in Article 4(1) of the Treaty is interchangeable with "arbitrary," which appears to be agreed by the Claimants.[676] In turn, the standard definition of arbitrariness is a "wilful disregard of due process of law, and act which shocks, or at least surprises, a sense of juridical propriety,"[677] or a "manifest impropriety."[678] The threshold of proof for arbitrary conduct is high, and the burden is on a claimant to meet that standard.[679] Conversely, a measure is reasonable when there is a rational policy to which the measure in question is reasonably related.[680] On this basis, the Respondent concludes that there was nothing improper, shocking or unreasonable in the Government of India's decision to reserve the S-band spectrum for non-commercial, strategic requirements in light of the nation's burgeoning security needs.[681]

477.   Further, the Respondent denies that these measures were discriminatory, since no "capricious, irrational or absurd differentiation in the treatment accorded to [the Claimants] as compared to other entities or sectors"[682] was present. The CCS reserved S-band for non-commercial, strategic use, prohibiting its use by all private parties, Indian and foreign.[683]

---

[674]   Statement of Claim, para. 222; Statement of Reply, para. 171; *See* Chaturvedi Report, March 12, 2011, para. 3.5.9 (App. KS-10).

[675]   Statement of Reply, para. 172.

[676]   Statement of Defence, para. 158; Respondent's Rejoinder, para. 135, citing *National Grid plc v. Argentina*, UNCITRAL, Award, 2008, para. 197.

[677]   Statement of Defence, para. 158, citing *Elettronica Sicula S.P.A. (ELSI)*, Judgment, I.C.J. Reports 1989, p. 15, para. 128. *See also Alex Genin, Eastern Credit Limited, Inc. and A.S. Baltoil v. Republic of Estonia*, ICSID Case No. ARB/99/2, Award, 2001, para. 371; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 2009, para. 303.

[678]   *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007, para. 281.

[679]   Statement of Defence, para. 161, citing A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment* (Kluwer Law International 2009), pp. 302-03 (Ex. R-57).

[680]   Statement of Defence, para. 162, citing *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 2010, para. 10.3.7-10.3.8.

[681]   Statement of Defence, paras 162-63; Respondent's Rejoinder, para. 135. *See supra*, para. 304; Anand I, paras 5-6.

[682]   *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007, para. 282.

[683]   Statement of Defence, para. 164; Respondent's Rejoinder, para. 136.

## B.   THE TRIBUNAL'S ANALYSIS

478.   According to the Claimants, its case—"featuring covert action to undermine a contract, a bogus 'policy' decision engineered towards commercial ends, and an insincere after-the-fact attempt to justify these self-interested actions under the mantra of 'security'—overwhelmingly proves a breach of Article 4(1)'s prohibition on 'unreasonable' actions."

479.   The Tribunal, by majority, has already concluded that, although extraneous factors may have played a role in the Respondent's decision, the Respondent had reasonable justification of military and other societal needs to take that decision partly under Article 11(3) and partly under Article 6 of the Treaty.

480.   The Claimants also argue, quoting the *BG Group* award[684] that this case involves the "withdrawal of undertakings and assurances given in good faith to investors as an inducement to their making investments" and that such action is "by definition unreasonable and a breach of the Treaty."[685] In that particular respect, the Claimants are on more solid ground and the Tribunal has already covered this issue above when discussing good faith and transparency. As demonstrated in a number of arbitral awards, while FET may have a broader meaning than "unreasonable or discriminatory measures," such measures would automatically constitute a breach of FET.[686]

481.   As to the argument about discrimination, the Claimants refer to statements made by officials after the nullification of the Agreement, in which they sought to justify their actions on the grounds that foreigners might have profited from the Devas system and some reference to that argument can be found in documents anterior to the Government decision.

482.   However, looking at the Space Commission Note for the Cabinet Committee on Security,[687] one can find a few references to foreign ownership but there is no suggestion that the Devas Agreement should be annulled because of that fact. Thus, in Article 2 of that Note, the Commission refers to the SATCOM policy approved by the Government of India on June 24,

---

[684]   *BG Group Plc. v. Argentina*, UNCITRAL, Final Award, 2007, paras 342-43.

