# EXHIBIT 4

# judgment

**THE HAGUE DISTRICT COURT**

Commercial bench

case list number / cause list number: C/09/529140 / HA ZA 17-315

**Judgment of 14 November 2018**

in the case of

**THE REPUBLIC OF INDIA** (New Delhi),
claimant,
counsel: T.L. Claassens of Rotterdam,

*v*

1.     **CC/DEVAS (MAURITIUS) LTD.** (Port Louis, Mauritius),
2.     **DEVAS EMPLOYEES MAURITIUS PRIVATE LTD** (Port Louis, Mauritius),
3.     **TELCOM DEVAS MAURITIUS LIMITED** (Port Louis, Mauritius),
defendants,
counsel: G.J. Meijer of Amsterdam.

In what follows below, the parties are referred to as India and CC/Devas, Devas Employees and Telcom Devas. The defendants are referred to jointly as Devas et al.

## 1.     The proceedings

1.1.     The course of the proceedings is evidenced by:
- the summons of 27 October 2016 with exhibits 1 to 109;
- the statement of defence with exhibits G-1 to G-55;
- the interim judgment of 11 October 2017 ordering a post-statement hearing;
- the submission on the part of India with exhibits 110 to 122;
- the submission on the part of Devas et al. with exhibits 56A, 56B and 56C;
- the submission on the part of India with exhibit 123;
- the official court record of the parties' appearance that took place on 30 March 2018.

1.2.     With the parties' consent the official court record was drafted in their absence. The parties were given the opportunity to make comments about the official court record in so far as this concerned errors of fact. In a fax of 26 April 2018 India made use of this opportunity as did Devas et al. in a letter of the same date. The official court record will be read having regard to the additions stated and the observations made by the parties.

1.3.     Judgment was finally determined.

2.      **The facts**

2.1.      On 20 June 2000 a bilateral investment treaty (the "BIT") came into effect between India and the Republic of Mauritius ("Mauritius"). The BIT's purpose is to protect investments of Mauritian investors in India and of Indian investors in Mauritius. Article 8, BIT provides for arbitration for the resolution of disputes.

2.2.      Devas et al. are the (indirect) shareholders of an Indian company called Devas Multimedia Private Limited ("Devas"). Devas et al. are companies registered in Mauritius. Antrix Corporation Limited ("Antrix") is the commercial branch of the Indian Space Research Organization ("ISRO"), the business of which is the exploitation of Indian satellites.

2.3.      On 28 January 2005 Devas concluded an agreement with Antrix with reference to the lease of 70 MHz capacity of the S-band for a twelve year period with the option of extension (the "Devas Contract"). For this purpose transponders were to be based on two satellites that were still to be developed. Devas wished to use the satellites and the accompanying spectrum, together with a network of transmission masts that it was to develop, for offering to its customers in India audio-visual broadcasts and broadband wireless access (the "Devas Services"). In the 2005-2010 period, Devas, in collaboration with, amongst others, Antrix and ISRO, worked on preparing these services.

2.4.      On 17 February 2011 the Cabinet Committee on Security - consisting of the Prime Minister and the Ministers of Defence, Home Affairs, Foreign Affairs and Finance of India - which was competent to take decisions concerning defence and internal and external security (the "CCS"), decided that the Devas Contract had to be terminated. Prior to this decision a variety of governmental bodies and commissions had provided advice.

The press release of that same date concerning the CCS decision reads as follows:

> "(…)
> *Taking note of the fact that Government policies with regard to allocation of spectrum have undergone a change in the last few years and there has been an increased demand for allocation of spectrum for national needs, including for the needs of defence, para-military forces, railways and other public utility services as well as societal needs, and having regard to the needs of the country's strategic requirements, the Government will not be able to provide orbit slot in S band to Antrix for commercial activities, including for those which are the subject matter of existing contractual obligations for S band.*
>
> *In light of this policy of not providing orbit slot in S Band to Antrix for commercial activities, the* [Devas Contract, addition by the court] *shall be annulled forthwith*."

2.5.      On 25 February 2011 Antrix formally notified Devas of the termination of the Devas Contract.

2.6.      On 3 July 2012, based on, amongst other things, Article 8, BIT, Devas et al. filed arbitration proceedings against India (the "Arbitration Proceedings"). Mr. David R. Haigh, The Honourable Shri Justice Anil Dev Singh and The Honourable Marc Lalonde (who was also the president) constituted the arbitral tribunal (the "Tribunal"). The arbitration was seated in The Hague.

2.7.      In so far as is material to the adjudication in this action in set-aside the course of the Arbitration Proceedings was as follows:

- on 1 July 2013 Devas et al. lodged a statement of claim;
- on 2 December 2013 India lodged a statement of defence (the "Statement of Defence");
- on 18 March 2014 Devas et al. lodged a Statement of Reply on Jurisdiction and Liability;
- on 1 July 2014 India lodged a rejoinder (the "Rejoinder");
- the hearing (the "Hearing") took place between 1 and 5 September 2014 in the Peace Palace in The Hague; and
- after the Hearing India inserted a number of new documents into the case, in respect of which the parties then conducted a debate in writing.

2.8.     In a Partial Award of 25 July 2016 (the "Partial Award") the Tribunal took the following decisions:

*(a) Unanimously, that the Claimants' claims relate to an "investment" protected under the Treaty;*
*(b) Unanimously, that the notice of termination of the Devas Agreement sent by Antrix to Devas constituted an act of State attributable to the Respondent;*
*(c) By majority, that the Tribunal lacks jurisdiction over the Claimants' claims insofar as the Respondent's decision to annul the Devas Agreement was in part directed to the protection of the Respondent's essential security interests;*
*(d) By majority, that the Respondent has expropriated the Claimants' investment insofar as the Respondent's decision to annul the Devas Agreement was in part motivated by considerations other than the protection of the Respondent's essential security interests;*
*(e) By majority, that the protection of essential security interests accounts for 60% of the Respondent's decision to annul the Devas Agreement, and that the compensation owed by the Respondent to the Claimants for the expropriation of their investment shall therefore be limited to 40% of the value of that investment;*
*(f) Unanimously, that the Respondent has breached its obligation to accord fair and equitable treatment to the Claimants between July 2, 2010 and February 17, 2011.*
*(g) Unanimously, that the Claimants' other claims shall be dismissed.*
*(h) Unanimously, that any decision regarding the quantification of compensation or damages, as well as any decision regarding the allocation of the costs of arbitration, shall be reserved for a later stage of the proceedings.*

The Arbitration Proceedings were then pursued with respect to the quantum of damages.

2.9.     On 28 July 2016 the Partial Award was lodged with the The Hague District Court.

2.10.     On 11 August 2016 the Central Bureau of Investigation of the Indian Registrar of Companies, Income Tax Authorities (the "CBI") lodged a charge sheet so as to commence criminal proceedings against former Indian civil servants who had approved the Devas Contract as well as against Devas and some of its former and current directors (the "Charge Sheet").

## 3.     The dispute

3.1.     India seeks the setting aside of the Partial Award between India as Respondent and Devas et al. as Claimants, together with an order directing Devas et al. to bear the costs. India has grouped its objections to the Partial Award and, by extension, the grounds for set-aside around three themes: (i) the investments of Devas et al. are to be ranked as pre-investments that do not enjoy BIT protection; (ii) the decision to terminate the Devas Contract was made on the grounds of essential security interests, so barring the payment of damages; and (iii) the Charge Sheet (or the facts supporting it) cause the Devas Contract to be null.

3.2.　　Devas et al. have put forward a defence.

3.3.　　To the extent material, the parties' claims are examined in greater detail below.


## 4.　　Adjudication

*Introduction*

4.1.　　The default position governing this adjudication is that, according to established case law, a state court is to observe restraint when investigating whether there exists a ground for setting aside an arbitral award. A ground for set-aside may not be used as an appeal in disguise. The common interest in an effectively functioning arbitral system of justice furthermore demands that only in egregious cases are state courts to intervene in arbitral decisions (compare Supreme Court 17 January 2003, *NJ* 2004, 384 and Supreme Court 9 January 2004, AV 2005, 190).

4.2.　　This Court will evaluate the grounds for set-aside by reference to the three main themes put forward by India. To this end, for each main theme the core grievance will be formulated after which, to the extent material to this adjudication, the relevant sections from the BIT and from the Partial Award will be cited. This Court will then examine the grounds for set-aside put forward by India. It will do this first by setting out the assessment criteria, then India's propositions, after which an adjudication is performed, in which context the defence of Devas et al. will, to the extent necessary, play a part.

## (1) Pre-investment

*Introduction*

4.3.　　In the first place, India has argued that Devas' activities only rank as pre-investment and do not rank as a qualifying investment within the meaning of Article 1(1)(a), BIT. A pre-investment falls outside the scope of the BIT and does not enjoy BIT protection including the provision in the BIT concerning arbitration. India claims that that which is relevant to the "pre-investment question" are not the investments which Devas et al. claim to have and to which the Tribunal directed itself, but in lieu thereof, whether Devas had an acquired right - which had sustained prejudice by virtue of governmental actions – to roll out the Devas Services.

4.4.　　Article 1(1)(a), BIT provides the following description of an investment:

""investment" means every kind of asset established or acquired under the relevant laws and regulations of the Contracting Party in whose territory the investment is made, and in particular, though not exclusively, includes:

> *(i) movable and immovable property as well as other rights in rem such as mortgages, liens or pledges;*
> *(ii) shares, debentures and any other form of participation in a company;*
> *(iii) claims to money, or to any performance under contract having an economic value;*
> *(iv) intellectual property rights, goodwill, technical processes, knowhow, copyrights, trade-+marks, trade-names and patents in accordance with the relevant laws of the respective Contracting Parties;*
> *(v) business concession conferred by law or under contract, including any concessions to search for, extract or exploit natural resources."*

4.5.     In the Arbitration Proceedings, just as it did in these setting-aside proceedings, India has claimed that prior to the exploitation of the satellites and the accompanying frequencies Devas still had to obtain a licence from the Wireless Planning and Coordination Wing of the Department of Telecommunications (the "WPC licence"). When the Devas Contract was terminated in February 2011, Devas in fact still had no WPC licence. Devas had never obtained an undertaking or guarantee that the necessary licences would be provided. The lack of the WPC licence meant that Devas did not have any acquired rights and that it was still unable to offer the Devas Services. Devas' endeavours and the expenses it incurred in that context were therefore only pre-investments and were not investments enjoying BIT protection. In addition, India has argued that the Tribunal did not investigate the circumstance that the shares of Devas et al. in Devas were not expropriated and that therefore the partially indirect ownership of the assets of Devas were unaffected by India's governmental doings.

4.6.     The Tribunal ruled as follows with respect to India's pre-investment defence:

"197. The Respondent [India, addition by the court] does not dispute that the Claimants [Devas et al., addition by the court] are "investors" as defined under Article 1(1)(b) of the Treaty. (....)

(...)

199. The Tribunal does not agree with the Respondent's contention that this case "only involves pre-investment activities that are outside the scope of protection afforded by [the Treaty]."

200. First, the Claimants' "shares, debentures and any other form of participation" in Devas and their indirect partial ownership of Devas business assets are assets "established or acquired under the relevant laws and regulations" of the Respondent. The Claimants received the approval of the Foreign Investment Promotion Board prior to their share subscriptions. (...) Moreover, the Tribunal has received no evidence to the effect that the Claimants' investment was not properly made "under the relevant laws and regulations".

201. Secondly, the Tribunal finds deficient the Respondent's argument that the Claimants' activities were "only pre-investment activities" because their investment was the alleged right to proceed with the Devas project pursuant to the Devas Agreement and because said project could not proceed without the WPC License, which Devas had no right to receive under the Devas Agreement.

202. The Devas Agreement was a valid contract between Devas and Antrix, a State-owned commercial corporation. It provided that Antrix was leasing to Devas space segment capacity on ISRO/Antrix S-band spacecraft. That leased capacity was on a non-pre-emptible basis, which meant that it could not be "utilized or repurposed for use by another party during life of the satellite and when this Agreement is effective and when Devas is not in default of its obligation".

203. The Agreement spelled out, among other provisions, the period of the lease and its terms and conditions, the contributions to be made as well as the circumstances and consequences of termination by each party, including in the case of force majeure. It also provided that it would become effective "on the date that ANTRIX is in receipt of all required approvals and communicates to DEVAS in writing regarding the same." (...)

204. On February 2, 2006, Antrix informed Devas that "it has received the necessary approval for building, launching and leasing capacity of S-band satellite, henceforth designated as INSAT- 4E," adding that it "is now in a position to go ahead with the building and launch of the INSAT 4-E spacecraft and lease the capacity on the same to Devas Multimedia Pvt. Ltd, as per Agreement No. Antrix/2003/DEVAS/2005 dated 28 January 2005."(...) The Agreement thereby became

*effective on February 2, 2006.*

*205. Under the Agreement, the Claimants had to pay Upfront Capacity Reservation fees for the first and the second satellites. They paid the first instalments as per the Agreement on June 21, 2006 for the first satellite (GSAT-6)(...) and on June 18, 2007 (...) for the second satellite (GSAT-6A); these payments represented a total of about USD 13 million.*

*206. The Agreement also provided that Antrix was responsible for obtaining certain governmental authorizations(...) (which it did) and that Devas was responsible for obtaining others, with best effort support from Antrix273 (which it obtained for two licenses but did not reach the point of obtaining the third). But there is nothing in the Agreement which makes its validity dependent on Devas obtaining such permits, and at no time during the course of the Agreement or at the time of its annulment by Antrix was it argued by Antrix or any governmental authority that it was not in full effect. The non-issuance of a governmental license may pertain to the quantum of damages that may be claimed against the Respondent, if there was a breach of the Treaty, but it does not pertain to the validity of the Agreement or whether an investment was made by the Claimants.*

*207. The lease was binding on both Antrix and Devas and, by itself, it was an investment with significant value as was shown by the additional investment of some US$ 75 million in March 2008.(...)*

*(...)*

*210. The Tribunal therefore concludes that not only were the Claimants qualified investors under Article 1(1)(b) of the Treaty but that they also made qualifying investments under Article 1(1)(a) of that Treaty.*

4.7.     In the course of the Hearing, Devas et al. further contended that it was possible to offer a portion of the Devas Services without a WPC licence (what are called satellite-only-services). The Tribunal made the following findings with respect to satellite-only-services:

*180. In this regard, the Respondent rejects the Claimants' argument that, had the satellites been launched, and assuming that the Devas Agreement had not been annulled, terrestrial operators would not have been able to use the S-band frequencies that Devas would have been using for its space-to-earth transmissions because of interference. (...)*

*181. The Respondent denies that Devas could have rolled out any satellite-based service without the WPC License. (...) According to the Respondent, Mr. Sethuraman detailed during the Hearing on Jurisdiction and Liability, how, even on the basis of the ISP and IPTV licenses, Devas would still have required additional licenses or additional telecommunications media to provide any kind of service,(...) and how, in any event, obtaining the WPC License would have been the last step of a well-structured process that Devas still had to follow. (...)*

*209. As to the Respondent's argument that the Claimants had no acquired right to obtain the WPC License and that they had no guarantee that they would obtain such license, it is a matter that does not go to the definition of investment for jurisdictional purpose but rather to the value of that investment. On the basis of the evidence received by the Tribunal, it is satisfied that, even without a WPC license, Devas could have rolled out satellite-only services. The Tribunal also notes that it has been satisfactorily established that, because of problems of interference, it would not have been possible for competing services to operate in the same spectrum. The lack of a WPC license would be a matter to be considered when deciding on the quantum of damages, if the Respondent is found in breach of the Treaty."*

4.8.     According to India, the Tribunal paid no attention to the documents which India inserted into the dispute after the Hearing and the witness statements on which it was relying that showed that a licence, or

a WPC licence, was indeed required.

4.9.      With respect to pre-investment, India based its claim on the following grounds for set-aside: (i) there was no valid arbitration agreement because pre-investments fell outside of the BIT's protection; (ii) the Tribunal did not keep to its mandate; (iii) the Partial Award was devoid of reasoning; and (iv) the Partial Award entailed a breach of public policy. In what follows this Court will evaluate the setting-aside grounds put forward.

### Ground for set-aside I-1: the Tribunal lacked jurisdiction on the basis of Article 1, BIT (Article 1065 paragraph 1 under a DCCP)

*Assessment criteria*
4.10.      The BIT provides the basis for the arbitration agreement between the parties. Article 8(2), BIT incorporates an open offer of arbitration made by India to Mauritian investors. The written application, dated 3 July 2012, of Devas et al. for arbitration proceedings ranks as acceptance of that offer. This application completed the arbitration agreement. As for the question of whether there exists a valid arbitration agreement within the meaning of Articles 1020 paragraph 1 DCCP / 1065 paragraph 1 under a DCCP, and of the scope which such an arbitration agreement has, the Tribunal, and by extension a state court in an action to set-aside, is under a duty to investigate, amongst other things, whether the investment that is the subject of the dispute is protected by the BIT.