[685]   Statement of Reply, para. 170.

[686]   *See, inter alia, CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, para. 290; *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 460 (Ex. CL-31); *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 2008, paras. 679-81; *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Liability, 2010, paras. 259, 418.

[687]   Department of Space, Note for the Cabinet Committee on Security, Annulling the "Agreement for the Lease of Space Segment Capacity on ISRO/Antrix S-Band Spacecraft by Devas Multimedia Pvt Ltd.," February 16, 2011 (Ex. C-229/R-22/JCB-219).

1997, which authorized foreign parties to lease INSAT capacity. In Article 37, there is a mention that, among other subjects, the Commission, at its July 2, 2010 meeting, deliberated on foreign equity in Devas but the minutes of that meeting merely state that the Chairman answered these various queries.[688] Elsewhere in these minutes, it is stated:

> Noting that ICC has not met since 2004, Commission suggested for reviving the ICC mechanism immediately. Also, as the activities of the Antrix have grown in the recent past involving execution of several contracts, and many of them with foreign parties, Commission suggested to set up a mechanism to review the structure and functioning of Antrix with a view to enhance the efficiency and to ensure due diligence of financial, contractual and legal aspects.[689]

483.    That suggestion is restated in the Space Commission Note to the CCS.[690] The same recommendation is made in the Note to the Space Commission. But, even more significantly, nowhere in the publication, on February 17, 2011,[691] of the CCS decision is there any indication that foreign ownership may have played any role in its conclusion that the S-band should be reserved for non-commercial purposes and that the Devas Agreement should be annulled.

484.    The claim under Article 4(1) of the Treaty is therefore rejected.

## CHAPTER X - MOST-FAVOURED-NATION TREATMENT

485.    Paragraphs 2 and 3 of Article 4 of the Treaty provide as follows:

> (2)    Each Contracting Party shall accord to investments of investors of the other Contracting Party, treatment which shall not be less favorable than that accorded either to investments of its own or investments of investors of any third State.

> (3)    In addition, each Contracting Party shall accord to investors of the other Contracting Party, including in respect of returns on their investments, treatment which shall not be less favorable than that accorded to investors of any third State.

---

[688]    *Id.*, Annexure 5, para. 117.6.10.

[689]    *Id.*, Annexure 5, para. 117.6.9.

[690]    *Id.*, paras. 41 and 42.

[691]    Press Information Bureau, Government of India, CCS Decides to Annul Antrix-Devas Deal, February 17, 2011, available at pib.nic.in (C-134/R-35/JCB-220).

A.    THE PARTIES' ARGUMENTS

486.  The Claimants' position is that, pursuant to the most favored nation ("**MFN**") clauses in paragraphs 2 and 3 of Articles 4 of the Treaty, they are entitled to the protections set forth in Article 3(2) of the Serbia-India BIT,[692] which provides as follows:

> (2)    Investments and returns of investors of each Contracting Party shall at all times be accorded fair and equitable treatment in the territory of the other Contracting Party and shall enjoy full legal protection and security.[693]

487.  The Respondent's main contention is that the MFN clauses in the Treaty cannot be relied upon by the Claimants to create an entirely new right as the one embodied in Article 3(2) of the Serbia-India BIT.[694] Even if it were possible, there would be no breach of the full legal protection and security clause of the Serbia-India BIT on the facts of the case.

*1.    The Possibility of Importing the 'Full Legal Protection and Security' Clause of the Serbia-India BIT*

a.    **The Claimants' Position**

488.  The Claimants submit, following the reasoning of the tribunal in *White Industries v. India,* that the "'full legal protection and security' clause of Article 3(2) of the Serbia-India BIT, which they seek to import, is a 'more favorable substantive provision…in a third party treaty,'"[695] which, by the plain terms of Article 4(2) and (3), is importable.[696] According to the Claimants, this approach is fully consistent with numerous arbitral decisions,[697] and must be distinguished from importing

---

[692]  Notice of Arbitration, para. 75; Statement of Claim, paras 224-25; Statement of Reply, paras 173-87. Throughout their Notice of Arbitration, the Claimants gave notice that, on the basis of Articles 4(2) and (3) of the Treaty, they would rely on several provisions of BITs signed between India and third countries. Their final position, recalled in this award, is different from the one expressed in the Notice of Arbitration. *See* Notice of Arbitration, paras 63, 70.