4.11.      When making the evaluation the primary point is that the arbitral tribunal which has been appointed is under a duty to establish its own competence (Article 1052 paragraph 1 DCCP), but that the fundamental character of the right to recourse to state means means that the question of whether a valid arbitration agreement was concluded is one that is finally for the state court. This Court dismisses Devas et al.' proposition that, as a sovereign state, India is barred from relying on such a fundamental or human right and that for this reason in this case the lack of a valid arbitration agreement requires restrained investigation. The fundamental character of the right to recourse to a state court does not only concern private persons or private legal persons. The question of whether a valid arbitration agreement has been concluded touches on India's sovereignty and its administration of justice in a case such as this one. Based on a treaty a state may choose to waive part of its sovereignty but the question of whether in that particular case this in fact took place is so fundamental that this question may not be answered by arbitrators alone. In any case such a question must also be eligible for adjudication by the courts. This fundamental right also means that a court is not to practise restraint when investigating a claim seeking the setting aside of an arbitral award on the basis of Article 1065 paragraph 1, at a, DCCP (compare Supreme Court 26 September 2014, ECLI:NL:HR:2014:2837 and The Hague Appeal Court 18 July 2017 under 5.2, ECLI:NL:GHDHA:2017: 2009).

*Scope of the definition of 'investment'*
4.12.      With respect to the pre-investment question the parties are divided on the issue of whether the Tribunal correctly interpreted the term *investment* in Article 1(1)(a), BIT and paid heed to the correct circumstances and factors in its interpretation. As has been noted (4.3), for India the primary question is whether Devas had an acquired right - which had been prejudiced by governmental doings - to roll out the Devas Services. In paragraph numbers 25 and 26 of its pleading notes, India argued that it was "excellent and logical" for the Tribunal, in its interpretation, to have examined the content of Article 1(1)(a), BIT. As India sees it, the Tribunal had in fact applied the wording of the BIT in an excessively mechanical fashion and this had led to an interpretation which led to an outcome which was manifestly absurd or unreasonable. When adjudicating on the question of whether an investment obtains, the Tribunal ought not only to have looked at the definition of investment in the BIT but also at whether this definition falls within the objective definition of investment, so India contended. Contrariwise, Devas et al. have, in summary, argued that the definition of investment in the BIT is very broad and that the contents of the articles in the BIT regulating investment (Article 1(1)(a)) and the arbitration procedure (Article 8) are

clear.

4.13.    The interpretation of the content of the BIT is to be performed by reference to the rules of construction set out in the 1969 Vienna Convention on the Law of Treaties (the "Vienna Convention"). The following provisions [translator: which are translated into Dutch in the judgment] are relevant:

"Article 31(1): *A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*

*(...)*

Article 32: *Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:*

*a)  leaves the meaning ambiguous or obscure; or*

*b)  leads to a result which is manifestly absurd or unreasonable."*

4.14.    It follows from the logic of the Vienna Convention that for the purposes of interpreting the BIT and therefore for answering the question of whether the investments of Devas et al. rank as a protected investment, it is first of all the ordinary meaning, in the context and in the light of the BIT's object and purpose, that is to be determined. It is only if this interpretation is absurd or unreasonable that reliance may be made on supplementary means of interpretation.

4.15.    This Court is of the view, a view that Devas et al. put forward, that what is to take precedence in the adjudication is that the definition of investment in the BIT is very broad and that many forms of investments fall under the scope of the BIT. Pursuant to the Devas Contract, Antrix and, respectively, ISRO bound themselves to build satellites in exchange for payment by Devas and Devas obtained unconditional and exclusive rights to a portion of the S-band for a twelve year period. This Court concurs with Devas et al. in finding that the right to a portion of the spectrum already represents a significant value and therefore ranks as an asset. In addition, it is not been disputed that Devas made a payment of USD 13 million and that Devas had obtained permission from India's Foreign Investment Promotion Board for the investments in question, whereby Devas' investment was recognised by the Indian authorities.

4.16.    In the framework of the interpretation, India has pointed to the preamble to the BIT which states *'(...) that the promotion and protection of such investments will lend greater stimulation to the development of business initiatives and will increase prosperity in the territories of both Contracting Parties (...)'.* It is correct that the objective set out in the preamble is to play a part in the interpretation. However, if the terms in the BIT are to be construed in the context of its objective, then this interpretation does not lead to the conclusion that the investments of Devas et al. fall outside the scope of a qualifying investment. These were characterised by an intention to contribute to the economic welfare in India (in this case, by offering telecommunication services in India) that stretched over a lengthier period (in this case, a twelve year period with the possibility of an extension). A reasonable interpretation of this preamble is incompatible with India's approach that a qualifying investment only obtains as from the moment that this truly contributes to India's economy.

4.17.    This Court is of the view that, based on the rules set out in Article 31(1) of the Vienna Convention and contrary to India's belief, the interpretation of the term investment does not therefore lead to a manifestly absurd or unreasonable result, with the result that this Court will not broach the interpretation of the BIT on the basis of supplementary means of interpretation. The sources outside of the BIT which India put forward in the context of construction will not be examined any further. As a

reasonable interpretation of Article 1(1)(a), BIT means that the use of a portion of the S-band ranks as a qualifying investment that falls within the scope of the BIT, the question of whether Devas could offer satellite-only-services ceases to be relevant to further adjudication. It may be that the circumstance that Devas did not have a WPC licence influences the value of the investments, as was found in the Partial Award, but the answer to this question is one that is to be reserved to the continuation of the Arbitration Proceedings and falls outside of the scope of these setting-aside proceedings. It is unclear whether, in the context of its reliance on the absence of an arbitration agreement, India wishes to argue that the participation or investment of Devas et al. does not qualify as an investment under the BIT. Irrespective of the above, with the broad definition of 'investment' in the BIT, many forms of investment fall under its scope, including '*shares, debentures and any other form of participation in a company*' (see 4.4.). Devas et al. are (indirect) shareholders in Devas who made investments in Devas. As the Tribunal found (Arbitral Award 200 and 208), these are circumstances that contribute to the conclusion that Devas et al. made qualifying investments under the BIT. In this action, India has not gainsaid the point that Devas et al. made significant investments in Devas.

4.18.    The foregoing causes this Court to conclude that the set-aside sought on the basis of a lack of jurisdiction merits dismissal.

### *Ground for set-aside I-1: The Tribunal did not keep to its mandate (Article 1065 paragraph 1 under c DCCP)*

4.19.    Under Article 1065 paragraph 1 under c DCCP, an arbitral award may be set aside if the tribunal has not kept to its mandate. A breach of mandate obtains when, amongst other things, the tribunal breaches rules of procedure, whether or not statutory; makes an award that is greater or different from that which was sought; does not decide on claims or on essential defences; or where it adds erroneous facts or grounds in law in its decision which were not put forward by the parties or which differ from facts that were common ground between the parties. A setting-aside on the basis of breach of mandate may not operate as an appeal in disguise. This means that a setting-aside claim may only succeed if the breach of mandate is serious. This means that in its adjudication, a court is under a duty to practice restraint and may only proceed to set-aside in egregious cases (compare Supreme Court 17 January 2003, *NJ* 2004, 384).

4.20.    India has contended that the Tribunal did not keep to its mandate and failed to take a decision on the following essential defences with respect to the pre-investment question: (i) it was not the shareholding of Devas et al. in Devas or the assets of Devas but the purported right to proceed further with the Devas Services that was pertinent to the adjudication; (ii) the activities of Devas and Devas et al. were pre-investments or developmental activities, a position that is supported by various authorities; and (iii) Devas could not offer any satellite services without a WPC licence.

4.21.    This Court concurs with Devas et al. that the Tribunal indeed furnished a reasoned argument on all three defences set out above. With respect to that which is claimed under (i) and (ii), this Court finds that the Tribunal performed an extensive review of India's pre-investment defence in paragraph numbers 199 - 210 of the Arbitral Award (see paragraph 4.6). In its determination, the Tribunal specifically paid heed to the shareholding of Devas et al. and to the rights of Devas. In its award, an arbitral tribunal is under no duty to proceed to a substantive review of the precedents and case law put forward in the context of an essential defence. The mere circumstance that the Tribunal omitted such a review in this case cannot rank as a breach of mandate. With respect to that which was put forward under (iii), this Court finds that the Tribunal examined India's position about the satellite-only-services in paragraph number 209 of the Arbitral Award (see paragraph 4.7). In paragraph numbers 180 and 181 of the Arbitral Award (see paragraph 4.7) the Tribunal reproduced India's substantiation of its defence. It follows from the Arbitral Award that the Tribunal paid heed to the relevant propositions of India in its adjudication but ultimately found them not to be conclusive.

4.22.    In the framework of a setting-aside claim on the basis of Article 1065 paragraph 1 under c

DCCP, a court, in its adjudication, may not pay heed to the content and validity of the reasoning supporting a decision about essential defences. In so far as India's propositions concern the content of the adjudication, this Court declines to review them. Given that the Tribunal performed a reasoned determination of India's essential defences that it has raised in this set-aside action and which it has itself ranked as essential, a ground warranting the setting aside of the Arbitral Award for breach of mandate is absent.

*Ground for set-aside I-3: The Partial Award does not contain reasoning supporting various important findings (Article 1065 paragraph 1 under d DCCP)*

4.23.     Article 1065 paragraph 1 under d DCCP provides that the setting aside of an arbitral award may only be performed if reasoning is lacking. No setting-aside is possible in the case of invalid or flawed reasoning. After all, a state court lacks competence to investigate the content of an arbitral award: Article 1065 paragraph 1 under d DCCP (compare Supreme Court 9 January 2004, *NJ* 2005, 190). The absence of any reasoning must be equated with the case in which indeed grounds have been provided, but where the a valid explanation for the relevant decision cannot be identified in that reasoning. The courts are bound to apply this criterion with restraint, in the sense that the courts may only interfere in arbitral awards in egregious cases.

4.24.     India has taken the position that the Tribunal passed over propositions of India with respect to the pre-investment question and has put forward five flaws in the reasoning. The Arbitral Tribunal failed to provide reasoning for the following: (i) why the shareholding of Devas et al. in Devas and their direct ownership in Devas were protected investments, although these shares were not taken away; (ii) why the Devas Contract was an investment of value; (iii) how the significant investments in Devas could alter the nature of the investment; (iv) why the lack of a WPC licence should only be pertinent to the value of the investment and not to the Tribunal's competence; and (v) why, as India contended, satellite-only-services could be offered without a WPC licence.

4.25.     At paragraph numbers 199-210 (see paragraph 4.6) and paragraph numbers 180, 181 and 209 of the Arbitral Award (see paragraph 4.7), the Tribunal examined India's defence with respect to the pre-investment question, the shareholding and the investments of Devas et al. in Devas, the WPC licence and the satellite-only-services. Hence with respect to these parts, the Arbitral Award was reasoned and on this ground no set-aside of the Partial Award may be performed. Lack of reasoning may also obtain where a tribunal has failed to examine the parties' essential propositions. However, the duty to provide substantiation does not go so far as to oblige an arbitral tribunal to furnish a substantive response to all the parties' propositions in its award. In 4.20 - 4.22 this Court has already found that in its Arbitral Award the Tribunal examined those defences which India has ranked as essential. India has in fact failed to provide substantiation showing why the lack of reasoning it is claiming (in addition to the defences that have been adjudicated upon in 4.20 - 4.22 above) rank as essential defences or why these rank as egregious cases. India has failed to provide a sufficiency of substantiation on this part and for this reason no set-aside may be performed on the grounds of absence of reasoning.

*Ground for set-aside I-4: The Partial Award and the way in which it has come about breaches public policy because the Tribunal breached India's fundamental right to adversarial proceedings (Article 1065 paragraph 1 under e DCCP)*

4.26.     Pursuant to Article 1065 paragraph 1 under e DCCP, an arbitral award may be set aside if the content or the manner in which it was reached is in breach of public policy, which breach includes the situation where the fundamental right to adversarial proceedings has been breached.

4.27.     As substantiation of this part of its claim, India has contended that its right to adversarial proceedings was breached because the Partial Award does not include any discussion of: (i) India's proposition that the relevant investment in the pre-investment question was not the shareholding of Devas

et al. in Devas, but the purported right to proceed further with the Devas Services; (ii) various authoritative judgments about the pre-investment defence that India prayed in aid before the Tribunal; and (iii) the various items of evidence which India presented to the Tribunal that show that Devas could not supply any satellite-only-services at all without a WPC licence.

4.28.     Concurring with Devas et al., this Court finds that that which India has put forward is to be ranked as reliance on an absence of reasoning and concerns neither the course of the proceedings nor a breach of the fundamental right to adversarial proceedings. An adjudication on this matter to India's disadvantage has already been given above at 4.24 - 4.25, finding that the alleged absence of reasoning does not hold. As India has not supplied any further substantiation supporting this part of its claim, it is dismissed on the grounds of insufficiency of substantiation.

**(II) Essential security interests**

*Introduction*
4.29.     India has contended that it terminated the Devas Contract because India required the frequencies that it had leased to Devas for, in the main, military usage. This is the reason why the CCS decided to refuse commercial usage of the S-band and to reserve this space on the segment for the State of India *'having regard to the needs of the country's strategic requirements'.* India set out its requirements in great detail in the Arbitration Proceedings. These strategic requirements concerned to a great degree those of its armed forces, but also those of other security services such as the border police which needed to use the S-Band. All these requirements rank as essential security interests that cannot coexist with the Devas Contract.

4.30.     In Article 11(3), BIT lays down the following about essential security interests:

"*(t)he provisions of this Agreement* [=BIT, addition of the court] *shall not in any way limit the right of either Contracting Party to apply prohibitions or restrictions of any kind or take any other action which is directed to the protection of its essential security interests (...).*"

4.31.     India has taken the position that use of the S-Band for military or paramilitary usage ranks as an essential security interest, with the result that Article 11(3), BIT bars an award of damages.

4.32.     The Partial Award set out the following findings about essential security interests:

*370. Although the requests of the military for part of the S-band spectrum are large, the Tribunal notes that no specific allocation has been made by the Respondent, and the Tribunal cannot assume that such requests will be approved in full by the Respondent. All around the world, governments are faced every year with very large demands for funds for various projects from their military establishment and, just as regularly, governments grant only a percentage of such requests.*

*371. The Tribunal, by majority, therefore concludes that, although the CCS decision of 2011 appears to have been in part "directed to the protection of its essential security interests," that part remained undefined and several other objectives were included in that decision, which had nothing to do with national security. In the circumstances, the Tribunal rules that, although the Respondent was fully entitled to reassign the S-spectrum to non-commercial use, the part which was not reserved for military or paramilitary purposes would be subject to the provisions of Article 6 of the Treaty concerning*

*expropriation.*

*372. Moreover, in the present case, the request by the armed forces for the attribution of spectrum is spread over a number of years (up to 2022) and, looking at the past performance of the space program, it is extremely doubtful that the envisaged schedule could be realistic. In fact, the requirement of 17.5 MHZ up to 2012 had not even been allocated by the time of the launch of GSAT-6 in 2015.*

*373. On the basis of the evidence submitted to it as described above and bearing in mind that the Respondent had already reserved to itself 10% of the spectrum in question the Tribunal, by majority, is of the view that a reasonable allocation of spectrum directed to the protection of the Respondent's essential security interests would not exceed 60% of the S-band spectrum allocated to the Claimants* [=Devas, addition of the court]*, the remaining 40% being allocated for other public interest purposes and being subject to the expropriation conditions under Article 6 of the Treaty. It will be up to the Tribunal, in the next phase of this arbitral process (damages), to establish the compensation due to the Claimants in that respect."*

And the Tribunal then made the following rulings:

(...)

*(c) By majority, that the Tribunal lacks jurisdiction over the Claimants' claims insofar as the Respondent's decision to annul the Devas Agreement was in part directed to the protection of the Respondent's essential security interests;*
*(d) By majority, that the Respondent has expropriated the Claimants' investment insofar as the Respondent's decision to annul the Devas Agreement was in part motivated by considerations other than the protection of the Respondent's essential security interests;*

*(e) By majority, that the protection of essential security interests accounts for 60% of the Respondent's decision to annul the Devas Agreement, and that the compensation owed by the Respondent to the Claimants for the expropriation of their investment shall therefore be limited to 40% of the value of that investment;*

4.33.    In this action to set-aside, India is challenging the Tribunal's decision declaring it had jurisdiction for 40% (the "60/40 ruling"). This notion of a partial declaration of competence is in breach of the meaning of the wording of the BIT and in breach of the fundamental principles of treaty interpretation as well as being in breach of the objective and purpose of the BIT, so India contends. In addition, the Tribunal failed to provide any reason showing why the 60/40 ruling, which forms an essential part of the Partial Award, was reasonable. In addition, the position is that with its 60/40 ruling the Tribunal did not keep to its mandate, given that this finds no basis whatsoever in the indisputable facts and the evidence in the instant case. Lastly, there was a breach of the *audi et alteram partem* principle because the declaration of partial jurisdiction, lacking any precedent whatsoever, ranks as a surprise decision.