[693]  Agreement between The Government of The Republic Of India and The Federal Government of The Federal Republic of Yugoslavia for The Reciprocal Promotion and Protection of Investments, dated January 31, 2003, Article 3(2) (Ex. CL-40) (the "**Serbia-India BIT**").

[694]  Statement of Defence, paras 166-68; Respondent's Rejoinder, paras 137-39.

[695]  *White Industries Australia Ltd. v. India*, UNCITRAL, Final Award, 2011, para. 11.2.3 (Ex. CL-38).

[696]  Statement of Reply, paras 173-83.

[697]  *See* Statement of Reply, para. 177, citing *Rumeli Telekom A.S. v. Kazakhstan*, ICISD Case No. ARB/05/16, Award, 2008, paras 575, 681 (Ex. CL-29); *EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, paras 931-32; *MTD Equity Sdn Bhd, v. Chile*, ICSID Case No. ARB/01/7, Award, 2004, para. 104; *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 2009, paras 146-49, 165; *Arif v. Moldova*, ICSID Case No. ARB/11/23, Award, 2013, para. 396.

"an entirely new provision from another treaty," which is what the Respondent alleges the Claimants are attempting.[698]

489.  In the Claimants' view, the Respondent's claim that relying on the 'full protection and security' clause of the Serbia-India BIT would entail creating wholly new rights is based on selective quotations and misreading of a number of decisions, including *Paushok*[699] and *Hochtief*.[700] Whereas *Paushok* is of no assistance to India because the MFN clause at stake only extended MFN treatment in respect of the obligation to afford fair and equitable treatment,[701] *Hochtief* is, according to the Claimants, helpful to their own position. The claimant in *Hochtief* sought to rely, by means of an MFN clause, on a dispute resolution clause in a third party treaty which, unlike the applicable BIT, did not require the parties to litigate in the Argentine courts for 18 months before resorting to arbitration. The *Hochtief* tribunal allowed this importation because "the 18-month pre-arbitration litigation requirement should be regarded as a matter of the treatment of investors in exercising their rights in relation to dispute settlement and not as the subject of a distinct right."[702] Equally, the Claimants contend that, the 'full legal protection and security' clause of the Serbia-India BIT can be imported because both this BIT and the Treaty cover the same subject matter, i.e. the treatment of investments, meaning that the rights in the Serbia-India BIT are not "wholly distinct" from those in the Treaty.[703]

### b.    The Respondent's Position

490.  The Respondent avers that the Claimants' attempt to import an entirely new provision from another treaty would be improper because it would entail creating a standard that is not present in the applicable Treaty.[704] Investor-State tribunals, such as the ones in *Hochtief v. Argentina*,

---

[698]  Statement of Reply, para. 178, referring to Statement of Defence, para. 166.

[699]  *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. Mongolia*, UNCITRAL, Award on Jurisdiction and Liability, 2011, paras 362-3, 570-72.

[700]  *Hochtief Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction, 2011.

[701]  Statement of Reply, para. 180, citing *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. Mongolia*, UNCITRAL, Award on Jurisdiction and Liability, 2011, paras 361-62 (citing the Russia-Mongolia BIT, Article 3).

[702]  *Hochtief Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction, 2011, paras. 83-86.

[703]  Statement of Reply, para. 183.

[704]  Statement of Defence, paras 166-69; Respondent's Rejoinder, paras. 137-39.