4.34.    India has based its claim on the following grounds for set-aside: (i) a valid arbitration agreement was lacking; (ii) the Tribunal did not keep to its mandate; (iii) the Partial Award was devoid of reasoning; and (iv) the Partial Award incorporated a breach of public policy. In what follows this Court will evaluate the grounds for set-aside put forward.

### *Ground for set-aside II-1: The lack of a valid arbitration agreement (article 1065 paragraph 1 under a DCCP)*

*Assessment criteria*
4.35.    This Court refers to paragraph 4.11 (ground for set-aside I-1) for the applicable assessment criteria.

4.36.     In these proceedings, the Tribunal's ruling declaring that it enjoyed 40% jurisdiction is challenged. Although the Tribunal's ruling declining competence with respect to the remaining 60% is directly connected to this, no setting aside of this ruling has been sought. (The (in)correctness of) this partial declaration of lack of competence therefore falls outside of the scope of this action to set-aside and is therefore not a subject on which this Court is bound to adjudicate.

*Late reliance on the jurisdictional objection*

4.37.     The most far-reaching formal defence of Devas et al. is that not once did India claim in the Arbitration Proceedings that the presence of essential security interests fettered the Tribunal's jurisdiction such as to bar it from determining the question between the parties. India was under a duty to produce this jurisdictional objection prior to all defences in the Arbitration Proceedings and lastly in its Statement of Defence. As India failed to do this, in the instant proceedings Article 1052 DCCP read in conjunction with Article 1065 paragraph 2 DCCP bars it from further reliance on a lack of jurisdiction. According to Devas et al. in the instant action to set-aside, this Court is under a duty to pass over India's propositions in this regard. Countering this, during the hearing India argued that it had indeed put forward its reliance on essential security interests in the Arbitration Proceedings as a defence challenging jurisdiction.

4.38.     This Court finds that the Tribunal understood India's propositions on essential security interests as being a defence challenging jurisdiction. At paragraph number 169 of the Partial Award, the Tribunal held: "*Secondly, the Respondent* [India, addition of the court] *submits that the Tribunal lacks jurisdiction over the claims in this case by operation of the "essential security interests" ("ESI") provision of the Treaty. The Claimants reject all of these objections and submit that the Tribunal has jurisdiction over its claims.*" In its decision under (c) the Tribunal also determined that: "*the Tribunal lacks jurisdiction over the Claimants' claims insofar as the Respondent's decision to annul the Devas Agreement was in part directed to the protection of the Respondent's essential security interests.*"

4.39.     Because the Tribunal understood both parties' propositions concerning essential security interests as a defence challenging jurisdiction, because jurisdiction was the subject of debate between the parties and because this was, as such, the object of a ruling by the Tribunal, there is no need to enter into the question of the point in time at which, in the Arbitration Proceedings, India explicitly appealed to the Tribunal's lack of jurisdiction on the grounds of essential security interests.

*Essential security interests do not limit jurisdiction*

4.40.     It is not in dispute between the parties that Article 11(3), BIT provides that the BIT may not restrain a guest state, in this case India, from taking measures which are directed at the protection of its essential security interests. Furthermore, it is common ground between the parties that where essential security interests are at stake, India is not bound to offer financial compensation where an investment has been expropriated. In this action to set-aside, there is a dispute between the parties as to whether Article 11(3), BIT also ranks as a jurisdictional threshold clause. India takes the position that this is the case and that the Tribunal should have declined all jurisdiction because of essential security interests. Devas et al. contest this interpretation.

4.41.     As found in paragraph 4.13, interpretation of the content of the BIT is to be performed by reference to the rules of interpretation set out in the Vienna Convention. Article 31(1) lays down that: '*A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*'

4.42.     For the purposes of answering the question of whether a valid arbitration clause came into being, one must first examine the arbitration clause (Article 8, BIT). This article does not incorporate any reference whatsoever to Article 11(3), BIT. Nor does Article 11(3), BIT incorporate any reference to the arbitration clause or is a relationship created in some other fashion between essential security interests and the jurisdiction of arbitrators. For this reason, no points of anchorage can be found in the wording of the BIT supporting India's position that heed is to be paid to essential security interests when determining an

arbitral tribunal's jurisdiction.

4.43.    As India correctly confirmed during the hearing (at paragraph numbers 99 to 102 of its pleading notes), the mere circumstance that the BIT does not incorporate any reference or cross-reference linking Articles 8 and 11(3), BIT is not of itself conclusive for the purposes of determining the interpretation of the arbitration clause and of answering the question of the Tribunal's jurisdiction. However, if, when interpreting, heed is paid to the object and purpose of the BIT consistent with the Vienna Convention rules of interpretation, no support may be found for a restriction on the Tribunal's jurisdiction. A reasonable interpretation of the arbitration clause means that this provision incorporates a broadly formulated open offer of arbitration given that *"any dispute between an investor of one Contracting Party* [here, Devas et al., addition of the court] *and another Contracting Party* [here India, addition of the court] *in relation to an investment"* may be the subject of arbitration. That the arbitration clause is not to be interpreted restrictively also follows from the purpose of the BIT. In the preamble to the BIT, the contracting parties formulated the purpose of the BIT as being that of '*creat[ing] favourable conditions for greater flow or investors of either Contracting Party* [India and Mauritius, addition of the court] *in the territory of the other Contracting Party'*. In so doing the contractual parties acknowledged that '*promotion and protection of such investment will lend greater stimulation of the development of business initiatives (...)'. [Translator: the text has not been correctly cited.]*  The purpose of the BIT is therefore that of creating favourable conditions for investors, including the protection of these investments in arbitration proceedings. This purpose and the protection offered under the BIT are hard to reconcile with India's interpretation that specified points in dispute (here essential security interests) fall outside of the scope of adjudication by an arbitral tribunal without the BIT incorporating any explicit points of anchorage to that effect.

4.44.    In support of its position, India also pointed to various precedents and national and international sources. This Court finds that these sources confirm India's position that a sovereign state is at liberty to determine whether national security is at issue and what matters are then necessary to protect that national security; and that an arbitral tribunal must for this reason exercise extreme restraint when ruling on reliance on essential security interests. However, none of these sources provides confirmation for India's position that an arbitral tribunal lacks jurisdiction if essential security interests are at issue.

4.45.    At the hearing, the parties engaged in a lengthy debate about the significance of the award in the arbitration proceedings between Deutsche Telekom ("DT") and India of 13 December 2017 (the "DT Award") for the determination of propositions concerning essential security interests. This Court is of the view that the DT Award offers no support for India's propositions. The fact that the DT arbitral tribunal found that it was entirely competent to rule on the dispute opposing DT and India together with the fact that the wording of the arbitration clause and the essential security issues in the applicable bilateral investment treaty are identical to those in the BIT, constitute a major contraindication denying that arguments may be derived from the DT Award so as to support India's position. This Court concurs with Devas et al. that the circumstance that the DT Tribunal ruled on essential security issues under the heading of preliminary objections (DT Award, chapter V) does not, without more, mean that these issues touch on the jurisdiction of the arbitral tribunal given that matters other than issues of jurisdiction may be ranked as preliminary objections as well. In the DT Award, essential security issues were not ranked (or not explicitly ranked) as an issue of jurisdiction or as a threshold issue, in contrast to the pre-investment defence, a defence that India also put forward in the arbitration proceedings with DT.

4.46.    This Court therefore concludes that the essential security issues raised by India cannot result in the placing of a limitation on the Tribunal's jurisdiction to hear the dispute opposing the parties. Given that the declaration of partial lack of jurisdiction from which India derives arguments that the Arbitral Tribunal paid heed to essential security issues when determining its own jurisdiction is not the subject of this action to set-aside, this Court will not adjudicate further on that which the Tribunal put forward as reasoning supporting its declaration of partial lack of competence. On the grounds of the foregoing alone

the set-aside sought cannot succeed, with the result that this Court will not broach that which the parties put forward in addition with respect to the criterion against which essential security issues are to be investigated, with respect to whether a declaration of partial competence (or of lack of partial competence) is possible and with respect to what degree the facts in this file provide support for the choice of the 60/40 allocation that was made.

*Ground for set-aside II-2: The Tribunal did not keep to its mandate (Article 1065 paragraph 1 under c DCCP)*

4.47.    This Court refers to paragraph 4.19 (ground for set-aside I-2) for the applicable assessment criteria.

4.48.    India has contended that a clearly demarcated dispute was put to the Tribunal. In the Arbitration Proceedings, India took the position that the CCS decision to reserve *all* space on the S-Band was directed at the protection of essential security interests. Yet in the Arbitration Proceedings, none of the parties took the position that the CCS decision was directed in part at the protection of essential security interests. Instead of inviting the parties to provide further information, the Tribunal decided 'in all reasonableness' to choose in favour of the 60/40 allocation. But there was no basis in either fact or law for such a decision. In finding that it enjoyed partial jurisdiction, the Tribunal ventured beyond the dispute opposing the parties and therefore did not keep to its mandate, so India contended.

4.49.    This Court finds that with its 60/40 allocation the Tribunal did not award more than that which was sought and therefore cannot have ventured beyond the bounds of the legal dispute for that reason. In principle an arbitral tribunal is free to award less than that which was sought and therefore to find that it lacks jurisdiction to adjudicate on a portion of that which was sought. In these proceedings the question of whether in this case the Tribunal was entitled to take a decision of this nature divides the parties.

4.50.    This Court concurs with India in its position that essential security interests enjoy a dichotomous character, in the sense that these are or are not present. The conclusion which India derives from this in this case, i.e., that the Tribunal did not keep to the mandate by finding that it enjoyed partial jurisdiction (or that it lacked partial jurisdiction) is not one that this Court endorses. India fails to recognise that in principle it is indeed possible to split up the frequency and then to use this for different – commercial and public – purposes. This possibility follows already from the Devas Contract, in which the parties agreed at the time to use ninety per cent of the frequency for civil/commercial purposes and the remaining ten per cent for military usage. The Tribunal's decision is therefore not a proportional application of the "essential security interests provision" but a complete application of this provision to a portion of the frequency at issue in the dispute. For that reason, the Tribunal remained within the bounds of the legal dispute. The question of whether the case file incorporates sufficient points of anchorage supporting the 60/40 allocation concerns the content of the Tribunal's decision and falls outside the scope of the restrained adjudication to be performed in the context of this action to set-aside.

4.51.    In addition, this Court finds that on the basis of the factual material put before it the Tribunal came to the conclusion that 60% of the S-band was necessary for essential security interests. It has neither been claimed nor has it become apparent that, in making this determination, the Tribunal based this conclusion on facts that were not put forward by the parties. The very words 'in all reasonableness' that the Tribunal added when making the allocation, shows that the Tribunal made an allocation based on facts presented by the parties in line with the principles of reasonableness. The allocation made by the Tribunal and the question of whether a different allocation would be defensible (or can be defended better) falls outside the investigation which a court is under a duty to perform in the context of the set-aside sought.

4.52.    This Court therefore concludes that there is no basis warranting the setting aside of the Partial Award because the Tribunal did not keep to the mandate with regard to essential security interests.

*Ground for set-aside II-3: The Partial Award does not contain reasoning supporting various important findings (Article 1065 paragraph 1 under d DCCP)*

4.53.     This Court refers to paragraph 4.23 (ground for set-aside I-3) for the applicable assessment criteria.

4.54.     In support of its claim, India has contended that the Tribunal found that reserving the S-band for military or paramilitary requirements to which the essential security interests clause applied, concerned other requirements of public interest. In the CCS decision no precise allocation was made between, on the one hand, the military or paramilitary requirements (a loss that did not call for financial compensation) and the other requirements of national interest, for which compensation indeed had to be offered. At paragraph number 370 of the Partial Award, the Tribunal found that the Indian authorities would not honour the full S-band requirement because "*all around the world governments are faced every year with very large demands for funds for various projects from their military establishment and, just as regularly, governments grant only a percentage of such requests*". Subsequently, at paragraph number 373 of the Partial Award, the Tribunal concluded that "*a reasonable allocation of spectrum directed to the protection of [India's] security interests would not exceed 60% of the S-Band spectrum allocation to [Devas et al.], the remaining 40% being allocated for other public interest purposes and being subject to the expropriation conditions under Article 6 of the Treaty*". This reasoning is, as India sees it, so flawed as to compel set-aside.

4.55.     This Court is of the view that there is insufficient support to be found in the file for India's proposition that the Tribunal did not provide any reason whatsoever for its decision to come to the 60/40 allocation. At this point it is reiterated that a court is under a duty to exercise great restraint when adjudicating on a claim to set-aside on the basis of Article 1065 paragraph 1 under d DCCP; and may only proceed to set aside in egregious cases. In paragraph numbers 370 and 371 of the Partial Award (see paragraph 4.32), the Tribunal set out reasoning showing why, as it saw it, the frequencies claimed for military or paramilitary purposes would not be honoured in full. This reasoning, which, so this Court finds, cannot be equated with a lack of reasoning, then in part supplied a basis for its decision to come to the 60/40 allocation. This means that the Tribunal's decision is equipped with reasoning and a ground for setting aside the Partial Award for lack of reasoning is absent. The legal and factual validity of the reasoning falls outside the scope of adjudication by a court given that an action in set-aside is not designed as an appeal forum for arbitration proceedings.

*Ground for set-aside II-4: The Partial Award and the way in came about breach public policy because the Tribunal breached India's fundamental right to adversarial proceedings (Article 1065 paragraph 1 under e DCCP)*

4.56.     This Court refers to paragraph 4.26 (ground for set-aside I-4) for the applicable assessment criteria.

4.57.     India has taken the position that, when drawing up the Partial Award, the Tribunal came up with the 60/40 allocation between essential security interests and other public interests without the parties ever having argued in favour of such an allocation and without the parties having had the opportunity to express their views on such an allocation. This finding was therefore a surprise decision that none of the parties could have foreseen or that the parties could not have been expected to address in their pleadings or in other documents, whether or not addressed to the court.

4.58.     As found in paragraph 4.26, the Tribunal did not rule in favour of a proportional application of essential security interests, but ruled that only one part of the S-Band was needed for military and paramilitary purposes, which purposes ranked as essential security interests and that the Tribunal lacked jurisdiction for that portion of the claim. In the Arbitration Proceedings, India contended that the entire S-band that was in dispute was needed for military and paramilitary purposes, while Devas et al. adopted

the contrary position. In paragraph numbers 370-373 of the Partial Award (see paragraph 4.32), the Tribunal, partially referring to Devas et al's contentions, accepted a part of India's defence challenging jurisdiction. A tribunal is at liberty to award less than that which was sought, all the more so given that heed was paid to the parties' positions in the reasoning supporting that determination. That none of the parties argued in favour of the 60/40 allocation selected by the Tribunal does not place an obligation on the Tribunal to hear the parties about this intended determination. The same applies to the case, as India argued, where an international arbitral tribunal declares itself to enjoy partial jurisdiction (or to lack partial jurisdiction) which in such a situation has never taken place previously.

4.59.    The claim in set-aside on the grounds of breach of the *audi et alteram partem* principle is dismissed.

## (III) Charge Sheet

*Introduction*
4.60.    India has taken the position that various former directors and officers of Devas and of the Indian authorities have engaged in the commission of criminal acts. On 11 August 2016, CBI lodged a Charge Sheet. The following suspicions/accusations support the Charge Sheet: (i) avoidance of an ICC ruling concerning S-band usage; (ii) avoidance of the licence regime; (iii) conclusion of a contract with Devas, a company without a track record and without any capital of significance; and (iv) concealment of the existence of the Devas Contract in relation to the obtaining of approval for the construction and launch of GSAT-6 for Indian government officials. The Directorate of Enforcement of India's Ministry of Finance has lodged a separate charge. Devas et al. have rebutted the content of the Charge Sheet, in essence arguing that this concerns a trumped-up charge, the intention of which is to undermine the arbitral awards and to intimidate Devas et al.

4.61.    Given that the Charge Sheet (11 September 2016) was only lodged shortly after the Tribunal issued the Partial Award (25 July 2016), the Tribunal was unable to pay heed to the Charge Sheet or its contents in its determination. The Partial Award therefore contains no findings or determinations relating to the Charge Sheet.