*Paushok v. Mongolia* and *Accession Mezzanine v. Hungary*[705] have recognized that an MFN clause cannot be relied upon to create wholly new rights.[706]

## 2.   The Respondent's Alleged Violation of the 'Full Legal Protection and Security' Provision

### a.   The Claimants' Position

491.   The Claimants argue that the Respondent has breached the 'full legal protection and security' clause of Article 3(2) of the Serbia-India BIT, and, in turn, Article 4(2) and (3) of the Treaty.[707] This clause obligates the host State "to ensure that neither by amendment of its laws nor by actions of its administrative bodies is the agreed and approved security and protection of the foreign investor's investment withdrawn or devalued."[708] This standard has been violated by (i) the Indian Cabinet's actions, and other affirmative acts, which caused a "withdrawal and devaluation" of the investment, and (ii) the several government acts that served as a pretextual basis for annulling the Devas Agreement.[709]

492.   The Claimants argue that *AES v. Hungary*, cited by India, does not lead to a different conclusion.[710] In that case the tribunal held that the respondent State had not breached the "most constant protection and security obligation" because it had acted "with a view to achieving objectively rational public policy goals." By contrast, the Respondent's measures leading to the annulment of the Devas Agreement were not aimed, in the Claimants' case, at a legitimate and objective policy goal.[711]

493.   Finally, the Claimants argue that it is no answer to the Respondent to claim that, because the Devas Agreement contained a *force majeure* clause applicable in the case of "sovereign action," there was no "withdraw[al]" or "devaluat[ion]" of the "agreed and approved security and

---

[705]   *Accession Mezzanine Capital L.P. and Danubius Kereskedőház Vagyonkezelő Zrt. v. Hungary*, ICSID Case No. ARB/12/3, Decision on Respondent's Objection under Arbitration Rule 41(5), 2013, paras. 73-74.

[706]   *See Hochtief Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction, 2011, para. 81.

[707]   Statement of Claim, paras. 224-25; Statement of Reply, paras. 184-86.

[708]   Statement of Claim, para. 224, citing *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 613 (Ex. CL-5).

[709]   Statement of Claim, para. 225, Statement of Reply, para. 184.

[710]   Statement of Reply, para. 185, referring to Statement of Defence, paras 170-72.

[711]   Statement of Reply, para. 185.

protection" applicable to the Claimants' investment.[712] That clause did not give a license to Antrix to rely upon a self-generated *force majeure* defence.[713]

### b.  The Respondent's Position

494.  According to the Respondent, even if the Tribunal disregarded its argument that the 'full protection and security' clause of Article 3(2) of the Serbia-India BIT cannot be imported into the Treaty, there would still be no breach of such clause on the facts of the case because it cannot operate as a legal stabilization clause.[714] In the words of the *AES v. Hungary* tribunal:

> To conclude that the right to constant protection and security implies that no change in law that affects the investor's rights could take place, would be practically the same as to recognizing the existence of a non-existent stability agreement as a consequence of the full protection and security standard.[715]

495.  The Respondent then denies that the 'full security and protection' clause obligates the host State "to ensure that neither by amendment of its laws nor by actions of its administrative bodies is the agreed and approved security and protection of the foreign investor's investment withdrawn or devalued."[716] In the Respondent's view, it is unclear what "agreed and approved security" the Claimants refer to because the Devas Agreement made clear that the Government of India could take decisions in its sovereign capacity, without being limited by a stabilization clause.[717]

## B.  THE TRIBUNAL'S ANALYSIS

496.  As to the possibility of importing the "full protection and security" clause of the Serbia-India BIT, the Tribunal shares the views expressed by the Claimants concerning the possibility of importing the "full protection and security" clause of the Serbia-India BIT. The numerous arbitral awards mentioned by the Claimants and referred to above confirm that conclusion. Moreover, the three cases mentioned by the Respondent do not support its argument that accepting the importation of the relevant provision of the Serbia-India BIT would entail creating a standard that is not present in the applicable Treaty.

---

[712]  Statement of Reply, para. 186, referring to Statement of Defence, para. 171, fn. 387.

[713]  Statement of Reply, para. 186.