4.62.    Given the content of the Charge Sheet India has prayed in aid some three grounds, these being (i) the lack of an arbitration agreement, (ii) the lack of reasoning and (iii) a breach of public policy, supporting the setting aside of the Partial Award. India has requested that the first and third ground for set-aside be stayed until an Indian criminal court has rendered a verdict on the Charge Sheet.

4.63.    This Court dismisses this request for a stay. It has neither been claimed nor has it become apparent that at the time of the hearing, one and a half years after the Charge Sheet was lodged, a decision was taken to proceed to a prosecution in the light of the Charge Sheet and India has in no way indicated the time period within which such a decision may be expected. Nor has it been claimed nor has it become apparent that, should a decision to prosecute be taken, criminal proceedings will begin within a foreseeable period. Nor has India made clear over what period of time a decision by an Indian criminal court (that is, an irrevocable decision) may be expected. This means that the further course of the examination of the Charge Sheet is currently exceedingly uncertain. Under these circumstances the principles of due process bar a stay of the case. This means that this Court will adjudicate on the grounds for set-aside in the light of the current state of affairs.

*Ground for set-aside III-1: the Tribunal lacked jurisdiction on the basis of Articles 1 and 2, BIT (Article 1065 paragraph 1 under a DCCP)*

4.64.    This Court refers to paragraph 4.11 (ground for set-aside I-1) for the applicable assessment criteria.

4.65.     India has taken the position that agreements tainted by criminal acts are null *ab initio* under Indian law. If the Charge Sheet is confirmed in law, then this establishes the "tainted nature" of the Devas Contract, as a consequence of which the Devas Contract is null and the legal basis supporting the "investment" collapses. For both reasons, the Tribunal is not competent to adjudicate the dispute opposing Devas et al. and India and for this reason the Partial Award merits set-aside because of a lack of jurisdiction, so India contended.

4.66.     It is not in dispute between the parties that the Charge Sheet can only have legal consequences for the Devas Contract if this results in a (irrevocable) criminal conviction. The mere circumstance that a Charge Sheet has been lodged is still devoid of legal consequence. This means that as long as no court has issued a verdict, or an irrevocable verdict, about the Charge Sheet, the Devas Contract cannot be said to be null on the grounds of having been tainted by criminal acts.

4.67.     If in the adjudication heed is also paid to the question of whether the Charge Sheet can lead to criminal prosecution, then this Court holds that it is relevant that the content of the Charge Sheet has been gainsaid, with reasoning, by Devas et al. In particular, Devas et al. have argued that neither Devas et al., nor its directors nor its officers, are mentioned in the Charge Sheet. In the hearing, India did not supply further substantiation supporting the Charge Sheet and did not gainsay the defence of Devas et al. Given this state of affairs, India has failed to supply a sufficiency of factual substantiation supporting its position that the Devas Contract is threatened with nullity. This holds with all the greater vigour given that India has failed to particularise the degree to which the accusations concern Devas et al. and its officers and to what degree these accusations then touch on the Devas Contract.

4.68.     This Court therefore concludes that the Charge Sheet cannot at this point in time lead to an *ab initio* null Devas Contract and that India has provided an insufficiency of substantiation supporting its position that Devas et al. (or its directors and officers) engaged in the commission of criminal acts resulting in the nullity of the Devas Contract. This means that there now obtains a qualifying investment which enjoys BIT protection, including the rule with respect to arbitration set out therein. This means that there is a valid arbitration agreement and that the Tribunal was competent to hear the dispute opposing Devas et al. and India. Given that the claim has already foundered on this ground, the other submissions that the parties have put forward in the context of this ground for set-aside require no examination.

*Ground for set-aside III-2: For an essential part, the Partial Award lacks all reasoning (Article 1065 paragraph 1 under d DCCP)*

4.69.     This Court refers to paragraph 4.23 (ground for set-aside I-3) for the applicable assessment criteria.

4.70.     According to India, in its Partial Award the Tribunal paid no attention to India's argument that Devas had wrongly attempted to have it believed that it had the ownership and the right of usage of the intellectual property at the time of concluding the Devas Contract and that the Devas Contract was based on deception and therefore did not enjoy BIT protection.

4.71.     This Court finds that lack of reasoning may also obtain where an arbitral tribunal has failed to examine the parties' essential propositions. India only set out its argument that there was deception with regard to intellectual property, an argument on which it bases its claim to set-aside, exclusively in footnote 228 of the Rejoinder. It has neither been claimed nor has it become apparent that this argument was advanced in other trial documents or otherwise in the Arbitration Proceedings. This Court concurs with Devas et al. that a proposition found exclusively in a single footnote was not presented as an essential defence and therefore does not place upon the Tribunal any duty to respond in its Partial Award to the defence, with the result that the absence of an explicit rejection does not constitute a ground for setting-aside.

*Ground for set-aside III-3: In terms of content, the Partial Award breaches public policy (Article 1065 paragraph 1 under e DCCP)*

4.72.  This Court refers to paragraph 4.26 (ground for set-aside I-4) for the applicable assessment criteria.

4.73.  In addition, referring to the content of the Charge Sheet, India has argued that the content of the Devas Contract breaches public policy. By ruling that there was indeed a valid contract, the Tribunal's finding breaches public policy and for this reason this Partial Award merits dismissal.

4.74.  As already found in 4.63, it has not been established in law that there were criminal acts on the occasion of the genesis of the Devas Contract. Moreover, India has provided insufficient substantiation supporting the proposition that Devas et al., or its directors and officers, engaged in the commission of criminal acts. This causes the purported breach of public policy to lack a sufficient basis in fact. The claim seeking the setting aside of the Partial Award on the grounds of breach of public policy is dismissed.

*Conclusion and costs*

4.75.  As none of the grounds for set-aside succeed, India's claim seeking the setting aside of the Partial Award is dismissed.

4.76.  As the party against whom judgment has been given, India will be ordered to pay the costs on the side of Devas et al. These costs are quantified at € 619 on the grounds of the clerk's fee paid by Devas et al. and at € 7,712 (two points at € 3,856 according to rate VIII) as counsel's fee; thereby totalling € 8,331.

4.77.  There is no ground for a separate order with respect to subsequent costs, given that the order with respect to costs also supplies executory title for these subsequent costs (compare Supreme Court 19 March 2010, ECLI:NL:HR:2010:BL 1116, NJ 2011/237). In line with the application, this Court will quantify the subsequent costs pursuant to the applicable statutory scale of costs.


## 5.        The judgment

The District Court

5.1.        dismisses the application,

5.2.        directs India to bear the costs, quantified at € 8,331, as well as the subsequent costs still to be incurred, to be increased by € 82 in case of service, increased by the statutory rate of interest due as from 28 November 2018 until the date of complete repayment.


This judgment has been rendered by D.R. Glass, I.A.M. Kroft and R.C. Hartendorp and was pronounced in open court on 14 November 2018.

# ECLI:NL:RBDHA:2018:15532

| | |
|---|---|
| Instantie | Rechtbank Den Haag |
| Datum uitspraak | 14-11-2018 |
| Datum publicatie | 14-01-2019 |
| Zaaknummer | C-09-529140-HA ZA 17-315 |
| Rechtsgebieden | Civiel recht |
| Bijzondere kenmerken | Bodemzaak<br>Eerste aanleg - meervoudig |
| Inhoudsindicatie | procedure vernietiging arbitraal vonnis op grond van BIT India – Mauritius (afwijzing)" |
| Vindplaatsen | Rechtspraak.nl |

# Uitspraak

—

vonnis

**RECHTBANK DEN HAAG**

Team handel

zaaknummer / rolnummer: C/09/529140 / HA ZA 17-315

**Vonnis van 14 november 2018**

in de zaak van

**DE REPUBLIEK INDIA** te New Delhi,
eiseres,
advocaat mr. T.L. Claassens te Rotterdam,

tegen

**1 CC/DEVAS (MAURITIUS) LTDte Port Louis, Mauritius,**

2. **DEVAS EMPLOYEES MAURITIUS PRIVATE LTD** te Port Louis, Mauritius,

3. **TELCOM DEVAS MAURITIUS LIMITED** te Port Louis, Mauritius,

gedaagden,

advocaat mr. G.J. Meijer te Amsterdam.

Partijen zullen hierna India en CC/Devas, Devas Employees en Telcom Devas genoemd worden. De gedaagden zullen gezamenlijk Devas c.s. genoemd worden.

## 1 De procedure

1.1. Het verloop van de procedure blijkt uit:

- de dagvaarding van 27 oktober 2016 met de producties 1 tot en met 109;
- de conclusie van antwoord met de producties G-1 tot en met G-55;
- het tussenvonnis van 11 oktober 2017 waarin een comparitie na antwoord bevolen is;
- de akte van de zijde van India met de producties 110 tot en met 122;
- de akte van de zijde van Devas c.s. met de producties 56A, 56B en 56C;
- de akte van de zijde van India met de productie 123;
- het proces-verbaal van de op 30 maart 2018 gehouden comparitie van partijen.

1.2. Met instemming van partijen is het proces-verbaal buiten hun aanwezigheid opgemaakt. Partijen zijn in de gelegenheid gesteld om opmerkingen te maken over het proces-verbaal voor zover het feitelijke onjuistheden betreft. India heeft bij faxbericht van 26 april 2018 en Devas c.s. bij brief van dezelfde datum van die gelegenheid gebruik gemaakt. Het proces-verbaal zal met inachtneming van de door partijen genoemde aanvullingen en de gemaakte opmerkingen worden gelezen.

1.3. Ten slotte is vonnis bepaald.

## 2 De feiten

2.1. Op 20 juni 2000 is tussen India en de Republiek Mauritius (hierna: Mauritius) een bilateraal investeringsverdrag (hierna: het Verdrag) in werking getreden. Het Verdrag heeft als doel investeringen van Mauritiaanse investeerders in India en Indiaanse investeerders in Mauritius te beschermen. Artikel 8 van het Verdrag voorziet in een arbitrale procedure voor de beslechting van geschillen.

2.2. Devas c.s. zijn de (indirect) aandeelhouders van de Indiase vennootschap Devas Multimedia Private Limited (hierna: Devas). Devas c.s. zijn in Mauritius gevestigde vennootschappen. Antrix Corporation Limited (hierna: Antrix) is de commerciële onderneming van de Indiase ruimtevaartorganisatie (Indian Space Research Organization (hierna: ISRO)) en houdt zich bezig met de commerciële exploitatie van Indiase satellieten.

2.3. Op 28 januari 2005 heeft Devas een overeenkomst gesloten met Antrix met betrekking tot de lease van 70 MHz capaciteit van de S-band voor een periode van twaalf jaar met de mogelijkheid

van verlenging (hierna: het Devas Contract). Hiervoor zouden transponders worden geplaatst op twee nog te ontwikkelen satellieten. . Devas wilde de satellieten en het bijbehorende spectrum, samen met een door haar te ontwikkelen netwerk van zendmasten, gebruiken voor het aanbieden van audiovisuele uitzendingen en breedband draadloze toegang aan haar klanten in India (hierna: de Devas Diensten). In de periode 2005-2010 heeft Devas in samenwerking met onder andere Antrix en ISRO gewerkt aan de voorbereidingen van deze diensten.

2.4.  Op 17 februari 2011 heeft het Cabinet Committee on Security – bestaande uit de premier en de ministers van Defensie, Binnenlandse Zaken, Buitenlandse Zaken en Financiën van India – dat bevoegd is om beslissingen te nemen die defensie en de binnenlandse en buitenlandse veiligheid aangaan (hierna: CCS), besloten dat het Devas Contract beëindigd dient te worden. Voorafgaand aan dit besluit hebben diverse overheidsinstanties en commissies geadviseerd.

Het persbericht van dezelfde datum over het door het CCS genomen besluit luidt als volgt:

"*(…)*

*Taking note of the fact that Government policies with regard to allocation of spectrum have undergone a change in the last few years and there has been an increased demand for allocation of spectrum for national needs, including for the needs of defence, para-military forces, railways and other public utility services as well as for societal needs, and having regard to the needs of the country's strategic requirements, the Government will not be able to provide orbit slot in S band to Antrix for commercial activities, including for those which are the subject matter of existing contractual obligations for S band.*

*In light of this policy of not providing orbit slot in S Band to Antrix for commercial activities, the [Devas Contract, rb.] shall be annulled forthwith*."

2.5.  Op 25 februari 2011 heeft Antrix Devas formeel op de hoogte gebracht van de beëindiging van het Devas Contract.

2.6.  Op 3 juli 2012 heeft Devas c.s. op grond van onder meer artikel 8 van het Verdrag een arbitrale procedure tegen India aanhangig gemaakt (hierna: de Arbitrale Procedure). Mr. David R. Haigh, The Honorable Shri Justice Anil Dev Singh en The Honorable Marc Lalonde (tevens voorzitter) hebben het scheidsgerecht gevormd (hierna: het Scheidsgerecht). De plaats van arbitrage was Den Haag.

2.7.  De Arbitrale Procedure heeft, voor zover relevant voor de beoordeling in de vernietigingsprocedure, het volgende verloop gehad:
- op 1 juli 2013 heeft Devas c.s. een statement of claim ingediend;
- op 2 december 2013 heeft India een statement of defence (hierna: de Statement of Defence) ingediend;
- op 18 maart 2014 heeft Devas c.s. een statement of Reply on Jurisdiction and Liability ingediend;
- op 1 juli 2014 heeft India een rejoinder (hierna: de Rejoinder) ingediend;
- van 1 tot en met 5 september 2014 heeft in het Vredespaleis in Den Haag de hearing (hierna: de Hearing) plaatsgevonden; en
- na de Hearing heeft India nog een aantal nieuwe documenten in het geding gebracht, waarover partijen vervolgens een schriftelijk debat gevoerd hebben.

2.8.  Bij arbitraal deelvonnis van 25 juli 2016 (hierna: het Arbitraal Deelvonnis) heeft het Scheidsgerecht de navolgende beslissingen genomen:

*(a) Unanimously, that the Claimants' claims relate to an "investment" protected under the Treaty;*

*(b) Unanimously, that the notice of termination of the Devas Agreement sent by Antrix to Devas constituted an act of State attributable to the Respondent.*

*(c) By majority, that the Tribunal lacks jurisdiction over the Claimants' claims insofar as the Respondent's decision to annul the Devas Agreement was in part directed to the protection of the Respondent's essential security interests;*

*(d) By majority, that the Respondent has expropriated the Claimants' investment insofar as the Respondent's decision to annul the Devas Agreement was in part motivated by considerations other than the protection of the Respondent's essential security interests;*

*(e) By majority, that the protection of essential security interests accounts for 60% of the Respondent's decision to annul the Devas Agreement, and that the compensation owed by the Respondent to the Claimants for the expropriation of their investment shall therefore be limited to 40% of the value of that investment;*

*(f) Unanimously, that the Respondent has breached its obligation to accord fair and equitable treatment to the Claimants between July 2, 2010 and February 17, 2011.*

*(g) Unanimously, that the Claimants' other claims shall be dismissed;*

*(h) Unanimously, that any decision regarding the quantification of compensation or damages, as well as any decision regarding the allocation of the costs of arbitration, shall be reserved for a later stage of the proceedings.*

De Arbitrale Procedure is daarna ten aanzien van de omvang van de schade voortgezet.

2.9. Op 28 juli 2016 is het Arbitrale Deelvonnis gedeponeerd bij de rechtbank Den Haag.

2.10. Op 11 augustus 2016 heeft het Central Bureau of Investigation van het Indiase Registrar of Companies, Income Tax Authorities (hierna: CBI) een *chargesheet* ingediend tot het aanvangen van een strafrechtelijke procedure tegen voormalige Indiase ambtenaren die het Devas Contract hebben goedgekeurd alsmede tegen Devas en enkele van haar voormalige en huidige bestuurders (hierna: de Strafklacht).

## 3  Het geschil

3.1. India vordert vernietiging van het Arbitrale Deelvonnis tussen India als gedaagde partij en Devas c.s. als eiseressen met veroordeling van Devas c.s. in de kosten. India heeft haar bezwaren tegen het Arbitraal Deelvonnis, en de daaraan in het verlengde liggende vernietigingsgronden, gegroepeerd rondom een drietal thema's: (i) de investeringen van Devas c.s. dienen aangemerkt te worden als een *pre-investment* dat niet door het Verdrag beschermd wordt; (ii) de beslissing om het Devas Contract te beëindigen is gedaan omwille van *essential security interests*, waarvan een schadevergoeding uitgesloten is; en

(iii) (de feiten die ten grondslag liggen aan) de Strafklacht leiden tot een nietig Devas Contract.