[714]  Statement of Defence, paras 170-72; Respondent's Rejoinder, paras 140-42.

[715]  *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 2010, para. 13.3.5.

[716]  *See* Statement of Claim, para. 224.

[717]  Statement of Defence, fn. 387; Respondent's Rejoinder, para. 142.

497.  As far as the alleged violation by the Respondent of the "full legal protection and security provision" is concerned, the Tribunal disagrees with the Claimants' conclusion.

498.  As to the State obligation under the FPS standard, it is generally described as an "obligation of vigilance and due diligence"[718] and it has generally been applied in the context of "use of force."[719]

499.  The nature of that provision has been aptly described in the *El Paso* award as "no more than the traditional obligation to protect aliens under international customary law and (that) it is a residual obligation provided for those cases in which the acts challenged may not in themselves be attributed to the Government, but to a third party."[720] If, on the other hand, the acts can be attributed to the Government, then the FET standard would apply.

500.  The Tribunal has already decided that the invocation of *force majeure* by Antrix is attributable to the State under Article 8 of the ILC Articles. The Claimants' claim under full protection and security is therefore rejected.

## CHAPTER XI - DECISIONS

501.  **For the reasons set out above, the Tribunal decides and awards as follows:**

   (a)  **Unanimously, that the Claimants' claims relate to an "investment" protected under the Treaty;**

   (b)  **Unanimously, that the notice of termination of the Devas Agreement sent by Antrix to Devas constituted an act of State attributable to the Respondent.**

---

[718]  *Técnicas Medioambientales Tecmed, S.A. v. Mexico,* ICSID Case No. ARB (AF) /00/02, Award, 2003, para. 177; *El Paso Energy International Company v. The Argentine Republic,* ICSID Case No. ARB/03/15, Award, 2011, paras 522-523; *Pantechniki S.A. Contractors & Engineers (Greece) v. The Republic of Albenia,* ICSID Case No. ARB/07/21, Award, 2009, paras 77 and 81.

[719]  *Saluka Investments B.V. (The Netherlands) v. the Czech Republic,* Partial Award, 2006, para. 483; *Asian Agricultural Products Ltd. (APPL) v. Sri Lanka,* ICSID Case No. ARB/87/3, Award, 1990, paras 46-53; *Wena Hotel Limited v. Egypt,* ICSID Case No. ARB/98/4, Award, 2000, para. 84; *Eastern Sugar v. The Czech Republic,* Arbitration Institute of the Stockholm Chamber of Commerce, Partial Award, 2007, para. 203.

[720]  *El Paso Energy International Company v. The Argentine Republic,* ICSID Case No. ARB/03/15, Award, 2011, para. 522.

(c)     **By majority, that the Tribunal lacks jurisdiction over the Claimants' claims insofar as the Respondent's decision to annul the Devas Agreement was in part directed to the protection of the Respondent's essential security interests;**

(d)     **By majority, that the Respondent has expropriated the Claimants' investment insofar as the Respondent's decision to annul the Devas Agreement was in part motivated by considerations other than the protection of the Respondent's essential security interests;**

(e)     **By majority, that the protection of essential security interests accounts for 60% of the Respondent's decision to annul the Devas Agreement, and that the compensation owed by the Respondent to the Claimants for the expropriation of their investment shall therefore be limited to 40% of the value of that investment;**

(f)     **Unanimously, that the Respondent has breached its obligation to accord fair and equitable treatment to the Claimants between July 2, 2010 and February 17, 2011.**

(g)     **Unanimously, that the Claimants' other claims shall be dismissed;**

(h)     **Unanimously, that any decision regarding the quantification of compensation or damages, as well as any decision regarding the allocation of the costs of arbitration, shall be reserved for a later stage of the proceedings.**

Place of Arbitration: The Hague, the Netherlands

Date of Award:     July 25, 2016

Mr. David R. Haigh, Q.C.
(Subject to the attached dissenting opinion)

The Honorable Shri Justice Anil Dev Singh

The Honorable Marc Lalonde, P.C., O.C., Q.C.
President