3.2. Devas c.s. voert verweer.

3.3. Op de stellingen van partijen wordt hierna, voor zover van belang, nader ingegaan.

## 4  De beoordeling

*Inleiding*

4.1. Als uitgangspunt voor de beoordeling heeft te gelden dat, naar vaste rechtspraak, de burgerlijke rechter bij zijn onderzoek of er grond voor vernietiging van een arbitraal vonnis bestaat terughoudendheid dient te betrachten. Een vernietigingsgrond mag niet worden gebruikt als een verkapt hoger beroep. Bovendien brengt het algemeen belang bij een effectief functionerende arbitrale rechtspleging mee dat de burgerlijke rechter slechts in sprekende gevallen dient in te grijpen in arbitrale beslissingen. (vgl. HR 17 januari 2003, *NJ* 2004, 384 en HR 9 januari 2004, *NJ* 2005, 190).

4.2. De rechtbank zal de vernietigingsgronden beoordelen aan de hand van de drie hoofdthema's die India heeft opgevoerd. Hiertoe zal per hoofdthema allereerst het kernverwijt verwoord worden, waarna – voor zover nodig voor de beoordeling – de relevante passages uit het Verdrag en het Arbitraal Deelvonnis worden aangehaald. Vervolgens zal de rechtbank de door India opgevoerde vernietigingsgronden bespreken. Dit zal zij doen door eerst het beoordelingskader weer te geven, vervolgens de stellingen van India, waarna een beoordeling plaatsvindt, waarbij zo nodig het verweer van Devas c.s. betrokken wordt.

(I) **Pre-investment**

*Inleiding*

4.3. India heeft in de eerste plaats aangevoerd dat de activiteiten van Devas slechts kunnen worden aangemerkt als een *pre-investment* en geen kwalificerende investering zijn, zoals bedoeld in artikel 1 lid 1 sub a van het Verdrag. Een *pre-investment* valt buiten de reikwijdte van het Verdrag en kan geen bescherming genieten van het Verdrag inclusief de daarin opgenomen arbitrage-regeling. India stelt dat relevant voor het 'pre-investment vraagstuk' niet zijn de investeringen die Devas c.s. stelden te hebben en waarop het Scheidsgerecht zich richtte, maar in plaats daarvan, of Devas een verworven recht had – dat door overheidshandelen was aangetast – om de Devas diensten uit te rollen.

4.4. In artikel 1 lid 1 onder a van het Verdrag is investering als volgt omschreven:

"*"investment" means every kind of asset established or acquired under the relevant laws and regulations of the Contracting Parties [*Mauritius en India, *rb.] in whose territory the investment is made, and in particular, though not exclusively, includes:*

(i) *movable and immovable property as well as other rights in rem such as mortgages, liens or pledges;*

(ii) *shares, debentures and any other form of participation in a company;*

(iii) *claims to money, or to any performance under contract of an economic value;*

(iv) *intellectual property rights, goodwill, technical processes, know-how, copyrights, trade-marks, trade-names and patents in accordance with the relevant laws of the respective Contracting Parties;*

(v) *business concessions conferred by law or under contract, including any concession to search for, extract or exploit natural resources*;"

4.5. India heeft in de Arbitrage Procedure, evenals in onderhavige vernietigingsprocedure, aangevoerd dat Devas voor de exploitatie van de satellieten en de bijbehorende frequenties nog een vergunning diende te verkrijgen van de Wireless Planning and Coordination Wing van het Department of Telecommunications (hierna: de WPC-vergunning). Ten tijde van de beëindiging van het Devas Contract in februari 2011 had Devas echter nog geen beschikking over een WPC-vergunning. Devas heeft nooit een toezegging of garantie gekregen dat de vereiste vergunningen verstrekt zouden worden. Het ontbreken van de WPC-vergunning maakte dat Devas nog geen verworven rechten had en de Devas Diensten nog niet kon aanbieden. De inspanningen van

Devas, en de kosten die in dat kader gemaakt zijn, waren dan ook slechts ontwikkelingsactiviteiten (*pre-investments*) en geen investeringen die door het Verdrag beschermd worden. Verder heeft India aangevoerd dat het Scheidsgerecht niet is ingegaan op de omstandigheid dat de aandelen van Devas c.s. in Devas niet zijn onteigend en dat ook de gedeeltelijk indirecte eigendom van de activa van Devas door het overheidshandelen van India niet getroffen is.

4.6. Het Scheidsgerecht heeft het verweer van India ten aanzien van de *pre-investment* als volgt beoordeeld:

"*197. The Respondent* [India*, rb.] does not dispute that the Claimants* [Devas c.s.*, rb] are "investors" as defined under Article 1(1) (b) of the Treaty (….)*

(…)

*199. The Tribunal does not agree with the Respondent's contention that this case "only involves pre-investment activities that are outside the scope of protection afforded by [the Treaty]."*

*200. First, the Claimants' "shares, debentures and any other form of participation" in Devas and their indirect partial ownership of Devas business assets are assets "established or acquired under the relevant laws and regulations" of the Respondent. The Claimants received the approval of the Foreign Investment Promotion Board prior to their share subscriptions.(…) Moreover, the Tribunal has received no evidence to the effect that the Claimants' investment was not properly made "under the relevant laws and regulations".*

*201. Secondly, the Tribunal finds deficient the Respondent's argument that the Claimants' activities were "only pre-investment activities" because their investment was the alleged right to proceed with the Devas project pursuant to the Devas Agreement and because said project could not proceed without the WPC License, which Devas had no right to receive under the Devas Agreement.(…)*

*202. The Devas Agreement was a valid contract between Devas and Antrix, a State-owned commercial corporation. It provided that Antrix was leasing to Devas space segment capacity on ISRO/Antrix S-band spacecraft. That leased capacity was on a non-pre-emptible basis, which meant that it could not be "utilized or repurposed for use by another party during life of the satellite and when this Agreement is effective and when Devas is not in default of its obligation.*

*203. The Agreement spelled out, among other provisions, the period of the lease and its terms and conditions, the contributions to be made as well as the circumstances and consequences of termination by each party, including in the case of force majeure. It also provided that it would become effective "on the date that ANTRIX is in receipt of all required approvals and communicates to DEVAS in writing regarding the same".(…)*

*204. On February 2, 2006, Antrix informed Devas that "it has received the necessary approval for building, launching and leasing capacity of S-band satellite, henceforth designated as INSAT-4E," adding that it "is now in a position to go ahead with the building and launch of the INSAT 4-E spacecraft and lease the capacity on the same to Devas Multimedia Pvt. Ltd., as per Agreement No. Antrix/2003/DEVAS/2005 dated 28 January 2005."(…) The Agreement thereby became effective on February 2, 2006.*

*205. Under the Agreement, the Claimants had to pay Upfront Capacity Reservation fees for the first and second satellites. They paid the first instalments as per the Agreement on 21 June, 2006 for the first satellite (GSAT-6)(…) and on June 18, 2007(…) for the second satellite (GSAT-6A); these payments represented a total of about USD 13 million.*

*206. The Agreement also provided that Antrix was responsible for obtaining certain governmental*

*authorizations(…) (which it did) and that Devas was responsible for obtaining others, with best effort support from Antrix(…) (which it obtained for two licenses but did not reach the point of obtaining the third). But there is nothing in the Agreement which makes it validity dependent on Devas obtaining such permits, and at no time during the course of the Agreement or at the time of its annulment by Antrix was it argued by Antrix or any governmental authority that it was not in full effect. The non-issuance of a governmental license may pertain to the quantum of damages that may be claimed against the Respondent, if there was a breach of the Treaty, but it does not pertain to the validity of the Agreement or whether an investment was made by the Claimants.*

*207. The lease was binding on both Antrix and Devas and, by itself, it was an investment with significant value as was shown by the additional investment of some US$ 75 million in March 2008.(…)*

*208. It has been established that the Claimants made significant investments in time and money in Devas and that Devas honoured its obligations under the Agreement until its annulment by Antrix, including the payment of Upfront Capacity Reservation Fees of some US$ 13 million.*

*(…)*

*210. The Tribunal therefore concludes that not only were the Claimants qualified investors under Article 1(1)(b) of the Treaty but that they also made qualifying investments under Article 1(1)(a) of the Treaty*."

4.7. Tijdens de Hearing heeft Devas c.s. nog aangevoerd dat het mogelijk is om een deel van de Devas Diensten zonder WPC-vergunning (zogenaamde *satellite-only*-diensten) aan te bieden. Het Scheidsgerecht heeft aan de *satellite-only*-diensten de volgende overwegingen gewijd:

"*180. In this regard, the Respondent rejects the Claimants' argument that, had the satellites been launched, and assuming that the Devas Agreement had not been annulled, terrestrial operators would not have been able to use the S-band frequencies that Devas would have been using for this space-to-earth transmission because of interference. (…)*

*181. The Respondent denies that Devas could have rolled out any satellite-based service without the WPC License.(…) According to the Respondent, Mr. […] detailed during the Hearing on Jurisdiction and Liability, how, even on the basis of the ISP and IPTV licenses, Devas would still have required additional licenses or additional telecommunications to provide any kind of service,(…) and how, in any event, obtaining the WPC License would have been the last step of a well-structured process that Devas still had to follow. (…)*

*209. As to the Respondent's argument that the Claimant had no acquired right to obtain the WPC License and that they had no guarantee that they would obtain such license, it is a matter that does not go to the definition of investment for jurisdictional purpose but rather to the value of that investment. On the basis of the evidence received by the Tribunal, it is satisfied that, even without a WPC License, Devas could have enrolled out satellite-only services. The Tribunal also notes that it has been satisfactorily established that, because of problems of interference, it would not have been possible for competing services to operate in the same spectrum. The lack of a WPC License would be a matter to be considered when deciding on the quantum of damages, if the Respondent is found in breach of the Treaty.*"

4.8. Het Scheidsgerecht heeft aan de stukken die India na de Hearing in het geding heeft gebracht en de getuigenverklaringen waarop zij zich beroepen heeft, en waaruit blijkt dat weldegelijk een (WPC-)vergunning vereist is, geen aandacht besteed, aldus India.

4.9. Ten aanzien van de *pre-investment* heeft India de volgende vernietigingsgronden aan haar vordering ten grondslag gelegd: (i) er ontbreekt een geldige arbitrageovereenkomst omdat *pre-investments* buiten de bescherming van het Verdrag vallen; (ii) het Scheidsgerecht heeft zich niet

aan zijn opdracht gehouden; (iii) het Arbitrale Deelvonnis is niet gemotiveerd; en (iv) het Arbitrale Deelvonnis houdt een schending van de openbare orde in. De rechtbank zal hierna de aangevoerde vernietigingsgronden beoordelen.

*Vernietigingsgrond I-1: Het Scheidsgerecht was niet bevoegd op grond van artikel 1 van het Verdrag (artikel 1065 lid 1 sub a Rv)*

*Beoordelingskader*

4.10. De grondslag voor de arbitrageovereenkomst tussen partijen is gelegen in het Verdrag. Artikel 8 lid 2 van het Verdrag bevat een open aanbod van India aan Mauritiaanse investeerders tot arbitrage. De schriftelijk aanvraag van Devas c.s. van een arbitrage op

3 juli 2012 moet worden beschouwd als een aanvaarding van dat aanbod. Deze aanvraag heeft de arbitrageovereenkomst gecompleteerd. Voor de vraag of er een geldige arbitrageovereenkomst bestaat, zoals bedoeld in artikel 1020 lid 1 Rv jo 1065 lid 1 sub a Rv, en welke reikwijdte deze arbitrageovereenkomst heeft, dient het Scheidsgerecht, en in het verlengde daarvan de overheidsrechter in een vernietigingsprocedure, onder meer te toetsen of de investering waarop het geschil betrekking heeft beschermd wordt door het Verdrag.

4.11. Bij de beoordeling staat voorop dat het aldus benoemde scheidsgerecht zijn eigen bevoegdheid dient vast te stellen (artikel 1052 lid 1 Rv), maar dat het fundamentele karakter van het recht op toegang tot de rechter meebrengt dat de beantwoording van de vraag of een geldige arbitrageovereenkomst is gesloten, uiteindelijk aan de rechter is opgedragen. De rechtbank verwerpt de stelling van Devas c.s. dat India als soevereine staat geen beroep kan doen op een dergelijk fundamenteel *mensen*recht en dat om die reden in onderhavige zaak het ontbreken van een geldige arbitrage-overeenkomst terughoudend getoetst moet worden. Het fundamentele karakter van het recht op toegang tot de overheidsrechter heeft niet slechts betrekking op private (rechts)personen. De vraag of een geldige arbitrageovereenkomst gesloten is, raakt in een geval als het onderhavige ook de soevereiniteit van India en zijn rechtspraak. Op grond van een verdrag kan een staat een deel van zijn soevereiniteit prijsgeven, maar de vraag of dat in het concrete geval ook heeft plaatsgevonden is dusdanig fundamenteel dat deze vraag niet exclusief door arbiters beantwoord dient te worden. In ieder geval dient een dergelijke vraag ook door de rechter beoordeeld te kunnen worden. Dit fundamentele recht brengt voorts mee dat een vordering tot vernietiging van een arbitraal vonnis vermeld in artikel 1065 lid 1 sub a Rv door de rechter niet terughoudend getoetst dient te worden (vgl. HR 26 september 2014, ECLI:NL:HR:2014:2837 en gerechtshof Den Haag 18 juli 2017 onder 5.2, ECLI:NL:GHDHA:2017: 2009).

*Reikwijdte definitie 'investment'*

4.12. Partijen zijn ten aanzien van het *pre-investment*-vraagstuk verdeeld over de vraag of het Scheidsgerecht het begrip *investment* in artikel 1 lid 1 onder a van het Verdrag op juiste wijze heeft uitgelegd en bij de uitleg de juiste omstandigheden en factoren betrokken heeft. Als gezegd (4.3.) gaat het India hierbij primair om de vraag of Devas een verworven recht had – dat door overheidshandelen was aangetast – om de Devas diensten uit te rollen. In de randnummers 25 en 26 van haar pleitaantekeningen heeft India aangevoerd dat het 'prima en logisch' is dat het Scheidsgerecht bij de uitleg gekeken heeft naar de inhoud van artikel 1 lid 1 onder a van het Verdrag. In de visie van India heeft het Scheidsgerecht de Verdragstekst echter op een te mechanische wijze toegepast hetgeen heeft geleid tot een uitleg die heeft geresulteerd in een uitkomst die *manifestly absurd or unreasonable* is. Bij de beoordeling van de vraag of er sprake is van een *investment* had het Scheidsgerecht niet alleen naar definitie van '*investment*' in het Verdrag moeten kijken, maar ook of deze definitie valt binnen de objectieve definitie van '*investment*', aldus India. Devas c.s. heeft daarentegen – samengevat – aangevoerd dat de definitie van '*investment*' in het Verdrag zeer breed is en dat de inhoud van de artikelen in het Verdrag waarin *investment* (artikel 1 lid 1 sub a) en de arbitrage-procedure (artikel 8) geregeld zijn, helder zijn.

4.13. De uitleg van de inhoud van het Verdrag dient te geschieden aan de hand van de uitlegregels opgenomen in het Verdrag van Wenen inzake het Verdragenrecht van 1969 (hierna: het Weens Verdragenverdrag). De volgende, in het Nederlands vertaalde bepalingen, zijn relevant:

"Artikel 31 lid 1: *Een verdrag moet te goeder trouw worden uitgelegd overeenkomstig de gewone betekenis van de termen van het Verdrag in hun context en in het licht van voorwerp en doel van het Verdrag.*

*(…)*

Artikel 32: *Er kan een beroep worden gedaan op aanvullende middelen van uitlegging en in het bijzonder op de voorbereidende werkzaamheden en de omstandigheden waaronder het verdrag is gesloten, om de betekenis die voortvloeit uit de toepassing van artikel 31 te bevestigen of de betekenis te bepalen indien de uitlegging, geschied overeenkomstig artikel 31:*

a. *a) de betekenis dubbelzinnig of duister laat; of*

b) *leidt tot een resultaat dat duidelijk ongerijmd of onredelijk is.*"

4.14. Uit de systematiek van het Weens Verdragenverdrag volgt dat voor de uitleg van het Verdrag, en dus ook de beantwoording van de vraag of de investeringen van Devas c.s. moeten worden aangemerkt als een beschermde investering, allereerst de gewone betekenis, in de context en het licht van het voorwerp en doel van het Verdrag vastgesteld te worden. Pas als deze uitleg ongerijmd of onredelijk is, kan een beroep worden gedaan op aanvullende middelen van uitleg.

4.15. Naar het oordeel van de rechtbank dient bij de beoordeling voorop te staan, zoals ook aangevoerd door Devas c.s., dat de definitie van *investment* in het Verdrag zeer breed is en dat vele vormen van investeringen onder de reikwijdte van het Verdrag vallen. Op grond van het Devas Contract heeft Antrix respectievelijk ISRO zich verbonden om, tegen betaling door Devas, satellieten te bouwen, en heeft Devas onvoorwaardelijke en exclusieve rechten verkregen op een deel van de S-band voor een periode van twaalf jaren. De rechtbank is met Devas c.s. van oordeel dat het recht op een deel van het spectrum reeds een significante waarde vertegenwoordigt, en derhalve als een *asset* moet worden aangemerkt. Bovendien staat onweersproken vast dat Devas een betaling van USD 13 miljoen gedaan heeft en dat Devas toestemming heeft gekregen van India's Foreign Investment Promotion Board voor de betreffende investeringen, waarmee de investering van Devas erkend is door de Indiase autoriteiten.

4.16. India heeft in het kader van de uitleg nog gewezen op de preambule bij het Verdrag waarin is opgenomen '*(…) that the promotion and protection of such investments will lend greater stimulation to the development of business initiatives and will increase prosperity in the territories of both Contracting Parties (…)*'. Het is juist dat bij de uitleg de in de preambule verwoorde doelstelling betrokken moet worden. Echter, indien de termen in het Verdrag worden uitgelegd in de context van de doelstelling, dan leidt die uitleg niet tot de conclusie dat investeringen van Devas c.s. buiten de reikwijdte van een kwalificerende *investment* vallen. Deze hadden immers het oogmerk om voor een langere periode, i.c. een periode van twaalf jaar met de mogelijkheid van verlenging, bij te dragen aan de economische welvaart in India, i.c. het aanbieden van telecommunicatiediensten in India. Een redelijke uitleg van deze preambule verzet zich tegen de benadering van India dat pas sprake kan zijn van een kwalificerende *investment* vanaf het moment dat deze daadwerkelijk bijdraagt aan de economie van India.

4.17. Naar het oordeel van de rechtbank leidt de uitleg van het begrip *investment* op basis van de regels verwoord in artikel 31 lid 1 van het Weens Verdragenverdrag, anders dan India meent, dan ook niet tot een duidelijk ongerijmd of onredelijk resultaat, zodat de rechtbank niet toekomt aan een uitleg van het Verdrag op basis van aanvullende uitlegregels. De buiten het Verdrag gelegen bronnen die India heeft aangevoerd in het kader van de uitleg, zullen verder buiten beschouwing blijven. Nu een redelijke uitleg van artikel 1 lid 1 sub van het Verdrag meebrengt dat het recht op het gebruik van een deel van de S-band moet worden aangemerkt als een kwalificerende investering die binnen de reikwijdte van het Verdrag valt, is de vraag of Devas *satellite-only-*diensten had kunnen aanbieden voor de verdere beoordeling niet meer relevant. Mogelijkerwijs is

de omstandigheid dat Devas geen beschikking heeft over een WPC-vergunning wel van invloed op de waarde van de investeringen, zoals in het Arbitrale Deelvonnis ook is geoordeeld, maar de beantwoording van die vraag dient aan de orde te komen in de voortzetting van de Arbitrale Procedure en valt buiten het bereik van deze vernietigingsprocedure. Het is onduidelijk of India - in het kader van haar beroep op het ontbreken van een arbitrageovereenkomst - wil betogen dat de participatie of investering van Devas c.s. niet kwalificeert als een investering onder het Verdrag. Wat daarvan zij: met de brede definitie van 'investment' in het Verdrag vallen vele vormen van investeringen onder haar reikwijdte, waaronder '*shares, debentures and any other form of participation in a company*' (zie 4.4.). Devas c.s. zijn (indirect) aandeelhouders in Devas die investeringen in Devas hebben gepleegd. Zoals ook het Scheidsgerecht heeft overwogen (Arbitraal Vonnis 200 en 208) zijn dit omstandigheden die bijdragen aan de conclusie dat Devas c.s. kwalificerende investeringen onder het Verdrag heeft gedaan. India heeft ook in deze procedure niet weersproken dat Devas c.s. significante investeringen in Devas heeft gepleegd.

4.18. Het voorgaande brengt de rechtbank tot de conclusie dat de gevorderde vernietiging wegens het ontbreken van bevoegdheid afgewezen dient te worden.

*Vernietigingsgrond I-2: Het Scheidsgerecht heeft zich niet aan zijn opdracht gehouden (artikel 1065 lid 1 sub c Rv)*

4.19. Op grond van artikel 1065 lid 1 sub c Rv kan een arbitraal vonnis worden vernietigd als het scheidsgerecht zich niet aan zijn opdracht heeft gehouden. Van een schending van de opdracht is onder meer sprake indien het scheidsgerecht de (wettelijke) procedurele regels schendt, meer of anders toewijst dan gevorderd, niet beslist op vorderingen of essentiële verweren, in zijn beslissing onjuiste feiten of rechtsgronden toevoegt die niet door partijen zijn aangevoerd of afwijkt van tussen partijen vaststaande feiten. De vernietiging wegens schending van de opdracht mag niet fungeren als een verkapt hoger beroep. Dit betekent dat alleen indien de schending van de opdracht ernstig is het beroep op vernietiging kan slagen. Dit betekent dat de rechtbank bij de beoordeling terughoudendheid moet betrachten en in alleen sprekende gevallen tot vernietiging kan overgaan (vgl. HR 17 januari 2003, *NJ* 2004, 384).

4.20. India heeft aangevoerd dat het Scheidsgerecht zich niet aan zijn opdracht gehouden heeft en heeft nagelaten een beslissing te nemen over navolgende essentiële verweren ten aanzien van het *pre-investment*-vraagstuk: (i) niet het aandelenbelang van Devas c.s. in Devas of de activa van Devas, maar het beweerde recht om verder te gaan met de Devas Diensten is voor de beoordeling van belang; (ii) de activiteiten van Devas en Devas c.s. zijn *pre-investments* of ontwikkelingsactiviteiten, welk standpunt ook gesteund wordt door verschillende autoriteiten; en (iii) Devas kon geen satellietdiensten aanbieden zonder WPC-vergunning.

4.21. De rechtbank is met Devas c.s. van oordeel dat het Scheidsgerecht weldegelijk op alle drie voornoemde verweren gemotiveerd beslist heeft. Ten aanzien van het gestelde onder (i) en (ii) overweegt de rechtbank dat het Scheidsgerecht onder de randnummers 199 - 210 van het Arbitraal Vonnis (zie r.o. 4.6) uitvoerig is ingegaan op het *pre-investment*-verweer van India. Het Scheidsgerecht heeft in zijn beoordeling in het bijzonder betrokken het aandelenbelang van Devas c.s. en de rechten van Devas. Op een scheidsgerecht rust geen verplichting om in een arbitraal vonnis de precedenten en rechtspraak die in het kader van een essentieel verweer worden aangevoerd inhoudelijk te bespreken. De enkele omstandigheid dat het Scheidsgerecht een dergelijke bespreking in dit geval heeft nagelaten, kan dat niet als een schending van de opdracht worden beschouwd. Ten aanzien van het gestelde onder (iii) overweegt de rechtbank dat het Scheidsgerecht onder randnummer 209 van het Arbitraal Vonnis (zie r.o. 4.7) is ingegaan op de stellingen van India over de *satellite-only* diensten. Onder randnummer 180 en 181 van het Arbitraal Vonnis (zie r.o. 4.7) heeft het Scheidsgerecht de onderbouwing van het verweer van India weergegeven. Uit het Arbitraal Vonnis volgt dat het Scheidsgerecht betreffende stellingen van India in zijn beoordeling betrokken heeft, maar uiteindelijk niet doorslaggevend heeft geacht.

4.22. De rechtbank mag in het kader van de vernietiging op grond van artikel 1065 lid 1 sub c Rv niet de inhoud en deugdelijkheid van de motivering van de beslissing over essentiële verweren in haar beoordeling betrekken. Voor zover de stellingen van India betrekking hebben op de inhoud van de beoordeling gaat de rechtbank daaraan voorbij. Nu het Scheidsgerecht op de door India in de vernietigingsprocedure opgevoerde en – door haarzelf aangemerkte – essentiële verweren gemotiveerd heeft beslist, ontbreekt een grond om het Arbitraal Vonnis wegens een schending van de opdracht te vernietigen.

*Vernietigingsgrond I-3: Het Arbitrale Deelvonnis is niet gemotiveerd met betrekking tot diverse belangrijke overwegingen (artikel 1065 lid 1 sub d Rv)*

4.23. In artikel 1065 lid 1 onderdeel d Rv is bepaald dat vernietiging van een arbitraal vonnis slechts kan plaatsvinden indien de motivering ontbreekt. In het geval van een ondeugdelijke of gebrekkige motivering is geen vernietiging mogelijk. Aan de overheidsrechter komt immers niet de bevoegdheid toe om op grond van artikel 1065 lid 1 onderdeel d Rv een arbitraal vonnis op zijn inhoud te toetsen (vgl. HR 9 januari 2004, *NJ* 2005, 190). Met het ontbreken van een motivering moet op één lijn worden gesteld het geval dat weliswaar een motivering gegeven is, maar dat daarin enige steekhoudende verklaring voor de desbetreffende beslissing niet valt te onderkennen. Dit criterium moet door de rechter met terughoudendheid worden toegepast, in die zin dat hij slechts in sprekende gevallen dient in te grijpen in arbitrale beslissingen.

4.24. India heeft zich op het standpunt gesteld dat het Scheidsgerecht voorbij gegaan is aan stellingen van India over het *pre-investment*-vraagstuk en heeft een vijftal motiveringsgebreken opgevoerd. Het Scheidsgerecht heeft niet gemotiveerd: (i) waarom het aandelenbelang van Devas c.s. in Devas en hun indirecte eigendom in Devas beschermde investeringen waren, terwijl deze aandelen niet zijn afgenomen; (ii) waarom het Devas Contract een investering van waarde was; (iii) hoe de significante investeringen in Devas de aard van de investering kunnen veranderen; (iv) waarom het ontbreken van een WPC-vergunning alleen van belang is voor de waarde van de investering en niet voor de bevoegdheid van het Scheidsgerecht; en (v) waarom, zoals door India aangevoerd, zonder WPC-vergunning *satellite-only* diensten aangeboden kunnen worden.

4.25. Het Scheidsgerecht is onder randnummers 199 – 210 (zie r.o. 4.6) en de randnummers 180, 181 en 209 van het Arbitraal Vonnis (zie r.o. 4.7) ingegaan op het verweer van India ten aanzien van het *pre-investment*-vraagstuk, het aandelenbelang en de investeringen van Devas c.s. in Devas, de WPC-vergunning en de *satellite-only*-diensten. Op deze onderdelen is het Arbitraal Vonnis derhalve met redenen omkleed en kan op die grond geen vernietiging van het Arbitraal Deelvonnis plaatsvinden. Van een motiveringsgebrek kan ook sprake zijn indien een scheidsgerecht verzuimd heeft in te gaan op essentiële stellingen van partijen. De motiveringsplicht gaat echter niet zo ver dat een scheidsgerecht in een arbitraal vonnis op alle stellingen van partijen inhoudelijk dient te responderen. Onder 4.20 – 4.22 heeft de rechtbank reeds overwogen dat het Scheidsgerecht in het Arbitraal Vonnis ingegaan is op – door India als zodanig aangemerkte – essentiële verweren. India heeft echter nagelaten om te onderbouwen waarom de door haar opgevoerde motiveringsgebreken – in aanvulling op de verweren die onder 4.20 – 4.22 beoordeeld zijn – moeten worden aangemerkt als essentiële verweren of waarom deze als sprekende gevallen moeten worden aangemerkt. India heeft haar vordering op dit onderdeel onvoldoende onderbouwd en derhalve kan wegens een gebrekkige motivering geen vernietiging plaatsvinden.

*Vernietigingsgrond I-4: Het Arbitrale Deelvonnis en de totstandkoming ervan is in strijd met de openbare orde omdat het Scheidsgerecht India's fundamentele recht op hoor en wederhoor heeft geschonden (artikel 1065 lid 1 sub e Rv)*

4.26. Op grond van 1065 lid 1 sub e Rv kan een arbitraal vonnis vernietigd worden als de inhoud of de wijze van totstandkoming in strijd is met de openbare orde, waaronder de situatie dat het fundamentele recht van hoor en wederhoor geschonden is.

4.27. India heeft ter onderbouwing van dit onderdeel van haar vordering aangevoerd dat haar recht op hoor en wederhoor geschonden is omdat het Arbitrale Deelvonnis geen bespreking bevat van: (i) de stelling van India dat de relevante investering in *het pre-investment*-vraagstuk niet het aandelenbelang van Devas c.s. in Devas is, maar het beweerde recht om verder te gaan met de Devas Diensten; (ii) diverse gezaghebbende uitspraken over het *pre-investment*-verweer waarop India een beroep gedaan heeft ten overstaan van het Scheidsgerecht; en (iii) de diverse bewijsstukken die India aan het Scheidsgerecht heeft overgelegd waaruit blijkt dat Devas geen enkele *satellite-only*-dienst kan aanbieden zonder WPC-Vergunning.

4.28. De rechtbank overweegt, met Devas c.s., dat hetgeen India heeft aangevoerd moet worden aangemerkt als een beroep op motiveringsgebreken en niet ziet op het verloop van de procedure en een schending van het fundamentele recht van hoor en wederhoor. Hiervoor is reeds onder 4.24 – 4.25 in het nadeel van India geoordeeld dat van de gestelde motiveringsgebreken geen sprake is. Nu India geen nadere onderbouwing heeft gegeven aan dit deel van de vordering, wordt het wegens onvoldoende onderbouwing afgewezen.

**(II) Essential security interests**

*Inleiding*

4.29. India heeft aangevoerd dat zij het Devas Contract heeft beëindigd omdat zij de frequenties die aan Devas zijn *geleaset* nodig heeft voor, hoofdzakelijk, militair gebruik. Dat is de reden dat het CCS heeft besloten om commercieel gebruik van de S-band te weigeren en het ruimtesegment te reserveren voor de Indiase staat '*having regard to the needs of the country's strategic requirements*'. India heeft haar behoeften uitvoerig naar voren gebracht in de Arbitrale Procedure. De strategische behoeften betroffen voor het overgrote deel die van de krijgsmacht, maar ook andere veiligheidsdiensten, zoals de grenspolitie, hadden behoefte aan gebruik van de S-Band. Al deze behoeften zijn aan te merken als *essential security interests* die niet kunnen co-existeren met het Devas Contract.

4.30. In artikel 11 lid 3 van het Verdrag is over *essential security interests* het navolgende bepaald:

'*(t)he provisions of this Agreement [=*Verdrag*, rb.] shall not in any way limit the right of either Contracting Party [=*i.c. India*, rb.] to apply prohibitions or restrictions of any kind or take any other action which is directed to the protection of its essential security interests (…)*'.

4.31. India heeft zich in op het standpunt gesteld dat het gebruik van de S-Band voor (para)militaire doeleinden moet worden aangemerkt als *essential security interest*, zodat artikel 11 lid 3 van het Verdrag in de weg staat aan een toekenning van een schadevergoeding.

4.32. In het Arbitraal Deelvonnis zijn de volgende overwegingen ten aanzien van de *essential security interests* opgenomen:

"*370. Although the requests of the military for part of the S-band spectrum are large, the Tribunal notes that no specific allocation has been made by the Respondent [*India*, rb.], and that the Tribunal cannot assume that such request will be approved in full by the Respondent. All around the world governments are faced every year with very large demands for funds for various projects from their military establishment and, just as regularly, governments grant only a percentage of such requests.*

*371. The Tribunal, by majority, therefore concludes that, although the CCS decision of 2011 appears to have been in part "directed to the protection of its essential security interests" that part remained undefined and several other objectives were included in that decision, which had*

*nothing to do with national security. In the circumstances, the Tribunal rules that, although the Respondent was fully entitled to reassign the S-spectrum to non-commercial use, the part which was not reserved for military or paramilitary purposes would be subject to the provisions of*

*Article 6 of the Treaty concerning expropriation.*

*372. Moreover, in the present case, the request by the armed forces for the attribution of spectrum spread over a number of years (up to 2022) and, looking at the past performance of the space program, it is extremely doubtful that the envisaged schedule could be realistic. In fact, the requirement of 17.5 MHZ up to 2012 had not even been allocated by the time of the launch of GSAT-6 in 2015.*

*373. On the basis of the evidence submitted to it as described above and bearing in mind that the Respondent had already reserved to itself 10% of the spectrum in question, the Tribunal, by majority, is of the view that a reasonable allocation of the spectrum directed to the protection of the Respondent's essential security interests would not exceed 60% of the S-band spectrum allocated to the Claimants [= Devas c.s.], the remaining 40% being allocated for public interest purposes and being subject to the expropriation conditions under Article 6 of the Treaty. It will be up to the Tribunal, in the next phase of this arbitral process (damages), to establish the compensation due to the Claimants in that respect.*

*(…)"*

En het Scheidsgerecht heeft vervolgens de volgende beslissingen genomen:

*(…)*
*( c) By majority, that the Tribunal lacks jurisdiction over the Claimants' claims insofar as the Respondent's decision to annul the Devas Agreement was in part directed to the protection of the Respondent's essential security interests;*
*(d) By majority, that the Respondent has expropriated the Claimants' investment insofar as the Respondent's decision to annul the Devas Agreement was in part motivated by considerations other than the protection of the Respondent's essential security interests;*
*(e) By majority, that the protection of essential security interests accounts for 60% of the Respondent's decision to annul the Devas Agreement, and that the compensation owed by the Respondent to the Claimants for the expropriation of their investment shall therefore be limited to 40% of the value of that investment;*
*(…)'*

4.33. India komt in onderhavige vernietigingsprocedure op tegen de beslissing van het Scheidsgerecht om zich voor 40 procent bevoegd (hierna: de 60/40-beslissing) te verklaren. Deze gedachte van een partiële bevoegdverklaring is in strijd met de betekenis van de tekst van het Verdrag en met de grondbeginselen van verdragsinterpretatie, alsmede met het doel en de strekking van het Verdrag, aldus India. Bovendien heeft het Scheidsgerecht nagelaten om enige reden te geven waarom de 60/40-beslissing, dat een essentieel onderdeel van het Arbitrale Deelvonnis vormt, een redelijke was. Verder heeft te gelden dat het Scheidsgerecht met de 60/40-beslissing zich niet aan zijn opdracht gehouden heeft, aangezien deze geen enkele basis vindt in de vaststaande feiten en het bewijs in onderhavige zaak. Ten slotte is er sprake van een schending van het beginsel van hoor- en wederhoor omdat de partiële bevoegdheidsverklaring, zonder enige precedent, is aan te merken als een verrassingsbeslissing.

4.34. India heeft de volgende vernietigingsgronden aan haar vordering ten grondslag gelegd: (i) er ontbreekt een geldige arbitrageovereenkomst; (ii) het Scheidsgerecht heeft zich niet aan zijn opdracht gehouden; (iii) het Arbitrale Deelvonnis is niet gemotiveerd; en (iv) het Arbitrale Deelvonnis houdt een schending van de openbare orde in. De rechtbank zal hierna de aangevoerde vernietigingsgronden beoordelen.

*Vernietigingsgrond II-1: Het ontbreken van een geldige arbitrage-overeenkomst (artikel 1065 lid 1 sub a Rv*

*Beoordelingskader*

4.35. De rechtbank verwijst naar r.o. 4.11 (vernietigingsgrond I-1) voor het toepasselijke beoordelingskader.

4.36. In onderhavige procedure wordt de beslissing van het Scheidsgerecht om zich voor 40 procent bevoegd te verklaren bestreden. Hoewel de beslissing van het Scheidsgerecht om zich voor de overige 60 procent onbevoegd te verklaren hiermee rechtstreeks samenhangt, is geen vernietiging van die beslissing gevorderd. (De (on)juistheid van) deze partiële onbevoegdverklaring valt dan ook buiten de reikwijdte van onderhavige vernietigingsprocedure en is derhalve geen onderwerp waarover de rechtbank dient te beslissen.

*Bevoegdheidsexceptie te laat ingeroepen*

4.37. Het meest verstrekkende formele verweer van Devas c.s. is dat India niet één keer in de Arbitrale Procedure gesteld heeft dat de aanwezigheid van *essential security interests* de bevoegdheid van het Scheidsgerecht aantast om te beslissen over het geschil tussen partijen. India had deze bevoegdheidsexceptie vóór alle weren in de Arbitrale Procedure en uiterlijk in de Statement of Defence moeten opvoeren. Nu India dat heeft nagelaten, kan zij op grond van artikel 1052 Rv jo 1065 lid 2 Rv in onderhavige procedure de vernietiging wegens het ontbreken van bevoegdheid niet meer inroepen. De rechtbank dient volgens Devas c.s. in onderhavige vernietigingsprocedure voorbij te gaan aan de stellingen van India dienaangaande. India heeft tijdens de comparitie hiertegen ingebracht dat haar beroep op *essential security interests* in de Arbitrale Procedure weldegelijk gepresenteerd is als een bevoegdheidsverweer.

4.38. De rechtbank overweegt dat het Scheidsgerecht de stellingen van India met betrekking tot *essential security interests* heeft opgevat als een bevoegdheidsverweer. Onder randnummer 169 van het Arbitraal Deelvonnis heeft het Scheidsgerecht overwogen:

'*Secondly, the Respondent [*India, *Rb.] submits that the Tribunal lacks jurisdiction over the claims in this case by operation of the "essential security interests" ("**ESI**") provision of the Treaty. The Claimants reject all of these objections and submit that the Tribunal has jurisdiction over its claims.*' Ook in zijn beslissing onder (c) oordeelt het Scheidsgerecht dat: '*the Tribunal lacks jurisdiction over the Claimants' claims insofar as the Respondent's decision to annul the Devas Agreement was in part directed to the protection of the Respondent's essential security interests.*'

4.39. Nu het Scheidsgerecht de stellingen van beide partijen met betrekking tot *essential security interests* als een bevoegdheidsverweer heeft opgevat, de bevoegdheid onderwerp van partijdebat geweest is en als zodanig is beoordeeld door het Scheidsgerecht, kan verder in het midden blijven of en op welk moment India in de Arbitrale Procedure expliciet een beroep gedaan heeft op de onbevoegdheid van het Scheidsgerecht wegens *essential security interests*.

*Essential security interests geen bevoegdheidsbeperking*

4.40. Tussen partijen is niet in geschil dat artikel 11 lid 3 van het Verdrag bepaalt dat het Verdrag een gaststaat, in dit geval India, niet kan beperken in het treffen van maatregelen die gericht zijn op de bescherming van haar *essential security interests*. Verder is tussen partijen *in confesso* dat indien *essential security interests* aan de orde zijn, India niet gehouden is financiële compensatie aan te bieden in het geval van een onteigening van een investering. In onderhavige vernietigingsprocedure bestaat tussen partijen wel een geschil of artikel 11 lid 3 van het Verdrag ook niet tevens als een bevoegdheidsdrempelclausule moet worden aangemerkt. India stelt zich op het standpunt dat dit het geval is en dat het Scheidsgerecht zich vanwege *essential security interests* volledig onbevoegd had moeten verklaren. Devas c.s. verzet zich tegen deze uitleg.

4.41. Zoals overwogen in r.o. 4.13 dient de uitleg van de inhoud van het Verdrag te geschieden aan de hand van de uitlegregels opgenomen in het Weens Verdragenverdrag. In artikel 31 lid 1 is bepaald dat: '(…) een verdrag (…) te goeder trouw [moet] worden uitgelegd overeenkomstig de gewone betekenis van de termen van het Verdrag in hun context en in het licht van voorwerp en doel van het verdrag.'

4.42. Voor de beantwoording van de vraag of een geldige arbitrageovereenkomst tot stand gekomen is, dient in de eerste plaats gekeken te worden naar de arbitrageclausule (artikel 8 van het Verdrag). In dit artikel is geen enkele verwijzing naar artikel 11 lid 3 van het Verdrag opgenomen. Tegelijkertijd bevat artikel 11 lid 3 van het Verdrag geen verwijzing naar de arbitrageclausule of wordt anderszins een relatie gelegd tussen *essential security interests* en de bevoegdheid van arbiters. In de tekst van het Verdrag kunnen derhalve geen aanknopingspunten gevonden worden voor het standpunt van India dat de *essential security interests* betrokken moeten worden bij het bepalen van de bevoegdheid van het scheidsgerecht.

4.43. Zoals India terecht onderschreven heeft tijdens de comparitie onder randnummers 99 tot en met 102 van haar pleitaantekeningen, is de enkele omstandigheid dat in het Verdrag geen (kruis)verwijzing tussen de artikelen 8 en 11 lid 3 van het Verdrag is opgenomen op zichzelf niet doorslaggevend voor de uitleg van de arbitrageclause en de beantwoording van de vraag of het Scheidsgerecht bevoegd is. Echter, als ook het voorwerp en het doel van het Verdrag in de uitleg betrokken worden, conform de uitlegregels van het Weens Verdragenverdrag, kan er geen steun gevonden worden voor een beperking van de bevoegdheid van het Scheidsgerecht. Een redelijke uitleg van de arbitrageclausule brengt immers mee dat deze bepaling een breed geformuleerd open aanbod tot arbitrage bevat, nu "any dispute between an investor of one Contracting Party [i.c. Devas c.s., *rb.*] and another Contracting Party [i.c. India, *rb.*] in relation to an investment" onderwerp van arbitrage kan zijn. Dat de arbitrageclausule niet restrictief moet worden uitgelegd, volgt ook uit de doelstelling van het Verdrag. In de preambule bij het Verdrag hebben de verdragsluitende partijen: 'to create favourable conditions for greater flow of investors of either Contracting Party [India en Mauritius, *rb.*] in the territory of the other Contracting Party' als doelstelling van het Verdrag geformuleerd. Daarbij is door de verdragspartijen onderkend dat 'promotion and protection of such investment will lend greater stimulation of the development of business initiatives (…)'. Het doel van het Verdrag is dan ook het scheppen van gunstige voorwaarden voor investeerders, waaronder de bescherming van deze investeringen in een arbitrale procedure. Deze doelstelling en de onder het Verdrag geboden bescherming, zijn niet goed te verenigen met de interpretatie van India dat bepaalde geschilpunten – i.c. *essential security interests* – buiten het bereik van de beoordeling door een scheidsgerecht dienen te vallen, zonder dat het Verdrag daarvoor expliciet aanknopingspunten bevat.

4.44. India heeft ter onderbouwing van haar standpunt ook nog verwezen naar verschillende precedenten en (inter)nationale bronnen. De rechtbank overweegt dat deze bronnen het standpunt van India onderschrijven dat een soevereine staat de vrijheid dient te hebben om te beoordelen of de nationale veiligheid in het geding is en welke maatregelen vervolgens noodzakelijk zijn om die nationale veiligheid te beschermen en dat een scheidsgerecht om die reden zeer terughoudend dient te zijn in de beoordeling van een beroep op *essential security interests*. Geen van deze bronnen biedt echter bevestiging voor India's stelling dat een scheidsgerecht onbevoegd is op het moment dat *essential security interests* in het geding zijn.

4.45. Partijen hebben op de comparitie nog uitvoerig gedebatteerd over de betekenis van het vonnis in de arbitrale procedure tussen Deutsche Telekom [hierna: DT] en India van 13 december 2017 (hierna: het DT-Vonnis) voor de beoordeling van de stellingen met betrekking tot de *essential security interests*. De rechtbank is van oordeel dat het DT-Vonnis geen ondersteuning biedt voor de stellingen van India. Het gegeven dat het DT-scheidsgerecht zichzelf volledig bevoegd verklaard heeft om te oordelen over het geschil tussen DT en India, en de tekst van de arbitrageclausule en de *essential security issues* in het toepasselijk bilaterale investeringsverdrag gelijkluidend zijn aan die in het Verdrag, is een belangrijke contra-indicatie dat aan het DT-Vonnis argumenten ontleend

kunnen worden ter onderbouwing van het standpunt van India. Met Devas c.s. is de rechtbank van oordeel dat aan de omstandigheid dat het DT-Scheidsgerecht *essential security issues* beoordeeld zijn onder de kop *preliminary objections* (DT-Vonnis, hoofdstuk V) niet zonder meer maakt dat deze issues de bevoegdheid van het scheidsgerecht betreffen, nu ook andere zaken dan bevoegdheidskwesties als *preliminary objections* aangemerkt kunnen worden. In het DT-Vonnis zijn *essential security issues* niet (expliciet) gekwalificeerd als een bevoegdheidskwestie of *treshold issue*, in tegenstelling tot het *pre-investment*-verweer, welk verweer India ook in de arbitrage met DT heeft gevoerd.

4.46. De rechtbank concludeert dan ook dat de door India opgevoerde *essential security issues* niet leiden tot een beperking van de bevoegdheid van het Scheidsgerecht om kennis te nemen van het geschil tussen partijen. Nu de partiële onbevoegdverklaring, waaraan India argumenten ontleent dat het Scheidsgerecht *essential security issues* betrokken heeft bij de vaststelling van de eigen bevoegdheid (*jurisdiction*), geen onderwerp is van onderhavige vernietigingsprocedure, laat de rechtbank hetgeen het Scheidsgerecht heeft aangevoerd ter motivering van deze beslissing tot partiële onbevoegdverklaring verder buiten de beoordeling. Reeds op grond van hier voorgaande kan de gevorderde vernietiging niet slagen zodat de rechtbank niet toekomt aan hetgeen partijen verder hebben aangevoerd over de maatstaf waaraan *essential security issues* moeten worden getoetst, of een partiële (on)bevoegdheidsverklaring mogelijk is en in welke mate de feiten in onderhavig dossier steun bieden voor de gemaakt keuze voor de 60/40-verdeling.

*Vernietigingsgrond II-2: Het Scheidsgerecht heeft zich niet aan zijn opdracht gehouden (artikel 1065 lid 1 sub c Rv)*

4.47. De rechtbank verwijst naar r.o. 4.19 (vernietigingsgrond I-2) voor het toepasselijke beoordelingskader.

4.48. India heeft aangevoerd dat aan het Scheidsgerecht een duidelijk afgebakend geschil is voorgelegd. In de Arbitrale Procedure heeft India zich op het standpunt gesteld dat het besluit van het CCS om *alle* ruimte op de S-Band te reserveren gericht was op de bescherming van *essential security interests.* Geen van de partijen heeft zich in de Arbitrale Procedure echter op het standpunt gesteld dat het besluit van de CCS gedeeltelijk gericht was op de bescherming van *essential security interests.* In plaats van partijen te vragen om nadere informatie te verstrekken, heeft het Scheidsgerecht ervoor gekozen om '*in all reasonableness*' voor de 60/40-verdeling te kiezen. Voor een dergelijke beslissing is rechtens noch feitelijk een basis. Het Scheidsgerecht is met de beslissing om zichzelf partieel bevoegd te verklaren buiten de rechtsstrijd van partijen getreden en heeft zich om die reden niet aan zijn opdracht gehouden, aldus India

4.49. De rechtbank overweegt dat het Scheidsgerecht met de 60/40-verdeling niet mé\'ér heeft toegewezen dan gevorderd en dus niet om die reden buiten de rechtsstrijd getreden kan zijn. In beginsel staat het een arbitraal college vrij om minder toe te wijzen dan gevorderd en dus te beslissen dat bevoegdheid ontbreekt om een deel van het gevorderde te beoordelen. In onderhavige procedure houdt de vraag of in de onderhavige zaak het Scheidsgerecht een dergelijke beslissing had kunnen nemen partijen verdeeld.

4.50. De rechtbank volgt India in haar standpunt dat *essential security interests* een dichotoom karakter hebben, in die zin dat deze aanwezig zijn of niet. De conclusie die India daaraan in onderhavige zaak verbindt, te weten dat het Scheidsgerecht zich niet aan de opdracht gehouden heeft door zichzelf gedeeltelijk (on)bevoegd te verklaren, neemt de rechtbank niet over. India miskent dat het in beginsel weldegelijk mogelijk is om de frequentie op te splitsen en vervolgens voor verschillende – commerciële en publieke – doeleinden te gebruiken. Deze mogelijkheid volgt reeds uit het Devas Contract waarin partijen indertijd overeengekomen zijn om negentig procent van de frequentie te gebruiken voor civiele/commerciële doeleinden en de overige tien procent voor militair gebruik. De beslissing van het Scheidsgerecht is dan ook geen proportionele toepassing van de "*essential security interests*-bepaling", maar een volledige toepassing van die

bepaling op een deel van de in het geding zijnde frequentie. Het Scheidsgerecht is derhalve binnen de grenzen van de rechtsstrijd gebleven. De vraag of het dossier voldoende aanknopingspunten bevat voor de 60/40-verdeling betreft de inhoud van de beslissing van het Scheidsgerecht en valt buiten de reikwijdte van de beperkte beoordeling in het kader van deze vernietigingsprocedure.

4.51. Verder overweegt de rechtbank dat het Scheidsgerecht op basis van het aan hem gepresenteerde feitenmateriaal tot de conclusie is gekomen dat zestig procent van de S-band nodig is voor *essential security interests*. Gesteld noch gebleken is dat het Scheidsgerecht bij die beslissing feiten, die niet door partijen zijn aangevoerd, aan die conclusie ten grondslag gelegd heeft. Juist de toevoeging dat het Scheidsgerecht '*in all reasonableness*' een verdeling heeft gemaakt, duidt erop dat het Scheidsgerecht op basis van de door partijen gepresenteerde feiten naar redelijkheid een verdeling heeft gemaakt. De door het Scheidsgerecht gemaakt verdeling, en de vraag of een andere verdeling (beter) verdedigbaar zou zijn, valt buiten de toetsing die de rechtbank in het kader van de gevorderde vernietiging moet uitvoeren.

4.52. De rechtbank concludeert dan ook dat een grondslag ontbreekt voor een vernietiging van het Arbitraal Deelvonnis omdat het Scheidsgerecht zich ten aanzien van de *essential security interests* niet aan de opdracht gehouden heeft.


*Vernietigingsgrond II-3: Het Arbitrale Deelvonnis is niet gemotiveerd met betrekking tot diverse belangrijke overwegingen (artikel 1065 lid 1 sub d Rv)*

4.53. De rechtbank verwijst naar r.o. 4.23 (vernietigingsgrond I-3) voor het toepasselijke beoordelingskader.

4.54. India heeft ter onderbouwing van haar vordering aangevoerd dat het Scheidsgerecht beslist heeft dat het reserveren van de S-band voor (para)militaire behoeften, waarop de *essential security interests*-bepaling van toepassing is, andere behoeften van openbaar belang betrof. In het besluit van CCS is geen precieze verdeling gemaakt tussen enerzijds de (para)militaire behoeften, welk nadeel niet financieel gecompenseerd hoeft te worden, en de andere behoeften van nationaal belang, waarvoor wel een compensatie geboden moet worden. Het Scheidsgerecht heeft onder randnummer 370 van het Arbitraal Deelvonnis overwogen dat de Indiase overheid niet de volledige behoefte aan S-band zal honoreren omdat "*all around the world governments are faced every year with very large demands for funds for various projects from their military establishment and, just as regularly, governments grant only a percentage of such requests*". Het Scheidsgerecht heeft vervolgens onder randnummer 373 van het Arbitraal Deelvonnis geconcludeerd dat "*a reasonable allocation of spectrum directed to the protection of [*India*]'s security interests would not exceed 60 % of the S-Band spectrum allocation to [*Devas c.s.*], the remaining 40% being allocated for other public interest purposes and being subject to the expropriation conditions under Article 6 of the Treaty.*" Deze motivering is, in de visie van India, dusdanig gebrekkig dat vernietiging moet volgen.

4.55. De rechtbank is van oordeel dat in het dossier onvoldoende steun bestaat voor de stelling van India dat het Scheidsgerecht voor de beslissing om tot de 60/40-verdeling te komen, geen enkele reden heeft aangedragen. Op deze plaats wordt herhaald dat de rechtbank grote terughoudendheid in acht moet nemen bij de beoordeling van een vernietiging op grond van artikel 1065 lid 1 sub d Rv en alleen in sprekende gevallen tot vernietiging kan overgaan. In de randnummers 370 en 371 van het Arbitraal Deelvonnis (zie r.o. 4.32) heeft het Scheidsgerecht gemotiveerd waarom in zijn visie de voor (para)militaire doeleinden geclaimde frequenties niet volledig gehonoreerd gaan worden. Deze motivering, die naar het oordeel van de rechtbank niet gelijk gesteld kan worden met het ontbreken van een motivering, heeft vervolgens (mede) ten grondslag gelegen aan de beslissing om te komen tot de 60/40-verdeling. Daarmee is de beslissing van het Scheidsgerecht van een motivering voorzien en ontbreekt een grond om het Arbitraal Deelvonnis wegens het ontbreken van een motivering te vernietigen. De juridische en

feitelijke deugdelijkheid van de motivering valt buiten de reikwijdte van de beoordeling door de rechtbank nu de vernietigingsprocedure niet de functie heeft van hoger beroep voor een arbitrale procedure.

*Vernietigingsgrond II-4: Het Arbitrale Deelvonnis en de totstandkoming ervan is in strijd met de openbare orde omdat het Scheidsgerecht India's fundamentele recht op hoor- en wederhoor heeft geschonden (artikel 1065 lid 1 sub e Rv)*

4.56. De rechtbank verwijst naar r.o. 4.26 (vernietigingsgrond I-4) voor het toepasselijke beoordelingskader.

4.57. India heeft zich op het standpunt gesteld dat het Scheidsgerecht de 60/40-verdeling tussen *essential security interests* en *other public interest* bedacht heeft bij het opstellen van het Arbitraal Deelvonnis, zonder dat partijen een dergelijke verdeling ooit bepleit hadden en zonder dat partijen de gelegenheid hebben gehad zich uit te laten over een dergelijke verdeling. Dit oordeel was dan ook een verrassingsbeslissing, die geen partijen heeft kunnen voorzien of waarvan verwacht kon worden dat de partijen dit punt hadden geadresseerd in hun pleidooi of ander (proces)stukken.

4.58. Zoals overwogen in r.o. 4.26 heeft het Scheidsgerecht niet beslist tot een proportionele toepassing van *essential security interests*, maar dat slechts een deel van de S-Band benodigd is voor (para)militaire doeleinden, welke doeleinden zijn aan te merken als *essential security interests,* en dat het Scheidsgerecht voor dat deel van de vordering onbevoegd is. In de Arbitrale Procedure heeft India bepleit dat de volledig in geschil zijnde S-band benodigd zijn voor (para)militaire doeleinden, terwijl Devas c.s. het tegenovergestelde standpunt heeft ingenomen. Het Scheidsgerecht heeft onder randnummers 370 – 373 van het Arbitraal Deelvonnis (zie r.o. 4.32), mede onder verwijzing naar hetgeen Devas c.s. heeft aangevoerd, een deel van het bevoegdheidsverweer van India gehonoreerd. Het staat een Scheidsgerecht vrij om minder toe te wijzen dan gevorderd, te meer nu in de motivering van die beslissing de standpunten van partijen betrokken worden. Dat geen van de partijen de door het Scheidsgerecht gekozen 60/40-verdeling heeft bepleit roept geen verplichting voor het Scheidsgerecht in het leven om partijen over deze voorgenomen beslissing te horen. Hetzelfde geldt voor het geval, zoals India heeft aangevoerd, indien een internationaal arbitraal college zich - in dit verband nog nooit eerder in een dergelijke situatie - gedeeltelijk (on)bevoegd verklaard heeft.

4.59. De vordering tot vernietiging wegens een schending van de hoor en wederhoor wordt afgewezen.

(III) **Strafklacht**

*Inleiding*

4.60. India heeft zich op het standpunt gesteld dat diverse (voormalige) bestuurders en functionarissen van Devas en de Indiase overheid zich schuldig hebben gemaakt aan het plegen van strafbare feiten. Om deze reden heeft CBI op 11 augustus 2016 een Strafklacht ingediend. Aan de Strafklacht liggen onder meer de volgende verdenkingen/verwijten ten grondslag: (i) het ontwijken van een beoordeling van het gebruik van de S-band door het ICC; (ii) het ontwijken van het vergunningenregime; (iii) het sluiten van een contract met Devas, een onderneming zonder *track record* en enig kapitaal van betekenis; en (iv) het verborgen houden van het bestaan van het Devas Contract in relatie tot de verkrijging van goedkeuring voor de bouw en lancering van GSAT-6 voor Indiase regeringsfunctionarissen. Ook het *Directorate of Enforcement* van *India's Ministry of Finance* heeft een afzonderlijke klacht ingediend. Devas c.s. hebben de inhoud van de Strafklacht weersproken, in essentie betogend dat het een gefabriceerde aanklacht betreft met het oogmerk om de arbitrale vonnissen te ondermijnen en Devas c.s. te intimideren.

4.61. Nu de Strafklacht (gedateerd 11 september 2016) pas is ingediend kort nadat het Scheidsgerecht het Arbitraal Deelvonnis (gedateerd 25 juli 2016) heeft gewezen, heeft het Scheidsgerecht (de inhoud van) de Strafklacht niet in haar beoordeling kunnen betrekken. Het Arbitraal Deelvonnis bevat derhalve geen overwegingen en beslissingen met betrekking tot de Strafklacht.

4.62. India heeft vanwege de inhoud van de Strafklacht op een drietal gronden ((i) het ontbreken van een arbitrageovereenkomst, (ii) het ontbreken van een motivering en (iii) een schending van de openbare orde) de vernietiging van het Arbitraal Deelvonnis ingeroepen. India heeft verzocht de behandeling van de eerste en derde vernietigingsgrond aan te houden totdat door een Indiase strafrechter over de Strafklacht is beslist.

4.63. De rechtbank wijst dit aanhoudingsverzoek af. Gesteld noch gebleken is dat ten tijde van de comparitie – anderhalf jaar na het indienen van de Strafklacht – al een beslissing tot strafvervolging genomen is naar aanleiding van de Strafklacht en India heeft op geen enkele wijze inzichtelijk gemaakt op welke termijn een dergelijke beslissing te verwachten valt. Ook is gesteld noch gebleken dat bij een beslissing tot strafvervolging vervolgens binnen een afzienbare tijd een strafprocedure zal aanvangen. Tevens heeft India niet inzichtelijk gemaakt op welke termijn een (onherroepelijke) beslissing van een Indiase strafrechter kan worden verwacht. Dit maakt dat het verdere verloop van de behandeling Strafklacht thans zeer ongewis is. Onder deze omstandigheden verzet de goede procesorde zich tegen een aanhouding van de zaak. Dit betekent dat de rechtbank de vernietigingsgronden zal beoordelen naar de huidige stand van zaken.

*Vernietigingsgrond III-1: Het Scheidsgerecht was niet bevoegd op grond van artikel 1 juncto 2 van het Verdrag (artikel 1065 lid 1 sub a Rv)*

4.64. De rechtbank verwijst naar r.o. 4.11 (vernietigingsgrond I-1) voor het toepasselijke beoordelingskader.

4.65. India heeft zich op het standpunt gesteld dat overeenkomsten die besmet zijn met strafbare feiten naar Indiaas recht *ab initio* nietig zijn. Als de Strafklacht in rechte wordt bevestigd dan staat daarmee de "besmetting" van het Devas Contract vast, waardoor het Devas Contract nietig is en de juridische grondslag aan de "investment" ontvalt. Om beide redenen is het Scheidsgerecht niet bevoegd om het geschil tussen Devas c.s. en India te beoordelen en het Arbitraal Deelvonnis dient derhalve vernietigd te worden wegens het ontbreken van bevoegdheid, aldus India.

4.66. Tussen partijen is niet in geschil dat de Strafklacht pas rechtsgevolgen voor het Devas Contract kan hebben op het moment dat deze leidt tot een (onherroepelijke) strafrechtelijke veroordeling. De enkele omstandigheid dat een Strafklacht is ingediend heeft op geen rechtsgevolg. Dit betekent dat zo lang geen (onherroepelijke) rechterlijke uitspraak gedaan is over de Strafklacht er geen sprake is van een nietig Devas Contract vanwege de besmetting met strafbare feiten.

4.67. Indien ook in de beoordeling betrokken dient wordt of de Strafklacht kan leiden tot een strafrechtelijke veroordeling, dan acht de rechtbank het relevant dat de inhoud van de Strafklacht gemotiveerd wordt weersproken door Devas c.s.. In het bijzonder heeft Devas c.s. aangevoerd dat Devas c.s. noch haar bestuurders of functionarissen zijn vermeld in de Strafklacht. India heeft de Strafklacht tijdens de comparitie niet van een nadere onderbouwing voorzien en het verweer van Devas c.s. verder niet weersproken. Bij deze stand van zaken heeft India onvoldoende feitelijke onderbouwing gegeven aan haar stelling dat het Devas Contract bedreigd wordt met nietigheid. Dit geldt te meer nu India verzuimd heeft te concretiseren in welke mate de – algemeen geformuleerde – verwijten ook Devas c.s. en haar functionarissen betreft en in welke mate deze verwijten vervolgens het Devas Contract raken.

4.68. De rechtbank concludeert dan ook dat de Strafklacht op dit moment niet kan leiden tot een *ab*

*initio* nietig Devas Contract en dat India onvoldoende onderbouwing gegeven heeft aan haar stelling dat (bestuurders en functionarissen van) Devas c.s. zich schuldig heeft/hebben gemaakt aan het plegen van strafbare feiten die leiden tot een nietigheid van het Devas Contract. Dit betekent dat er thans sprake is van een kwalificerende investering die bescherming geniet van het Verdrag, inclusief de daarin opgenomen arbitrageregeling. Dit maakt dat er een geldige arbitrage-overeenkomst is en het Scheidsgerecht bevoegd is kennis te nemen van het geschil tussen Devas c.s. en India. Nu de vordering reeds op deze grond strandt, behoeven de overige stellingen die partijen in het kader van deze vernietigingsgrond hebben aangevoerd geen bespreking.

*Vernietigingsgrond III-2: Het Arbitrale Deelvonnis ontbeert enige motivering van een essentieel onderdeel daarvan (artikel 1065 lid 1 sub d Rv)*

4.69. De rechtbank verwijst naar r.o. 4.23 (vernietigingsgrond I-3) voor het toepasselijke beoordelingskader.

4.70. Het Scheidsgerecht heeft, volgens India, in het Arbitraal Deelvonnis geen aandacht besteed aan India's argument dat Devas ten onrechte had doen voorkomen dat zij de eigendom en het recht tot gebruik had van het intellectueel eigendom ten tijde van het sluiten van het Devas Contract en dat het Devas Contract gebaseerd was op misleiding en daarom niet de bescherming van het Verdrag genoot.

4.71. Overwogen wordt dat van een motiveringsgebrek ook sprake kan zijn indien een scheidsgerecht verzuimd heeft in te gaan op essentiële stellingen van partijen. India heeft het argument dat er sprake is van misleiding met het intellectueel eigendom, die zij aan de vernietiging ten grondslag legt, uitsluitend in voetnoot 228 van de Rejoinder opgenomen. Gesteld noch gebleken is dat dit argument in andere processtukken of anderszins tijdens de Arbitrale Procedure naar voren gebracht is. De rechtbank is met Devas c.s. van oordeel dat een stelling die uitsluitend in één voetnoot opgenomen is, niet als een essentieel verweer gepresenteerd is en derhalve voor het Scheidsgerecht geen verplichting in het leven roept om in het Arbitraal Deelvonnis te responderen op het verweer, zodat het ontbreken van een expliciete verwerping geen grond voor vernietiging vormt.

*Vernietigingsgrond III-3: Het Arbitrale Deelvonnis schendt qua inhoud de openbare orde (artikel 1065 lid 1 sub e Rv)*

4.72. De rechtbank verwijst naar r.o. 4.26 (vernietigingsgrond I-4) voor het toepasselijke beoordelingskader.

4.73. Verder heeft India, onder verwijzing naar de inhoud van de Strafklacht, aangevoerd dat de inhoud van het Devas Contract in strijd is met de openbare orde. Door te beslissen dat er wel sprake was van een *valid contract* is het oordeel van het Scheidsgerecht in strijd met de openbare orde en die Arbitraal Deelvonnis om die reden vernietigd te worden.

4.74. Zoals reeds overwogen in 4.63 staat niet in rechte vast dat bij de totstandkoming van het Devas Contract sprake is geweest van strafbaar handelen. Bovendien heeft India de stelling dat (bestuurders en functionarissen van) Devas c.s. zich schuldig gemaakt hebben aan het plegen van strafbare feiten onvoldoende onderbouwd. Dit maakt dat de gestelde schending van de openbare orde voldoende feitelijke grondslag ontbeert. De vordering tot vernietiging van het Arbitraal Deelvonnis op grond van een schending van de openbare orde wordt afgewezen.

*Conclusie en proceskosten*

4.75. Nu geen van de vernietigingsgronden slaagt, wordt de vordering van India tot vernietiging van het Arbitraal Deelvonnis afgewezen.

4.76. India wordt als de in het ongelijk gestelde partij tot betaling van de proceskosten aan de zijde van Devas c.s. veroordeeld. Deze kosten worden begroot op € 619 wegens het door Devas c.s. betaalde griffierecht en op € 7.712 (twee punten à € 3.856 volgens tarief VIII) wegens het salaris van de advocaat; in totaal dus € 8.331.

4.77. Voor een afzonderlijke veroordeling in de nakosten bestaat geen grond, nu de kostenveroordeling ook voor deze nakosten een executoriale titel oplevert (vgl. HR 19 maart 2010, ECLI:NL:HR:2010:BL1116, NJ 2011/237). De rechtbank zal, zoals gevorderd, de nakosten begroten conform het daarop toepasselijke liquidatietarief.


**5 De beslissing**

De rechtbank

5.1. wijst het gevorderde af,

5.2. veroordeelt India in de proceskosten, begroot op € 8.331 en de nog te maken nakosten, te vermeerderen met € 82,- in geval van betekening, vermeerderd met de wettelijke rente verschuldigd vanaf 28 november 2018 tot aan de dag der algehele voldoening.


Dit vonnis is gewezen door mr. D.R. Glass, mr. I.A.M. Kroft en mr. R.C. Hartendorp en in het openbaar uitgesproken op 14 november 2018.